Mark P. Ladner
Mark David McPherson
Allison G. Schnierow
MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
(212) 468-8000 (tel.)
(212) 469-7900 (fax)

Attorneys for Defendant
AMERICAN EXPRESS BANK LTD.



UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| YAAKOV LICCI, a minor, by his father and natural guardian ELIHAV LICCI and by his mother and natural guardian YEHUDIT LICCI, et al., <br><br> Plaintiffs, <br><br> v. <br><br> AMERICAN EXPRESS BANK LTD., et al., <br><br> Defendants. | Case No.: _____ <br><br> **DEFENDANT AMERICAN EXPRESS BANK LTD.'S NOTICE OF REMOVAL** |

TO THE CLERK OF THE UNITED STATES DISTRICT COURT FOR THE

SOUTHERN DISTRICT OF NEW YORK:

PLEASE TAKE NOTICE that defendant American Express Bank Ltd. ("AEB") hereby

removes to this Court the state court action described below, pursuant to 28 U.S.C. § 1441.

1.    On or about July 11, 2008, a civil action was commenced in the Supreme Court of

the State of New York, New York County, entitled *Licci, et al. v. American Express Bank Ltd., et*

*al.*, Index No. 109548/08. The Complaint names as defendants AEB and Lebanese Canadian

Bank, SAL ("LCB").

2.      Defendant AEB was served with the Complaint no earlier than July 17, 2008. AEB is informed and believes that defendant LCB has not yet been properly served with the Summons and Complaint.  This notice is therefore timely under 28 U.S.C. § 1446(b).

3.      True and correct copies of the Summons and Complaint are attached to this notice collectively as Exhibit 1.  Plaintiffs and AEB entered into and filed a Stipulation extending AEB's time to answer, move against or otherwise respond to plaintiffs' Complaint to and including October 23, 2008.  A copy of that Stipulation is attached as Exhibit 2.  There have been no other proceedings in this action.  Accordingly, copies of all process and pleadings filed with the state court and served on AEB are attached hereto.

## I.      ALLEGATIONS OF THE COMPLAINT.

4.      In this action, plaintiffs seek to hold AEB and LCB liable for injuries allegedly caused by international terrorist attacks carried out in Israel in July and August 2006.  *See, e.g.*, Compl., ¶¶ 1, 4.  They broadly allege that AEB "intentionally and/or negligently provided extensive banking services to Hizbollah which caused, enabled and facilitated the terrorist rocket attacks in which the plaintiffs and their decedents were harmed and killed."  Compl., ¶ 3.

5.      Although the Complaint does not contain any specific factual allegations tying AEB to Hezbollah, plaintiffs seek to hold AEB liable for Hezbollah's conduct based solely on AEB's alleged role as a correspondent bank for LCB, a Lebanese bank.  *See, e.g.*, Compl., ¶ 38 (alleging that AEB served as a "correspondent bank" for LCB "between 2004 (or earlier) and until June 12, 2006 (and later).").  Plaintiffs allege that LCB, in turn, operated bank accounts titled to "Yousser Company" and to "Shahid (Martyrs) Foundation."  Compl., ¶ 40.  According to plaintiffs, Yousser and Shahid are an integral part of Hezbollah, a known terrorist organization:  plaintiffs allege that Yousser and Shahid constituted part of Hezbollah's financial

ny-825298

arm, Compl., ¶ 41, and that the bank accounts belonged to Hezbollah and were under its control. Compl., ¶ 43.

6.     Based on these allegations (such as they are), plaintiffs allege three causes of action against AEB, all pleaded under Israeli law:  negligence, Compl., ¶¶ 128-43; breach of statutory obligation, Compl., ¶¶ 144-49; and vicarious liability, Compl., ¶¶ 155-60.

7.     To support their breach of statutory obligation claim, plaintiffs allege that AEB has violated provisions of the following "enactments":

- 18 U.S.C. §§ 2331-2339 (the "Anti-Terrorism Act"), which prohibits terrorism and terrorism-related activity, and establishes a private right of action for U.S. victims of international terrorism;

- The Bank Secrecy Act (31 U.S.C. § 5311 *et seq.*), which relates to anti-money laundering policies, practices, and procedures;

- 31 C.F.R. Part 103, regulations promulgated pursuant to the Bank Secrecy Act;

- 3 N.Y.C.R.R. Part 300, which sets forth certain bank reporting obligations; and

- New York Penal Law §§ 470.21, 470.22, 470.23, and 470.24, which relate to "money laundering in support of terrorism."

Compl., ¶ 149.

## II.     THE PARTIES.

8.     Plaintiffs are "American, Israeli and Canadian civilians who were injured in [terrorist rocket attacks on civilians in Israel carried out by the Hizbollah terrorist organization during July and August 2006], and the family members and Personal Representatives of the estates of two Israeli civilians who were killed by the terrorist rocket attacks."  Compl., ¶¶ 1-2.

ny-825298

9.     As alleged, defendant AEB "is a banking corporation organized under the laws of Connecticut and headquartered in New York." Compl., ¶ 13.

10.     As alleged, defendant LCB "is a banking corporation organized under the laws of Lebanon and headquartered in Beirut, Lebanon." Compl., ¶ 17.

## III.  PLAINTIFFS' ACTION MAY BE REMOVED TO THIS COURT, BECAUSE IT ARISES UNDER FEDERAL LAW.

11.     This action may be removed to this Court for two independent reasons.  First, plaintiffs could have filed the action in federal district court pursuant to 18 U.S.C. § 2333(a), which permits any U.S. national to sue in federal court for injuries allegedly caused by international terrorism.  AEB may therefore remove the action, of which this Court has original jurisdiction.

12.     Second, as an independent and alternative basis for removal, plaintiffs' action necessarily presents a disputed and substantial federal question.  Plaintiffs claim that AEB violated the Anti-Terrorism Act (the "ATA"), Congress' expansive prohibition against terrorism and terrorism-related activity, codified at 18 U.S.C. §§ 2331-2339.  *See* Compl., ¶ 149 (alleging that AEB violated "18 U.S.C. §§ 2331-2339").  The ATA provides for a private right of action to redress violations of its provisions.  Although plaintiffs have not included a claim for relief under the ATA, they do seek relief under their claim, purportedly under Israeli law, of negligence per se (or "breach of statutory obligation").  As part of that claim, plaintiffs cite the ATA as one of the statutory obligations AEB allegedly breached.  *See id.*  Whether AEB violated the ATA is therefore a necessary element of plaintiffs' claim for breach of statutory obligation, requiring the Court to decide substantial, disputed questions of federal law to determine plaintiffs' negligence per se claim.

ny-825298

**A.    This Action May Be Removed Pursuant to Section 1441(a), Because Plaintiffs Could Have Brought The Action In Federal Court Originally.**

13.    AEB is entitled to remove this action if plaintiffs could have brought it in federal court originally.  *See* 28 U.S.C. § 1441(a) ("Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending."); *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 314 (2005) ("[Defendant] was entitled to remove the . . . action if [plaintiff] could have brought it in federal district court originally . . . .").

14.    The ATA creates federal jurisdiction over claims brought by U.S. nationals seeking to recover for injuries allegedly caused by international terrorism:  "Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States . . . ."  18 U.S.C. § 2333(a).  The legislative history of this provision confirms that it is intended to "provide a civil cause of action in Federal court for victims of terrorism."  102 S. Rpt. 342.  Indeed, the ATA provides for exclusive jurisdiction in federal courts of an action seeking redress for acts of international terrorism:  "The district courts of the United States shall have **exclusive jurisdiction** over an action brought under this chapter [18 USCS §§ 2331 et seq.]"  18 U.S.C.A. § 2338 (emphasis added).

15.    The ATA's jurisdiction-conferring provision means exactly what it says:  U.S. national victims of international terrorism may sue in federal district court, *regardless of the underlying substantive cause of action*:

> [Section 2333(a)] creates the right of action, allowing any U.S. national who has been injured in his person, property, or business by an act of

5

international terrorism to bring an appropriate action in a U.S. district court. The substance of such an action is not defined by the statute, because the fact patterns giving rise to such suits will be as varied and numerous as those found in the law of torts. This bill opens the courthouse door to victims of international terrorism.

102 S. Rpt. 342.

16.    Under the plain terms of Section 2333(a), therefore, this action could have been brought in federal court, even though plaintiffs purport to state their claims for relief solely under Israeli law.[1] Plaintiffs allege that they were, in the words of the ATA, "injured in [their] person, property, or business by reason of an act of international terrorism." 18 U.S.C. § 2333(a); *compare* Compl., ¶¶ 1-3. Under the ATA, "international terrorism" includes violent criminal acts which (a) either "occur primarily outside the territorial jurisdiction of the United States" or "transcend national boundaries," and which (b) "appear to be intended (i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) affect the conduct of a government by mass destruction, assassination, or kidnapping." 18 U.S.C. § 2331(1). Plaintiffs allege that they were harmed by terrorist rocket attacks carried out in Israel in 2006, and they seek civil remedies for these injuries. *See* Compl., ¶¶ 1, 4. Thus, based on their allegations, those plaintiffs who are U.S. citizens could have invoked Section 2333 to bring the entire action in federal court originally. *See* Compl. ¶ 4 (alleging that some plaintiffs are American citizens); 18 U.S.C. § 2331(2) (adopting definition of "national[s] of the

---

[1]    That is not to say, of course, that AEB in any way concedes that plaintiffs have adequately pleaded a claim under Israeli law or the ATA, or indeed any claim at all. AEB denies that plaintiffs are entitled to any of the relief requested, and reserves the right to challenge plaintiffs' claims based on any and all available defenses, including whether plaintiffs can recover under the ATA or any other statute or tort they can identify. But as the Supreme Court has held, plaintiffs' *allegations* control whether the complaint may be removed; the existence of viable *defenses* to plaintiffs' claims cannot defeat jurisdiction. *See, e.g., St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 289 (1938). Rather, "the status of the case as disclosed by the plaintiff's complaint is controlling in the case of a removal." *Id* at 291-92. Thus, this Notice of Removal is based on plaintiffs' allegations alone, and nothing contained in it should be construed as an admission regarding plaintiffs' allegations, or the viability of those allegations under the ATA or any other law.

United States" provided in 8 U.S.C. § 1101(a) for purposes of ATA); 8 U.S.C. § 1101(a)(22)

("national of the United States" means either "a citizen of the United States" or a person who

owes permanent allegiance to the United States).[2]

17.     Since plaintiffs could have brought the action in federal court originally, AEB is

entitled to remove the action. *See* 28 U.S.C. § 1441(a); *Grable & Sons*, 545 U.S. at 314.

**B.     Plaintiffs' Action Presents A Necessary And Substantial Federal Question, Which Is Properly Adjudicated In Federal Court.**

18.     As an alternative and independent basis for removal, this action may be removed

to federal court, because plaintiffs' claim for breach of the ATA's statutory obligation raises a

substantial and disputed federal question — whether AEB's alleged conduct violated the ATA.

