UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X

YAAKOV LICCI, a minor, by his father and natural
guardian ELIHAV LICCI and by his mother and
natural guardian YEHUDIT LICCI;

ELIHAV LICCI, individually;

YEHUDIT LICCI, individually;

TZVI HIRSH;

ARKADY GRAIPEL;

TATIANA KREMER;

YOSEF ZARONA;

TAL SHANI;

SHLOMO COHEN;

NITZAN GOLDENBERG;

RINA DAHAN;

RAPHAEL WEISS;

AGAT KLEIN;

TATIANA KOVLEYOV;

VALENTINA DEMESH;

RIVKA EPON;

JOSEPH MARIA;

Civ. No. 08-07253-GBD

**FIRST AMENDED
COMPLAINT**



IMMANUEL PENKER;

ESTHER PINTO;

AVISHAI REUVANE;

ELISHEVA ARON;

CHAYIM KUMER;

NECHAMA KUMER;

SARAH YEFET;

SHOSHANA SAPPIR;

RAHMI GUHAD GHANAM, a minor, by his father
and natural guardian FUAD SHCHIV GHANAM and
by his mother and natural guardian SUHA SHCHIV
GHANAM;

FUAD SHCHIV GHANAM, individually;

SUHA SHCHIV GHANAM, individually;

MA'AYAN ARDSTEIN, a minor, by her father and
natural guardian, BRIAN ARDSTEIN, and by her
mother and natural guardian, KEREN ARDSTEIN;

NOA ARDSTEIN, a minor, by her father and natural
guardian, BRIAN ARDSTEIN, and by her mother and
natural guardian, KEREN ARDSTEIN;

NETIYA YESHUA ARDSTEIN, a minor, by his father
and natural guardian, BRIAN ARDSTEIN, and by his
mother and natural guardian, KEREN ARDSTEIN

ARIEL CHAIM ARDSTEIN, a minor, by his father and
natural guardian, BRIAN ARDSTEIN, and by his
mother and natural guardian, KEREN ARDSTEIN

BRIAN ARDSTEIN, individually;

KEREN ARDSTEIN, individually;

MARGALIT RAPPEPORT, a minor, by her mother
and natural guardian, LAURIE RAPPEPORT;

LAURIE RAPPEPPORT, individually;

YAIR MOR,

ORNA MOR;

MICHAEL FUCHS;

MUSHKA KAPLAN, a minor, by her father and
natural guardian CHAIM KAPLAN, and by her
mother and natural guardian RIVKA KAPLAN;

ARYE LEIB KAPLAN, a minor, by his father and
natural guardian CHAIM KAPLAN, and by his
mother and natural guardian RIVKA KAPLAN;

MENACHEM KAPLAN, a minor, by his father and
natural guardian CHAIM KAPLAN, and by his
mother and natural guardian RIVKA KAPLAN;

CHANA KAPLAN, a minor, by her father and natural
guardian CHAIM KAPLAN, and by her mother and
natural guardian RIVKA KAPLAN;

EFRAIM LEIB KAPLAN, a minor, by his father and
natural guardian CHAIM KAPLAN, and by his

mother and natural guardian RIVKA KAPLAN;

CHAIM KAPLAN, individually;

RIVKA KAPLAN, individually;

ROCHELLE SHALMONI;

OZ SHALMONI;

DAVID OCHAYON;

YAAKOV MAIMON;

MIMI BITON;

MIRIAM JUMA'A, as Personal Representative of the
Estate of FADYA JUMA'A;

MIRIAM JUMA'A, individually;

SALAH JUMA'A, SAID JUMA'A, and ABD EL-
RAHMAN JUMA'A, as Personal Representatives of
the Estate of SAMIRA JUMA'A;

SALAH JUMA'A, individually;

SAID JUMA'A, individually;

ABD EL-RAHMAN JUMA'A, individually;

RAHMA ABU-SHAHIN,

ABDEL GAHNI ABDEL GAHNI, as Personal
Representative of the Estate of SOLTANA JUMA'A,

ABDEL GAHNI ABDEL GAHNI, individually;

SHADI SALMAN AZZAM, as the Personal

Representative of the Estate of MANAL CAMAL
AZAM;

KANAR SHA'ADI AZZAM, a minor, by his father
and natural guardian, SHADI SALMAN AZZAM;

ADEN SHA'ADI AZZAM, a minor, by his father and
natural guardian, SHADI SALMAN AZZAM;

SHADI SALMAN AZZAM, individually;

ADINA MACHASAN DAGESH,

ARKADY SPEKTOR,

YORI ZOVREV;

THEODORE (TED) GREENBERG;

MAURINE GREENBERG;

JACOB KATZMACHER;

DEBORAH CHANA KATZMACHER;

CHAYA KATZMACHER;

MIKIMI STEINBERG;

JARED SAUTER;

DANIELLE SAUTER;

MYRA MANDEL;

YAAKOV ABUTBUL;

ABRAHAM NATHAN MOR, a minor, by his father
and natural guardian, ZION MOR, and by his mother

and natural guardian, REVITAL MOR;

BAT ZION MOR, a minor, by her father and natural
guardian, ZION MOR, and by her mother and natural
guardian, REVITAL MOR;

MICHAL MOR, a minor, by her father and natural
guardian, ZION MOR, and by her mother and natural
guardian, REVITAL MOR;

ODED CHANA MOR, a minor, by her father and
natural guardian, ZION MOR, and by her mother and
natural guardian, REVITAL MOR;

ZION MOR, individually;

REVITAL MOR, individually;

ADHAM MAHANE TARRABASHI;

EMILLIA SALMAN ASLAN;

JIHAN KAMUD ASLAN;

ZOHARA LOUIE SA'AD;

IYAH ZAID GANAM, a minor, by his father and
natural guardian ZIAD SHCHIV GHANAM, and by
his mother and natural guardian, GOUROV TISIR
GHANAM;

ZIAD SHCHIV GHANAM, individually; and

GOUROV TISIR GHANAM, individually,

                    Plaintiffs,


            -against-

AMERICAN EXPRESS BANK LTD.; and

LEBANESE CANADIAN BANK, SAL

                     Defendants.

------------------------------------------------------------------- X

        Plaintiffs, complaining of the Defendants, by their attorneys, Jaroslawicz & Jaros, LLC, allege for their First Amended Complaint as follows:

## <u>NATURE OF THIS ACTION</u>

        1.     This is a civil action for a money judgment under the Antiterrorism Act, 18 U.S.C. § 2331 *et seq.*, the Alien Tort Claims Act, 28 U.S.C. § 1350 and causes of action in tort under Israeli law, arising from a series of terrorist rocket attacks on civilians in Israel carried out by the Hizbollah terrorist organization during July and August 2006.

        2.     The plaintiffs are American, Israeli and Canadian civilians who were injured in the terrorist rocket attacks, and the family members and Personal Representatives of the estates of four Israeli civilians who were killed by the terrorist rocket attacks.

        3.     Defendants American Express Bank Ltd. and Lebanese Canadian Bank SAL intentionally and/or negligently provided extensive banking services to Hizbollah, which caused, enabled and facilitated the terrorist rocket attacks in which the plaintiffs and their decedents were harmed and killed.

## THE PARTIES

4.      Plaintiffs Avishai Reuvane, Elisheva Aron, Chayim Kumer, Nechama Kumer Brian Ardstein, Keren Ardstein, Ma'ayan Ardstein, Noa Ardstein, Netiya Yeshua Ardstein, Ariel Chaim Ardstein, Laurie Rappeport, Margalit Rappeport, Yair Mor, Michael Fuchs, Chaim Kaplan, Rivka Kaplan, Mushka Kaplan, Arye Leib Kaplan, Menachem Kaplan, Chana Kaplan, Efraim Kaplan, Theodore (Ted) Greenberg, Maurine Greenberg, Jacob Katzmacher, Deborah Chana Katzmacher, Chaya Katzmacher, Mikimi Steinberg, Jared Sauter, Danielle Sauter and Myra Mandel (sometimes collectively referred to hereinafter as: the "American Plaintiffs") are American citizens who were injured by rocket attacks carried out by the Hizbollah terrorist organization between July 12 and August 14, 2006. The details of the attacks and the nature of these plaintiffs' injuries are set forth below.

5.      Plaintiffs Brian Ardstein, Keren Ardstein, Chaim Kaplan, Rivka Kaplan and Laurie Rappeport bring this action individually and on behalf of their respective minor children (as set forth in the caption and below) plaintiffs Ma'ayan Ardstein, Noa Ardstein, Netiya Yeshua Ardstein, Ariel Chaim Ardstein, Margalit Rappeport, Mushka Kaplan, Arye Leib Kaplan, Menachem Kaplan, Chana Kaplan and Efraim Kaplan.

6.      Plaintiffs Sarah Yefet, Shoshana Sappir, Oz Shalmoni and Rochelle Shalmoni are Canadian citizens (sometimes collectively referred to hereinafter as: the "Canadian Plaintiffs") who were injured by the aforementioned Hizbollah rocket

attacks. The details of the attacks and the nature of these plaintiffs' injuries are set forth below.

7.      Plaintiffs Elihav Licci, Yehudit Licci, Yaakov Licci, Tzvi Hirsh, Arkady Graipel, Tatiana Kremer, Yosef Zarona, Tal Shani, Shlomo Cohen, Nitzan Goldenberg, Rina Dahan, Raphael Weiss, Agat Klein, Tatiana Kovleyov, Valentina Demesh, Rivka Epon, Joseph Maria, Immanuel Penker, Esther Pinto, Fuad Shchiv Ghanam, Suha Shchiv Ghanam, Rahmi Guhad Ghanam, Orna Mor, David Ochayon, Yaakov Maimon, Mimi Biton, Miriam Juma'a, Salah Juma'a, Said Juma'a, Abd El-Rahman Juma'a, Rahma Abu-Shahin, Abdel Gahni Abdel Gahni, Shadi Salman Azzam, Kanar Sha'adi Azzam, Aden Sha'adi Azzam, Kanar Sha'adi Azzam, Adina Machasan Dagesh, Arkady Spektor, Yori Zovrev, Yaakov Abutbul, Zion Mor, Revital Mor Abraham Nathan Mor, Bat Zion Mor, Michal Mor and Oded Chana Mor, Adham Mahane Tarrabashi, Emillia Salman Aslan, Jihan Kamud Aslan, Zohara Louie Sa'ad, Ziad Shchiv Ghanam, Iyah Zaid Ghanam and Gourov Tisir Ghanam are Israeli citizens (sometimes collectively referred to hereinafter as: the "Israeli Plaintiffs") who were injured by the aforementioned Hizbollah rocket attacks. The details of the attacks and the nature of these plaintiffs' injuries are set forth below.

8.      Plaintiffs Elihav Licci, Yehudit Licci, Fuad Shchiv Ghanam, Suha Shchiv Ghanam, Shadi Salman Azzam, Ziad Shchiv Ghanam, Gourov Tisir Ghanam, Zion and Revital Mor bring this action individually and on behalf of their respective minor children (as set forth in the caption and below) plaintiffs Yaakov Licci,

Rahmi Guhad Ghanam, Kanar Sha'adi Azzam, Aden Sha'adi Azzam, Abraham Nathan Mor, Bat Zion Mor, Michal Mor, Oded Chana Mor and Iyah Zaid Ghanam.

9.      Plaintiff Abdel Gahni Abdel Gahni is the heir of Soltana Juma'a and is authorized under Israeli law to bring this action on behalf of the Estate of Soltana Juma'a, and he brings this action both individually and on behalf of the Estate of Soltana Juma'a.

10.     Plaintiff Miriam Juma'a, is the heir of Fadya Juma'a and is authorized under Israeli law to bring this action on behalf of the Estate of Fadya Juma'a, and she brings this action both individually and on behalf of the Estate of Fadya Juma'a.

11.     Plaintiffs Salah Juma'a, Said Juma'a and Abd El-Rahman Juma'a are the heirs of Samira Juma'a and are authorized under Israeli law to bring this action on behalf of the Estate of Samira Juma'a, and they bring this action both individually and on behalf of the Estate of Samira Juma'a.

12.     Plaintiff Shadi Salman Azzam is the heir of Manal Camal Azzam and is authorized under Israeli law to bring this action on behalf of the Estate of Manal Camal Azzam, and brings this action both individually and on behalf of the Estate of Manal Camal Azzam.

13.     Defendant American Express Bank Ltd. ("Amex Bank") is a banking corporation organized under the laws of Connecticut and headquartered in New York.

14.     Defendant Amex Bank does extensive business and holds significant assets in New York.

15.     Defendant Amex Bank is supervised by the New York State Banking Department.

16.     Defendant Amex Bank intentionally and/or negligently provided extensive banking services to Hizbollah, which caused, enabled and facilitated the terrorist rocket attacks in which the plaintiffs and their decedents were harmed and killed.