As the Supreme Court made clear in *Grable & Sons*, an action may be removed to federal court

if it "necessarily raise[s] a stated federal issue, actually disputed and substantial, which a federal

forum may entertain without disturbing any congressionally approved balance of federal and

state judicial responsibilities." 545 U.S. at 314. This is a separate question from whether

plaintiffs could have brought their claims in federal court, and is therefore an independently

---

[2] The foreign plaintiffs (those who allege they are citizens of Israel or Canada) assert exactly the same claims as the U.S. national plaintiffs' claims, and those claims arise out of the same core of operative factual allegations as the U.S. nationals' claims. The Court therefore has supplemental jurisdiction over the foreign plaintiffs' claims under 28 U.S.C. § 1367(a): "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution"; *see, e.g., Sisso v. Islamic Republic of Iran*, 448 F. Supp. 2d 76, 87 n.14 (D.D.C. 2006) (where only one plaintiff is a U.S. citizen and the rest are Israeli citizens, there is "*no doubt* that the Court has jurisdiction over the subject matter of plaintiffs' [ATA] claims") (emphasis added).
    The Court should not, in its discretion, decline to exercise supplemental jurisdiction over the foreign plaintiffs' claims. Section 1367's first three exceptions do not apply here: the foreign plaintiffs' claims do not raise a novel or complex issue of state law; their claims do not predominate over the U.S. plaintiffs' claims over which this Court has original jurisdiction; and this Court has not dismissed the U.S. plaintiffs' claims. *See* 28 U.S.C. § 1367(c)(1)-(3). And no other "compelling" reason exists for this Court to decline jurisdiction over the non-U.S. plaintiffs' claims. *See* 28 U.S.C. § 1367(c)(4); *Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 140 F.3d 442, 448 (2d Cir. 1998) ("declining jurisdiction outside the ambit of 1367(c)(1)-(3) appears as the exception rather than the rule"). Indeed, remanding the

sufficient basis for removal of this action. *See id.*, at 312 (describing the "substantial federal question" basis for removal as "another longstanding, if less frequently encountered, variety of federal 'arising under' jurisdiction" than the variety of jurisdiction created when plaintiffs "could have brought [their action] in federal district court originally").

19.     Although plaintiffs' action contains multiple claims, a single claim over which federal-question jurisdiction exists is sufficient to remove the entire action. *See Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 194 (2d Cir. 2004) (citing *Exxon Mobil Corp. v. Allapattah Servs, Inc.*, 545 U.S. 546 (2005)).

20.     Here, plaintiffs' claim of negligence per se, to the extent it relies upon AEB's alleged breach of the ATA, entitles AEB to remove this action. This is so for three reasons: plaintiffs' negligence per se claim (1) necessarily raises a stated federal issue, (2) the federal issue is actually disputed and substantial, and (3) this Court may entertain the federal issue without disturbing any congressionally approved balance of federal and state judicial responsibilities. *See Grable & Sons*, 545 U.S. at 314.

### 1.     Plaintiffs' Claim Raises a Federal Issue.

21.     Plaintiffs claim that AEB breached the statutory obligation created by the ATA, Compl., ¶ 149, thereby "necessarily rais[ing] a stated federal issue." Indeed, the Complaint relies heavily on AEB's alleged breach of statutory duties, including those created by the ATA, to provide a duty where there otherwise would be none. *See, e.g., In re Terrorist Attacks on September 11, 2001*, 349 F.Supp.2d 765, 830-31 (S.D.N.Y. 2005) ("Banks do not owe non-customers a duty to protect them from the intentional torts of their customers."). Whether

---

foreign plaintiffs' claims while hearing the U.S. nationals' claims would be wholly inefficient, since the claims are based on the same factual allegations as the U.S. plaintiffs' claims.

ny-825298

plaintiffs can prove that AEB is liable to them therefore requires the Court to decide whether AEB's conduct in fact violated the ATA.

## 2.    The Federal Issue Is Actually Disputed and Substantial.

22.    This federal issue — whether AEB's conduct violated the ATA — is "actually disputed and substantial." *Grable & Sons*, 545 U.S. at 314. AEB wholly denies any allegations that it violated the ATA. Although AEB has not yet responded to the Complaint, AEB intends to contest any such allegations vigorously, either through a motion to dismiss or otherwise.

23.    The question of AEB's compliance with the ATA is "substantial" in two ways. First, whether AEB violated the ATA is a substantial element of plaintiffs' *entire case*. Of the five "enactments" plaintiffs cite, the ATA is the only one that actually establishes a privately enforceable duty of care. A statute does not give rise to a privately enforceable duty of care unless the statute itself creates a private right of action. *See Vitolo v. Mentor H/S, Inc.*, 426 F. Supp. 2d 28, 36 (E.D.N.Y. 2006) (citing *New York Univ. v. Continental Ins. Co.*, 87 N.Y.2d 308, 318 (N.Y. 1995)); *see also Aiken v. Interglobal Mergers and Acquisitions*, 05 Civ. 5503 (LAP), 2006 U.S. Dist. LEXIS 45730, at *4-5 (S.D.N.Y. July 5, 2006). None of the other four "enactments" plaintiffs cite gives rise to a privately enforceable duty of care. *See Aiken*, 2006 U.S. Dist. LEXIS 45730, at *4-5 (no private right of action under Bank Secrecy Act); 31 C.F.R. § 103.56 (enforcement provisions for 31 C.F.R. Part 103); N.Y. COMP. CODES R. & REGS. tit. 3, §§ 300.1-.8 (2008); N.Y. PENAL LAW §§ 470.00-.25 (Consol. 2008). Plaintiffs' *only* potential breach of statutory obligation claim, therefore, is based upon AEB's alleged violation of the ATA.

24.    Second, this federal question has a substantial role in the broader framework of federal law. Whether AEB's conduct violated the ATA directly raises, among other issues, the degree to which an American correspondent bank may legally provide financial services to other

9

international banks. This interpretation of federal law has a serious practical impact on the operations of all international banks doing business within the United States.

> **3.    A Federal Court May Entertain The Federal Issue Without Disturbing Any Congressionally Approved Balance Of Federal And State Judicial Responsibilities.**

25.    Finally, this Court may decide the federal issue "without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Grable & Sons*, 545 U.S. at 314. Because plaintiffs purport to state their claims under Israeli law, there is no state interest they could identify that would warrant a federal court's deference. But even if plaintiffs pursued claims exclusively under state law, the federal interests at stake would overwhelm any state interests. Congress explicitly created a private right of action for U.S. nationals seeking to recover for injuries caused by international terrorism. 18 U.S.C. § 2333(a). And Congress clearly intended federal courts to hear such claims, going so far as to create exclusive federal jurisdiction over actions brought under the ATA. 18 U.S.C. § 2338. Where, as here, Congress has declared such a strong preference for the federal judiciary's resolution of a federal question, an action presenting that federal question may be removed to federal court, despite any countervailing interest in a state court's resolution of any state law issues.

## IV.    CONCLUSION.

26.    For all the reasons stated above, plaintiffs' action may be removed to this Court based on two alternative and independent grounds. First, AEB is entitled to remove this action because plaintiffs could have brought the action in federal court originally, pursuant to 18 U.S.C. § 2333(a). Second, plaintiffs' action necessarily raises a disputed and substantial question of federal law, and is therefore within the original jurisdiction of this Court pursuant to 28 U.S.C. § 1331 (federal question jurisdiction). Accordingly, 28 U.S.C. § 1441(a)&(b) permits the removal of this action to this Court.

ny-825298

27.   Counsel for AEB certifies that a Notice of Filing of Notice of Removal to United States District Court will be filed with the Clerk of the Supreme Court of the State of New York, New York County and served on plaintiffs promptly, pursuant to 28 U.S.C. § 1446(d).

WHEREFORE, defendant AEB gives notice that the above-described action pending against it in the Supreme Court of the State of New York, New York County is removed to this Court.

Dated: August 1 5, 2008

MORRISON & FOERSTER LLP


Mark P. Ladner
Mark David McPherson
Allison G. Schnieders

1290 Avenue of the Americas
New York, New York  10104
(212) 468-8000 (tel.)
(212) 468-7900 (fax)


Attorneys for Defendant
AMERICAN EXPRESS BANK LTD.

11

# Exhibit 1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------------X

YAAKOV LICCI, a minor, by his father and natural
guardian ELIHAV LICCI and by his mother and
natural guardian YEHUDIT LICCI;

ELIHAV LICCI, individually;

YEHUDIT LICCI, individually;

TZVI HIRSH;

ARKADY GRAIPEL;

TATIANA KREMER;

YOSEF ZARONA;

TAL SHANI;

SHLOMO COHEN;

NITZAN GOLDENBERG;

RINA DAHAN;

RAPHAEL WEISS;

AGAT KLEIN;

TATIANA KOVLEYOV;

VALENTINA DEMESH;

RIVKA EPON;

JOSEPH MARIA;

Index No:

_109548_ / 08

Date Purchased: 7/11 / 08

Plaintiffs designate New York
County as the venue of the
action. The basis of venue is
the place of business of the
defendant(s)

**SUMMONS**

Plaintiffs reside at:
STATE OF ISRAEL

NEW YORK
COUNTY CLERK'S OFFICE

JUL 11 2008

NOT COMPARED
WITH COPY FILE

IMMANUEL PENKER;

ESTHER PINTO;

AVISHAI REUVANE;

ELISHEVA ARON;

CHAYIM KUMER;

NECHAMA KUMER;

SARAH YEFET;

SHOSHANA SAPPIR;

RAHMI GUHAD GHANAM, a minor, by his father and natural guardian FUAD SHCHIV GHANAM and by his mother and natural guardian SUHA SHCHIV GHANAM;

FUAD SHCHIV GHANAM, individually;

SUHA SHCHIV GHANAM, individually;

MA'AYAN ARDSTEIN, a minor, by her father and natural guardian, BRIAN ARDSTEIN, and by her mother and natural guardian, KEREN ARDSTEIN;

NOA ARDSTEIN, a minor, by her father and natural guardian, BRIAN ARDSTEIN, and by her mother and natural guardian, KEREN ARDSTEIN;

NETIYA YESHUA ARDSTEIN, a minor, by his father and natural guardian, BRIAN ARDSTEIN, and by his mother and natural guardian, KEREN ARDSTEIN

ARIEL CHAIM ARDSTEIN, a minor, by his father and
natural guardian, BRIAN ARDSTEIN, and by his
mother and natural guardian, KEREN ARDSTEIN

BRIAN ARDSTEIN, individually;

KEREN ARDSTEIN, individually;

MARGALIT RAPPEPORT, a minor, by her mother
and natural guardian, LAURIE RAPPEPORT;

LAURIE RAPPEPPORT, individually;

YAIR MOR,

ORNA MOR;

MICHAEL FUCHS;

MUSHKA KAPLAN, a minor, by her father and
natural guardian CHAIM KAPLAN, and by her
mother and natural guardian RIVKA KAPLAN;

ARYE LEIB KAPLAN, a minor, by his father and
natural guardian CHAIM KAPLAN, and by his
mother and natural guardian RIVKA KAPLAN;

MENACHEM KAPLAN, a minor, by his father and
natural guardian CHAIM KAPLAN, and by his
mother and natural guardian RIVKA KAPLAN;

CHANA KAPLAN, a minor, by her father and natural
guardian CHAIM KAPLAN, and by her mother and
natural guardian RIVKA KAPLAN;

EFRAIM LEIB KAPLAN, a minor, by his father and
natural guardian CHAIM KAPLAN, and by his
mother and natural guardian RIVKA KAPLAN;

CHAIM KAPLAN, individually;

RIVKA KAPLAN, individually;

ROCHELLE SHALMONI;

OZ SHALMONI;

DAVID OCHAYON;

YAAKOV MAIMON;

MIMI BITON;

MIRIAM JUMA'A, as Personal Representative of the
Estate of FADYA JUMA'A;

MIRIAM JUMA'A, individually;

SALAH JUMA'A, SAID JUMA'A, and ABD EL-
RAHMAN JUMA'A, as Personal Representatives of
the Estate of SAMIRA JUMA'A;

SALAH JUMA'A, individually;

SAID JUMA'A, individually;

ABD EL-RAHMAN JUMA'A, individually;

RAHMA ABU-SHAHIN,

ABDEL GAHNI ABDEL GAHNI, as Personal
Representative of the Estate of SOLTANA JUMA'A,

ABDEL GAHNI ABDEL GAHNI, individually;