17.     Defendant Lebanese Canadian Bank SAL ("LCB") is a banking corporation organized under the laws of Lebanon and headquartered in Beirut, Lebanon.

18.     Defendant LCB intentionally and/or negligently provided extensive banking services to Hizbollah, which caused, enabled and facilitated the terrorist rocket attacks in which the plaintiffs and their decedents were harmed and killed. The banking services which harmed the plaintiffs and their decedents were carried out by LCB in and through the State of New York.


## STATEMENT OF FACTS

### Hizbollah

19.     Hizbollah was established in Lebanon circa 1982.

20.     At all times relevant hereto Hizbollah is and was a radical Islamic terrorist organization which views the State of Israel, the United States and other Western countries as its enemies.

21.    At all times relevant hereto Hizbollah sought, as an official and publicly-stated policy and goal of Hizbollah, to destroy the State of Israel and murder or expel its Jewish residents.

22.    At all times relevant hereto Hizbollah sought, as an official and publicly-stated policy and goal of Hizbollah, to ethnically cleanse the territory of the State of Israel of its Jewish population.

23.    Since its founding and until July 12, 2006 (and until the present day), Hizbollah has sought to achieve its goal of destroying the State of Israel and murdering or expelling its Jewish residents through the use of terrorist attacks on Jewish civilians in Israel and elsewhere.

24.    Since its founding and until July 12, 2006 (and until the present day), Hizbollah carried out hundreds of terrorist attacks against Jewish civilians in Israel and elsewhere, which have killed hundreds of innocent civilians and wounded hundreds more.

25.    Since its founding and until July 12, 2006 (and until the present day), Hizbollah has used terrorism against Jewish civilians in Israel and elsewhere in order to coerce, intimidate and influence the Israeli government and public, and thereby ultimately bring about the destruction of the State of Israel and the murder or expulsion of the Jews in Israel.

26.    Since its founding and until July 12, 2006 (and until the present day), Hizbollah has also carried out hundreds of terrorist attacks against American targets which have killed hundreds of U.S. citizens and wounded hundreds more.

27.     Between 1982 and July 12, 2006, Hizbollah's policy and practice of carrying out terrorist attacks against Jewish civilians in Israel and elsewhere, and against United States targets, was notorious and well known to defendants Amex Bank and LCB and to the public at large.

28.     Hizbollah's policy and practice of carrying out terrorist attacks against Jewish civilians in Israel and elsewhere and against United States targets was notorious and well known to defendants Amex Bank and LCB and to the public at large between 1982 and July 12, 2006, because during this period Hizbollah openly, publicly and repeatedly acknowledged having such a policy and carrying out such attacks. Hizbollah made these acknowledgments on its official websites, in its official press releases, on its official television station, Al-Manar, on its official radio station, Al-Nour, and in numerous press conferences and news media interviews conducted by senior Hizbollah officials.

29.     During the period relevant hereto, including the period between 2004 and July 12, 2006, defendant Amex Bank maintained an office in Beirut, Lebanon, staffed by Arabic-speaking officers and employees of defendant Amex Bank, and Amex Bank therefore had and/or should be deemed to have had the same knowledge of and access to Arabic-language websites, press releases, television and radio broadcasts, press conferences and news media reports as any other person in Lebanon.

30.     Additionally, Hizbollah's policy and practice of carrying out terrorist attacks against Jewish civilians in Israel and elsewhere and against United States targets was notorious and well known to defendants Amex Bank and LCB and to

the public at large between 1982 and July 12, 2006, because since its founding, Hizbollah has committed multiple such acts of terrorism, including but not limited to the following:

a) The July 19, 1982, kidnapping of American University president David S. Dodge in Beirut.

b) The April 18, 1983, car bomb attack on the United States Embassy in Beirut in which 63 people were killed.

c) The October 23, 1983, truck bomb attack on the U.S. Marine barracks in Beirut in which 241 American military personnel were killed.

d) The September 20, 1984, car bomb attack on the U.S. Embassy annex in Beirut in which two Americans and 22 others were killed.

e) The March 16, 1984, kidnapping and murder of William Buckley, a CIA operative working at the U.S. Embassy in Beirut.

f) The April 12, 1984, attack on a restaurant near the U.S. Air Force Base in Torrejon, Spain in which eighteen U.S. servicemen were killed and 83 people injured.

g) The December 4, 1984, terrorist hijacking of a Kuwait Airlines plane in which four passengers were murdered, including two Americans.

h) The June 14, 1985, hijacking of TWA Flight 847 in which Robert Stethem, a U.S. Navy diver, was murdered. Other American

passengers were held hostage before being released on June 30, 1985.

i)      The February 17, 1988, kidnapping and subsequent murder of U.S. Marine Col. William Higgins.

j)      The March 17, 1992, bombing of the Israeli Embassy in Buenos Aires that killed 29 people and injured over 200.

k)      The July 18, 1994, bombing of the Jewish community center in Buenos Aires that killed 86 people and injured over 200.

l)      The November 28, 1995, bombardment of towns in northern Israel with missiles aimed at Jewish civilians.

m)      The March 30, 1996, bombardment of northern Israeli towns with 28 missiles. A week later, Hizbollah fired 16 additional missiles, injuring 36 Israelis.

n)      The August 19, 1997, bombardment of northern Israel with dozens of missiles aimed at Jewish civilians.

o)      The December 28, 1998, bombardment on northern Israel with dozens of missiles aimed at Jewish civilians.

p)      The May 17, 1999 bombardment on northern Israel with dozens of missiles aimed at Jewish civilians.

q)      The June 24, 1999, bombardment on northern Israel, killing 2 people.

r)      The April 9, 2002, launching of missiles into northern Israeli towns.

s)     The August 10, 2003, firing of shells that killed a 16-year-old Israeli boy and wound other Israelis.

31.     Additionally, Hizbollah's policy and practice of carrying out terrorist attacks was notorious and well known to defendants Amex Bank and LCB and to the public at large between 1982 and July 12, 2006, because between 1998 and July 12, 2006, the courts of the United States published numerous decisions finding that Hizbollah was responsible for carrying out such terrorist attacks.

32.     Additionally, Hizbollah's policy and practice of carrying out terrorist attacks against Jewish civilians in Israel and elsewhere and against United States targets was notorious and well known to defendants Amex Bank and LCB and to the public at large between 1982 and July 12, 2006, because Hizbollah has been designated by the United States Government as a Specially Designated Terrorist ("SDT") continuously since 1995, as a Foreign Terrorist Organization ("FTO") continuously since 1997, and as a Specially Designated Global Terrorist ("SDGT") continuously since 2001.

## Defendants' Provision of Wire Transfer Services to Hizbollah

33.     Hizbollah is subject to strict economic sanctions programs imposed by the United States as the result of its designation as an SDT, FTO and SDGT (collectively hereinafter: "U.S. Sanctions Regime").

34.     The U.S. Sanctions Regime is intended to prevent Hizbollah from conducting banking activities, and thereby limit its ability to carry out terrorist attacks.

35.    The U.S. Sanctions Regime is effective when it is observed and enforced.

36.    Hizbollah is unable to conduct banking activities via banks and other financial institutions which observe and enforce the U.S. Sanctions Regime.

37.    If all banks and financial institutions worldwide observed and enforced the U.S. Sanctions Regime, the ability of Hizbollah to conduct banking activities would be severely restricted, and Hizbollah's ability to plan, to prepare and to carry out terrorist attacks would be significantly reduced.

38.    Nearly all banks and financial institutions around the world observe and enforce the U.S. Sanctions Regime.

39.    Hizbollah is therefore forced to conduct its banking activities using those very few banks and financial institutions which do not observe and enforce the U.S. Sanctions Regime.

40.    Defendants Amex Bank and LCB do not observe or enforce the U.S. Sanctions Regime.

41.    Defendant LCB conducts much of its business in U.S. dollars.

42.    In order to execute U.S. dollar transactions, defendant LCB requires a correspondent bank in the United States through which to carry out those dollar transactions.

43.    Accordingly, LCB sought and entered into a business relationship with defendant Amex Bank, pursuant to which Amex Bank serves as a correspondent bank for LCB and carries out LCB's U.S. dollar transactions.

44.     Amex Bank served as a correspondent bank for LCB between 2004 (or earlier) and until July 12, 2006 (and later).

45.     Between 2004 (or earlier) and until July 12, 2006 (and later), Hizbollah continuously maintained bank accounts at various LCB branches in Lebanon which are and were titled to the Shahid (Martyrs) Foundation (a/k/a Shahid (Martyrs) Organization) (hereinafter "Shahid").[1]

46.     Shahid is an integral part of Hizbollah and constitutes part of Hizbollah's financial arm.

47.     All of the accounts described in paragraph 45 are collectively referred to hereinafter as "Hizbollah Accounts."

48.      One of the Hizbollah Accounts was and is account number 108987.

49.     At all times, all of the Hizbollah Accounts belonged to Hizbollah and were under the control of Hizbollah.

50.     At all times, all of the funds held in the Hizbollah Accounts belonged to Hizbollah and were under the control of Hizbollah.

51.      At all times, all transactions carried out in all the Hizbollah Accounts were carried by Hizbollah and at the direction of Hizbollah.

52.     Beginning in 2004, defendants Amex Bank and LCB began to provide extensive wire transfer services to Hizbollah.

---

[1]     The name "Shahid," which is Arabic for "martyr," is sometimes spelled "Shaheed."

53.    Specifically, between 2004 and July 12, 2006 (and subsequently), Hizbollah made and received dozens of dollar wire transfers via defendants Amex Bank and LCB, totaling several million dollars (hereinafter: "Hizbollah Wire Transfers").

54.    All the Hizbollah Wire Transfers were made to, from and/or between the Hizbollah Accounts, via Amex Bank in New York.

55.    Amex Bank served as LCB's correspondent bank for the Hizbollah Wire Transfers and carried out the Hizbollah Wire Transfers on behalf of and in concert with LCB and Hizbollah.

56.    Thus, all the Hizbollah Wire Transfers were carried out in and through the State of New York, by both Amex Bank and LCB.

## The Hizbollah Rocket Attacks

57.    Between July 12, 2006 and August 14, 2006, Hizbollah fired thousands of rockets at civilians in northern Israel (collectively hereinafter: "Hizbollah Rocket Attacks").

58.    The plaintiffs were injured and their decedents were killed by the Hizbollah Rocket Attacks, as detailed below.

59.    On July 13, 2006 at approximately 7:30 am, a rocket launched by Hizbollah directly struck plaintiff David Ochayon's apartment building in the Israeli city of Nahariyah. Ochayon was in his home at the time of the powerful explosion and was struck with shrapnel and debris. In addition, he was badly traumatized from the blast and is still being treated for emotional disorders. As a result of this rocket attack

David Ochayon suffered severe physical, psychological, emotional and financial injuries.

60.     On July 13, 2006 at approximately 2:00 p.m. a rocket launched by Hizbollah directly hit the business owned by plaintiff Yaakov Maimon in the Israeli town of Safed in the Galilee and collapsed the building on him. The force of the blast seriously physically injured and traumatized Yaakov Maimon. His business was badly damaged as well. As a result of this rocket attack Yaakov Maimon suffered severe physical, psychological, emotional and financial injuries.

61.     On July 12, 2006 at approximately 2:30 p.m. a rocket launched by Hizbollah struck the workplace of plaintiff Mimi Biton in Safed and collapsed the building on her. Biton was struck by shrapnel from the explosion and was badly traumatized by the blast and she experiences long-term psychological disorders. As a result of this rocket attack Mimi Biton suffered severe physical, psychological, emotional and financial injuries

62.     On July 29, 2006 a rocket launched by Hizbollah landed next to plaintiff Tzvi Hirsh as he was making his way to a bomb shelter near his home in the Israeli town of Kiryat Motzkin near Haifa. Hirsh was hit with shrapnel from the explosion and was badly injured. In addition, he experienced severe trauma. The injuries Hirsh sustained caused him to be permanently confined to a wheelchair. As a result of this rocket attack Tzvi Hirsh suffered severe physical, psychological, emotional and financial injuries.

63.    On July 26, 2006 at approximately 9:30 am a rocket launched by Hizbollah landed next to plaintiff Arkady Graipel as he traveled to work in the Israeli town of Kiryat Yam near Haifa. Arkadi was struck by shrapnel from the explosion. In addition he was badly traumatized from the blast. As a result of this rocket attack Arkady Graipel suffered severe physical, psychological, emotional and financial injuries.