SHADI SALMAN AZZAM, as the Personal
Representative of the Estate of MANAL CAMAL
AZAM;

KANAR SHA'ADI AZZAM, a minor, by his father
and natural guardian, SHADI SALMAN AZZAM;

ADEN SHA'ADI AZZAM, a minor, by his father and
natural guardian, SHADI SALMAN AZZAM;

SHADI SALMAN AZZAM, individually;

ADINA MACHASAN DAGESH,

ARKADY SPEKTOR,

YORI ZOVREV;

THEODORE (TED) GREENBERG;

MAURINE GREENBERG;

JACOB KATZMACHER;

DEBORAH CHANA KATZMACHER;

CHAYA KATZMACHER;

MIKIMI STEINBERG;

JARED SAUTER;

DANIELLE SAUTER;

MYRA MANDEL;

YAAKOV ABUTBUL;

ABRAHAM NATHAN MOR, a minor, by his father
and natural guardian, ZION MOR, and by his mother
and natural guardian, REVITAL MOR;

BAT ZION MOR, a minor, by her father and natural
guardian, ZION MOR, and by her mother and natural
guardian, REVITAL MOR;

MICHAL MOR, a minor, by her father and natural
guardian, ZION MOR, and by her mother and natural
guardian, REVITAL MOR;

ODED CHANA MOR, a minor, by her father and
natural guardian, ZION MOR, and by her mother and
natural guardian, REVITAL MOR;

ZION MOR, individually;

REVITAL MOR, individually;

ADHAM MAHANE TARRABASHI;

EMILLIA SALMAN ASLAN;

JIHAN KAMUD ASLAN;

ZOHARA LOUIE SA'AD;

IYAH ZAID GANAM, a minor, by his father and
natural guardian ZIAD SHCHIV GHANAM, and by
his mother and natural guardian, GOUROV TISIR
GHANAM;

ZIAD SHCHIV GHANAM, individually; and

GOUROV TISIR GHANAM, individually,

                Plaintiffs,

-against-

AMERICAN EXPRESS BANK LTD.

LEBANESE CANADIAN BANK, SAL

Defendants.

---------------------------------------------------------------------X

TO THE ABOVE NAMED DEFENDANTS:

YOU ARE HEREBY SUMMONED to answer the complaint in this action and to serve a copy of your answer, on the plaintiff's Attorneys within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after service is complete if this summons is not personally delivered to you within the State of New York) and to file a copy of your answer with the Clerk of the above-named Court; and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated:   New York, New York
         July 11, 2008

Yours,

JAROSLAWICZ & JAROS, LLC
*Attorneys for the Plaintiffs*

By: _____

     Robert J. Tolchin

225 Broadway, 24th floor
New York, New York 10007
(212) 227-2780

and

NITSANA DARSHAN-LEITNER & CO.
Nitsana Darshan-Leitner, Adv.
*Israeli Counsel for Plaintiffs*
10 Hata'as Street
Ramat Gan, 52512
Israel


Defendant's address:

American Express Bank Ltd.
200 Vesey Street
New York, New York, 10285

Lebanese Canadian Bank, SAL
Minaa El Hosn
Saint Charles City Center, 1st & 3rd floors
Beirut, Lebanon

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------X

YAAKOV LICCI, a minor, by his father and natural
guardian ELIHAV LICCI and by his mother and                    Index No: _____/ 08
natural guardian YEHUDIT LICCI;

ELIHAV LICCI, individually;                                    **COMPLAINT**

YEHUDIT LICCI, individually;

TZVI HIRSH;

ARKADY GRAIPEL;

TATIANA KREMER;

YOSEF ZARONA;

TAL SHANI;

SHLOMO COHEN;

NITZAN GOLDENBERG;

RINA DAHAN;

RAPHAEL WEISS;

AGAT KLEIN;

TATIANA KOVLEYOV;

VALENTINA DEMESH;

RIVKA EPON;

JOSEPH MARIA;

IMMANUEL PENKER;

ESTHER PINTO;

AVISHAI REUVANE;

ELISHEVA ARON;

CHAYIM KUMER;

NECHAMA KUMER;

SARAH YEFET;

SHOSHANA SAPPIR;

RAHMI GUHAD GHANAM, a minor, by his father
and natural guardian FUAD SHCHIV GHANAM and
by his mother and natural guardian SUHA SHCHIV
GHANAM;

FUAD SHCHIV GHANAM, individually;

SUHA SHCHIV GHANAM, individually;

MA'AYAN ARDSTEIN, a minor, by her father and
natural guardian, BRIAN ARDSTEIN, and by her
mother and natural guardian, KEREN ARDSTEIN;

NOA ARDSTEIN, a minor, by her father and natural
guardian, BRIAN ARDSTEIN, and by her mother and
natural guardian, KEREN ARDSTEIN;

NETIYA YESHUA ARDSTEIN, a minor, by his father
and natural guardian, BRIAN ARDSTEIN, and by his
mother and natural guardian, KEREN ARDSTEIN

ARIEL CHAIM ARDSTEIN, a minor, by his father and
natural guardian, BRIAN ARDSTEIN, and by his
mother and natural guardian, KEREN ARDSTEIN

BRIAN ARDSTEIN, individually;

KEREN ARDSTEIN, individually;

MARGALIT RAPPEPORT, a minor, by her mother
and natural guardian, LAURIE RAPPEPORT;

LAURIE RAPPEPPORT, individually;

YAIR MOR,

ORNA MOR;

MICHAEL FUCHS;

MUSHKA KAPLAN, a minor, by her father and
natural guardian CHAIM KAPLAN, and by her
mother and natural guardian RIVKA KAPLAN;

ARYE LEIB KAPLAN, a minor, by his father and
natural guardian CHAIM KAPLAN, and by his
mother and natural guardian RIVKA KAPLAN;

MENACHEM KAPLAN, a minor, by his father and
natural guardian CHAIM KAPLAN, and by his
mother and natural guardian RIVKA KAPLAN;

CHANA KAPLAN, a minor, by her father and natural
guardian CHAIM KAPLAN, and by her mother and
natural guardian RIVKA KAPLAN;

EFRAIM LEIB KAPLAN, a minor, by his father and
natural guardian CHAIM KAPLAN, and by his
mother and natural guardian RIVKA KAPLAN;

CHAIM KAPLAN, individually;

RIVKA KAPLAN, individually;

ROCHELLE SHALMONI;

OZ SHALMONI;

DAVID OCHAYON;

YAAKOV MAIMON;

MIMI BITON;

MIRIAM JUMA'A, as Personal Representative of the
Estate of FADYA JUMA'A;

MIRIAM JUMA'A, individually;

SALAH JUMA'A, SAID JUMA'A, and ABD EL-
RAHMAN JUMA'A, as Personal Representatives of
the Estate of SAMIRA JUMA'A;

SALAH JUMA'A, individually;

SAID JUMA'A, individually;

ABD EL-RAHMAN JUMA'A, individually;

RAHMA ABU-SHAHIN,

ABDEL GAHNI ABDEL GAHNI, as Personal
Representative of the Estate of SOLTANA JUMA'A,

ABDEL GAHNI ABDEL GAHNI, individually;

SHADI SALMAN AZZAM, as the Personal
Representative of the Estate of MANAL CAMAL
AZAM;

KANAR SHA'ADI AZZAM, a minor, by his father
and natural guardian, SHADI SALMAN AZZAM;

ADEN SHA'ADI AZZAM, a minor, by his father and
natural guardian, SHADI SALMAN AZZAM;

SHADI SALMAN AZZAM, individually;

ADINA MACHASAN DAGESH,

ARKADY SPEKTOR,

YORI ZOVREV;

THEODORE (TED) GREENBERG;

MAURINE GREENBERG;

JACOB KATZMACHER;

DEBORAH CHANA KATZMACHER;

CHAYA KATZMACHER;

MIKIMI STEINBERG;

JARED SAUTER;

DANIELLE SAUTER;

MYRA MANDEL;

YAAKOV ABUTBUL;

ABRAHAM NATHAN MOR, a minor, by his father and natural guardian, ZION MOR, and by his mother and natural guardian, REVITAL MOR;

BAT ZION MOR, a minor, by her father and natural guardian, ZION MOR, and by her mother and natural guardian, REVITAL MOR;

MICHAL MOR, a minor, by her father and natural guardian, ZION MOR, and by her mother and natural guardian, REVITAL MOR;

ODED CHANA MOR, a minor, by her father and natural guardian, ZION MOR, and by her mother and natural guardian, REVITAL MOR;

ZION MOR, individually;

REVITAL MOR, individually;

ADHAM MAHANE TARRABASHI;

EMILLIA SALMAN ASLAN;

JIHAN KAMUD ASLAN;

ZOHARA LOUIE SA'AD;

IYAH ZAID GANAM, a minor, by his father and natural guardian ZIAD SHCHIV GHANAM, and by his mother and natural guardian, GOUROV TISIR GHANAM;

ZIAD SHCHIV GHANAM, individually; and

GOUROV TISIR GHANAM, individually,

Plaintiffs,

-against-

AMERICAN EXPRESS BANK LTD.

LEBANESE CANADIAN BANK, SAL

Defendants.

-------------------------------------------------------------------------X

Plaintiffs, complaining of the Defendants, by their attorneys, Jaroslawicz & Jaros, LLC, allege for their Complaint as follows:

## NATURE OF THIS ACTION

1.    This is a civil action for a money judgment arising from a series of terrorist rocket attacks on civilians in Israel carried out by the Hizbollah terrorist organization during July and August 2006.

2.    The plaintiffs are American, Israeli and Canadian civilians who were injured in the terrorist rocket attacks, and the family members and Personal Representatives of the estates of two Israeli civilians who were killed by the terrorist rocket attacks.

3.    Defendants American Express Bank Ltd. and Lebanese Canadian Bank SAL intentionally and/or negligently provided extensive banking services to

Hizbollah, which caused, enabled and facilitated the terrorist rocket attacks in which the plaintiffs and their decedents were harmed and killed.

## THE PARTIES

4.      Plaintiffs Avishai Reuvane, Elisheva Aron, Chayim Kumer, Nechama Kumer Brian Ardstein, Keren Ardstein, Ma'ayan Ardstein, Noa Ardstein, Netiya Yeshua Ardstein, Ariel Chaim Ardstein, Laurie Rappeport, Margalit Rappeport, Yair Mor, Michael Fuchs, Chaim Kaplan, Rivka Kaplan, Mushka Kaplan, Arye Leib Kaplan, Menachem Kaplan, Chana Kaplan, Efraim Kaplan, Theodore (Ted) Greenberg, Maurine Greenberg, Jacob Katzmacher, Deborah Chana Katzmacher, Chaya Katzmacher, Mikimi Steinberg, Jared Sauter, Danielle Sauter and Myra Mandel are American citizens who were injured by rocket attacks carried out by the Hizbollah terrorist organization between July 12 and August 14, 2006. The details of the attacks and the nature of these plaintiffs' injuries are set forth below.

5.      Plaintiffs Brian Ardstein, Keren Ardstein, Chaim Kaplan, Rivka Kaplan and Laurie Rappeport bring this action individually and on behalf of their respective minor children (as set forth in the caption and below) plaintiffs Ma'ayan Ardstein, Noa Ardstein, Netiya Yeshua Ardstein, Ariel Chaim Ardstein, Margalit Rappeport, Mushka Kaplan, Arye Leib Kaplan, Menachem Kaplan, Chana Kaplan and Efraim Kaplan.

6.      Plaintiffs Sarah Yefet, Shoshana Sappir, Oz Shalmoni and Rochelle Shalmoni are Canadian citizens who were injured by the aforementioned Hizbollah

rocket attacks. The details of the attacks and the nature of these plaintiffs' injuries are set forth below.