64.    On July 13, 2006 at approximately 3:45 p.m. a rocket launched by Hizbollah landed outside the home of plaintiff Tatiana Kremer in Safed. Kremer was struck by shrapnel from the explosion. In addition, she was badly traumatized from the blast and is still being treated for psychological disorders. As a result of this rocket attack Taitana Kremer suffered severe physical, psychological, emotional and financial injuries.

65.    On August 3, 2006 a rocket launched by Hizbollah slammed into the work place of plaintiff Yosef Zarona in the Israeli city of Acre, north of Haifa. Zarona was struck by shrapnel from the explosion which left him unable to walk without painful effort. In addition, he was badly traumatized from the blast and is still being treated with medication. He has had to stop working on account of his numerous injuries. As a result of this rocket attack Yosef Zarona suffered severe physical, psychological, emotional and financial injuries.

66.    On July 28, 2006 a rocket launched by Hizbollah struck the home of plaintiff Tal Shani in Kibbutz Amir in Israel's Hula Valley. Shani was struck with shrapnel and debris from the powerful blast and suffered severe head wounds. In

addition, she was badly traumatized from the blast and she sustained long term psychological disorders. As a result of this rocket attack Tal Shani suffered severe physical, psychological, emotional and financial injuries.

67.   On August 13, 2006 a rocket launched by Hizbollah directly struck the home of Shlomo Cohen in Haifa as well as his car. The powerful blast severely injured his ears and badly traumatized him. Medical experts are unable to provide treatment for his hearing difficulties. As a result of this rocket attack Shlomo Cohen suffered severe physical, psychological, emotional and financial injuries.

68.   On August 11, 2006 a rocket launched by Hizbollah directly struck the home of a business associate of Nitzan Goldenberg in Kiryat Bialik, near Haifa, while Goldenberg was visiting. Goldenberg was injured by shrapnel and permanently handicapped. One of his hands is paralyzed and does not function. Goldenberg had trained as a chef and was preparing to open his own restaurant at the time of the rocket attack. Because of the serious damage to his hand he is today unable to work in his chosen profession as a chef. As a result of this rocket attack Nitzan Goldenberg suffered severe physical, psychological, emotional and financial injuries.

69.   On August 4, 2006 a rocket launched by Hizbollah struck the house of plaintiff Shadi Salman Azzam, 33, in M'rar village in the Upper Galilee. Shrapnel from the rocket flew into his house and killed his wife, Manal Camal Azzam, who was 28 at the time of her death, and severely wounded the couple's minor children, plaintiff Kanar Sha'adi Azzam and Aden Sha'adi Azzam. The murder of Manal Camal Azzam

caused decedent and her estate severe harm, including conscious pain and suffering and pecuniary loss.

70.     Plaintiff Shadi Salman Azzam saw his wife torn to pieces and his children maimed by the rocket blast, and as a result he has suffered severe psychological harm and has been forced to seek professional mental health care. Before his wife's death Plaintiff Shadi Salman Azzam worked as a builder and made a good salary on which he was able to support his family, but after the attack he stopped working for 4 months and to this day is unable to work the same hours he used to – a fact that has hurt his family's income. In addition, plaintiff Shadi Salman Azzam is now responsible for assuming the duties that his wife previously fulfilled as a mother. As a result of this rocket attack decedent Manal Camal Azzam was murdered and plaintiff Shadi Salman Azzam suffered severe psychological, emotional and financial injuries.

71.     Plaintiff Kanar Sha'adi Azzam, minor, is the eight year-old daughter of plaintiff Shadi Salman Azzam and decedent Manal Camal Azzam. Plaintiff Kanar Sha'adi Azzam suffered severe physical injuries in the same rocket attack that killed her mother. As a result of her own injuries and watching the gruesome death of her mother in their family home, and seeing the maiming of her brother, she suffers from severe psychological and emotional trauma and is undergoing continuous psychological treatment. As a result of this rocket attack plaintiff Kanar Sha'adi Azzam suffered severe physical, psychological and emotional injuries.

72.     Plaintiff Aden Sha'adi Azzam, minor, is the four year-old son of plaintiff Shadi Salman Azzam and decedent Manal Camal Azzam. Plaintiff Aden

Sha'adi Azzam suffered physical shrapnel wounds in the same attack that severely injured his sister and killed his mother. As a result of her own injuries and watching the gruesome death of his mother in their family home, and seeing the maiming of his sister, he suffers from severe psychological and emotional trauma and is undergoing continuous psychological treatment. As a result of this rocket attack plaintiff Aden Sha'adi Azzam suffered severe physical, psychological and emotional injuries.

73.     Plaintiff Adina Machasan Dagesh, 53, is a relative of the Azzam family, and was present in their home at the time of the August 4, 2006 rocket attack. Due to the shock, fear and trauma that she suffered, she is now undergoing continuous psychological treatment to deal with the manifestations of severe psychological and emotional trauma. As a result of this rocket attack, Adina Dagesh suffered severe psychological and emotional injuries.

74.     On August 5, 2006 a rocket launched by Hizbollah landed near the home of the Juma'a family in Arb El-Aramshe, near the Israeli-Lebanese border. The rocket killed Fadya Juma'a, along with her daughters Samira Juma'a and Sultana Juma'a. The murder of Fadya Juma'a, Samira Juma'a and Sultana Juma'a caused decedents and their estates severe harm, including conscious pain and suffering and pecuniary loss.

75.     Plaintiff Miriam Juma'a, aged 88, is the mother of decedent Fadya Juma'a and the grandmother of decedents Samira Juma'a and Sultana Juma'a. Miriam Jum'a suffered severe emotional harm as a result of the death of her daughter and granddaughters, as well as a substantial loss of support. Miriam was very much

attached to her daughter, and dependent on her for care. This rocket attack caused Miriam Juma'a severe psychological and emotional injuries.

76.    Plaintiffs Salah Juma'a Said Juma'a, Abdel Rahman Juma'a and Rahma Abu-Shahin are the siblings of decedent Fadya Juma'a. The death of their beloved sister caused them severe emotional harm and distress. As a result of this rocket attack and the death of their sister, Salah Juma'a Said Juma'a, Abdel Rahman Juma'a and Rahma Abu-Shahin suffered severe psychological and emotional injuries.

77.    Plaintiff Abedel Gahni Abedel Gahni is the husband of decedent Soltana Juma'a. As a result of the death of his wife and the mother of his children, plaintiff Abedel Gahni Abedel Gahni has suffered terrible psychological and emotional trauma and distress, and financial loss. As a result of this rocket attack and the death of his wife Abedel Gahni Abedel Gahni suffered severe psychological, emotional and financial injuries.

78.    On July 25, 2006 and August 4, 2006 Hizbollah rockets landed near plaintiffs Adham Mahane Tarrabashi, Emillia Salman Aslan and Jihan Kamud Aslan in Kfar Maghar in the Galilee. They experienced extreme trauma from the explosions and are undergoing treatment for psychological disorders. As a result of this rocket attack Adham Mahane Tarrabashi, Emillia Salman Aslan and Jihan Kamud Aslan suffered severe psychological and emotional injuries.

79.    On July 25, 2006 a rocket launched by Hizbollah struck the work place of plaintiff Zohara Louie Sa'ad in Kfar Maghar. She was psychologically and

emotionally traumatized by the blast. As a result of this rocket attack Zohara Louie Sa'ad suffered severe psychological, emotional and financial injuries.

80.    On July 25, 2006 a rocket launched by Hizbollah directly hit the Kfar Maghar home of plaintiffs Ziad Shchiv Ghanam and Gourov Tisir Ghanam. The blast caused Ziad suffered severe physical injuries. Plaintiff Gourov Tisir Ghanam and the couple's son plaintiff Iyah Zaid Ghanam, who were also in the home, suffered severe psychological trauma as a result of the attack. As a result of this rocket attack Ziad Shchiv Ghanam suffered severe physical, psychological, emotional and financial injuries and plaintiffs Gourov Tisir Ghanam and Iyah Zaid Ghanam suffered severe psychological and emotional injuries.

81.    On August 8, 2006 a rocket launched by Hizbollah landed next to plaintiff Rina Dahan as she was making her way to a bomb shelter in Haifa. Rina was injured in both her legs and she is still in need of medical treatments, including pain-relieving shots. Rina's ability to walk is limited, especially climbing stairs. Rina Dahan's quality of life was severely damaged by her injuries and she is now disabled and dependent on medical care and third party assistance. In addition she was badly emotionally traumatized by the blast. As a result of this rocket attack Rina Dahan suffered severe physical, psychological, emotional and financial injuries.

82.    On August 3, 2006 at approximately 16:15 p.m., a rocket launched by Hizbollah struck outside the car of plaintiff Raphael Weiss in Acre. Weiss sustained shrapnel injury in his head and was rushed to the operating room. As a result of his injury, Weiss has been turned from a healthy active man to a disabled patient confined

to a wheelchair, requiring regular medical treatments and a permanent assistance. As a result of this injury, Weiss suffered a CVA on the left part of his brain, and became epileptic. In addition to his physical injuries Weiss was badly emotionally traumatized by the blast. As a result of this rocket attack Raphael Weiss suffered severe physical, psychological, emotional and financial injuries.

83.     On July 16, 2006, in the morning hours, a rocket launched by Hizbollah struck next to the bomb shelter in Kiryat Yam where plaintiff Agat Klein was seeking refuge. As a result of the powerful blast, Agat Klein suffered serious psychological and emotional damage. She was evacuated to Carmel Hospital in Haifa. Agat Klein continues to suffer from psychological disorders and anxiety attacks. She still has not regained her ability function properly to this day, has trouble functioning and has had to resign from her job. As a result of this rocket attack Agat Klein suffered severe psychological, emotional and financial injuries.

84.     On July 13, 2006 a rocket launched by Hizbollah directly struck the home of plaintiffs Zion Mor and Revital Mor in Safed and injured their entire family. After the explosion, while fighting the smoke, fire and destruction, Zion hysterically rushed to save his family who were in the center of the house at the time. The family home was completely destroyed by the rocket's explosion. Due to the emotional trauma Zion has been severely impaired psychologically and emotionally and remains disabled. Zion is largely unable to work as he must spend his time caring for his wife and children. Zion's wife, plaintiff Revital Mor was sprayed with rocket shrapnel and glass in her legs and she suffered deep tissue injuries and major scars.

Revital has been diagnosed with severe psychological and emotional damage and has been declared mentally debilitated and must rely on anxiety medicines for her day-to-day existence. The couple's minor son, plaintiff Abraham Nathan Mor, was also hit with shrapnel throughout his body, most acutely in his head and back. One of the shrapnel fragments pierced Abraham's appendix which required surgery to remove. Abraham Nathan Mor remains scarred throughout his body as a result of the injuries he sustained in the rocket attack. Another child, plaintiff Bat Zion Mor, was also sprayed with shrapnel throughout her body. The large and visible scars that riddle her body as a result of the injuries she sustained in the rocket attack will never be healed – most notably the significant scars near her nose, near her eyes, on her torso and on her lower back. Another child, plaintiff Michal Mor, suffered severe head trauma caused by large shrapnel fragments that pierced her head. Michal was also severely injured in the belly area. The young girl was rushed to the hospital while on life support and was administered life-saving emergency surgery. Michal Mor remains scarred throughout her body as a result of the injuries she sustained in the rocket attack and suffers from severe headaches and severe psychological and emotional trauma that manifest themselves in acute restlessness, inability to concentrate, scattered thoughts and activities, severe attention deficit, and non-stop tics in her hands. The Mor's youngest child, plaintiff Oded Chana Mor was also sprayed with shrapnel, most acutely in her head and legs. As a result of this rocket attack Zion Mor, Revital Mor, Abraham Nathan Mor, Bat Zion Mor, Michal Mor and Oded Chana Mor suffered severe physical, psychological, emotional and financial injuries.

85.     On July 25, 2006, at approximately 1:55am, a rocket launched by Hizbollah landed near plaintiff Tatiana Kovleyov in Haifa. As a result of the blast, Kovleyov was sprayed with shrapnel in all parts of her body. Her ability to walk has been severely impaired, her left hand does not work, her body is still riddled with shrapnel and she requires ongoing physiotherapeutic care. In addition, Kovleyov has been severely impaired psychologically and emotionally. She suffers depression and sleep impairment among other ailments, for which she requires ongoing psychiatric care. Kovleyov is unable to work, due to the heavy physical and psychological injuries she maintains. As a result of this rocket attack Tatiana Kovleyov suffered severe physical, psychological, emotional and financial injuries.