7.    Plaintiffs Elihav Licci, Yehudit Licci, Yaakov Licci, Tzvi Hirsh, Arkady Graipel, Tatiana Kremer, Yosef Zarona, Tal Shani, Shlomo Cohen, Nitzan Goldenberg, Rina Dahan, Raphael Weiss, Agat Klein, Tatiana Kovleyov, Valentina Demesh, Rivka Epon, Joseph Maria, Immanuel Penker, Esther Pinto, Fuad Shchiv Ghanam, Suha Shchiv Ghanam, Rahmi Guhad Ghanam, Orna Mor, David Ochayon, Yaakov Maimon, Mimi Biton, Miriam Juma'a, Salah Juma'a, Said Juma'a, Abd El-Rahman Juma'a, Rahma Abu-Shahin, Abdel Gahni Abdel Gahni, Shadi Salman Azzam, Kanar Sha'adi Azzam, Aden Sha'adi Azzam, Kanar Sha'adi Azzam, Adina Machasan Dagesh, Arkady Spektor, Yori Zovrev, Yaakov Abutbul, Zion Mor, Revital Mor Abraham Nathan Mor, Bat Zion Mor, Michal Mor and Oded Chana Mor, Adham Mahane Tarrabashi, Emillia Salman Aslan, Jihan Kamud Aslan, Zohara Louie Sa'ad, Ziad Shchiv Ghanam, Iyah Zaid Ghanam and Gourov Tisir Ghanam are Israeli citizens who were injured by the aforementioned Hizbollah rocket attacks. The details of the attacks and the nature of these plaintiffs' injuries are set forth below.

8.    Plaintiffs Elihav Licci, Yehudit Licci, Fuad Shchiv Ghanam, Suha Shchiv Ghanam, Shadi Salman Azzam, Ziad Shchiv Ghanam, Gourov Tisir Ghanam, Zion and Revital Mor bring this action individually and on behalf of their respective minor children (as set forth in the caption and below) plaintiffs Yaakov Licci, Rahmi Guhad Ghanam, Kanar Sha'adi Azzam, Aden Sha'adi Azzam, Abraham Nathan Mor, Bat Zion Mor, Michal Mor, Oded Chana Mor and Iyah Zaid Ghanam.

9.    Plaintiff Abdel Gahni Abdel Gahni is the heir of Soltana Jumaa and is authorized under Israeli law to bring this action on behalf of the Estate of Soltana Jumaa, and he brings this action both individually and on behalf of the Estate of Soltana Jumaa.

10.    Plaintiff Miriam Juma'a, is the heir of Fadya Juma'a and is authorized under Israeli law to bring this action on behalf of the Estate of Fadya Jumaa, and she brings this action both individually and on behalf of the Estate of Fadya Jumaa.

11.    Plaintiffs Salah Juma'a, Said Juma'a and Abd El-Rahman Juma'a are the heirs of Samira Jumaa and are authorized under Israeli law to bring this action on behalf of the Estate of Samira Juma'a, and they bring this action both individually and on behalf of the Estate of Samira Jumaa.

12.    Plaintiff Shadi Salman Azzam is the heir of Manal Camal Azzam and is authorized under Israeli law to bring this action on behalf of the Estate of Manal Camal Azzam, and brings this action both individually and on behalf of the Estate of Manal Camal Azzam.

13.    Defendant American Express Bank Ltd. ("Amex Bank") is a banking corporation organized under the laws of Connecticut and headquartered in New York.

14.    Defendant Amex Bank does extensive business and holds significant assets in New York.

15.    Defendant Amex Bank is supervised by the New York State Banking Department.

16.     Defendant Amex Bank intentionally and/or negligently provided extensive banking services to Hizbollah, which caused, enabled and facilitated the terrorist rocket attacks in which the plaintiffs and their decedents were harmed and killed.

17.     Defendant Lebanese Canadian Bank SAL ("LCB") is a banking corporation organized under the laws of Lebanon and headquartered in Beirut, Lebanon.

18.     Defendant LCB intentionally and/or negligently provided extensive banking services to Hizbollah, which caused, enabled and facilitated the terrorist rocket attacks in which the plaintiffs and their decedents were harmed and killed. These banking services were carried out by LCB in and through the State of New York.

## STATEMENT OF FACTS

### Hizbollah

19.     Hizbollah was established in Lebanon circa 1982.

20.     At all times relevant hereto Hizbollah is and was a radical Islamic terrorist organization which views the State of Israel, the United States and other Western countries as its enemies.

21.     At all times relevant hereto Hizbollah sought to destroy the State of Israel and murder or expel its Jewish residents, and to weaken and harm the United States by any means.

22.     At all times relevant hereto Hizbollah considered the State of Israel and the United States as legitimate targets for terrorist attacks.

23.     Between the time of its founding and June 12, 2006 (and until the present day) Hizbollah carried out thousands of terrorist attacks against Israeli and United States targets, which have killed hundreds of Israeli and U.S. citizens and wounded thousands more.

24.     Between 1982 and until June 12, 2006, Hizbollah's policy and practice of carrying out terrorist attacks against Israel and the United States was and is notorious and well known to defendants Amex Bank and LCB and to the public at large.

25.     Between 1998 and June 12, 2006, the courts of the United States published numerous decisions finding that Hizbollah was responsible for terrorist attacks in which American and Israeli citizens were killed or injured.

26.     Hizbollah has been designated by the United States as a Specially Designated Terrorist ("SDT") continuously since 1995, as a Foreign Terrorist Organization ("FTO") continuously since 1997, and as a Specially Designated Global Terrorist ("SDGT") continuously since 2001.

### Defendants' Provision of Banking Services to Hizbollah

27.     Hizbollah is subject to strict economic sanctions programs imposed by the United States as the result of its designation as an SDT, FTO and SDGT (collectively hereinafter: "U.S. Sanctions Regime").

28.    The U.S. Sanctions Regime is intended to prevent Hizbollah from conducting banking activities, and thereby limit its ability to carry out terrorist attacks.

29.    The U.S. Sanctions Regime is effective when it is observed and enforced.

30.    Hizbollah is unable to conduct banking activities via banks and other financial institutions which observe and enforce the U.S. Sanctions Regime.

31.    If all banks and financial institutions worldwide observed and enforced the U.S. Sanctions Regime, the ability of Hizbollah to conduct banking activities would be severely restricted, and Hizbollah's ability to plan, to prepare and to carry out terrorist attacks would be significantly reduced.

32.    Nearly all banks and financial institutions around the world observe and enforce the U.S. Sanctions Regime.

33.    Hizbollah is therefore forced to conduct its banking activities using those very few banks and financial institutions which do not observe and enforce the U.S. Sanctions Regime.

34.    Defendants Amex Bank and LCB do not observe or enforce the U.S. Sanctions Regime.

35.    Defendant LCB conducts much of its business in U.S. dollars.

36.    In order to execute U.S. dollar transactions, defendant LCB requires a correspondent bank in the United States through which to carry out those transactions.

37.    Accordingly, LCB sought and entered into a business relationship with defendant Amex Bank, pursuant to which Amex Bank serves as a correspondent bank for LCB and carries out LCB's U.S. dollar transactions.

38.    Amex Bank served as a correspondent bank for LCB between 2004 (or earlier) and until June 12, 2006 (and later).

39.    Between 2004 (or earlier) and until June 12, 2006 (and later), Hizbollah continuously maintained bank accounts at various LCB branches in Lebanon.

40.    These accounts are and were titled, *inter alia*, to Yousser Company (a/k/a Yousser Company for Finance and Investment) (hereinafter: "Yousser") and to Shahid (Martyrs) Foundation (hereinafter "Shahid").

41.    Yousser and Shahid are an integral part of Hizbollah and constitute part of Hizbollah's financial arm.

42.    All of the accounts described in the previous paragraphs, whether or not titled to Yousser or Shahid, are collectively referred to hereinafter as "Hizbollah Accounts."

43.    At all times, all of the Hizbollah Accounts belonged to Hizbollah and were under the control of Hizbollah.

44.    At all times, all of the funds held in all the Hizbollah Accounts belonged to Hizbollah and were under the control of Hizbollah.

45.    At all times, all transactions carried out in all the Hizbollah Accounts were carried by Hizbollah and at the direction of Hizbollah.

46.    Beginning in 2004, defendants Amex Bank and LCB began to provide extensive wire transfer services to Hizbollah.

47.    Specifically, between 2004 and June 12, 2006 (and subsequently), Hizbollah made and received dozens of wire transfers via defendants Amex Bank and LCB, totaling several million dollars (hereinafter: "Hizbollah Wire Transfers").

48.    All the Hizbollah Wire Transfers were made to, from and/or between the Hizbollah Accounts via Amex Bank in New York.

49.    Amex Bank served as LCB's correspondent bank for the Hizbollah Wire Transfers and carried out the Hizbollah Wire Transfers on behalf of and in concert with LCB and Hizbollah.

50.    Thus, all the Hizbollah Wire Transfers were carried out in and through the State of New York, by both Amex Bank and LCB.


**The Hizbollah Rocket Attacks**

51.    Between July 12, 2006 and August 14, 2006, Hizbollah fired thousands of rockets at civilians in northern Israel (collectively hereinafter: "Hizbollah Rocket Attacks").

52.    The plaintiffs were injured and their decedents were killed by the Hizbollah Rocket Attacks, as detailed below.

53.    On July 13, 2006 at approximately 7:30 am, a rocket launched by Hizbollah directly struck plaintiff David Ochayon's apartment building in the Israeli city of Nahariyah. Ochayon was in his home at the time of the powerful explosion and

was struck with shrapnel and debris. In addition, he was badly traumatized from the blast and is still being treated for emotional disorders. As a result of this rocket attack David Ochayon suffered severe physical, psychological, emotional and financial injuries.

54.     On July 13, 2006 at approximately 2:00 p.m. a rocket launched by Hizbollah directly hit the business owned by plaintiff Yaakov Maimon in the Israeli town of Safed in the Galilee and collapsed the building on him. The force of the blast seriously physically injured and traumatized Yaakov Maimon. His business was badly damaged as well. As a result of this rocket attack Yaakov Maimon suffered severe physical, psychological, emotional and financial injuries.

55.     On July 12, 2006 at approximately 2:30 p.m. a rocket launched by Hizbollah struck the work place of plaintiff Mimi Biton in Safed and collapsed the building on her. Biton was struck by shrapnel from the explosion and was badly traumatized by the blast and she experiences long term psychological disorders. As a result of this rocket attack Mimi Biton suffered severe physical, psychological, emotional injuries.

56.     On July 29, 2006 a rocket launched by Hizbollah landed next to plaintiff Tzvi Hirsh as he was making his way to a bomb shelter near his home in the Israeli town of Kiryat Motzkin near Haifa. Hirsh was hit with shrapnel from the explosion and was badly injured. In addition, he experienced severe trauma. The injuries Hirsh sustained caused him to be permanently confined to a wheelchair. As a

result of this rocket attack Tzvi Hirsh suffered severe physical, psychological, emotional and financial injuries.

57.    On July 26, 2006 at approximately 9:30 am a rocket launched by Hizbollah landed next to plaintiff Arkady Graipel as he traveled to work in the Israeli town of Kiryat Yam near Haifa. Arkadi was struck by shrapnel from the explosion. In addition he was badly traumatized from the blast. As a result of this rocket attack Arkady Graipel suffered severe physical, psychological, emotional and financial injuries.

58.    On July 13, 2006 at approximately 3:45 p.m. a rocket launched by Hizbollah landed outside the home of plaintiff Tatiana Kremer in Safed. Kremer was struck by shrapnel from the explosion. In addition, she was badly traumatized from the blast and is still being treated for psychological disorders. As a result of this rocket attack Taitana Kremer suffered severe physical, psychological, emotional and financial injuries.