86.     On July 25, 2006, a rocket launched by Hizbollah landed next to plaintiff Valentina Demesh as she was walking down the street in Haifa. Demesh was sprayed with shrapnel and is suffering from functional disability in her hands and legs. In addition, Valentina has suffered psychological and emotional damage. She suffers from nightmares and other emotional disorders for which she requires ongoing psychiatric care. Damesh has been unable to return to work as a result of her medical condition. As a result of this rocket attack Valentina Demesh suffered severe physical, psychological, emotional and financial injuries.

87.     On August 11, 2006, at approximately 4:00 p.m., a rocket launched by Hizbollah directly struck the home of plaintiff Rivka Epon in Kiryat Shemona in the Galilee Panhandle. Epon was in the house at the time of the explosion and she was hit in the face with shrapnel. The blast broke her nose and jaw and knocked three of her

teeth from her mouth. She continues to suffer from dizziness, an inability to concentrate, headaches, severe ringing in her ears and significant pain in the spot in which a two centimeter piece of rocket shrapnel is still lodged in her body. Rivka suffers from severe psychological and emotional damage and is unable to be alone. She requires continuous psychiatric care. As a result of this rocket attack Rivka Epon suffered severe physical, psychological, emotional and financial injuries.

88.    In the afternoon hours of July 28, 2006, a rocket launched by Hizbollah landed outside the home of plaintiff Joseph Maria in Acre. As a result of the powerful explosion Maria suffered a severe stroke and half his body remains paralyzed. His speech is confused and unintelligible, he requires continuous medical care and has nursing care 24 hours a day. Maria was also badly traumatized by the blast and suffers from psychological and emotional damage. As a result of this rocket attack Joseph Maria suffered severe physical, psychological, emotional and financial injuries.

89.    On August 13, 2006, at approximately 10 p.m., a rocket launched by Hizbollah exploded outside the bus being operated by plaintiff Immanuel Penker in Naharia. The powerful blast wounded Penker throughout his body including his right hand. Since the attack Penker has undergone surgery several times on his hand, left leg and left eye. In addition he has required skin grafts and figure restructuring. Penker needs medical care as well as occupational therapy due to his injuries and the extensive series of operations he has endured. In addition, he has been badly traumatized by the rocket blast. Since being hit, Penker is not able to work. As a result of this rocket attack

Immanuel Penker suffered severe physical, psychological, emotional and financial injuries.

90.    On July 17, 2006, at approximately 1:10 p.m., Esther Pinto's house in Safed suffered a direct hit from a rocket launched by Hizbollah. Pinto was in her home at the time. In the powerful explosion Pinto was injured in both her legs and required surgery. Her walking remains impaired and she requires regular medical care. Pinto was badly traumatized from the blast and suffers from psychological and emotional damage. As a result of the rocket attack Esther Pinto suffered severe physical, psychological, emotional and financial injuries.

91.    On July 13, 2006, plaintiff Chaim Kaplan was severely injured by two Hizbollah rocket which landed in Safed. The first rocket landed outside his car and severly injured him. The second rocket struck the Kaplan family's home, and also injured Chaim's wife, plaintiff Rivka Kaplan, as well as the couple's minor children plaintiffs Mushka Kaplan, Arye Leib Kaplan, Menachem Kaplan, Chana Kaplan and Efraim Kaplan. As a result of these rocket attacks plaintiffs Chaim Kaplan, Rivka Kaplan, Mushka Kaplan, Arye Leib Kaplan, Menachem Kaplan, Chana Kaplan and Efraim Kaplan suffered severe physical, psychological, emotional and financial injuries.

92.    Plaintiffs Avishai Reuvane and Elisheva Aron were injured on July 13, 2006, by a rocket fired by Hizbollah which landed in Safed. As a result of this rocket attack Avishai Reuvane and Elisheva Aron suffered severe physical, psychological, emotional and financial injuries.

93.     Plaintiff Chayim Kumer, a resident of Safed, suffered a nervous breakdown and was hospitalized as a result of the Hizbollah Rocket Attacks, which in turn caused severe harm to his wife, Plaintiff Nechama Kumer. As a result of the Hizbollah Rocket Attacks plaintiffs Chayim Kumer and Nechama Kumer suffered severe psychological, emotional and financial injuries.

94.     Plaintiffs Sarah Yefet and her daughter Shoshana Sappir were both in their apartment in Safed on July 12, 2006, when the first of several Hizballah rockets struck their home. Both Yefet and Sappir suffered nervous shock and psychological damage as a result of the bomb attacks. They continue to suffer psychological symptoms, including nervousness, lack of sleep, inability to work or concentrate on tasks. Shoshana in particular suffers in relation to her child-rearing responsibilities, and has diminished abilities due to emotional stress and psychological trauma resulting from the bombing. As a result of these rocket attacks Sarah Yefet and Shoshana Sappir suffered severe physical, psychological, emotional and financial injuries.

95.     On July 25, 2006 a rocket exploded in the yard of the home of plaintiffs Fuad and Suha Shchiv Ghanam in the Israeli village of Ma'ar. Fuad suffered severe rocket shrapnel injuries throughout his body. He was also badly traumatized by the blast. Fuad's wife, Suha, suffered rocket shrapnel injuries throughout her body and suffers from severe psychological and emotional trauma. She requires continuous psychiatric care since the attack. The couple's young son plaintiff Rahmi Guhad Ghanam was also injured in the explosion. Rahmi suffered rocket shrapnel wounds throughout his body, In addition, Rhami Ghanam suffers from psychological and

emotional trauma due to the attack. As a result of this rocket attack Fuad, Suha and Rahmi Shchiv Ghanam suffered severe physical, psychological, emotional and financial injuries.

96.     On July 13, 2006, at approximately 14:30, plaintiff Michael Fuchs was driving in his car in Safed when a rocket launched by Hizbollah struck nearby. Massive amounts of shrapnel penetrated Fuchs' car and caused him severe injuries. Fuchs lost large quantities of blood, lost consciousness and was rushed to the intensive care unit of Rebecca Ziv Hospital. Fuchs' throat was slashed as a result of the explosion and his right hand remains completely paralyzed. Fuchs has been permanently disabled. He is unable to work and relies on intensive and expensive medical treatments on an ongoing basis. As a result of this rocket attack Michael Fuchs suffered severe physical, psychological, emotional and financial injuries.

97.     On July 14, 2006, a rocket launched by Hizbollah landed next to plaintiff Yaakov Abutbul as he was leaving his hospital shift in Safed. Abutbul was wounded with shrapnel in his legs, his back and his chest. He subsequently required surgery three times. In addition, he was traumatized by the explosion. As a result of this rocket attack Yaakov Abutbul suffered severe physical, psychological, emotional and financial injuries.

98.     Plaintiffs Karen and Brian Ardstein resided in Safed at the time of the Hizbollah Rocket Attacks. Numerous rockets landed near the family's home. Karen was pregnant at the time the attacks began and due to the ongoing strain, stress and anxiety, and the rocket explosions near the Ardstein home she suffered a miscarriage

and lost the baby. In the wake of the miscarriage, Karen suffered from post-partum depression, damage to her immune system and has developed other medical complications. Brian was greatly traumatized by the rocket attacks and the loss of the baby. In addition, as a result of the rocket attacks and the collapse of tourism in Israel, Brian, a licensed tour guide, lost all of his work and had extreme difficulties supporting his family. The Ardsteins' minor children, plaintiffs Ma'ayan, Noa, Ariel Chaim and Netiya Yeshua Ardstein all suffered emotional and psychological trauma from the Hizbollah Rocket Attacks. All of the children have been diagnosed with permanent and severe emotional disorders and are receiving on-going psychiatric treatment and therapy. As a result of the Hizbollah Rocket Attacks, Brian, Keren, Ma'ayan, Noa, Ariel Chaim and Netiya Yeshua Ardstein suffered severe physical, psychological, emotional and financial injuries.

99.     On July 13, 2006 at approximately 7:00 p.m. a rocket launched by Hizbollah landed outside the home of plaintiffs Laurie Rappeport and her minor daughter Margalit in Safed. The powerful explosion threw Margalit, who was playing outside on a wall, a distance into the air. Margalit was hospitalized as a result of the explosion and suffered severe psychological trauma. Laurie was emotionally distraught over the injury sustained by her young daughter. As a result of this rocket attack Laurie and Margalit Rappeport suffered severe physical, psychological, and emotional injuries.

100.     On July 19, 2006 the art gallery owned by plaintiffs Yair and Orna Mor in Safed was directly hit by a rocket launched by Hizbollah. The business was completely destroyed in the blast. The couple was extremely traumatized by the

destruction of their family's business. As a result of this rocket attack Yair and Orna Mor suffered severe psychological, emotional and financial injuries.

101.   On July 22, 2006, a rocket launched by Hezbollah landed in close proximity to plaintiff Arkady Spektor in Nahariya. Spektor was sprayed with shrapnel in his right thigh, left shoulder, left lung and was hospitalized in Nahariya. As a result of this rocket attack, Arkady Spektor suffered severe physical, psychological and emotional injuries.

102.   On July 28, 2006, a rocket launched by Hezbollah landed about forty meters from plaintiff Yori Zovrev as he was running to a bomb shelter near his home in Nahariya. As a result, he broke his left ankle (compound fracture) and was hospitalized. As a result of this injury, he has suffered severe, constant pain through the present. In addition, he suffers from severe anxiety, manifesting itself in the form of insomnia and inability to rest. As a result of this rocket attack, Zovrev has suffered severe physical and psychological and emotional injuries.

103.   In the summer of 2006, plaintiffs Theodore (Ted) Greenberg and Maurine Greenberg were the proprietors of a tourism business in Safed. The Hizbollah Rocket Attacks caused a complete halt in tourism in northern Israel for several months during the peak tourism season, which in turn caused the Greenbergs severe financial damage. As a result of the Hizbollah Rocket Attacks, Theodore (Ted) Greenberg and Maurine Greenberg suffered severe financial damages.

104.   In the summer of 2006, plaintiffs Jacob Katzmacher and Deborah Chana Katzmacher were the proprietors of an art gallery in the city of Safed (a business

that caters almost exclusively to tourists). The Hizbollah Rocket Attacks caused a complete halt in tourism in northern Israel for several months during the peak tourism season, which in turn caused the Katzmachers severe financial damage. As a result of the Hizbollah Rocket Attacks, Jacob Katzmacher and Deborah Chana Katzmacher suffered severe financial damages.

105.    On July 13, 2008, a rocket launched by Hizbollah landed a few meters away from plaintiff Chaya Katzmacher, in Safed causing her psychological and emotional damage. As a result of this rocket attack, Chaya Katzmacher suffered severe psychological and emotional damage.

106.    On August 11, 2006, at approximately 1:15 p.m., a rocket launched by Hizbollah landed directly on plaintiff Mikimi Steinberg's house in Safed severely damaging the house and the possessions therein. As a result of this rocket attack, Mikimi Steinberg suffered severe financial damages.

107.    In the summer of 2006, plaintiffs Jared Sauter and Danielle Sauter were the owners of a tourism business in the town of Rosh Pina in the Galilee. The Hizbollah Rocket Attacks caused a complete halt in tourism in northern Israel for several months during the peak tourism season, which in turn caused the Sauters severe financial damage. The Sauters' business collapsed and they was forced to relocate to a different city. As a result of the Hizbollah Rocket Attacks, Jared Sauter and Danielle Sauter suffered severe financial damages.

108.    In the summer of 2006 plaintiff Myra Mandel was the owner of an art gallery in Safed. Rockets launched by Hizbollah damaged her art gallery.

Additionally, the Hizbollah Rocket Attacks caused a complete halt in tourism in northern Israel for several months during the peak tourism season, which in turn caused Mandel severe financial damage. As a result of the Hizbollah Rocket Attacks, Myra Mandel suffered severe financial damages.

109.   On July 13, 2006, alarms sounded in response to rockets launched by Hizbollah at Safed, and, while running to the bomb shelter, plaintiff Yaakov Licci stumbled and fell on his stomach and suffered an injury requiring that his spleen be immediately removed. On July 20, 2006 while still hospitalized in Safed from the spleen operation, another rocket launched by Hizbollah landed directly on the hospital very close to the room in which Yaakov Licci was staying. Yaakov Licci received shrapnel and glass shard wounds to his entire body, especially to his left foot and hand, his head, his back and his eyes. Yaakov Licci has a fracture in his skull that has no chance of healing, and bulging scars in his limbs, back, and head. In addition, Yaakov Licci suffered severe emotional injuries. While previously a healthy and active boy, Yaakov Licci is now dependant on his psychiatric treatment and medications. Yaakov Licci's condition has not improved. Even today, at 16 years old, he sleeps in his parents' bed. As a result of these rocket attacks, Yaakov Licci suffered severe physical, psychological, emotional and financial injuries.