59.    On August 3, 2006 a rocket launched by Hizbollah slammed into the work place of plaintiff Yosef Zarona in the Israeli city of Acre, north of Haifa. Zarona was struck by shrapnel from the explosion which left him unable to walk without painful effort. In addition, he was badly traumatized from the blast and is still being treated with medication. He has had to stop working on account of his numerous injuries. As a result of this rocket attack Yosef Zarona suffered severe physical, psychological, emotional and financial injuries.

60.    On July 28, 2006 a rocket launched by Hizbollah struck the home of plaintiff Tal Shani in Kibbutz Amir in Israel's Hula Valley. Shani was struck with shrapnel and debris from the powerful blast and suffered severe head wounds. In addition, she was badly traumatized from the blast and she sustained long term psychological disorders. As a result of this rocket attack Tal Shani suffered severe physical, psychological, emotional and financial injuries.

61.    On August 13, 2006 a rocket launched by Hizbollah directly struck the home of Shlomo Cohen in Haifa as well as his car. The powerful blast severely injured his ears and badly traumatized him. Medical experts are unable to provide treatment for his hearing difficulties. As a result of this rocket attack Shlomo Cohen suffered severe physical, psychological, emotional and financial injuries.

62.    On August 11, 2006 a rocket launched by Hizbollah directly struck the home of a business associate of Nitzan Goldenberg in Kiryat Bialik, near Haifa, while Goldenberg was visiting. Goldenberg was injured by shrapnel and permanently handicapped. One of his hands is paralyzed and does not function. Goldenberg has trained as a chef and was preparing to open his own restaurant at the time of the rocket attack. Because of the serious damage to his hand he is today unable to work in his chosen profession as a chef. As a result of this rocket attack Nitzan Goldenberg suffered severe physical, psychological, emotional and financial injuries.

63.    On August 4, 2006 a rocket launched by Hizbollah struck the house of plaintiff Shadi Salman Azzam, 33, in M'rar village in the Upper Galilee. Shrapnel from the rocket flew into his house and killed his wife, Manal Camal Azzam, who was

28 at the time of her death, and severely wounded the couple's minor children, plaintiff Kanar Sha'adi Azzam and Aden Sha'adi Azzam. The murder of Manal Camal Azzam caused decedent and her estate severe harm, including conscious pain and suffering and pecuniary loss.

64.    Plaintiff Shadi Salman Azzam saw his wife torn to pieces and his children maimed by the rocket blast, and as a result has suffered severe psychological harm and has been forced to seek professional mental health care. Before his wife's death Plaintiff Shadi Salman Azzam worked as a builder and made a good salary on which he was able to support his family, but after the attack he stopped working for 4 months and to this day is unable to work the same hours he used to – a fact that has hurt his family's income. In addition, plaintiff Shadi Salman Azzam is now responsible for assuming the duties that his wife previously fulfilled as a mother. As a result of this rocket attack decedent Manal Camal Azzam was murdered and plaintiff Shadi Salman Azzam suffered severe psychological, emotional and financial injuries.

65.    Plaintiff Kanar Sha'adi Azzam, minor, is the eight year-old daughter of plaintiff Shadi Salman Azzam and decedent Manal Camal Azzam. Plaintiff Kanar Sha'adi Azzam suffered severe physical injuries in the same rocket attack that killed her mother. As a result of her own injuries and watching the gruesome death of her mother in their family home, and seeing the maiming of her brother, she suffers from severe psychological and emotional trauma and is undergoing continuous psychological treatment. As a result of this rocket attack plaintiff Kanar Sha'adi Azzam suffered severe physical, psychological and emotional injuries.

66.     Plaintiff Aden Sha'adi Azzam, minor, is the four year-old son of plaintiff Shadi Salman Azzam and decedent Manal Camal Azzam. Plaintiff Aden Sha'adi Azzam suffered physical shrapnel wounds in the same attack that severely injured his sister and killed his mother. As a result of her own injuries and watching the gruesome death of his mother in their family home, and seeing the maiming of his sister, he suffers from severe psychological and emotional trauma and is undergoing continuous psychological treatment. As a result of this rocket attack plaintiff Aden Sha'adi Azzam suffered severe physical, psychological and emotional injuries.

67.     Plaintiff Adina Machasan Dagesh, 53, is a relative of the Azzam family, and was present in their home at the time of the August 4, 2006 rocket attack. Due to the shock, fear and trauma that she suffered, she is now undergoing continuous psychological treatment to deal with the manifestations of severe psychological and emotional trauma. As a result of this rocket attack, Adina Dagesh suffered severe psychological and emotional injuries.

68.     On August 5, 2006 a rocket launched by Hizbollah landed near the home of the Juma'a family in Arb El-Aramshe, near the Israeli-Lebanese border. The rocket killed Fadya Juma'a, along with her daughters Samira Juma'a and Sultana Juma'a. The murder of Fadya Juma'a, Samira Juma'a and Sultana Juma'a caused decedents and their estates severe harm, including conscious pain and suffering and pecuniary loss.

69.     Plaintiff Miriam Juma'a, aged 88, is the mother of decedent Fadya Juma'a and the grandmother of decedents Samira Juma'a and Sultana Juma'a. Miriam

Jum'a suffered severe emotional harm as a result of the death of her daughter and granddaughters, as well as a substantial loss of support. Miriam was very much attached to her daughter, and dependent on her for care. This rocket attack caused Miriam Juma'a severe psychological and emotional injuries.

70.    Plaintiffs Salah Juma'a Said Juma'a, Abdel Rahman Juma'a and Rahma Abu-Shahin are the siblings of decedent Fadya Juma'a. The death of their beloved sister caused them severe emotional harm and distress. As a result of this rocket attack and the death of their sister, Salah Juma'a Said Juma'a, Abdel Rahman Juma'a and Rahma Abu-Shahin suffered severe psychological and emotional injuries.

71.    Plaintiff Abedel Gahni Abedel Gahni is the husband of decedent Soltana Juma'a. As a result of the death of his wife and the mother of his children, plaintiff Abedel Gahni Abedel Gahni has suffered terrible psychological and emotional trauma and distress, and financial loss. As a result of this rocket attack and the death of his wife Abedel Gahni Abedel Gahni suffered severe psychological, emotional and financial injuries.

72.    On July 25, 2006 and August 4, 2006 Hizbollah rockets landed near plaintiffs Adham Mahane Tarrabashi, Emillia Salman Aslan and Jihan Kamud Aslan in Kfar Maghar in the Galilee. They experienced extreme trauma from the explosions and are undergoing treatment for psychological disorders. As a result of this rocket attack Adham Mahane Tarrabashi, Emillia Salman Aslan and Jihan Kamud Aslan suffered severe psychological and emotional injuries.

73.    On July 25, 2006 a rocket launched by Hizbollah struck the work place of plaintiff Zohara Louie Sa'ad in Kfar Maghar. She was psychologically and emotionally traumatized by the blast. As a result of this rocket attack Zohara Louie Sa'ad suffered severe psychological, emotional and financial injuries.

74.    On July 25, 2006 a rocket launched by Hizbollah directly hit the Kfar Maghar home of plaintiffs Ziad Shchiv Ghanam and Gourov Tisir Ghanam. The blast caused Ziad suffered severe physical injuries. Plaintiff Gourov Tisir Ghanam and the couple's son plaintiff Iyah Zaid Ghanam, who were also in the home, suffered severe psychological trauma as a result of the attack. As a result of this rocket attack Ziad Shchiv Ghanam suffered severe physical, psychological, emotional and financial injuries and plaintiffs Gourov Tisir Ghanam and plaintiff Iyah Zaid Ghanam suffered severe psychological and emotional injuries.

75.    On August 8, 2006 a rocket launched by Hizbollah landed next to plaintiff Rina Dahan as she was making her way to a bomb shelter in Haifa. Rina was injured in both her legs and she is still in need of medical treatments, including pain-relieving shots. Rina's ability to walk is limited, especially climbing stairs. Rina Dahan's quality of life was severely damaged by her injuries and she is now disabled and dependent on medical care and third party assistance. In addition she was badly emotionally traumatized by the blast. As a result of this rocket attack Rina Dahan suffered severe physical, psychological, emotional and financial injuries.

76.    On August 3, 2006 at approximately 16:15 p.m., a rocket launched by Hizbollah struck outside the car of plaintiff Raphael Weiss in Acre. Weiss sustained

shrapnel injury in his head and was rushed to the operating room. As a result of his injury, Weiss has been turned from a healthy active man to a disabled patient confined to a wheelchair, requiring regular medical treatments and a permanent assistance. As a result of this injury, Weiss suffered a CVA on the left part of his brain, and became epileptic. In addition to his physical injuries Weiss was badly emotionally traumatized by the blast. As a result of this rocket attack Raphael Weiss suffered severe physical, psychological, emotional and financial injuries.

77.     On July 16, 2006, in the morning hours, a rocket launched by Hizbollah struck next to the bomb shelter in Kiryat Yam where plaintiff Agat Klein was seeking refuge. As a result of the powerful blast, Agat Klein suffered serious psychological and emotional damage. She was evacuated to Carmel Hospital in Haifa. Agat Klein continues to suffer from psychological disorders and anxiety attacks. She still has not regained her ability function properly to this day, has trouble functioning and has had to resign from her job. As a result of this rocket attack Agat Klein suffered severe psychological, emotional and financial injuries.

78.     On July 13, 2006 a rocket launched by Hizbollah directly struck the home of plaintiffs Zion Mor and Revital Mor in Safed and injured their entire family. After the explosion, while fighting the smoke, fire and destruction, Zion hysterically rushed to save his family who were in the center of the house at the time. The family home was completely destroyed by the rocket's explosion. Due to the emotional trauma Zion has been severely impaired psychologically and emotionally and remains disabled. Zion is largely unable to work as he must spend his time caring

for his wife and children. Zion's wife, plaintiff Revital Mor was sprayed with rocket shrapnel and glass in her legs and she suffered deep tissue injuries and major scars. Revital has been diagnosed with severe psychological and emotional damage and has been declared mentally debilitated and must rely on anxiety medicines for her day-to-day existence. The couple's minor son, plaintiff Abraham Nathan Mor, was also hit with shrapnel throughout his body, most acutely in his head, back and. One of the shrapnel fragments pierced Abraham's appendix which required surgery to remove. Abraham Nathan Mor remains scarred throughout his body as a result of the injuries he sustained in the rocket attack. Another child, plaintiff Bat Zion Mor, was also sprayed with shrapnel throughout her body. The large and visible scars that riddle her body as a result of the injuries she sustained in the rocket attack will never be healed – most notably the significant scars near her nose, near her eyes, on her torso and on her lower back. Another child, plaintiff Michal Mor, suffered severe head trauma caused by large shrapnel fragments that pierced her head. Michal was also severely injured in the belly area. The young girl was rushed to the hospital while on life support and was administered life-saving emergency surgery. Michal Mor remains scarred throughout her body as a result of the injuries she sustained in the rocket attack and suffers from severe headaches and severe psychological and emotional trauma that manifest themselves in acute restlessness, inability to concentrate, scattered thoughts and activities, severe attention deficit, and non-stop tics in her hands. The Mor's youngest child, plaintiff Oded Chana Mor was also sprayed with shrapnel e body, most acutely in her head and legs. As a result of this rocket attack Zion Mor, Revital Mor, Abraham

Nathan Mor, Bat Zion Mor, Michal Mor and Oded Chana Mor suffered severe physical, psychological, emotional and financial injuries.