110.   On July 21, 2006, a rocket launched by Hizbollah landed on the hospital in Safed where plaintiff Elihav Licci was attending to his son Yaakov Licci who had been hospitalized as a result of a previous rocket attack by Hizbollah. Elihav Licci was injured by the rocket, and suffered shrapnel wounds and glass shards embedded in

his right hand and in his left foot. Some of these shards could not be removed and are still in Elihav's body. Elihav Licci also experienced psychological injuries (severe post trauma disorder) as a result of the rocket attack. As a result of this rocket attack, Yaakov Licci suffered severe physical, psychological, emotional and financial injuries.

111.   On July 13 2006, a rocket launched by Hizbollah landed on a dairy owned by plaintiffs Elihav and Yehudit Licci near Safed, paralyzing the dairy's activity. On July 20, 2006, a rocket launched by Hizbollah landed on the Licci's dairy and destroyed it. The dairy had until that time generated approximately $90,000 monthly revenue. Since the war the dairy has been paralyzed, and the Liccis have been caused severe financial losses. In order to rebuild the dairy the Licci's need to invest over $500,000. As a result of these rocket attacks, plaintiffs Elihav and Yehudit Licci suffered severe financial damages.

112.   On July 19, 2006 the home of plaintiffs Rochelle Shalmani and Oz Shalmani in Carmiel in the Northern Galilee was hit by a Hizballah rocket, partly destroying it. The family could not live in the house in Carmiel due to the damage and the danger of ongoing rocket attacks, and spent several weeks crowded into a small Tel Aviv apartment with 12 other people. The Shalmanis lost significant work time due to the bombing. As result of this rocket attack Rochelle Shalmani and Oz Shalmani suffered severe financial injuries.

## Plaintiffs' Injuries Are the Result of Defendants' Conduct

113.    Terrorist organizations such as Hizbollah need to transfer funds through wire transfers in order to operate, and in order to plan, to prepare for and to carry out terrorist attacks.

114.    Provision of wire transfer services to Hizbollah enables Hizbollah to operate and to plan, to prepare for and to carry out terrorist attacks, and enhances Hizbollah's ability to plan, to prepare for and to carry out such attacks.

115.    Hizbollah carried out the Hizbollah Wire Transfers in order to transfer and receive funds necessary for planning, preparing and carrying out Hizbollah's terrorist activity, including rocket attacks on civilians generally and the Hizbollah Rocket Attacks specifically.

116.    The Hizbollah Wire Transfers carried out by the defendants substantially increased and facilitated Hizbollah's ability to plan, to prepare for and to carry out rocket attacks on civilians, including the Hizbollah Rocket Attacks.

117.    Hizbollah planned, made the preparations necessary for and carried out the Hizbollah Rocket Attacks utilizing funds received by Hizbollah as part of the Hizbollah Wire Transfers, and/or utilizing funds received by Hizbollah in exchange or consideration for the Hizbollah Wire Transfers, and/or utilizing funds that were freed up and/or otherwise made available to Hizbollah as a result of the Hizbollah Wire Transfers, and/or using funds drawn from a pool of funds created in part by the Hizbollah Wire Transfers.

118.    The Hizbollah Wire Transfers were enabled, facilitated and carried out by the conduct of defendants Amex Bank and LCB described herein.

119.    The Hizbollah Rocket Attacks were thereby enabled, facilitated and proximately caused by the conduct of defendants Amex Bank and LCB described herein.

120.    Plaintiffs' injuries are therefore the direct and proximate result of defendants' conduct.

### Defendant LCB Knew and Intended That Its Conduct Would Result in Harm to the Plaintiffs

121.    The Republic of Lebanon and the State of Israel have had hostile relations since 1948.

122.    Anti-Israeli sentiment, and support for Hizbollah and its anti-Israel program, goals and activities, is very widespread in Lebanese society.

123.    Since the 1980s, Hizbollah is and has been a major and popular political organization in Lebanon.

124.    At all relevant times, Hizbollah held a large number of seats in the Lebanese parliament, was part of the Lebanese central government and held seats in numerous municipal governments throughout Lebanon.

125.    At all relevant times, Hizbollah enjoyed and enjoys extensive support in the Lebanese public.

126. At all relevant times, including the period between 2004 and the present day, as a matter of official LCB policy defendant LCB continuously supports and supported Hizbollah and its anti-Israel program, goals and activities.

127. Specifically, at all relevant times, including the period between 2004 and the present day, as a matter of official LCB policy defendant LCB supports and supported Hizbollah's terrorist activities against Jews in Israel, and Hizbollah's goal of using terrorism to destroy the State of Israel and murder or expel its Jewish inhabitants.

128. Additionally, at all relevant times, including the period between 2004 and the present day, as a matter of official LCB policy defendant LCB supports and supported Hizbollah's terrorist activities against Jews in Israel, and Hizbollah's goal of using terrorism to coerce, intimidate and influence the Israeli government and public.

129. At all relevant times, including the period between 2004 and the present day, defendant LCB carried out the Hizbollah Wire Transfers as a matter of official LCB policy, in order to assist and advance Hizbollah's terrorist activities against Jews in Israel, in order to assist and advance Hizbollah's goal of using terrorism to destroy the State of Israel and murder or expel its Jewish inhabitants and in order to assist and advance Hizbollah's goal of coercing, intimidating and influencing the Israeli government and public.

130. As discussed in paragraphs 20-32 above, at all relevant times, including the period between 2004 and the present day, defendant LCB had actual knowledge that Hizbollah is a violent terrorist organization which had carried out

numerous terrorist attacks against Israeli civilians and American targets and which planned and intended to carry out additional such terrorist attacks.

131.   At all relevant times, including the period between 2004 and the present day, defendant LCB had actual knowledge that terrorist organizations such as Hizbollah require wire transfer services in order to operate and in order to plan, to prepare for and to carry out terrorist attacks, and that providing wire transfer services to Hizbollah would enable Hizbollah to plan, to prepare for and to carry out terrorist attacks and/or enhance Hizbollah's ability to plan, to prepare for and to carry out such attacks, because such knowledge is notorious and known to the public at large.

132.   At all relevant times, including the period between 2004 and the present day, defendant LCB had actual knowledge that terrorist organizations such as Hizbollah require wire transfer services in order to operate and in order to plan, to prepare for and to carry out terrorist attacks, and that providing wire transfer services to Hizbollah would enable Hizbollah to plan, to prepare for and to carry out terrorist attacks and/or enhance Hizbollah's ability to plan, to prepare for and to carry out such attacks, because defendant LCB was aware of the U.S. Sanctions Regime and that the U.S. Sanctions Regime is and was intended to prevent Hizbollah from conducting banking activities, including wire transfers, and thereby limit its ability to operate and to carry out terrorist attacks.

133.   At all relevant times, including the period between 2004 and the present day, defendant LCB had actual knowledge that terrorist organizations such as Hizbollah require wire transfer services in order to operate and in order to plan, to

prepare for and to carry out terrorist attacks, and that providing wire transfer services to Hizbollah would enable Hizbollah to plan, to prepare for and to carry out terrorist attacks and/or enhance Hizbollah's ability to plan, to prepare for and to carry out such attacks, because defendant LCB was aware of the rules promulgated by the inter-governmental Financial Action Task Force ("FATF") and by the Middle East and North Africa Financial Action Task Force ("MENAFATF") (which Lebanon has adopted), requiring banks to know their customers, perform due diligence and not provide banking services to terrorist organizations, and that the FATF and MENAFATF rules are and were intended to prevent terrorist organizations such as Hizbollah from conducting banking activities, including wire transfers, and thereby limit their ability to operate and to carry out terrorist attacks.

134.   At all relevant times, including the period between 2004 and until July 12, 2006, defendant LCB had actual knowledge that Shahid is an integral part of Hizbollah and constitutes part of Hizbollah's financial arm, that the Hizbollah Accounts and the funds therein were owned and controlled by Hizbollah, and that the Hizbollah Wire Transfers were being carried out by and at the direction of Hizbollah.

135.   At all relevant times, including the several year period prior to July 12, 2006, defendant LCB had actual knowledge that Shahid is an integral part of Hizbollah and constitutes part of Hizbollah's financial arm, that the Hizbollah Accounts and the funds therein were owned and controlled by Hizbollah, and that the Hizbollah Wire Transfers were being carried out by and at the direction of Hizbollah, because the

fact that Shahid is part of Hizbollah's financial arm was notorious public knowledge during the period between 2004 and until July 12, 2006.

136.    The fact that Shahid is an integral part of Hizbollah and constitutes part of Hizbollah's financial arm was openly, publicly and repeatedly acknowledged and publicized by Hizbollah during the several year period prior July 12, 2006, *inter alia* on Hizbollah's official websites, in official press releases issued by Hizbollah, on Hizbollah's official television station, Al-Manar, on Hizbollah's official radio station, Al-Nour, and in numerous press conferences and news media interviews conducted by senior Hizbollah officials.

137.    Additionally, the fact that Shahid is an integral part of Hizbollah and constitutes part of Hizbollah's financial arm was repeatedly publicized for many years prior July 12, 2006, in various English-language publications, including without limitation the following:

a)    On October 8, 1991, The Independent newspaper (published in London) reported that the Martyrs Foundation (i.e. Shahid) supplies stipends to the families of Hizbollah terrorists. *See* Robert Fisk, *Testament of a doomed youth; In the home of a Hizbollah family in Beirut, hears how a father's death sent his son to 'martyrdom' in southern Lebanon*, The Independent, October 8, 1991.

b)    On May 30, 2000, The Irish Times published an article reporting that Hizbollah operatives, including personnel "from the Martyrs' Foundation," were moving into parts of Southern Lebanon. *See Hizbullah moves to consolidate its political gains in Lebanon*, The Irish Times, May 30, 2000.

c)     On November 27, 2001, BBC Worldwide Monitoring service published an English-language transcript of an article which appeared the same day in the Lebanese newspaper Al-Safir, regarding a Shahid event officiated over by Hizbollah Secretary-General Hasan Nasrallah. *See* BBC Worldwide Monitoring, *USA makes "big mistake" if it wages war in Mideast, says Hezbollah leader*, November 27, 2001.

d)     In January 2002, the Middle East Intelligence Bulletin (a joint publication of the United States Committee for a Free Lebanon and the Middle East Forum) published an article on its website reporting that Paraguayan authorities had found fundraising forms for Shahid in the possession of a senior Hizbollah operative. *See* Blanca Madani, *Hezbollah's Global Finance Network: The Triple Frontier*, available at http://www.meib.org/articles/0201_l2.htm.

e)     On June 14, 2002, BBC Worldwide Monitoring service published an English-language translation of a June 8, 2002 article which appeared in the Arabic-language newspaper Al-Sharq al-Awsat (published in London), which reported that "'Al-Shaheed' the Martyrs Foundation ... give every month vast amounts of financial aid" to Hizbollah operatives. *See* BBC Worldwide Monitoring, *Iran reportedly agrees to increase Islamic Jihad's budget*, June 14, 2002.

f)     An English-language article published by the wire service Agence France Presse on September 2, 2002, reported that Paraguayan authorities had found receipts for the transfer of over $3.5 million to the "Martyr's Organization" (i.e. Shahid) in the possession of Hizbollah's leader in Latin America.

g)      On November 7, 2003, BBC Worldwide Monitoring service published an English-language transcript of a November 3, 2003 report on Al Manar (Hizbollah's TV station) of a Shahid event led by the Secretary-General of Hizbollah. *See* BBC Worldwide Monitoring, *Lebanese Hezbollah leader discusses Bush's speech, democracy in Mideast,* November 7, 2003.

h)      In July 2003, the Federal Research Division of the Library of Congress issued a report linking Shahid to Hizbollah. *See Terrorist and Organized Crime Groups in the Tri-Border Area (TBA) of South America*, available at http://www.loc.gov/rr/frd/pdf-files/TerrOrgCrime_TBA.pdf, at 72-75 (noting that the "'Martyr' Social Beneficent Organization … is linked to the Hizballah" and that Paraguayan authorities had found fundraising forms for Shahid in the possession of a senior Hizbollah operative).

i)      On December 30, 2004, Slate Magazine published an article about Hizbollah's television station, Al Manar, and which reported that "An Al-Manar public service message tells families of suicide bombers where to go to collect the subsidy from a martyrs' foundation." *See* Jack Shafer, *Who's Afraid of Hezbollah TV?*, Slate Magazine, December 30, 2004.

j)      In February 2005, counterterrorism expert Dr. Matthew Levitt published an article on the website of the Washington Institute for Near East Policy, which confirms that Shahid provides funds for Hizbollah terrorists. *See* Matthew Levitt, *Hizballah Finances: Funding the Party of God*, available at http://www.washingtoninstitute.org/templateC06.php?CID=772.