79.    On July 25, 2006, at approximately 1:55am, a rocket launched by Hizbollah landed near plaintiff Tatiana Kovleyov in Haifa. As a result of the blast, Kovleyov was sprayed with shrapnel in all parts of her body. Her ability to walk has been severely impaired, her left hand does not work, her body is still riddled with shrapnel and she requires ongoing physiotherapeutic care. In addition, Kovleyov has been severely impaired psychologically and emotionally. She suffers depression and sleep impairment among other ailments, for which she requires ongoing psychiatric care. Kovleyov is unable to work, due to the heavy physical and psychological injuries she maintains. As a result of this rocket attack Tatiana Kovleyov suffered severe physical, psychological, emotional and financial injuries.

80.    On July 25, 2006, a rocket launched by Hizbollah landed next to plaintiff Valentina Demesh as she was walking down the street in Haifa. Demesh was sprayed with shrapnel and is suffering from functional disability in her hands and legs. In addition, Valentina has suffered psychological and emotional damage. She suffers from nightmares and other emotional disorders for which she requires ongoing psychiatric care. Damesh has been unable to return to work as a result of her medical condition. As a result of this rocket attack Valentina Demesh suffered severe physical, psychological, emotional and financial injuries.

81.    On August 11, 2006, at approximately 4:00 p.m., a rocket launched by Hizbollah directly struck the home of plaintiff Rivka Epon in Kiryat Shemona in the

Galilee Panhandle. Epon was in the house at the time of the explosion and she was hit in the face with shrapnel. The blast broke her nose and jaw and knocked three of her teeth from her mouth. She continues to suffer from dizziness, an inability to concentrate, headaches, severe ringing in her ears and significant pain in the spot in which a two centimeter piece of rocket shrapnel is still lodged in her body. Rivka suffers from severe psychological and emotional damage and is unable to be alone. She requires continuous psychiatric care. As a result of this rocket attack Rivka Epon suffered severe physical, psychological, emotional and financial injuries.

82.    In the afternoon hours of July 28, 2006, a rocket launched by Hizbollah landed outside the home of plaintiff Joseph Maria in Acre. As a result of the powerful explosion Maria suffered a severe stroke and half his body remains paralyzed. His speech is confused and unintelligible, he requires continuous medical care and has a nursing care 24-hours a day. Maria was also badly traumatized by the blast and suffers from psychological and emotional damage. As a result of this rocket attack Joseph Maria suffered severe physical, psychological, emotional and financial injuries.

83.    On August 13, 2006, at approximately 10 p.m., a rocket launched by Hizbollah exploded outside the bus being operated by plaintiff Immanuel Penker in Naharia. The powerful blast wounded Penker throughout his body including his right hand. Since the attack Penker has undergone surgery several times on his hand, left leg and left eye. In addition he has required skin grafts and figure restructuring. Penker needs medical care as well as occupational therapy due to his injuries and the extensive series of operations he has endured. In addition, he has been badly traumatized by the

rocket blast. Since being hit, Penker is not able to work. As a result of this rocket attack Immanuel Penker suffered severe physical, psychological, emotional and financial injuries.

84.     On July 17, 2006, at approximately 1:10 p.m., Esther Pinto's house in Safed suffered a direct hit from a rocket launched by Hizbollah. Pinto was in her home at the time. In the powerful explosion Pinto was injured in both her legs and required surgery. Her walking remains impaired and she requires regular medical care. Pinto was badly traumatized from the blast and suffers from psychological and emotional damage. As a result of the rocket attack Esther Pinto suffered severe physical, psychological, emotional and financial injuries.

85.     On July 13, 2006, plaintiff Chaim Kaplan was severely injured by two Hizbollah rocket which landed in Safed. The first rocket landed outside his car and severly injured him. The second rocket struck the Kaplan family's home, and also injured Chaim's wife, plaintiff Rivka Kaplan, as well as the couple's minor children plaintiffs Mushka Kaplan, Arye Leib Kaplan, Menachem Kaplan, Chana Kaplan and Efraim Kaplan. As a result of these rocket attacks plaintiffs Chaim Kaplan, Rivka Kaplan, Mushka Kaplan, Arye Leib Kaplan, Menachem Kaplan, Chana Kaplan and Efraim Kaplan suffered severe physical, psychological, emotional and financial injuries.

86.     Plaintiffs Avishai Reuvane and Elisheva Aron were injured on July 13, 2006, by a rocket fired by Hizbollah which landed in Safed. As a result of this rocket attack Avishai Reuvane and Elisheva Aron suffered severe physical, psychological, emotional and financial injuries.

87.     Plaintiff Chayim Kumer, a resident of Safed, suffered a nervous breakdown and was hospitalized as a result of the Hizbollah Rocket Attacks, which in turn caused severe harm to his wife, Plaintiff Nechama Kumer. As a result of the Hizbollah Rocket Attacks plaintiffs Chayim Kumer and Nechama Kumer severe psychological, emotional and financial injuries.

88.     Plaintiffs Sarah Yefet and her daughter Shoshana Sappir were both in their apartment in Safed on July 12, 2006, when the first of several Hizballah rockets struck their home. Both Yefet and Sappir suffered nervous shock and psychological damage as a result of the bomb attacks. They continue to suffer psychological symptoms, including nervousness, lack of sleep, inability to work or concentrate on tasks. Shoshana in particular suffers in relation to her child-rearing responsibilities, and has diminished abilities due to emotional stress and psychological trauma resulting from the bombing. As a result of these rocket attacks Sarah Yefet and Shoshana Sappir suffered severe physical, psychological, emotional and financial injuries.

89.     On July 25, 2006 a rocket exploded in the yard of the home of plaintiffs Fuad and Suha Shchiv Ghanam in the Israeli village of Ma'ar. Fuad suffered severe rocket shrapnel injuries throughout his body. He was also badly traumatized by the blast. Fuad's wife, Suha, suffered rocket shrapnel injuries throughout her body and suffers from severe psychological and emotional trauma. She requires continuous psychiatric care since the attack. The couple's young son plaintiff Rahmi Guhad Ghanam was also injured in the explosion. Rahmi suffered rocket shrapnel wounds throughout his body, In addition, Rhami Ghanam suffers from psychological and

emotional trauma due to the attack. As a result of this rocket attack Fuad, Suha and Rahmi Shchiv Ghanam suffered severe physical, psychological, emotional and financial injuries.

90.     On July 13, 2006, at approximately 14:30, plaintiff Michael Fuchs was driving in his car in Safed when a rocket launched by Hizbollah struck nearby. Massive amounts of shrapnel penetrated Fuchs' car and caused him severe injuries. Fuchs lost large quantities of blood, lost consciousness and was rushed to the intensive care unit of Rebecca Ziv Hospital. Fuchs' throat was slashed as a result of the explosion and his right hand remains completely paralyzed. Fuchs has been permanently disabled. He is unable to work and relies on intensive and expensive medical treatments on an ongoing basis. As a result of this rocket attack Michael Fuchs suffered severe physical, psychological, emotional and financial injuries.

91.     On July 14, 2006, a rocket launched by Hizbollah landed next to plaintiff Yaakov Abutbul as he was leaving his hospital shift in Safed. Abutbul was wounded with shrapnel in his legs, his back and his chest. He subsequently required surgery three times. In addition, he was traumatized by the explosion. As a result of this rocket attack Yaakov Abutbul suffered severe physical, psychological, emotional and financial injuries.

92.     Plaintiffs Karen and Brian Ardstein resided in Safed at the time of the Hizbollah Rocket Attacks. Numerous rockets landed near the family's home. Karen was pregnant at the time the attacks began and due to the ongoing strain, stress and anxiety, and the rocket explosions near the Ardstein home she suffered a miscarriage

and lost the baby. In the wake of the miscarriage, Karen suffered from post-partum depression, damage to her immune system and has developed other medical complications. Brian was greatly traumatized by the rocket attacks and the loss of the baby. In addition, as a result of the rocket attacks and the collapse of tourism in Israel, Brian a licensed tour guide lost all of his work and had extreme difficulties supporting his family. The Ardsteins' minor children, plaintiffs Ma'ayan, Noa, Ariel Chaim and Netiya Yeshua Ardstein all suffered emotional and psychological trauma from the Hizbollah Rocket Attacks. All of the children have been diagnosed with permanent and severe emotional disorders and are receiving on-going psychiatric treatment and therapy. As a result of the Hizbollah Rocket Attacks, Brian, Keren, Ma'ayan, Noa, Ariel Chaim and Netiya Yeshua Ardstein suffered severe physical, psychological, emotional and financial injuries.

93.    On July 13, 2006 at approximately 7:00 p.m. a rocket launched by Hizbollah landed outside the home of plaintiffs Laurie Rappeport and her minor daughter Margalit in Safed. The powerful explosion threw Margalit, who was playing outside on a wall, a distance into the air. Margalit was hospitalized as a result of the explosion and suffered severe psychological trauma. Laurie was emotionally distraught over the injury sustained by her young daughter. As a result of this rocket attack Laurie and Margalit Rappeport suffered severe physical, psychological, and emotional injuries.

94.    On July 19, 2006 the art gallery owned by plaintiffs Yair and Orna Mor in Safed was directly hit by a rocket launched by Hizbollah. The business was completely destroyed in the blast. The couple was extremely traumatized by the

destruction of their family's business. As a result of this rocket attack Yair and Orna Mor suffered severe psychological, emotional and financial injuries.

95.     On July 22, 2006, a rocket launched by Hezbollah landed in close proximity to plaintiff Arkady Spektor in Nahariya. Spektor was sprayed with shrapnel in his right thigh, left shoulder, left lung and was hospitalized in Nahariya. As a result of this rocket attack, Arkady Spektor suffered severe physical, psychological and emotional injuries.

96.     On July 28, 2006, a rocket launched by Hezbollah landed about forty meters from plaintiff Yori Zovrev as he was running to a bomb shelter near his home in Nahariya. As a result, he broke his left ankle (compound fracture) and was hospitalized. As a result of this injury, he has suffered severe, constant pain through the present. In addition, he suffers from severe anxiety, manifesting itself in the form of insomnia and inability to rest. As a result of this rocket attack, Zovrev has suffered severe physical and psychological and emotional injuries.

97.     In the summer of 2006, plaintiffs Theodore (Ted) Greenberg and Maurine Greenberg were the proprietors of a tourism business in Safed. The Hizbollah Rocket Attacks caused a complete halt in tourism in northern Israel for several months during the peak tourism season, which in turn caused the Greenbergs severe financial damage. As a result of the Hizbollah Rocket Attacks, Theodore (Ted) Greenberg and Maurine Greenberg suffered severe financial damages.

98.     In the summer of 2006, plaintiffs Jacob Katzmacher and Deborah Chana Katzmacher were the proprietors of an art gallery in the city of Safed (a business

that caters almost exclusively to tourists). The Hizbollah Rocket Attacks caused a complete halt in tourism in northern Israel for several months during the peak tourism season, which in turn caused the Katzmachers severe financial damage. As a result of the Hizbollah Rocket Attacks, Jacob Katzmacher and Deborah Chana Katzmacher suffered severe financial damages.

99.     On July 13, 2008, a rocket launched by Hizbollah landed a few meters away from plaintiff Chaya Katzmacher, in Safed causing her psychological and emotional damage. As a result of this rocket attack, Chaya Katzmacher suffered severe psychological and emotional damage.

100.     On August 11, 2006, at approximately 1:15 p.m., a rocket launched by Hizbollah landed directly on plaintiff Mikimi Steinberg's house in Safed severely damaging the house and the possessions therein. As a result of this rocket attack, Mikimi Steinberg suffered severe financial damages.

101.     In the summer of 2006, plaintiffs Jared and Sauter and Danielle Sauter were the owners of a tourism business in the town of Rosh Pina in the Galilee. The Hizbollah Rocket Attacks caused a complete halt in tourism in northern Israel for several months during the peak tourism season, which in turn caused the Sauters severe financial damage. The Sauters' business collapsed and they was forced to relocate to a different city. As a result of the Hizbollah Rocket Attacks, Jared Sauter and Danielle Sauter suffered severe financial damages.