k)      On March 1, 2005, a summary of Dr. Levitt's February 2005 article was published by the Washington Institute, which reiterates that Shahid "supplies charitable funds for Hizballah-affiliated suicide bombers." *See* Matthew Levitt, *Hizballah Finances: Funding the Party of God*, available at http://www.washingtoninstitute.org/templateC05.php?CID=2266.

l)      On March 28, 2005, the PR Newswire company (a news and information distribution service) distributed a press release issued by Fortress Global Investigations (a major private investigation and security firm operated by former FBI and CIA agents) asserting that Shahid is "a front organization for the terrorist organization, Hezbollah." This press release was published on numerous news and websites.

m)      An article published on May 1, 2005, in Infantry Magazine, reported that the role of the "Shaheed (martyrs) Foundation" is to fund and provide benefits "for the families of those dying for Hizballah's objectives. This includes maintaining a $2,500 stipend for families of suicide bombers and martyrs of Hizballah." Youssef Aboul-Enein, *Hizballah: a discussion of its early formation,* Infantry Magazine, May 1, 2005.

n)      On May 25, 2005, counterterrorism expert (and former FBI agent) Dr. Matthew Levitt appeared before the Committee on Senate Homeland Security and Governmental Affairs, and testified that Shahid "admittedly supplies charitable funds for the family of suicide bombers." *See Terrorists, Criminals and Counterfeit Goods*, CQ Congressional Testimony May 25, 2005.

o)      A RICO complaint filed in this Court in November 2004 in the matter of *Ayyash v. Bank Al-Madina*, C.A. 04-9201 (S.D.N.Y.), alleged that Shahid is a "front organization" for Hizbollah. *See Ayyash*, dkt. # 1 at ¶ 48.

p)      On March 9, 2006, this Court issued a decision in the *Ayyash* case, expressly noting that "'Al-Shaheed,' [is] a front organization for Hezbollah." *Ayyash v. Bank Al-Madina*, 2006 WL 587342 at *1 n. 1 (S.D.N.Y. March 9, 2006).

138.    All of the documents cited in the previous paragraph are and at all times were publicly available on the internet and/or on the Lexis-Nexis news archive. Thus, a simple internet and Lexis-Nexis search would have apprised defendant LCB of all the information contained in the documents cited in the previous paragraph even assuming, strictly *arguendo*, that defendant LCB was not already independently aware of that information.

139.    Additionally and/or alternatively, at all times, defendant LCB should have known and had a duty to inform itself of all the facts enumerated in paragraphs 130 - 138 because they are notorious and public knowledge.

140.    Additionally and/or alternatively, at all times, defendant LCB should have known and had a duty to inform itself of all the facts enumerated in paragraphs 130 - 138 because defendant LCB had and has statutory duties, *inter alia* under United States law, under the laws of the State of New York, under Lebanese law, and under the rules promulgated by FATF and by MENAFATF, to know its customers, perform due diligence and not provide banking services to terrorist organizations such as Hizbollah.

141.   By executing the Hizbollah Wire Transfers, defendant LCB breached its statutory duties to know its customers and perform due diligence and not provide banking services to terrorist organizations such as Hizbollah.

142.   Additionally and/or alternatively, at all times, defendant LCB should have known and had a duty to inform itself of all the facts enumerated in paragraphs 130 - 138 because defendant LCB had and has statutory duties, *inter alia* under United States law, under the laws of the State of New York, under Lebanese law, and under the rules promulgated by FATF and MENAFATF, to monitor, report and refuse to execute illegal, suspicious and/or irregular banking transactions. The Hizbollah Wire Transfers were facially suspicious and irregular because they had no business or apparent lawful purpose, and there was no reasonable explanation for them.

143.   By executing the Hizbollah Wire Transfers, defendant LCB breached its statutory duties to monitor, report and refuse to execute suspicious and/or irregular banking transactions.

## Defendant Amex Bank Knew or Should Have Known That Its Conduct Would Result in Harm to the Plaintiffs

144.   As discussed in paragraphs 20-32 above, at all relevant times, including the period between 2004 and the present day, defendant Amex Bank had actual knowledge that Hizbollah is a violent terrorist organization which had carried

out numerous terrorist attacks against Israeli civilians and American targets and which planned and intended to carry out additional such terrorist attacks.

145.   At all relevant times, including the period between 2004 and the present day, defendant Amex Bank had actual knowledge that terrorist organizations such as Hizbollah require wire transfer services in order to operate and in order to plan, to prepare for and to carry out terrorist attacks, and that providing wire transfer services to Hizbollah would enable Hizbollah to plan, to prepare for and to carry out terrorist attacks and/or enhance Hizbollah's ability to plan, to prepare for and to carry out such attacks, because such knowledge is notorious and known to the public at large.

146.   At all relevant times, including the period between 2004 and the present day, defendant Amex Bank had actual knowledge that terrorist organizations such as Hizbollah require wire transfer services in order to operate and in order to plan, to prepare for and to carry out terrorist attacks, and that providing wire transfer services to Hizbollah would enable Hizbollah to plan, to prepare for and to carry out terrorist attacks and/or enhance Hizbollah's ability to plan, to prepare for and to carry out such attacks, because defendant Amex Bank was aware of the U.S. Sanctions Regime and that the U.S. Sanctions Regime is and was intended to prevent Hizbollah from conducting banking activities, including wire transfers, and thereby limit its ability to operate and to carry out terrorist attacks.

147.   At all relevant times, including the period between 2004 and the present day, defendant Amex Bank had actual knowledge that terrorist organizations such as Hizbollah require wire transfer services in order to operate and in order to plan,

to prepare for and to carry out terrorist attacks, and that providing wire transfer services to Hizbollah would enable Hizbollah to plan, to prepare for and to carry out terrorist attacks and/or enhance Hizbollah's ability to plan, to prepare for and to carry out such attacks, because defendant Amex Bank was aware of the rules promulgated by FATF requiring banks to know their customers, perform due diligence and not provide banking services to terrorist organizations, and that the FATF rules are and were intended to prevent terrorist organizations such as Hizbollah from conducting banking activities, including wire transfers, and thereby limit their ability to operate and to carry out terrorist attacks.

148.   At all relevant times, including the period between 2004 and until July 12, 2006, defendant Amex Bank had actual knowledge that Shahid is an integral part of Hizbollah and constitutes part of Hizbollah's financial arm, that the Hizbollah Accounts and the funds therein were owned and controlled by Hizbollah, and that the Hizbollah Wire Transfers were being carried out by and at the direction of Hizbollah.

149.   At all relevant times, including the several year period prior to July 12, 2006, defendant Amex Bank had actual knowledge that Shahid is an integral part of Hizbollah and constitutes part of Hizbollah's financial arm, that the Hizbollah Accounts and the funds therein were owned and controlled by Hizbollah, and that the Hizbollah Wire Transfers were being carried out by and at the direction of Hizbollah, because the fact that Shahid is part of Hizbollah's financial arm was notorious public knowledge during the period between 2004 and until July 12, 2006.

150.   The fact that Shahid is an integral part of Hizbollah and constitutes part of Hizbollah's financial arm was openly, publicly and repeatedly acknowledged and publicized by Hizbollah during the several year period prior July 12, 2006, *inter alia* on Hizbollah's official websites, in official press releases issued by Hizbollah, on Hizbollah's official television station, Al-Manar, on Hizbollah's official radio station, Al-Nour, and in numerous press conferences and news media interviews conducted by senior Hizbollah officials.

151.   During the period relevant hereto, including the period between 2004 and July 12, 2006, defendant Amex Bank maintained an office in Beirut, Lebanon, staffed by Arabic-speaking officers and employees of defendant Amex Bank, and Amex Bank therefore had and/or should be deemed to have had the same knowledge of and access to Arabic-language websites, press releases, television and radio broadcasts, press conferences and news media reports as any other person in Lebanon.

152.   Additionally, the fact that Shahid is an integral part of Hizbollah and constitutes part of Hizbollah's financial arm was repeatedly publicized for many years prior July 12, 2006, in various English-language publications, including without limitation the following:

a)   On October 8, 1991, The Independent newspaper (published in London) reported that the Martyrs Foundation (i.e. Shahid) supplies stipends to the families of Hizbollah terrorists. *See* Robert Fisk, *Testament of a doomed youth; In the home of a Hizbollah family in Beirut, hears how a father's death sent his son to 'martyrdom' in southern Lebanon*, The Independent, October 8, 1991.

b)      On May 30, 2000, The Irish Times published an article reporting that Hizbollah operatives, including personnel "from the Martyrs' Foundation," were moving into parts of Southern Lebanon. *See Hizbullah moves to consolidate its political gains in Lebanon,* The Irish Times, May 30, 2000.

c)      On November 27, 2001, BBC Worldwide Monitoring service published an English-language transcript of an article which appeared the same day in the Lebanese newspaper Al-Safir, regarding a Shahid event officiated over by Hizbollah Secretary-General Hasan Nasrallah. *See* BBC Worldwide Monitoring, *USA makes "big mistake" if it wages war in Mideast, says Hezbollah leader,* November 27, 2001.

d)      In January 2002, the Middle East Intelligence Bulletin (a joint publication of the United States Committee for a Free Lebanon and the Middle East Forum) published an article on its website reporting that Paraguayan authorities had found fundraising forms for Shahid in the possession of a senior Hizbollah operative. *See* Blanca Madani, *Hezbollah's Global Finance Network: The Triple Frontier,* available at http://www.meib.org/articles/0201_l2.htm.

e)      On June 14, 2002, BBC Worldwide Monitoring service published an English-language translation of a June 8, 2002 article which appeared in the Arabic-language newspaper Al-Sharq al-Awsat (published in London), which reported that "'Al-Shaheed' the Martyrs Foundation ... give every month vast amounts of financial aid" to Hizbollah operatives. *See* BBC Worldwide Monitoring, *Iran reportedly agrees to increase Islamic Jihad's budget,* June 14, 2002.

f)      An English-language article published by the wire service Agence France Presse on September 2, 2002, reported that Paraguayan authorities had found receipts for the transfer of over $3.5 million to the "Martyr's Organization" (i.e. Shahid) in the possession of Hizbollah's leader in Latin America.

g)      On November 7, 2003, BBC Worldwide Monitoring service published an English-language transcript of a November 3, 2003 report on Al Manar (Hizbollah's TV station) of a Shahid event led by the Secretary-General of Hizbollah. *See* BBC Worldwide Monitoring, *Lebanese Hezbollah leader discusses Bush's speech, democracy in Mideast*, November 7, 2003.

h)      In July 2003, the Federal Research Division of the Library of Congress issued a report linking Shahid to Hizbollah. *See Terrorist and Organized Crime Groups in the Tri-Border Area (TBA) of South America*, available at http://www.loc.gov/rr/frd/pdf-files/TerrOrgCrime_TBA.pdf, at 72-75 (noting that the "'Martyr' Social Beneficent Organization … is linked to the Hizballah" and that Paraguayan authorities had found fundraising forms for Shahid in the possession of a senior Hizbollah operative).

i)      On December 30, 2004, Slate Magazine published an article about Hizbollah's television station, Al Manar, and which reported that "An Al-Manar public service message tells families of suicide bombers where to go to collect the subsidy from a martyrs' foundation." *See* Jack Shafer, *Who's Afraid of Hezbollah TV?*, Slate Magazine, December 30, 2004.

j)      In February 2005, counterterrorism expert Dr. Matthew Levitt published an article on the website of the Washington Institute for Near East Policy, which confirms that Shahid provides funds for Hizbollah terrorists. *See* Matthew Levitt, *Hizballah Finances: Funding the Party of God*, available at http://www.washingtoninstitute.org/templateC06.php?CID=772.

k)      On March 1, 2005, a summary of Dr. Levitt's February 2005 article was published by the Washington Institute, which reiterates that Shahid "supplies charitable funds for Hizballah-affiliated suicide bombers." *See* Matthew Levitt, *Hizballah Finances: Funding the Party of God*, available at http://www.washingtoninstitute.org/templateC05.php?CID=2266.

l)      On March 28, 2005, the PR Newswire company (a news and information distribution service) distributed a press release issued by Fortress Global Investigations (a major private investigation and security firm operated by former FBI and CIA agents) asserting that Shahid is "a front organization for the terrorist organization, Hezbollah." This press release was published on numerous news and websites.

m)      An article published on May 1, 2005, in Infantry Magazine, reported that the role of the "Shaheed (martyrs) Foundation" is to fund and provide benefits "for the families of those dying for Hizballah's objectives. This includes maintaining a $2,500 stipend for families of suicide bombers and martyrs of Hizballah." Youssef Aboul-Enein, *Hizballah: a discussion of its early formation*, Infantry Magazine, May 1, 2005.

n)      On May 25, 2005, counterterrorism expert (and former FBI agent) Dr. Matthew Levitt appeared before the Committee on Senate Homeland Security and Governmental Affairs, and testified that Shahid "admittedly supplies charitable funds for the family of suicide bombers." *See Terrorists, Criminals and Counterfeit Goods*, CQ Congressional Testimony May 25, 2005.

o)      A RICO complaint filed in this Court in November 2004 in the matter of *Ayyash v. Bank Al-Madina*, C.A. 04-9201 (S.D.N.Y.), alleged that Shahid is a "front organization" for Hizbollah. *See Ayyash*, dkt. # 1 at ¶ 48.

p)      On March 9, 2006, this Court issued a decision in the *Ayyash* case, expressly noting that "'Al-Shaheed,' [is] a front organization for Hezbollah." *Ayyash v. Bank Al-Madina*, 2006 WL 587342 at *1 n. 1 (S.D.N.Y. March 9, 2006).