102.     In the summer of 2006 plaintiff Myra Mandel was the owner of an art gallery in Safed. Rockets launched by Hizbollah damaged her art gallery.

Additionally, the Hizbollah Rocket Attacks caused a complete halt in tourism in northern Israel for several months during the peak tourism season, which in turn caused Mandel severe financial damage. As a result of the Hizbollah Rocket Attacks, Myra Mandel suffered severe financial damages.

103.   On July 13, 2006, alarms sounded in response to rockets launched by Hizbollah at Safed, and, while running to the bomb shelter, plaintiff Yaakov Licci stumbled and fell on his stomach and suffered an injury requiring that his spleen be immediately removed. On July 20, 2006 while still hospitalized in Safed from the spleen operation, another rocket launched by Hizbollah landed directly on the hospital very close to the room in which Yaakov Licci was staying. Yaakov Licci received shrapnel and glass shard wounds to his entire body, especially to his left foot and hand, his head, his back and his eyes. Yaakov Licci has a fracture in his skull that has no chance of healing, and bulging scars in his limbs, back, and head. In addition, Yaakov Licci suffered severe emotional injuries. While previously a healthy and active boy, Yaakov Licci is now dependant on his psychiatric treatment and medications. Yaakov Licci's condition has not improved. Even today, at 16 years old, he sleeps in his parents' bed. As a result of these rocket attacks, Yaakov Licci suffered severe physical, psychological, emotional and financial injuries.

104.   On July 21, 2006, a rocket launched by Hizbollah landed on the hospital in Safed where plaintiff Elihav Licci was attending to his son Yaakov Licci who had been hospitalized as a result of a previous rocket attack by Hizbollah. Elihav Licci was injured by the rocket, and suffered shrapnel wounds and glass shards embedded in

his right hand and in his left foot. Some of these shards could not be removed and are still in Elihav's body. Elihav Licci also experienced psychological injuries (severe post trauma disorder) as a result of the rocket attack. As a result of this rocket attack, Yaakov Licci suffered severe physical, psychological, emotional and financial injuries.

105.    On July 13 2006, a rocket launched by Hizbollah landed on a dairy owned by plaintiffs Elihav and Yehudit Licci near Safed, paralyzing the dairy's activity. On July 20, 2006, a rocket launched by Hizbollah landed on the Licci's dairy and destroyed it. The dairy had until that time generated approximately $90,000 monthly revenue. Since the war the dairy has been paralyzed, and the Liccis have been caused severe financial losses. In order to rebuild the dairy the Licci's need to invest over $500,000. As a result of these rocket attacks, plaintiffs Elihav and Yehudit Licci suffered severe financial damages.

106.    On July 19, 2006 the home of plaintiffs Rochelle Shalmani and Oz Shalmani in Carmiel in the Northern Galilee was hit by a Hizballah rocket, partly destroying it. The family could not live in the house in Carmiel due to the damage and the danger of ongoing rocket attacks, and spent several weeks crowded into a small Tel Aviv apartment with 12 other people. The Shalmanis lost significant work time due to the bombing. As result of this rocket attack Rochelle Shalmani and Oz Shalmani suffered severe financial injuries.

**Plaintiffs' Injuries Are the Result of Defendants' Conduct**

107.    Terrorist organizations such as Hizbollah need wire transfer and other banking services in order to plan, to prepare for and to carry out terrorist attacks.

108.    Provision of wire transfer or other banking services to Hizbollah enables Hizbollah to plan, to prepare for and to carry out terrorist attacks and enhances Hizbollah's ability to plan, to prepare for and to carry out such attacks.

109.    Hizbollah carried out the Hizbollah Wire Transfers in order to transfer and receive funds necessary for planning, preparing and carrying out Hizbollah's terrorist activity, including rocket attacks on civilians generally and the Hizbollah Rocket Attacks specifically.

110.    The Hizbollah Wire Transfers substantially increased and facilitated Hizbollah's ability to plan, to prepare for and to carry out rocket attacks on civilians, including the Hizbollah Rocket Attacks.

111.    The Hizbollah Wire Transfers were enabled, facilitated and proximately caused by the conduct of defendants Amex Bank and LCB described herein. The Hizbollah Wire Transfers substantially increased and facilitated Hizbollah's ability to plan, to prepare for and to carry out the Hizbollah Rocket Attacks.

112.    The Hizbollah Rocket Attacks were thereby enabled, facilitated and proximately caused by the conduct of defendants Amex Bank and LCB described herein.

113.    Plaintiffs' injuries are therefore the direct and proximate result of defendants' conduct.

### Defendant Amex Bank Knew That Its Conduct
### Would Result in Harm to the Plaintiffs

114.    At all times, defendant Amex Bank had actual knowledge (i) that Hizbollah is a violent terrorist organization which had carried out numerous terrorist attacks against Israeli and American civilians and which planned and intended to carry out additional terrorist attacks against Israeli and American civilians, (ii) that terrorist organizations such as Hizbollah require wire transfer and other banking services in order to plan, to prepare for and to carry out terrorist attacks, (iii) that providing wire transfer and/or other banking services to Hizbollah would enable Hizbollah to plan, to prepare for and to carry out terrorist attacks and/or enhance Hizbollah's ability to plan, to prepare for and to carry out such attacks, (iv) that the Hizbollah Accounts and the funds therein were owned and controlled by Hizbollah, and (v) that the Hizbollah Wire Transfers were being carried out by and at the direction of Hizbollah.

115.    Additionally and/or alternatively, at all times, defendant Amex Bank should have known and had a duty to inform itself of all the facts enumerated in the previous paragraph because they are notorious and public knowledge.

116.    Additionally and/or alternatively, at all times, defendant Amex Bank should have known and had a duty to inform itself of all the facts enumerated in paragraph 114 because defendant Amex Bank had and has statutory duties, *inter alia*

under United States law, under the laws of the State of New York and under the rules promulgated by the inter-governmental Financial Action Task Force ("FATF"), to know its customers and perform due diligence.

117.    By executing the Hizbollah Wire Transfers, defendant Amex Bank breached its statutory duties to know its customers and perform due diligence.

118.    Additionally and/or alternatively, at all times, defendant Amex Bank should have known and had a duty to inform itself of all the facts enumerated in paragraph 114 because defendant Amex Bank had and has statutory duties, *inter alia* under United States law, under the laws of the State of New York and under the rules promulgated by FATF, to monitor, report and refuse to execute suspicious and/or irregular banking transactions.

119.    The Hizbollah Wire Transfers were facially suspicious and irregular because they had no business or apparent lawful purpose, and there was no reasonable explanation for them.

120.    By executing the Hizbollah Wire Transfers, defendant Amex Bank breached its statutory duties to monitor, report and refuse to execute illegal, suspicious and/or irregular banking transactions.

121.    The New York State Banking Department conducted an investigation of defendant Amex Bank and found that during the time period in which the Hizbollah Wire Transfers took place: (i) defendant Amex Bank failed to comply with applicable federal and state laws, rules, and regulations relating to terrorism financing and anti-money laundering policies, procedures, and practices, including the Bank

Secrecy Act (31 U.S.C. § 5311 *et seq*.), the rules and regulations promulgated thereunder by the U.S. Department of the Treasury (31 C.F.R. Part 103), and those of the New York State Banking Department (3 N.Y.C.R.R. Part 300); (ii) defendant Amex Bank's international wire transfer and correspondent banking services suffered from compliance and risk management deficiencies; and (iii) defendant Amex Bank's policies, procedures and procedures, internal control environment, compliance staffing, training, customer due diligence practices and suspicious activity reporting suffered from deficiencies.

## Defendant LCB Bank Knew That Its Conduct Would Result in Harm to the Plaintiffs

122.    At all times, defendant LCB had actual knowledge (i) that Hizbollah is a violent terrorist organization which had carried out numerous terrorist attacks against Israeli and American civilians and which planned and intended to carry out additional terrorist attacks against Israeli and American civilians, (ii) that terrorist organizations such as Hizbollah require wire transfer and other banking services in order to plan, to prepare for and to carry out terrorist attacks, (iii) that providing wire transfer and/or other banking services to Hizbollah would enable Hizbollah to plan, to prepare for and to carry out terrorist attacks and/or enhance Hizbollah's ability to plan, to prepare for and to carry out such attacks, (iv) that the Hizbollah Accounts and the funds therein were owned and controlled by Hizbollah, and (v) that the Hizbollah Wire Transfers were being carried out by and at the direction of Hizbollah.

123.    Additionally and/or alternatively, at all times, defendant LCB should have known and had a duty to inform itself of all the facts enumerated in the previous paragraph because they are notorious and public knowledge.

124.    Additionally and/or alternatively, at all times, defendant LCB should have known and had a duty to inform itself of all the facts enumerated in paragraph 122 because defendant LCB had and has statutory duties, *inter alia* under United States law, under the laws of the State of New York, under Lebanese law, and under the rules promulgated by FATF and by the Middle East and North Africa Financial Action Task Force ("MENAFATF") (which Lebanon has adopted), to know its customers and perform due diligence.

125.    By executing the Hizbollah Wire Transfers, defendant LCB breached its statutory duties to know its customers and perform due diligence.

126.    Additionally and/or alternatively, at all times, defendant LCB should have known and had a duty to inform itself of all the facts enumerated in paragraph 122 because defendant LCB had and has statutory duties, *inter alia* under United States law, under the laws of the State of New York, under Lebanese law, and under the rules promulgated by FATF and MENAFATF, to monitor, report and refuse to execute illegal, suspicious and/or irregular banking transactions. The Hizbollah Wire Transfers were facially suspicious and irregular because they had no business or apparent lawful purpose, and there was no reasonable explanation for them.

127.    By executing the Hizbollah Wire Transfers, defendant LCB breached its statutory duties to monitor, report and refuse to execute suspicious and/or irregular banking transactions.

### FIRST CAUSE OF ACTION BY ALL PLAINTIFFS
### AGAINST DEFENDANT AMEX BANK
### <u>NEGLIGENCE</u>
### (Under the Law of the State of Israel)

128.    Plaintiffs repeat and reallege each of the foregoing paragraphs with the same force and effect as if more fully set forth herein.

129.    Pursuant to CPLR 4511(b) plaintiffs hereby give notice of their intention to request that the Court take judicial notice of the law of the State of Israel.

130.    Causes of action in tort in Israeli law are codified in the *Civil Wrongs Ordinance (New Version) - 1968*, (hereinafter "CWO").

131.    The CWO provides that any person injured or harmed by the civil wrongs enumerated in the CWO is entitled to relief from the person liable or responsible for the wrong.

132.    CWO § 35 creates a "civil wrong" of Negligence.

133.    CWO § 35 provides that a person is liable for the civil wrong of Negligence when he commits an act which a reasonable and prudent person would not have committed under the same circumstances; or refrains from committing an act which a reasonable and prudent person would have committed under the same circumstances; or, in the performance of his occupation, does not use the skill or exercise the degree of caution which a reasonable person qualified to act in that

occupation would have used or exercised under the same circumstances, and thereby causes damage to another person toward whom, under those circumstances he is obligated not to act as he did.

134.    CWO § 36 provides that the obligation stated in the last sentence of § 35 is toward all persons, to the extent that a reasonable person would have under the same circumstances foreseen that, in the ordinary course of events, they were liable to be injured by the act or omission.

135.    Under binding precedent of the Israeli Supreme Court, the tort of Negligence also includes intentional and/or reckless conduct.