153.    All of the documents cited in the previous paragraph are and at all times were publicly available on the internet and/or on the Lexis-Nexis news archive. Thus, a simple internet and Lexis-Nexis search would have apprised defendant Amex Bank of all the information contained in the documents cited in the previous paragraph even assuming, strictly *arguendo*, that defendant Amex Bank was not already independently aware of that information.

154.    Additionally and/or alternatively, at all times, defendant Amex Bank should have known and had a duty to inform itself of all the facts enumerated in paragraphs 144 - 153 because they are notorious and public knowledge.

155.    Additionally and/or alternatively, at all times, defendant Amex Bank should have known and had a duty to inform itself of all the facts enumerated in

paragraphs 144 - 153 because defendant Amex Bank had and has statutory duties, *inter alia* under United States law, under the laws of the State of New York and under the rules promulgated by FATF, to know its customers, perform due diligence and not provide banking services to terrorist organizations such as Hizbollah.

156. By executing the Hizbollah Wire Transfers, defendant Amex Bank breached its statutory duties to know its customers and perform due diligence and not provide banking services to terrorist organizations such as Hizbollah.

157. Additionally and/or alternatively, at all times, defendant Amex Bank should have known and had a duty to inform itself of all the facts enumerated in paragraphs 144 - 153 because defendant Amex Bank had and has statutory duties, *inter alia* under United States law, under the laws of the State of New York and under the rules promulgated by FATF, to monitor, report and refuse to execute illegal, suspicious and/or irregular banking transactions. The Hizbollah Wire Transfers were facially suspicious and irregular because they had no business or apparent lawful purpose, and there was no reasonable explanation for them.

158. By executing the Hizbollah Wire Transfers, defendant Amex Bank breached its statutory duties to monitor, report and refuse to execute suspicious and/or irregular banking transactions.

159. The New York State Banking Department conducted an investigation of defendant Amex Bank and found that during the time period in which the Hizbollah Wire Transfers took place: (i) defendant Amex Bank failed to comply with applicable federal and state laws, rules, and regulations relating to terrorism financing

and anti-money laundering policies, procedures, and practices, including the Bank Secrecy Act (31 U.S.C. § 5311 *et seq.*), the rules and regulations promulgated thereunder by the U.S. Department of the Treasury (31 C.F.R. Part 103), and those of the New York State Banking Department (3 N.Y.C.R.R. Part 300); (ii) defendant Amex Bank's international wire transfer and correspondent banking services suffered from compliance and risk management deficiencies; and (iii) defendant Amex Bank's policies, procedures, internal control environment, compliance staffing, training, customer due diligence practices and suspicious activity reporting suffered from deficiencies.

160.   Had defendant Amex Bank complied with applicable federal and state laws, rules, and regulations relating to terrorism financing and anti-money laundering policies, procedures, and practices, including the Bank Secrecy Act (31 U.S.C. § 5311 *et seq.*), the rules and regulations promulgated thereunder by the U.S. Department of the Treasury (31 C.F.R. Part 103), and those of the New York State Banking Department (3 N.Y.C.R.R. Part 300), defendant Amex Bank would not have carried out the Hizbollah Wire Transfers.

161.   Had defendant Amex Bank's international wire transfer and correspondent banking services not suffered from compliance and risk management deficiencies, defendant Amex Bank would not have carried out the Hizbollah Wire Transfers.

162.   Had defendant Amex Bank's policies, procedures, internal control environment, compliance staffing, training, customer due diligence practices and

suspicious activity reporting not suffered from deficiencies, defendant Amex Bank would not have carried out the Hizbollah Wire Transfers.

163.    When acting as the correspondent bank for defendant LCB and when carrying out wire transfers for customers of defendant LCB, defendant Amex Bank is and was at all times provided with and was aware of the names of all the parties to each such wire transfer, including the names of the originator and the intended beneficiary and recipient of each such wire transfer. Thus, defendant Amex Bank knew in real time that each of the Hizbollah Wire Transfers was made to, from and/or between accounts titled to Shahid, and defendant Amex Bank had the technical and practical ability to block and refuse to carry out the Hizbollah Wire Transfers.

### FIRST CAUSE OF ACTION
### ON BEHALF OF THE AMERICAN PLAINTIFFS
### AGAINST DEFENDANT LCB
### INTERNATIONAL TERRORISM PURSUANT TO 18 U.S.C. § 2333

164.    Plaintiffs repeat and reallege each of the foregoing paragraphs with the same force and effect as if more fully set forth herein.

165.    The actions of defendant LCB in executing the Hizbollah Wire Transfers constituted "acts of international terrorism" as defined in 18 U.S.C. § 2331.

166.    As required by § 2331, the actions of defendant LCB in executing the Hizbollah Wire Transfers constituted a violation of the criminal laws of the United States including, without limitation, the criminal provisions of 18 U.S.C. §§ 2339A, 2339B and 2339C, which prohibit the provision of material support and resources to terrorist organizations.

167.    As required by § 2331, LCB's actions in executing the Hizbollah Wire Transfers were dangerous to human life, since Hizbollah is a violent terrorist organization which since its establishment has murdered hundreds of innocent civilians, and openly proclaims its intention to murder other such innocent civilians.

168.    As required by § 2331, LCB's actions in executing the Hizbollah Wire Transfers transcended national boundaries in terms of the means by which they were accomplished and locales in which LCB operates.

169.    Section 2331(1)(B) defines "international terrorism" as "activities that ... appear to be intended ... to intimidate or coerce a civilian population [or] to influence the policy of a government by intimidation or coercion." However, § 2331(1)(B) does not impose "a state-of-mind requirement; it is a matter of external appearance rather than subjective intent," *Boim v. Holy Land Foundation for Relief and Development*, 549 F.3d 685, 694 (7th Cir. 2008). This condition was satisfied here by the fact that LCB knowingly and intentionally executed the Hizbollah Wire Transfers when LCB knew full well that Hizbollah is a terrorist organization dedicated to using terrorism in order to intimidate and influence the conduct of the Israeli government and public. This conduct of LCB created the objective "external appearance" that LCB shared Hizbollah's goals of intimidating and coercing a civilian population and of influencing the policy of a government by intimidation and coercion.

170.    Alternatively, to the extent that § 2331(1)(B) imposes a subjective state-of-mind requirement, that requirement was also met here because (like much of the Lebanese public) LCB shares Hizbollah's hostility toward Israel, supports Hizbollah's

use of terrorism to intimidate the Israeli government and public and executed the Hizbollah Wire Transfers with the intention of intimidating and coercing a civilian population and influencing the policy of a government by intimidation and coercion.

171.    The actions of defendant LCB in executing the Hizbollah Wire Transfers therefore constituted "acts of international terrorism" as defined in 18 U.S.C. §§ 2331 and 2333.

172.    As a direct and proximate result of LCB's execution of the Hizbollah Wire Transfers, the American Plaintiffs suffered the harm described herein.

173.    Defendant LCB is therefore liable for all of the American Plaintiffs' damages in such sums as may hereinafter be determined, to be trebled pursuant to 18 U.S.C. § 2333(a).

**SECOND CAUSE OF ACTION**
**ON BEHALF OF THE AMERICAN PLAINTIFFS**
**AGAINST DEFENDANT LCB**
**AIDING AND ABETTING INTERNATIONAL TERRORISM**
**PURSUANT TO 18 U.S.C. § 2333**

174.    Plaintiffs repeat and reallege each of the foregoing paragraphs with the same force and effect as if more fully set forth herein.

175.    Hizbollah uses terrorism in an effort to coerce, intimidate and influence government decision-makers and the public in Israel.

176.    Hizbollah's actions described herein are and were dangerous to human life and constituted a violation of the criminal laws of the United States, since Hizbollah is a violent terrorist organization which since its establishment has murdered

hundreds of innocent civilians, and openly proclaims its intention to murder other such innocent civilians.

177.   Hizbollah's actions described herein transcended national boundaries in terms of the means by which they were accomplished, the persons they appeared intended to intimidate or coerce, and the locales in which Hizbollah operates.

178.   The actions of the Hizbollah described herein therefore constituted "acts of international terrorism" as defined in 18 U.S.C. §§ 2331 and 2333.

179.   Defendant LCB knowingly and intentionally carried out the Hizbollah Wire Transfers, totaling millions of dollars, on an on-going basis over a period of several years.

180.   Defendant LCB carried out the Hizbollah Wire Transfers with the specific purpose and intention of enabling and assisting Hizbollah to carry out terrorist attacks against Jewish civilians in Israel.

181.   The actions of defendant LCB therefore constituted aiding and abetting Hizbollah's "acts of international terrorism" within the meaning of 18 U.S.C. §§ 2331 and 2333.

182.   As a direct and proximate result of LCB's conduct the American Plaintiffs suffered the harm described herein.

183.   Defendant LCB is therefore liable for all of the American Plaintiffs' damages in such sums as may hereinafter be determined, to be trebled pursuant to 18 U.S.C. § 2333(a).

**THIRD CAUSE OF ACTION**
**ON BEHALF OF THE ISRAELI PLAINTIFFS AND THE CANADIAN PLAINTIFFS**
**(EXCEPT FOR SARAH YEFET, SHOSHANA SAPPIR,**
**ROCHELLE SHALMONI AND OZ SHALMONI)**
**AGAINST DEFENDANT LCB**
**AIDING AND ABETTING VIOLATIONS OF INTERNATIONAL LAW**

184.    Plaintiffs repeat and reallege each of the foregoing paragraphs with the same force and effect as if more fully set forth herein.

185.    At all times relevant hereto Hizbollah sought, as an official and publicly stated policy and goal of Hizbollah, to destroy the State of Israel and murder or expel its Jewish residents.

186.    At all times relevant hereto Hizbollah sought, as an official and publicly stated policy and goal of Hizbollah, to ethnically cleanse the territory of the State of Israel of its Jewish population.

187.    At all times relevant hereto, Hizbollah has sought to achieve its goal of destroying the State of Israel and murdering or expelling its Jewish residents by systematically committing thousands of terrorist attacks against Jewish civilians in Israel, including the Hizbollah Rocket Attacks.

188.    Hizbollah's actions described herein, i.e. its attempts to physically exterminate or expel the Jewish residents of Israel and its intentional and systematic use of violence against civilians, constitute genocide, crimes against humanity and war crimes under customary international law, and therefore constitute violations of "the law of nations" within the meaning of 28 U.S.C. § 1350.

189.    Defendant LCB knowingly and intentionally carried out the Hizbollah Wire Transfers, totaling millions of dollars, on an on-going basis over a period of several years.

190.    Defendant LCB carried out the Hizbollah Wire Transfers with the specific purpose and intention of enabling and assisting Hizbollah to carry out its goal of physically exterminating or expelling the Jewish residents of Israel, and its goal of intentionally and systematically using violence against Jewish civilians in Israel.

191.    The actions of defendant LCB therefore constituted aiding and abetting Hizbollah's acts of genocide, crimes against humanity and war crimes under the law of nations.

192.    As a direct and proximate result of LCB's conduct the Israeli Plaintiffs and the Canadian Plaintiffs suffered the harm described herein.

193.    Defendant LCB is therefore liable for all of the damages suffered by the Israeli Plaintiffs and the Canadian Plaintiffs[2] in such sums as may hereinafter be determined.

194.    Defendant LCB's conduct was criminal in nature, dangerous to human life, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages.

---

[2]    Except for plaintiffs Sarah Yefet, Shoshana Sappir, Rochelle Shalmoni and Oz Shalmoni, who do not bring this cause of action.