136.    By carrying out the Hizbollah Wire Transfers defendant Amex Bank carried out acts which a reasonable and prudent person would not have committed under the same circumstances, within the meaning of the CWO.

137.    Defendant Amex Bank refrained from committing acts which a reasonable and prudent person would have committed under the same circumstances, within the meaning of the CWO, in that, *inter alia*, defendant Amex Bank failed to comply with its statutory obligations under United States law, New York law and the FATF rules to know its customers and perform due diligence, and to monitor, report and refuse to execute illegal, suspicious and/or irregular banking transactions. Indeed, as stated above, the New York State Banking Department expressly found that Bank Amex failed to comply with these obligations.

138.    Defendant Amex Bank did not, in the performance of its occupation, use the skill or exercise the degree of caution which a reasonable person

qualified to act in those occupations would have used or exercised under the same circumstances, within the meaning of the CWO, in that, *inter alia*, Amex Bank carried out the Hizbollah Wire Transfers and failed to comply with its statutory obligations to know its customers and perform due diligence, and to monitor, report and refuse to execute illegal, suspicious and/or irregular banking transactions.

139.    Defendant Amex Bank acted negligently in connection with the plaintiffs and their decedents, toward whom, in the circumstances described herein, defendant Amex Bank had an obligation not to act as it did.

140.    Defendant Amex Bank was obligated not to act as it did because a reasonable person would, under the same circumstances, have foreseen that, in the ordinary course of events, persons such as the plaintiffs and the decedents were liable to be injured by defendant's Amex Bank's acts and omissions described herein.

141.    Defendant Amex Bank's behavior constitutes Negligence under the CWO, and that negligent behavior was the proximate cause of the injuries to the plaintiffs and the deaths of the decedents, including: death; severe physical injuries; pain and suffering; loss of pecuniary support; loss of income; loss of consortium; emotional distress; loss of society and companionship and loss of solatium.

142.    Defendant Amex Bank is therefore liable for the full amount of plaintiffs' damages.

143.    Defendant Amex Bank's conduct was criminal in nature, dangerous to human life, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages.

## SECOND CAUSE OF ACTION
## BY ALL PLAINTIFFS AGAINST DEFENDANT AMEX BANK
## BREACH OF STATUTORY OBLIGATION
### (Under the Law of the State of Israel)

144.    Plaintiffs repeat and reallege each of the foregoing allegations with the same force and effect as if more fully set forth herein.

145.    Pursuant to CPLR 4511(b) plaintiffs hereby give notice of their intention to request that the Court take judicial notice of the law of the State of Israel.

146.    CWO § 63 creates a civil wrong of Breach of Statutory Obligation defined as the failure to comply with an obligation imposed under any legal statute, if the legal statute is intended for the benefit or protection of another person, and if the breach of the statute caused that person damage of the kind or nature of damage intended to be prevent by the statute.

147.    CWO § 63(b) provides that for the purpose of CWO § 63, a statute is deemed to have been enacted for the benefit or protection of a specific person, if it is intended for the benefit or protection of that person, or for the benefit or protection of persons in general, or of persons of a category or definition to which that specific person belongs.

148.    Defendant Amex Bank breached and failed to comply with obligations imposed upon it by numerous statutes, which were intended for the benefit and protection of persons in general, and for the benefit and protection of persons of the type, category and definition to which plaintiffs and the decedents belong, within the meaning of the CWO.

149. The statutory obligations breached by defendant Amex Bank include, without limitation, the provisions of the following enactments:

a. The Bank Secrecy Act (31 U.S.C. § 5311 *et seq.*);

b. 31 C.F.R. Part 103;

c. 3 N.Y.C.R.R. Part 300;

d. 18 U.S.C. §§ 2331–2339 (criminal prohibitions on provision of material support and resources, including banking services, to terrorist organizations); and

e. New York Penal Law §§ 470.21, 470.22, 470.23 and 470.24 (criminal prohibitions on financial transactions in support of terrorism).

150. All of the statutory enactments listed above are intended for the benefit and protection of persons in general, for the specific benefit and protection of innocent civilians such as the plaintiffs and decedents and for the specific benefit and protection of American citizens such as some of the plaintiffs, in that all of the statutory enactments listed above are intended to protect all such persons from terrorist attacks and from all the damages which terrorist attacks are liable to inflict.

151. In written findings signed and confirmed by defendant Amex Bank itself, the New York State Banking Department expressly found that Bank Amex breached some or all of the statutory obligations enumerated above.

152. Defendant Amex Bank's breach of its statutory obligations was the proximate cause of the harm to the plaintiffs and the deaths of the decedents described

herein, and caused plaintiffs damage of the kind and nature intended to be prevented by the statutory enactments which were breached by Amex Bank, including: death; severe physical injuries, pain and suffering; loss of pecuniary support; loss of income; loss of consortium; emotional distress; loss of society and companionship and loss of solatium.

153.    Defendant Amex Bank committed the civil wrong of Breach of Statutory Obligation under CWO § 63, and is therefore liable for the full amount of plaintiffs' damages.

154.    Defendant Amex Bank's conduct was criminal in nature, dangerous to human life, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages.

## THIRD CAUSE OF ACTION BY ALL PLAINTIFFS
## AGAINST DEFENDANT AMEX BANK
## <u>VICARIOUS LIABILITY</u>
### (Under the Law of the State of Israel)

155.    Plaintiffs repeat and reallege each of the foregoing allegations with the same force and effect as if more fully set forth herein.

156.    Pursuant to CPLR 4511(b) plaintiffs hereby give notice of their intention to request that the Court take judicial notice of the law of the State of Israel.

157.    Defendant Amex Bank provided Hizbollah with banking services which enabled, facilitated, supported and assisted Hizbollah to carry out the acts of terrorism which harmed the plaintiffs.

158.    Vicarious liability principles are recognized in Israeli law in § 12 of the CWO, which provides that a person who participates in, assists, advises or solicits an act or omission, committed or about to be committed by another person, or who orders, authorizes, or ratifies such an act or omission, is liable for such act or omission.

159.    Defendant Amex Bank assisted Hizbollah to carry out the Hizbollah Rocket Attacks and is therefore liable for the full amount of plaintiffs' damages under CWO § 12.

160.    Defendant Amex Bank's conduct was criminal in nature, dangerous to human life, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages.

**FOURTH CAUSE OF ACTION BY ALL PLAINTIFFS
EXCEPT FOR PLAINTIFFS SARAH YEFET, SHOSHANA SAPPIR,
ROCHELLE SHALMONI AND OZ SHALMONI
AGAINST DEFENDANT LCB
<u>NEGLIGENCE</u>
(Under the Law of the State of Israel)**

161.    Plaintiffs repeat and reallege each of the foregoing allegations with the same force and effect as if more fully set forth herein.

162.    Pursuant to CPLR 4511(b) plaintiffs hereby give notice of their intention to request that the Court take judicial notice of the law of the State of Israel.

163.    By carrying out the Hizbollah Wire Transfers defendant LCB carried out acts which a reasonable and prudent person would not have committed under the same circumstances, within the meaning of the CWO.

164.    Defendant LCB refrained from committing acts which a reasonable and prudent person would have committed under the same circumstances, within the meaning of the CWO, in that, *inter alia*, defendant LCB failed to comply with its statutory obligations under United States law, New York law, Lebanese law and the FATF and MENAFATF rules to know its customers and perform due diligence, and to monitor, report and refuse to execute illegal, suspicious and/or irregular banking transactions.

165.    Defendant LCB did not, in the performance of its occupation, use the skill or exercise the degree of caution which a reasonable person qualified to act in those occupations would have used or exercised under the same circumstances, within the meaning of the CWO, in that, *inter alia*, LCB carried out the Hizbollah Wire Transfers and failed to comply with its statutory obligations to know its customers and perform due diligence, and to monitor, report and refuse to execute illegal, suspicious and/or irregular banking transactions.

166.    Defendant LCB acted negligently in connection with the plaintiffs and their decedents, toward whom, in the circumstances described herein, defendant LCB had an obligation not to act as it did. Defendant LCB was obligated not to act as it did because a reasonable person would, under the same circumstances, have foreseen that, in the ordinary course of events, persons such as the plaintiffs and the decedents were liable to be injured by defendant's LCB's acts and omissions described herein.

167.    Defendant LCB's behavior constitutes Negligence under the CWO, and that negligent behavior was the proximate cause of the injuries to the plaintiffs and

the deaths of the decedents, including: death; severe physical injuries, pain and suffering; loss of pecuniary support; loss of income; loss of consortium; emotional distress; loss of society and companionship and loss of solatium.

168.    Defendant LCB is therefore liable for the full amount of plaintiffs' damages.

169.    Defendant LCB's conduct was criminal in nature, dangerous to human life, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages.

## FIFTH CAUSE OF ACTION BY ALL PLAINTIFFS
## EXCEPT FOR PLAINTIFFS SARAH YEFET, SHOSHANA SAPPIR, ROCHELLE SHALMONI AND OZ SHALMONI AGAINST DEFENDANT LCB
## VICARIOUS LIABILITY
### (Under the Law of the State of Israel)

170.    Plaintiffs repeat and reallege each of the foregoing allegations with the same force and effect as if more fully set forth herein.

171.    Pursuant to CPLR 4511(b) plaintiffs hereby give notice of their intention to request that the Court take judicial notice of the law of the State of Israel.

172.    Defendant LCB provided Hizbollah with banking services which enabled, facilitated, supported and assisted Hizbollah to carry out the acts of terrorism which harmed the plaintiffs.

173.    Defendant LCB is therefore liable under § 12 of the CWO for the full amount of plaintiffs' damages.

174.    Defendant LCB's conduct was criminal in nature, dangerous to human life, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages.

**WHEREFORE**, plaintiffs demand judgment against the defendants as follows:

(a)    Enter judgment against defendants Amex Bank and LCB, jointly and severally, for compensatory damages in an amount to be determined at trial but no less than $650 million;

(b)    Enter judgment against defendants Amex Bank and LCB, jointly and severally, for punitive damages in an amount to be determined at trial;

(c)    Grant such other and further relief as justice requires.

(continued next page)

Dated:   New York, New York
         July 11, 2008

                         Yours,

                         JAROSLAWICZ & JAROS, LLC
                         *Attorneys for the Plaintiffs*

                         By:  _____

                              Robert J. Tolchin

                         225 Broadway, 24th floor
                         New York, New York 10007
                         (212) 227-2780

                         NITSANA DARSHAN-LEITNER & CO.
                         Nitsana Darshan-Leitner, Adv.
                         *Israeli Counsel for Plaintiffs*
                         10 Hata'as Street
                         Ramat Gan, 52512
                         Israel

Exhibit 2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| YAAKOV LICCI, a minor, by his father and natural guardian ELIHAV LICCI and by his mother and natural guardian YEHUDIT LICCI, et al., | Index No.  109548/08 |
| Plaintiffs, | **STIPULATION** |
| - against - | |
| AMERICAN EXPRESS BANK LTD., et al., | |
| Defendants. | |

IT IS HEREBY STIPULATED AND AGREED, by and between the undersigned

counsel for the parties, that the time for defendant American Express Bank Ltd. to answer, move

against or otherwise respond to plaintiffs' Complaint, dated July 11, 2008, is extended to and

including October 23, 2008.

Dated:   New York, New York
         August 1, 2008

JAROSLAWICZ & JAROS, LLC                    MORRISON & FOERSTER LLP


By: _____                 By: _____
     Robert J. Tolchin                            Mark P. Ladner


225 Broadway, 24th floor                     1290 Avenue of the Americas
New York, New York 10007                     New York, New York 10104
Telephone:  (212) 227-2780                   Telephone:  (212) 468-8000

Attorneys for Plaintiffs                     Attorneys for Defendant
                                             American Express Bank Ltd.