## FOURTH CAUSE OF ACTION
## BY ALL PLAINTIFFS
## (EXCEPT FOR SARAH YEFET, SHOSHANA SAPPIR,
## ROCHELLE SHALMONI AND OZ SHALMONI)
## AGAINST DEFENDANT LCB BANK
## NEGLIGENCE
### (Under the Law of the State of Israel)

195.    Plaintiffs repeat and reallege each of the foregoing paragraphs with the same force and effect as if more fully set forth herein.

196.    Pursuant to Rule 44.1 of the Federal Rules of Civil Procedure, plaintiffs hereby give notice of their intention to rely on the law of the State of Israel.

197.    Causes of action in tort in Israeli law are codified in the *Civil Wrongs Ordinance (New Version) - 1968,* (hereinafter "CWO").

198.    The CWO provides that any person injured or harmed by the civil wrongs enumerated in the CWO is entitled to relief from the person liable or responsible for the wrong.

199.    CWO § 35 creates a "civil wrong" of Negligence.

200.    CWO § 35 provides that a person is liable for the civil wrong of Negligence when he commits an act which a reasonable and prudent person would not have committed under the same circumstances; or refrains from committing an act which a reasonable and prudent person would have committed under the same circumstances; or, in the performance of his occupation, does not use the skill or exercise the degree of caution which a reasonable person qualified to act in that occupation would have used or exercised under the same circumstances, and thereby

causes damage to another person toward whom, under those circumstances he is obligated not to act as he did.

201.   CWO § 36 provides that the obligation stated in the last sentence of § 35 is toward all persons, to the extent that a reasonable person would have under the same circumstances foreseen that, in the ordinary course of events, they were liable to be injured by the act or omission.

202.   Under binding precedent of the Israeli Supreme Court, the tort of Negligence also includes intentional and/or reckless conduct.

203.   By carrying out the Hizbollah Wire Transfers defendant LCB carried out acts which a reasonable and prudent person would not have committed under the same circumstances, within the meaning of the CWO.

204.   Defendant LCB refrained from committing acts which a reasonable and prudent person would have committed under the same circumstances, within the meaning of the CWO, in that, *inter alia*, defendant LCB failed to comply with its statutory obligations under United States law, New York law, Lebanese law and the FATF and MENAFATF rules to know its customers and perform due diligence, and to monitor, report and refuse to execute illegal, suspicious and/or irregular banking transactions.

205.   Defendant LCB did not, in the performance of its occupation, use the skill or exercise the degree of caution which a reasonable person qualified to act in those occupations would have used or exercised under the same circumstances, within the meaning of the CWO, in that, *inter alia*, LCB carried out the Hizbollah Wire

Transfers and failed to comply with its statutory obligations to know its customers and perform due diligence, and to monitor, report and refuse to execute illegal, suspicious and/or irregular banking transactions.

206.    Defendant LCB acted negligently in connection with the plaintiffs and their decedents, toward whom, in the circumstances described herein, defendant LCB had an obligation not to act as it did. Defendant LCB was obligated not to act as it did because a reasonable person would, under the same circumstances, have foreseen that, in the ordinary course of events, persons such as the plaintiffs and the decedents were liable to be injured by defendant's LCB's acts and omissions described herein.

207.    Defendant LCB's behavior constitutes Negligence under the CWO, and that negligent behavior was the proximate cause of the injuries to the plaintiffs and the deaths of the decedents, including: death; severe physical injuries, pain and suffering; loss of pecuniary support; loss of income; loss of consortium; emotional distress; loss of society and companionship and loss of solatium.

208.    Defendant LCB is therefore liable for the full amount of plaintiffs' damages. [3]

209.    Under Israeli case law a plaintiff harmed by an act of Negligence caused by intentional or reckless conduct is entitled to punitive damages.

210.    Defendant LCB's conduct was intentional or reckless, warranting an award of punitive damages.

---

[3]     Except for plaintiffs Sarah Yefet, Shoshana Sappir, Rochelle Shalmoni and Oz Shalmoni, who do not bring this cause of action.

## FIFTH CAUSE OF ACTION
## BY ALL PLAINTIFFS
## (EXCEPT FOR PLAINTIFFS SARAH YEFET, SHOSHANA SAPPIR,
## ROCHELLE SHALMONI AND OZ SHALMONI)
## AGAINST DEFENDANT LCB
## BREACH OF STATUTORY DUTY
### (Under the Law of the State of Israel)

211.    Plaintiffs repeat and reallege each of the foregoing allegations with the same force and effect as if more fully set forth herein.

212.    Pursuant to Rule 44.1 of the Federal Rules of Civil Procedure, plaintiffs hereby give notice of their intention to rely on the law of the State of Israel.

213.    CWO § 63 creates a civil wrong of Breach of Statutory Duty defined as the failure to comply with an obligation imposed under any legal enactment, if the legal enactment is intended for the benefit or protection of another person, and if the breach of the enactment caused that person damage of the kind or nature of damage intended to be prevent by the enactment.

214.    Under Israel's *Interpretation Ordinance (New Version)*, an "enactment" within the meaning of the CWO is defined to mean "every law and every regulation," while the terms "law" and "regulation" are defined in turn as acts of the Knesset (Israel's parliament) and of "any authority in Eretz Israel or in Israel," respectively.

215.    CWO § 63(b) provides that for the purpose of CWO § 63, an enactment is deemed to have been enacted for the benefit or protection of a specific person, if it is intended for the benefit or protection of that person, or for the benefit or

protection of persons in general, or of persons of a category or definition to which that specific person belongs.

216.   Defendant LCB breached and failed to comply with obligations imposed upon it by numerous enactments, which were intended for the benefit and protection of persons in general, and for the benefit and protection of persons of the type, category and definition to which plaintiffs and the decedents belong, within the meaning of the CWO.

217.   The statutory obligations breached by defendant LCB include, without limitation, the provisions of the following enactments:

  a)  Section 4 of Israel's *Prevention of Terrorism Ordinance, 5708 – 1948* (which criminally prohibits the provision of material support to terrorist organizations such as Hizbollah);

  b)  Sections 145 and 148 of Israel's *Penal Law, 5737 – 1977* (which criminally prohibit the provision of material support to terrorist organizations such as Hizbollah);

  c)  Section 85 of Israel's *Defense Regulations (Emergency Period) – 1945* (which criminally prohibits the provision of services and other material support to terrorist organizations such as Hizbollah).

218.   The conduct of defendant LCB described herein breached the enactments listed above, despite the fact that defendant LCB's conduct did not take place in Israel, because Israel has extraterritorial criminal jurisdiction over crimes against the security

of the State of Israel and over crimes against the lives and persons of Israeli citizens as such, pursuant to § 13 of Israel's *Penal Law, 5737 – 1977*.

219.    All of the statutory enactments listed above are intended for the benefit and protection of persons in general, for the specific benefit and protection of innocent civilians such as the plaintiffs and decedents, in that all of the statutory enactments listed above are intended to protect all such persons from terrorist attacks and from all the damages which terrorist attacks are liable to inflict.

220.    Defendant LCB's breach of its statutory obligations was the proximate cause of the harm to the plaintiffs and the deaths of the decedents described herein, and caused plaintiffs damage of the kind and nature intended to be prevented by the statutory enactments which were breached by LCB, including: death; severe physical injuries, pain and suffering; loss of pecuniary support; loss of income; loss of consortium; emotional distress; loss of society and companionship and loss of solatium.

221.    Defendant LCB committed the civil wrong of Breach of Statutory Duty under CWO § 63, and is therefore liable for the full amount of plaintiffs' damages.[4]

222.    Under Israeli case law a plaintiff harmed by a Breach of Statutory Duty caused by intentional or reckless conduct is entitled to punitive damages.

223.    Defendant LCB's conduct was intentional or reckless, warranting an award of punitive damages.

---

[4]    Except for plaintiffs Sarah Yefet, Shoshana Sappir, Rochelle Shalmoni and Oz Shalmoni, who do not bring this cause of action.

## SIXTH CAUSE OF ACTION BY ALL PLAINTIFFS
## AGAINST DEFENDANT AMEX BANK
## <u>NEGLIGENCE</u>
### (Under the Law of the State of Israel)

224.    Plaintiffs repeat and reallege each of the foregoing allegations with the same force and effect as if more fully set forth herein.

225.    Pursuant to Rule 44.1 of the Federal Rules of Civil Procedure, plaintiffs hereby give notice of their intention to rely on the law of the State of Israel.

226.    By carrying out the Hizbollah Wire Transfers defendant Amex Bank carried out acts which a reasonable and prudent person would not have committed under the same circumstances, within the meaning of the CWO.

227.    Defendant Amex Bank refrained from committing acts which a reasonable and prudent person would have committed under the same circumstances, within the meaning of the CWO, in that, *inter alia*, defendant Amex Bank failed to comply with its statutory obligations under United States law, New York law and the FATF rules to know its customers and perform due diligence, and to monitor, report and refuse to execute illegal, suspicious and/or irregular banking transactions. Indeed, as stated above, the New York State Banking Department expressly found that Bank Amex failed to comply with these obligations.

228.    Defendant Amex Bank did not, in the performance of its occupation, use the skill or exercise the degree of caution which a reasonable person qualified to act in those occupations would have used or exercised under the same

circumstances, within the meaning of the CWO, in that, *inter alia*, Amex Bank carried out the Hizbollah Wire Transfers and failed to comply with its statutory obligations to know its customers and perform due diligence, and to monitor, report and refuse to execute illegal, suspicious and/or irregular banking transactions.

229.   Defendant Amex Bank acted negligently in connection with the plaintiffs and their decedents, toward whom, in the circumstances described herein, defendant Amex Bank had an obligation not to act as it did.

230.   Defendant Amex Bank was obligated not to act as it did because a reasonable person would, under the same circumstances, have foreseen that, in the ordinary course of events, persons such as the plaintiffs and the decedents were liable to be injured by defendant's Amex Bank's acts and omissions described herein.

231.   Defendant Amex Bank's behavior constitutes Negligence under the CWO, and that negligent behavior was the proximate cause of the injuries to the plaintiffs and the deaths of the decedents, including: death; severe physical injuries, pain and suffering; loss of pecuniary support; loss of income; loss of consortium; emotional distress; loss of society and companionship and loss of solatium.

232.   Defendant Amex Bank is therefore liable for the full amount of plaintiffs' damages.

233.   Defendant Amex Bank's conduct was intentional and/or reckless, warranting an award of punitive damages.

**WHEREFORE**, the Plaintiffs demand Judgment against the Defendants as follows:

(a)     Against defendants Amex Bank and LCB, jointly and severally, for compensatory damages in an amount to be determined at trial but no less than $650 million;

(b)     Against defendants Amex Bank and LCB, jointly and severally, for punitive damages in an amount to be determined at trial;

(c)     For such other and further relief as justice requires.


Dated:   New York, New York
         January 20, 2009

                         Yours,

                         JAROSLAWICZ & JAROS, LLC
                         *Attorneys for the Plaintiffs*

                         By:

                              Robert J. Tolchin

                         225 Broadway, 24th floor
                         New York, New York 10007
                         (212) 227-2780

                         NITSANA DARSHAN-LEITNER & CO.
                         Nitsana Darshan-Leitner, Adv.
                         *Israeli Counsel for Plaintiffs*
                         10 Hata'as Street
                         Ramat Gan, 52512, Israel

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF New York
-----------------------------------------------------------------------x
YAAKOV LICCI, a minor, by his father and natural guardian
ELIHAV LICCI and by his mother and natural guardian
YEHUDIT LICCI, et al.,

Index No. 109548/08

               Plaintiffs,

**AFFIDAVIT OF
SERVICE**

     -against-

AMERICAN EXPRESS BANK LTD.
LEBANESE CANADIAN BANK, SAL,

               Defendants.
-----------------------------------------------------------------------x

STATE OF NEW YORK      )
                        ) ss.:
COUNTY OF NEW YORK   )

      Eileen Goldsmith, being duly sworn, deposes and says:

      That she is over eighteen years of age, is not a party to this action; and is employed by the attorney for the plaintiff(s) herein.  That on January 21, 2009 she served the within:

### FIRST AMENDED COMPLAINT

upon the following, at the address(es) designated by said attorney(s) for that purpose by depositing a true copy of same enclosed in a postpaid properly addressed wrapper in an official depository under the exclusive care and custody of the United States Post Office Department within the State of New York.

TO:

Morrison Foerster LLP
1290 Avenue of the Americas
New York, New York 10104-0050

                                  _____
                                   EILEEN GOLDSMITH

Sworn to before me this
January 21, 2009

_____
Notary Public

BARBARA SIEGEL
Notary Public, State of New York
No. 01SI4635947
Qualified in Kings County
Commission Expires Oct. 31, 2010