**MANDATE**

UNITED STATES COURT OF APPEALS

FOR THE
SECOND CIRCUIT

N.Y.S.D. Case #
08-cv-7253(GBD)

_____

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 18th day of October, two thousand and thirteen.

Before:     Robert A. Katzmann,
                 *Chief Judge.*
             Amalya L. Kearse,
             Robert D. Sack,
                 *Circuit Judge*s.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: August 28, 2014

_____

Yaakov Licci, a minor, by his father and natural guardian, Elihav Licci and by his mother and natural guardian, Yehudit Licci, et al.,

**JUDGMENT**
Docket No.10-1306

Plaintiffs - Appellants

v.

Lebanese Canadian Bank, SAL; American Express Bank Ltd.,

Defendants - Appellees.

_____

The appeal in the above captioned case from a judgment of the United States District Court for the Southern District of New York was argued on the district court's record and the parties' briefs. Upon consideration thereof,

IT IS HEREBY ORDERED, ADJUDGED and DECREED that the judgment of the district court is VACATED and REMANDED in accordance with the opinion of this court.

For The Court:

Catherine O'Hagan Wolfe,

Clerk of Court

*Catherine O'Hagan Wolfe*

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

*Catherine O'Hagan Wolfe*

**MANDATE ISSUED ON 08/28/2014**

10-1306-cv
Licci, et al. v. Lebanese Canadian Bank, SAL

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2010

(Argued:  February 25, 2011;  Questions Certified:
March 5, 2012;  Certified Questions Answered:
November 20, 2012; Final Submission:  February 8, 2013;
Decided: October 18, 2013)

Docket No. 10-1306-cv

---------------------------------------

YAAKOV LICCI, a minor, by his father and natural guardian, ELIHAV LICCI,
and by his mother and natural guardian, YEHUDIT LICCI, et al.,

*Plaintiffs-Appellants*,

- v -

LEBANESE CANADIAN BANK, SAL; AMERICAN EXPRESS BANK LTD.,

*Defendants-Appellees*.

---------------------------------------

Before:      KATZMANN, *Chief Judge*, and KEARSE and SACK, *Circuit Judges*.

Appeal by the plaintiffs from an order of the United States District

Court for the Southern District of New York (George B. Daniels, *Judge*)

dismissing this action as to defendant Lebanese Canadian Bank, SAL, for want of personal jurisdiction.  In response to two questions we certified, the New York Court of Appeals concluded that allegations of the defendant's repeated use of a New York correspondent bank account to transfer substantial sums of money on behalf of a Hizballah affiliate "shows not only transaction of business, but an articulable nexus or substantial relationship between the transaction" and the plaintiffs' Anti-Terrorism Act, Alien Tort Statute, and Israeli law claims to support personal jurisdiction under New York's long-arm statute, N.Y. C.P.L.R. 302(a)(1).  *Licci v. Lebanese Canadian Bank, SAL*, 20 N.Y.3d 327, 340, 984 N.E.2d 893, 901, 960 N.Y.S.2d 695, 703 (2012).  In light of that guidance and our conclusion that such jurisdiction does not violate due process protections afforded to the defendant by the United States Constitution, we vacate the judgment of the district court with respect to personal jurisdiction over Lebanese Canadian Bank, and remand for further proceedings.

Vacated and remanded.

ROBERT J. TOLCHIN, The Berkman Law Office, LLC, Brooklyn, NY, *for Plaintiffs-Appellants*.

JONATHAN D. SIEGFRIED, DLA Piper LLP (Lawrence S. Hirsh, Dewey & LeBoeuf LLP, *of counsel*), New York, NY, *for Defendant-Appellee Lebanese Canadian Bank, SAL*.

2

Case 1:08-cv-07253-GBD-KHP   Document 248-2   Page: 3   Filed 08/28/2014   Page 16 of 45

SACK, *Circuit Judge*:

When this case first came to us on appeal, we certified to the New York Court of Appeals two questions concerning the scope of New York's long-arm statute, as set forth in N.Y. C.P.L.R. 302(a)(1), in our effort to determine whether the district court had personal jurisdiction over defendant Lebanese Canadian Bank, SAL ("LCB"). The Court of Appeals accepted our certified questions, and, in response, explained that a foreign bank's use of a New York correspondent account to execute dozens of wire transfers is sufficiently purposeful conduct to constitute a "transaction of business" within the meaning of that section. *Licci v. Lebanese Canadian Bank, SAL*, 20 N.Y.3d 327, 339, 984 N.E.2d 893, 900, 960 N.Y.S.2d 695, 702 (2012) ("*Licci III*"). The Court of Appeals also concluded that the allegations contained in the complaint, taken as true for these purposes, establish the requisite "nexus" or "relationship" between the foreign bank's New York business activity and the plaintiffs' claims to support the district court's exercise of personal jurisdiction under the long-arm statute. *Id.* at 340, 984 N.E.2d at 901, 960 N.Y.S.2d at 703.

Now that the New York Court of Appeals has answered the state-law portion of the jurisdictional inquiry, we must ensure that subjecting the

3

foreign bank to personal jurisdiction in New York comports with due process protections provided by the United States Constitution.  We conclude that it does.  We therefore vacate that part of the district court's judgment dismissing the complaint against defendant LCB for lack of personal jurisdiction and remand for further proceedings.

## BACKGROUND

Because our previous opinion extensively recites the facts and procedural history of this case, *see Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 55-59 (2d Cir. 2012) ("*Licci II*"), we reiterate here only those facts we think necessary to understand our disposition of this appeal following the New York Court of Appeals' answers to our certified questions.

Plaintiffs are American, Canadian, and Israeli citizens who were injured, or whose family members were injured or killed, in rocket attacks allegedly carried out by Hizballah[1] in July and August 2006 in Israel.  *Id.* at 54-55. Defendant LCB is a Lebanese bank with no operations, branches, or employees in

---

[1]  We continue to adopt the spelling used by the United States Department of State, which has designated Hizballah a Foreign Terrorist Organization since 1997.  *See* U.S. Dep't of State, Bureau of Counterterrorism, *Foreign Terrorist Organizations* (Oct. 16, 2013), http://www.state.gov/j/ct/rls/other/des/ 123085.htm.

4

the United States.[2]  *Id.* at 56.  To effectuate U.S.-dollar-denominated transactions,

LCB maintains a correspondent bank account[3] with defendant American Express

Bank Ltd. ("AmEx") in New York.  *Id.*  The plaintiffs allege that LCB used this

correspondent account to wire millions of dollars on behalf of Hizballah,

knowing that such wire transfers would enable Hizballah "to plan, to prepare for

and to carry out terrorist attacks," including the rocket attacks in which the

plaintiffs or their family members were injured.  Am. Compl. ¶ 131.  Specifically,

the plaintiffs allege that LCB executed wire transfers using its correspondent

---

[2]  The New York Court of Appeals reported that, during the pendency of this appeal, privately owned LCB merged with the Lebanese subsidiary of Société Générale SA, a French bank.  *Licci III*, 20 N.Y.3d at 330 n.1, 984 N.E.2d at 894 n.1, 960 N.Y.S.2d at 696 n.1 (2012).  Nothing in the record on appeal indicates that the entity we refer to as LCB has ceased to be the proper defendant-appellee in these proceedings.

[3]  A correspondent bank account is a domestic bank account held by a foreign bank, "similar to a personal checking account used for deposits, payments and transfers of funds."  *Int'l Hous. Ltd. v. Rafidain Bank Iraq*, 893 F.2d 8, 9 (2d Cir. 1989).  Correspondent accounts "facilitate the flow of money worldwide, often for transactions that otherwise have no other connection to New York, or indeed the United States."  *Licci III*, 20 N.Y.3d at 338, 984 N.E.2d at 900, 960 N.Y.S.2d at 702; *see also Tamam v. Fransabank SAL*, 677 F. Supp. 2d 720, 724-25 (S.D.N.Y. 2010) (noting that U.S. dollars are widely used in Lebanon, and that "Lebanese banks generally acquire U.S. currency either through the Central Bank of Lebanon clearinghouse or through correspondent banking relationships in other countries").

account in New York, for an account held by the Shahid (Martyrs) Foundation

("Shahid"), which is a "financial arm" of Hizballah. *Id.* ¶¶ 45-53. Shahid was the

account holder in name only. The plaintiffs allege that funds held in Shahid's

LCB account "belonged to Hizbollah and were under the control of Hizbollah," *id.*

¶ 50, and that LCB carried out wire transfers for the Shahid account "in order to

assist and advance Hizbollah's goal of using terrorism to destroy the State of

Israel," *id.* ¶ 129.

Proceedings in the District Court

The plaintiffs brought five claims against LCB: (1) commission of

international terrorism in violation of the Anti-Terrorism Act, 18 U.S.C. § 2333;

(2) aiding and abetting international terrorism in violation of the Anti-Terrorism

Act; (3) aiding and abetting genocide, war crimes, and crimes against humanity

in violation of international law, under the Alien Tort Statute, 28 U.S.C. § 1350

(the "ATS"); (4) negligence in violation of Israeli Civil Wrongs Ordinance § 35;

and (5) breach of statutory duty in violation of Israeli Civil Wrongs Ordinance

§ 63.[4]  LCB moved to dismiss all five claims for lack of personal jurisdiction under

---

[4]  The plaintiffs also brought a single cause of action against AmEx for
negligence under Israeli law. The district court dismissed the claim with
prejudice pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, *Licci*

6

Rule 12(b)(2) of the Federal Rules of Civil Procedure, and for failure to state a

claim under Rule 12(b)(6).

      In a memorandum decision and order dated March 31, 2010, the

district court granted LCB's Rule 12(b)(2) motion to dismiss for want of personal

jurisdiction.  *Licci v. Am. Express Bank Ltd.*, 704 F. Supp. 2d 403 (S.D.N.Y. 2010)

("*Licci I*").  The district court correctly noted that a defendant may be subject to

personal jurisdiction in New York under N.Y. C.P.L.R. 302(a)(1) if (1) the

defendant "'transacted business within the state; and (2) the claim asserted . . .

arise[s] from that business activity,'" *id.* at 406 (quoting *Solé Resort, S.A. de C.V. v.

Allure Resorts Mgmt., LLC*, 450 F.3d 100, 103 (2d Cir. 2006)), but decided that the

allegations in the amended complaint were insufficient to satisfy either such

prong, *id.* at 406-08.

      With respect to section 302(a)(1)'s transaction of business

requirement, the district court concluded that LCB's "execution of wire transfers

is not a 'use' of a correspondent account which alone is sufficient to confer

jurisdiction over a foreign bank" because one of the primary functions of a

---

*v. Am. Express Bank Ltd.*, 704 F. Supp. 2d 403, 411 (S.D.N.Y. 2010), and we
affirmed, *Licci v. Lebanese Canadian Bank, SAL*, 672 F.3d 155, 158 (2d Cir. 2012) (per
curiam).  This aspect of the matter is thus no longer before us.

correspondent account is to facilitate cross-border wire transfers.  *Id.* at 407.  It could perceive "no meaningful distinction" between "use" of a correspondent account and the "maintenance" of such an account, which some decisions had found to be insufficient, standing alone, to establish personal jurisdiction.  *Id.* at 407-08.

With respect to section 302(a)(1)'s requirement that a plaintiff's claim "arise from" New York business activity, the district court apparently interpreted New York's long-arm statute to require that the defendant's in-state transaction of business proximately caused the plaintiff's injury.  *Id.* at 408.  It found no such proximate causation because "[t]he injuries and death suffered by plaintiffs and their family members were caused by the rockets launched by Hizbollah, not by the banking services provided by LCB through its correspondent account or wire transfers with Amex Bank via New York."  *Id.*

Although the Rule 12(b)(2) dismissal rested entirely on the plaintiffs' failure to make a *prima facie* showing of long-arm jurisdiction under New York law, the district court also offered its view -- without further explication -- that "[t]he exercise of personal jurisdiction over LCB on the basis alleged by plaintiffs would not comport with constitutional principles of due process."  *Id.*  The court

8

did not reach LCB's alternative argument that the complaint should be dismissed

for failure adequately to plead a cause of action under Rule 12(b)(6).

<u>Proceedings in This Court</u>

In our initial consideration of the plaintiffs' appeal, we found the

scope and application of the long-arm statute's "transaction of business" and

"arising from" tests to be uncertain.  We determined that we could not

"confidently say whether the New York Court of Appeals would conclude that

the plaintiffs" have made a *prima facie* showing of jurisdiction under N.Y. C.P.L.R.

302(a)(1).  *Licci II*, 673 F.3d at 73.  We therefore certified the following questions to

the New York Court of Appeals:

> (1) Does a foreign bank's maintenance of a
> correspondent bank account at a financial institution in
> New York, and use of that account to effect "dozens" of
> wire transfers on behalf of a foreign client, constitute a
> "transact[ion]" of business in New York within the
> meaning of N.Y. C.P.L.R. § 302(a)(1)?

> (2) If so, do the plaintiffs' claims under the Anti-
> Terrorism Act, the ATS, or for negligence or breach of
> statutory duty in violation of Israeli law, "aris[e] from"
> LCB's transaction of business in New York within the
> meaning of N.Y. C.P.L.R. § 302(a)(1)?

*Id.* at 74-75 (alterations in original).

9

On March 29, 2012, the Court of Appeals accepted our certified

questions.  *Licci v. Lebanese Canadian Bank, SAL*, 18 N.Y.3d 952, 967 N.E.2d 697,

944 N.Y.S.2d 472 (2012).  Having heard argument on the case, the Court

answered the certified questions in the affirmative.  *Licci III*, 20 N.Y.3d at 341, 984

N.E.2d at 901, 960 N.Y.S.2d at 703.  Equipped with this guidance, we now return

to the jurisdictional questions presented.[5]

## DISCUSSION

### I. Personal Jurisdiction

We review *de novo* the district court's Rule 12(b)(2) dismissal for lack

of personal jurisdiction over the defendant.  *Chloé v. Queen Bee of Beverly Hills,*

*LLC*, 616 F.3d 158, 163 (2d Cir. 2010).  "In order to survive a motion to dismiss for

lack of personal jurisdiction, a plaintiff must make a prima facie showing that

jurisdiction exists."  *Thomas v. Ashcroft*, 470 F.3d 491, 495 (2d Cir. 2006).  In

evaluating whether the requisite showing has been made, we construe the

---

[5]  We deny the plaintiffs' February 8, 2013, request to supplement the
record on appeal with jurisdictional allegations drawn from the complaint in a
2011 civil forfeiture action brought by the United States against LCB in the
Southern District of New York because we are of the view that it is unnecessary
and would be unhelpful.

10

Case 1:08-cv-07253-GBD-KHP   Document 248-2   Filed 08/28/14   Page 12 of 45

pleadings and any supporting materials in the light most favorable to the
plaintiffs. *Chloé*, 616 F.3d at 163.

Determining personal jurisdiction over a foreign defendant in a
federal-question case such as this requires a two-step inquiry. First, we look to
the law of the forum state to determine whether personal jurisdiction will lie. *See*
*Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242 (2d Cir. 2007). If jurisdiction lies,
we consider whether the district court's exercise of personal jurisdiction over a
foreign defendant comports with due process protections established under the
United States Constitution. *Id.*; *see also Int'l Shoe Co. v. Washington*, 326 U.S. 310,
316 (1945).

A.  State Law

New York's long-arm statute provides in relevant part that "a court
may exercise personal jurisdiction over any non-domiciliary . . . who in person or
through an agent . . . transacts any business within the state or contracts
anywhere to supply goods or services in the state." N.Y. C.P.L.R. 302(a)(1). "To
establish personal jurisdiction under section 302(a)(1), two requirements must be
met: (1) The defendant must have transacted business within the state; and (2) the
claim asserted must arise from that business activity." *Solé Resort*, 450 F.3d at 103.

11

1.  <u>Transacting Business.</u>  In its response to our certified questions, the Court of Appeals confirmed that *Amigo Foods Corp. v. Marine Midland Bank-N.Y.*, 39 N.Y.2d 391, 348 N.E.2d 581, 384 N.Y.S.2d 124 (1976), stands for the proposition that the use of a New York correspondent bank account, standing alone, may be considered a "transaction of business" under the long-arm statute if the defendant's use of the correspondent account was purposeful.  *Licci III*, 20 N.Y.3d at 338-39, 984 N.E.2d at 899-900, 960 N.Y.S.2d at 701-02.  The Court concluded that whether a defendant has purposefully availed itself of the New York forum is a fact-intensive inquiry inasmuch as it requires the trial court, in the first instance, to "closely examine the defendant's contacts for their quality." *Id.* at 338, 984 N.E.2d at 899-900, 960 N.Y.S.2d at 701-02.  As a general matter, however,

> complaints alleging a foreign bank's repeated use of a correspondent account in New York on behalf of a client -- in effect, a "course of dealing" -- show purposeful availment of New York's dependable and transparent banking system, the dollar as a stable and fungible currency, and the predictable jurisdictional and commercial law of New York and the United States.

*Id.* at 339, 984 N.E.2d at 900, 960 N.Y.S.2d at 702 (citation omitted).

12

Case 1:08-cv-07253-GBD-KHP   Document 248-2   Page 15   08/28/2014   Page 14 of 45

With respect to LCB's contacts with New York, the Court of Appeals found both the frequency and deliberate nature of LCB's use of its correspondent account to be determinative.  The Court focused on the allegations that LCB used its New York correspondent account "dozens" of times "to effect its support of Shahid and shared terrorist goals," not "once or twice by mistake."  *Id.* at 340, 984 N.E.2d at 901, 960 N.Y.S.2d at 703.  The Court confirmed that this conduct "indicates desirability and a lack of coincidence," *id.*, 984 N.E.2d at 901, 960 N.Y.S.2d at 703; that is, it reflects LCB's purposeful availment of the privilege of doing business in the New York forum.

      **2.**  <u>Claims "Arising From" a Transaction of Business.</u>  The Court of Appeals made clear that the "arising from" prong of section 302(a)(1) does not require a causal link between the defendant's New York business activity and a plaintiff's injury.  Instead, it requires "a relatedness between the transaction and the legal claim such that the latter is not completely unmoored from the former, regardless of the ultimate merits of the claim."  *Id.* at 339, 984 N.E.2d at 900, 960 N.Y.S.2d at 702.  According to the Court, whether a plaintiff's claim arises from a defendant's New York contacts depends upon "the nature and elements of the particular causes of action pleaded."  *Id.* at 340, 984 N.E.2d at 901, 960 N.Y.S.2d at

13

703.  However, section 302(a)(1) "does not require that every element of the cause of action pleaded must be related to the New York contacts; rather, where at least one element arises from the New York contacts, the relationship between the business transaction and the claim asserted supports specific jurisdiction under the statute." *Id.* at 341, 984 N.E.2d at 901, 960 N.Y.S.2d at 703.

      With respect to the plaintiffs' claims against LCB, which the Court of Appeals characterized as claims for breach of various statutory duties, the Court acknowledged that "[n]ot all elements of the causes of action pleaded are related to LCB's use of the correspondent account," inasmuch as "the specific harms suffered by plaintiffs flowed not from LCB's alleged support of a terrorist organization, but rather from rockets." *Id.,* 984 N.E.2d at 901, 960 N.Y.S.2d at 703. But, the Court pointed out, the plaintiffs' claims are also grounded in the allegation that LCB violated various statutory duties by using its correspondent account to funnel money to Shahid and Hizballah. *Id.* at 340, 984 N.E.2d at 901, 960 N.Y.S.2d at 703.  Because the defendant's allegedly culpable conduct stems from this use of the New York correspondent account, the Court of Appeals concluded, the plaintiffs' claims are sufficiently related to LCB's New York

14

business activity to satisfy the second prong of section 302(a)(1).  *See id.*, 984

N.E.2d at 901, 960 N.Y.S.2d at 703.

      The plaintiffs have therefore made a *prima facie* showing that the

district court may exercise personal jurisdiction over LCB with respect to their

Anti-Terrorism Act, ATS, and Israeli law claims pursuant to the state long-arm

statute.

## B.  Constitutional Due Process

      Now that the state-law jurisdictional questions have been resolved,

we must determine whether the district court's exercise of personal jurisdiction

over LCB is consistent with the due process protections provided by the United

States Constitution.  *Ehrenfeld v. Mahfouz*, 489 F.3d 542, 547 (2d Cir. 2007) ("[E]ven

if the New York Court of Appeals concludes that personal jurisdiction is proper

under § 302(a)(1) of the New York long-arm statute, this Court must make the

ultimate determination whether this jurisdiction satisfies constitutional due

process.").

      Due process considerations require that the defendant "have certain

minimum contacts [with the forum state] such that the maintenance of the suit

does not offend traditional notions of fair play and substantial justice." *Int'l Shoe*,

15

326 U.S. at 316 (internal quotation marks omitted).  Where, as in this case, the

plaintiffs ask the district court to assert specific jurisdiction[6] over the defendants,

the jurisdictional inquiry focuses on the "affiliation between the forum and the

underlying controversy."  *Goodyear Dunlop Tires Operations S.A. v. Brown*, ___ U.S.

___, 131 S. Ct. 2846, 2851 (2011) (internal quotation marks and brackets omitted).

Our analysis typically proceeds in two steps.  First, we "evaluate the

quality and nature of the defendant's contacts with the forum state under a

totality of the circumstances test."  *Best Van Lines*, 490 F.3d at 242 (citations and

---

[6]

> A court may assert general jurisdiction over foreign
> (sister-state or foreign-country) corporations to hear any
> and all claims against them when their affiliations with
> the State are so "continuous and systematic" as to render
> them essentially at home in the forum State.  Specific
> jurisdiction, on the other hand, depends on an
> "affiliation between the forum and the underlying
> controversy," principally, activity or an occurrence that
> takes place in the forum State and is therefore subject to
> the State's regulation.  In contrast to general, all-purpose
> jurisdiction, specific jurisdiction is confined to
> adjudication of "issues deriving from, or connected
> with, the very controversy that establishes jurisdiction."

*Goodyear Dunlop Tires Operations S.A. v. Brown*, ___ U.S. ___, 131 S. Ct. 2846, 2851
(2011) (citations and brackets omitted).  There is no contention that LCB is subject
to general jurisdiction in New York.

16

internal quotation marks omitted). "Where the claim arises out of, or relates to, the defendant's contacts with the forum -- i.e., specific jurisdiction [is asserted] -- minimum contacts [necessary to support such jurisdiction] exist where the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 127 (2d Cir. 2002) (internal quotation marks omitted).

"Once it has been decided that a defendant purposefully established minimum contacts within the forum State, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with fair play and substantial justice." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985) (internal quotation marks omitted). Relevant factors at this second step of the analysis may include: "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; [and] (3) the plaintiff's interest in obtaining convenient and effective relief . . . ." *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996).

17

Case: 16-23306  Document: 248-2  Page: 15  08/28/2814  Page 19 of 45

We pause to note that, despite the fact that section 302(a)(1) of New York's long-arm statute and constitutional due process are not coextensive, and that personal jurisdiction permitted under the long-arm statute may theoretically be prohibited under due process analysis, we would expect such cases to be rare. It would be unusual, indeed, if a defendant transacted business in New York and the claim asserted arose from that business activity within the meaning of section 302(a)(1), and yet, in connection with the same transaction of business, the defendant cannot be found to have "purposefully availed itself of the privilege of doing business in the forum and [to have been able to] foresee being haled into court there," *Bank Brussels Lambert*, 305 F.3d at 127 (internal quotation marks omitted), or the assertion of specific jurisdiction would somehow otherwise "offend traditional notions of fair play and substantial justice," *Int'l Shoe*, 326 U.S. at 316 (internal quotation marks omitted). Indeed, we have been pointed to no such decisions in this Circuit. That observation does not, however, spare us from a separate constitutional analysis in each such case.

1. <u>Minimum Contacts.</u>  The jurisdictional basis for the plaintiffs' claims is LCB's execution of dozens of dollar-denominated wire transfers through its AmEx correspondent account in New York. These wire transfers are a part of

18

the principal wrong at which the plaintiffs' lawsuit is directed inasmuch as they allege that "LCB carried out the . . . [t]ransfers as a matter of official LCB policy, in order to assist and advance Hizbollah's terrorist activities against Jews in Israel" in violation of various statutory duties.  Am. Compl. ¶ 129.

> We conclude that the selection and repeated use of New York's banking system, as an instrument for accomplishing the alleged wrongs for which the plaintiffs seek redress, constitutes "purposeful[] avail[ment] . . . of the privilege of doing business in [New York]," *Bank Brussels Lambert*, 305 F.3d at 127 (internal quotation marks omitted), so as to permit the subjecting of LCB to specific jurisdiction within the Southern District of New York consistent with due process requirements.

> In light of the widespread acceptance and availability of U.S. currency, LCB could have, as it acknowledges, processed U.S.-dollar-denominated wire transfers for the Shahid account through correspondent accounts anywhere in the world.  Appellee's Post-Argument Letter Brief at 10; *see also Tamam v. Fransabank SAL*, 677 F. Supp. 2d 720, 729 (S.D.N.Y. 2010) (noting that foreign bank defendants maintained U.S. dollar correspondent relationships with banks located in Cairo, Sri Lanka, London, Paris, Jordan, the Philippines,

19

and Saudi Arabia, any of which they could have used to execute U.S.-dollar-denominated wire transfers on behalf of Hizballah front groups). But LCB deliberately chose to process the many Shahid wire transfers through AmEx in New York.

Moreover, LCB's use of a correspondent account in New York to accomplish its dollar-denominated wire transfers was recurring. Indeed, the plaintiffs allege wire transfers through AmEx that numbered in the dozens and totaled several million dollars, so it cannot be said that LCB's contacts with New York were "random, isolated, or fortuitous." *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984). This deliberate and recurring activity constitutes, as the Court of Appeals put it in analyzing the applicability of New York's long-arm statute, LCB's "purposeful availment of New York's dependable and transparent banking system, the dollar as a stable and fungible currency, and the predictable jurisdictional and commercial law of New York and the United States." *Licci III*, 20 N.Y.3d at 339, 984 N.E.2d at 900, 960 N.Y.S.2d at 702; *see also id.* at 340, 984 N.E.2d at 901, 960 N.Y.S.2d at 703 (speculating that, although LCB could have routed the Shahid wire transfers through any correspondent account, cost

20

savings or other conveniences associated with the AmEx account in New York enabled LCB to retain Shahid as a customer).

In reaching this conclusion, we by no means suggest that a foreign defendant's "mere maintenance" of a correspondent account in the United States is sufficient to support the constitutional exercise of personal jurisdiction over the account-holder in connection with any controversy. In this case, the correspondent account at issue is alleged to have been used as an instrument to achieve the very wrong alleged. We conclude that in connection with this particular jurisdictional controversy -- a lawsuit seeking redress for the allegedly unlawful provision of banking services of which the wire transfers are a part -- allegations of LCB's repeated, intentional execution of U.S.-dollar-denominated wire transfers on behalf of Shahid, in order to further Hizballah's terrorist goals, are sufficient. It should hardly be unforseeable to a bank that selects and makes use of a particular forum's banking system that it might be subject to the burden of a lawsuit in that forum for wrongs related to, and arising from, that use.[7]

---

[7] There is authority -- albeit not concerning correspondent accounts, and arising in varied contexts -- that stands for the general proposition that use of a forum's banking system as part of an allegedly wrongful course of conduct may expose the user to suits seeking redress in that forum when that use is an integral part of the wrongful conduct. *See, e.g.*, *U.S. Securities and Exchange Commission v.*

LCB argues that the exercise of personal jurisdiction in this case cannot be squared with our decisions in the multidistrict litigation stemming from the September 11, 2001 terrorist attacks.  In *In re Terrorist Attacks on September 11, 2001*, 538 F.3d 71 (2d Cir. 2008), *abrogated on other grounds*, *Samantar v. Yousuf*, 560 U.S. 305 (2010), the plaintiffs, who suffered personal injuries and financial losses as a result of the attacks, filed suit against hundreds of parties, including four Saudi princes who allegedly gave money to Muslim charities with the knowledge that such charities would transfer the funds to the terrorist organization al Qaeda.  *Id.* at 77.  We decided that minimum contacts with the United States would exist if the plaintiffs "show[ed] that the Four Princes engaged in 'intentional, and allegedly tortious, actions . . . expressly aimed' at residents of the United States."  *Id.* at 95 (quoting *Calder v. Jones*, 465 U.S. 783, 789

---

*Carrillo*, 115 F.3d 1540, 1545-47 (11th Cir. 1997) (resting personal jurisdiction in part on the "*use* of . . . bank accounts to carry out the sale of unregistered securities" because the use was "manifestly related to, and gave rise to, the causes of action," "constitute[d] purposeful availment and invocation of the benefits of the forum's laws," and contributed to the expectation that the account-user might be subject to suit in the forum (emphasis in original)); *Application to Enforce Administrative Subpoenas Duces Tecum of S.E.C. v. Knowles*, 87 F.3d 413, 419 (10th Cir. 1996) (resting jurisdiction in securities fraud investigation in part on the use of brokerage accounts in the forum).

(1984)) (ellipsis in original).  But we could find no basis for the constitutional

exercise of personal jurisdiction over the Saudi princes, explaining:

> [The plaintiffs'] burden is not satisfied by the allegation
> that the Four Princes intended to fund al Qaeda through
> their donations to Muslim charities. . . .  It may be the
> case that acts of violence committed against residents of
> the United States were a foreseeable consequence of the
> princes' alleged indirect funding of al Qaeda, but
> foreseeability is not the standard for recognizing
> personal jurisdiction.  Rather, the plaintiffs must
> establish that the Four Princes "expressly aimed"
> intentional tortious acts at residents of the United States.
> Providing indirect funding to an organization that was
> openly hostile to the United States does not constitute
> this type of intentional conduct.  In the absence of such
> a showing, American courts lacked personal jurisdiction
> over the Four Princes.

*Id.* at 95 (citation omitted).

Similarly, in another case related to the September 11th attacks, we

affirmed the dismissal for lack of personal jurisdiction over several foreign

financial institutions and individuals associated therewith who were alleged to

have "knowingly maintained bank accounts for individuals associated with al

Qaeda as well as for purported front charities that aided al Qaeda," where "those

accounts were used for al Qaeda operations."  *In re Terrorist Attacks on Sept. 11,*

*2001,* 714 F.3d 659, 676 (2d Cir. 2013).  As with the Saudi princes, the Court

23

Case 1:08-cv-07253-GBD-KHP   Document 248-2   Page: 24   08/28/2014   Page 25 of 9

rejected the exercise of personal jurisdiction over those banking defendants

because they did not expressly aim their conduct at the United States.  *Id.*

But LCB fails to recognize that the *In re Terrorist Attacks* cases, as well

as *Calder*, the Supreme Court case on which they rely, speak to the requirements

for personal jurisdiction under the so-called "effects test."  The effects test is a

theory of personal jurisdiction typically invoked where (unlike here[8]) the conduct

that forms the basis for the controversy occurs entirely out-of-forum, and the

only relevant jurisdictional contacts with the forum are therefore in-forum effects

harmful to the plaintiff.  In such circumstances, the exercise of personal

jurisdiction may be constitutionally permissible if the defendant expressly aimed

---

[8]  Whereas LCB purportedly supplied Shahid and Hizballah with U.S.
dollars obtained from AmEx in New York by executing dozens of dollar-
denominated wire transfers through its correspondent account, nothing in the
September 11th cases suggests that the Sudanese, Saudi Arabian, and
Liechtenstein-based banks which allegedly provided financial services to al
Qaeda and its affiliates did so by way of the United States.  This factual difference
may well explain the application of the "effects test" in the *In re Terrorist Attacks*
cases.  The only explicit mention of bank accounts held in New York in either
case appears to be that in *In re Terrorist Attacks on September 11, 2001*, 714 F.3d at
680, during a discussion of whether the existence of correspondent bank accounts
in New York could give rise to *general* jurisdiction.  And, indeed, in finding that
they could not give rise to such all-purpose jurisdiction, we expressly
distinguished the Court of Appeals' response to our certified questions in this
case as not implicating that issue.  *Id.* at 680 n.16.

24

its conduct at the forum.  *See Calder*, 465 U.S. at 789 (finding the exercise of personal jurisdiction over Florida defendants in California state court "based on the 'effects' of their Florida conduct in California" to be consistent with due process because "their intentional, and allegedly tortious, actions were expressly aimed at California").

We do not, however, understand the existence of in-state effects sufficient to satisfy the "effects test" to be a prerequisite to the constitutional exercise of personal jurisdiction over a foreign defendant in cases where the conduct on which the alleged personal jurisdiction is based occurs *within* the forum.  So long as this in-forum activity sufficiently reflects the defendant's "purposeful availment" of the privilege of carrying on its activities here, minimum contacts are established, even if the effects of the defendant's entire course of conduct are felt elsewhere.  *See Chloé*, 616 F.3d at 172 ("Because we have concluded that [the defendant] has purposefully availed himself of the benefits of the New York forum, we need not decide whether [his] act . . . represented conduct 'expressly aimed at' New York under the *Calder* effects test."); *Best Van Lines*, 490 F.3d at 243 ("Although *Calder* and *Keeton* were handed down simultaneously on similar subjects, they relied on independent, if conceptually

25

overlapping, methods of demonstrating minimum contacts -- *Keeton* on the

defendant's overall activity within the forum state; *Calder* on the in-state effects of

out-of-state activity.").

      As we have explained, LCB's repeated use of the correspondent

account -- and hence New York's banking system -- as an instrument to achieve

the wrong complained of in this suit satisfies the minimum contacts component

of the due process inquiry.

      2. <u>Reasonableness.</u>  Where a defendant has purposefully directed its

activities at the forum state, it may still defeat jurisdiction on due process

grounds.  To do so, however, it "must present a compelling case that the presence

of some other considerations would render jurisdiction unreasonable." *Burger*

*King Corp.*, 471 U.S. at 477; *see also Metro Life Ins. Co.*, 84 F.3d at 575 (instructing

that "dismissals resulting from the application of the reasonableness test should

be few and far between").  In conducting this part of the due process inquiry, we

focus on the factors we identified in Part I.B of this discussion, above.

      We recognize, of course, that LCB is based in Lebanon and that all of

the plaintiffs, including those who are American citizens, reside in Israel;

accordingly, many of the documents and witnesses relevant to this litigation are

26

located abroad.  But "the conveniences of modern communication and transportation ease" any burden the defense of this case in New York might impose on LCB.  *Metro. Life Ins.*, 84 F.3d at 574.

It is true, moreover, that the injuries and deaths for which compensation is sought occurred in Israel.  The claims, which are premised on LCB's use of a correspondent account to support a terrorist organization, however, involve acts by banks in New York.  And although not controlling, weighed in the balance is the United States' and New York's interest in monitoring banks and banking activity to ensure that its system is not used as an instrument in support of terrorism, money laundering, or other nefarious ends.

Considering these factors together, and in conjunction with the plaintiffs' showing of minimum contacts, we conclude that the exercise of personal jurisdiction over LCB would not offend principles of fair play and substantial justice.  LCB has identified no important interests that outweigh those of the plaintiffs and the forum state such that New York's assertion of jurisdiction would be unconstitutional.  Thus, the district court's exercise of personal jurisdiction over LCB is consistent with due process protections.

27

## II.  Subject Matter Jurisdiction

Because our remand may revive LCB's Rule 12(b)(6) motion to
dismiss, we note the issue of subject matter jurisdiction with respect to the
plaintiffs' ATS claim.  In our prior treatment of this appeal, we predicted that
should the Supreme Court affirm this Court's opinion in *Kiobel v. Royal Dutch
Petroleum Co.*, 621 F.3d 111 (2d Cir. 2010), "we will likely be required to affirm the
dismissal of the ATS claims" based on our conclusion in *Kiobel* that the ATS does
not provide subject matter jurisdiction over corporate defendants for violations of
customary international law.  *Licci II*, 673 F.3d at 73.  The Supreme Court has
indeed affirmed, but on different grounds from those upon which we decided the
appeal.  *See Kiobel v. Royal Dutch Petroleum Co.*, ___ U.S. ___, 133 S. Ct. 1659, 1669
(2013) (deciding that the presumption against extraterritoriality constrains federal
courts from hearing causes of action under the ATS "seeking relief for violations
of the law of nations occurring outside the United States"); *see also Balintulo v.
Daimler AG*, 727 F.3d 174 (2d Cir. 2013) (applying *Kiobel* to find the plaintiffs' ATS
claims barred).

Because the question of subject matter jurisdiction was not briefed
on appeal, because the Supreme Court's opinion did not directly address the

28

question of corporate liability under the ATS, and in light of the other claims

brought by the plaintiffs, we now think it best for the district court to address this

issue in the first instance.

## CONCLUSION

For the foregoing reasons, that portion of the district court's

judgment dismissing claims against defendant LCB for lack of personal

jurisdiction is vacated and the case is remanded for further proceedings.

Case: 10-1306 Document: 248-0 Page: 34 08/28/2014 Page 31 of 45

10-1306-cv

Licci ex rel. Licci v. Lebanese Canadian Bank, SAL

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2010

(Argued:  February 25, 2011                    Decided: October 18, 2013

Amended: January 9, 2014)

Docket No. 10-1306-cv

-------------------------------------

YAAKOV LICCI, a minor, by his father and natural guardian, ELIHAV LICCI,
and by his mother and natural guardian, YEHUDIT LICCI, et al.,

*Plaintiffs-Appellants-Movants-Petitioners*,

- v -

LEBANESE CANADIAN BANK, SAL; AMERICAN EXPRESS BANK LTD.,

*Defendants-Appellees-Respondents-Respondents*.

-------------------------------------

Before:   KATZMANN, *Chief Judge*, and KEARSE and SACK, *Circuit Judges*.

The plaintiffs have made a motion for the Court to permit them to

file a petition for rehearing at this time despite the fact that a judgment had yet

to issue in this appeal.  We grant the motion only insofar as it regards the filing

of a petition for panel rehearing and deny the petition.

Appearances:                          ROBERT J. TOLCHIN (Meir Katz, *of counsel*),
                                      The Berkman Law Office, LLC, Brooklyn, NY,
                                      *for Plaintiffs-Appellants-Movants-Petitioners*.

                                      MARK P. LADNER, Morrison & Foerster LLP,
                                      New York, NY, *for Defendant-Appellee-
                                      Respondent-Respondent American Express Bank
                                      Ltd.*

PER CURIAM:

On March 5, 2012, this Court filed an opinion affirming the judgment of

the United States District Court for the Southern District of New York (George

B. Daniels, *Judge*) insofar as it dismissed that portion of the complaint that

asserted claims against the defendant American Express Bank Ltd. ("AmEx").[1]

*Licci ex rel. Licci v. Lebanese Can. Bank, SAL and Am. Express Bank, Ltd.*, 672 F.3d

---

[1]  The Court simultaneously certified a question to the New York Court of
Appeals with respect to the district court's *in personam* jurisdiction over the co-
defendant Lebanese Canadian Bank, SAL.  *Licci ex rel. Licci v. Lebanese Can. Bank,
SAL*, 673 F.3d 50 (2d Cir. 2012).  On November 20, 2012, the New York Court of
Appeals responded to the certification, *Licci v. Lebanese Can. Bank, SAL*, 20 N.Y.3d
327, 960 N.Y.S.2d 695, 984 N.E.2d 893 (2012), and the question of jurisdiction over
that co-defendant remains pending before this court.  This opinion does not deal
with that portion of these proceedings regarding jurisdiction over the Lebanese
Canadian Bank.

2

Case 1:08-cv-07253-GBD-KHP  Document 48-8  Filed 09/26/14  Page 33 of 45

155 (2d Cir. 2012) ("*AmEx*").  On January 7, 2013, the appellants filed what they styled as a motion for leave to file a petition for rehearing and rehearing *en banc* prior to entry of judgment against them.  They appended to the motion a copy of the petition they sought to file.

On September 18, 2013, the appellants filed a letter pursuant to Federal Rule of Civil Procedure 28(j) calling to our attention a decision by the New York Supreme Court, Appellate Division, First Department, in *Elmaliach v. Bank of China Ltd.*, __A.D.2d__, 971 N.Y.S.2d 504 (1st Dep't 2013) ("*Bank of China*").  At our request, AmEx responded to the 28(j) letter on September 27, 2013, and the appellants responded to that letter on October 16, 2013.

We now grant the appellants' motion for leave to file a petition for panel rehearing, even though a judgment in this appeal had yet to issue, and we deny that petition.[2]

---

[2]  On October 30, 2013, the appellants filed a petition for rehearing *en banc*, arguing, *inter alia*, that our opinion, which conflicts with *Bank of China* and employs an interest-analysis approach, is erroneous because the New York Court of Appeals has stated that interest analysis is "limited to competing loss-allocation–not conduct-regulating–rules."  *Edwards v. Erie Coach Lines Co.*, 17 N.Y.3d 306, 319, 929 N.Y.S.2d 41, 43, 952 N.E.2d 1033, 1035 (2011).  Again at our request, AmEx responded to the appellants' petition on November 25, 2013.  We conclude that *Edwards*, itself a loss-allocation case, did not overrule *Padula v. Lilarn Properties Corp.*, 84 N.Y.2d 519, 620 N.Y.S.2d 310, 644 N.E.2d 1001 (1994),

3

Case: 13-306   Document: 248-1   Page: 34   08/28/2014   1306734   45

## BACKGROUND

The facts and history of this litigation insofar as it involves the defendant AmEx are set forth in our opinion in *AmEx*, 672 F.3d at 156, which in turn refers to a more complete version of the facts contained in *Licci ex rel. Licci v. Lebanese Can. Bank, SAL*, 673 F.3d 50 (2d Cir. 2012).  We wrote in *AmEx*:

> This case concerns a series of rocket attacks launched by Hizballah, a Lebanese terrorist organization, at targets in northern Israel in July and August 2006.  The plaintiffs are American, Canadian, and Israeli civilians who were injured, or whose family members were injured or killed, during the rocket attacks.  They allege that [Lebanese Canadian Bank ("LCB")] knowingly maintained bank accounts for an alleged Hizballah affiliate, the Shahid (Martyrs) Foundation ("Shahid"), and carried out dozens of international wire transfers on Shahid's behalf.  These wire transfers, which totaled several million dollars, were conducted using LCB's correspondent bank account at AmEx in New York. The plaintiffs assert that AmEx, by facilitating these wire transfers on behalf of LCB and Shahid, breached a legal duty of care to the plaintiffs and thereby caused the plaintiffs' injuries.

*AmEx*, 672 F.3d at 156.  The parties disagreed as to whether New York or Israeli law governs the plaintiffs' claims against AmEx.  Assuming there is an actual conflict between New York and Israeli law, we applied New York's interest-analysis test to determine which law should apply and concluded that

which instructs courts to engage in interest analysis in conduct-regulating cases, 84 N.Y.2d at 521, 620 N.Y.S.2d at 311, 644 N.E.2d at 1002.

4

> New York has the greatest interest in this litigation. All of the
> challenged conduct undertaken by AmEx occurred in New York,
> where AmEx is headquartered and where AmEx administers its
> correspondent banking services. Although the plaintiffs' injuries
> occurred in Israel, and Israel is also the plaintiffs' domicile, those
> factors do not govern where, as here, the conflict pertains to a
> conduct-regulating rule.

*Id.* at 158. We further concluded that

> New York, not Israel, has the stronger interest in regulating the
> conduct of New York-based banks operating in New York. *See,*
> *e.g.,* [*Schultz v. Boy Scouts of Am., Inc.,* 65 N.Y.2d 189, 198, 491
> N.Y.S.2d 90, 96, 480 N.E.2d 679, 684-85 (1985)]] (noting the "locus
> jurisdiction's interests in protecting the reasonable expectations of
> the parties who relied on it to govern their primary conduct").
> Accordingly, even assuming that the district court was mistaken in
> deciding that there was no actual conflict between New York law
> and Israeli law, . . . a choice-of-law analysis would nonetheless
> require application of New York law to the plaintiffs' negligence
> claim against AmEx.

*Id.* The parties agreed (as do we) that under New York law, AmEx has no

liability to the appellants for the harm to them that is the subject of this action.

*See Lerner v. Fleet Bank, N.A.,* 459 F.3d 273, 286 (2d Cir. 2006). We therefore

decided that the case against Amex must be dismissed. We entered no

judgment, however, because the appeal regarding the district court's *in*

*personam* jurisdiction over the other defendant, Lebanese Canadian Bank, SAL,

5

remains pending following our certifying and the New York Court of Appeals responding to questions vital to that issue.

## DISCUSSION

The appellants now principally argue that under New York law as recently expressed by the Appellate Division, First Department, in *Bank of China*, we must withdraw our *AmEx* opinion applying New York law and conclude instead that Israeli law governs their claims against AmEx. We decline to do so.

I.    The Binding Nature of the *Bank of China* Decision

We are bound, of course, by the law of New York as interpreted by the New York Court of Appeals. *See Comm'r of Internal Revenue v. Estate of Bosch*, 387 U.S. 456, 464 (1967); 28 U.S.C. § 1652. We "consider the language of the state intermediate appellate courts to be helpful indicators of how the state's highest court would rule." *DiBella v. Hopkins*, 403 F.3d 102, 112 (2d Cir. 2005). "Although we are not strictly bound by state intermediate appellate courts," we will look to their decisions unless "convinced by other persuasive data that the highest court of the state would decide otherwise." *Id.* (quoting *West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 237 (1940)); *see also Estate of Bosch*, 387 U.S. at 465

6

Case 1:13-cv-07253-GBD-KHP Document 248-8 Document 64 Filed 08/28/14 Page 37 of 45

("[E]ven in diversity cases [the Supreme] Court has . . . held that while the decrees of lower state courts should be attributed some weight . . . the decision is not controlling . . . where the highest court of the State has not spoken on the point.") (second and third ellipses in original; citation, internal quotation marks, and some alterations omitted).

We conclude that we are not bound by the First Department's decision in *Bank of China*. The New York Court of Appeals has already prescribed the choice-of-law rules applicable to the case at bar in *Schultz v. Boy Scouts of America, Inc.*, 65 N.Y.2d 189, 491 N.Y.S.2d 90, 480 N.E.2d 679 (1985). *Bank of China* is thus not a statement of an unsettled or ambiguous rule, but rather an application of a previously established rule. Because we are persuaded that it is a mistaken application, as explained below, we decline to follow it.

II.    The Persuasiveness of the *Bank of China* Opinion

The crucial New York Court of Appeals decision relevant to this proceeding, and the one on which we principally relied in reaching our earlier conclusion, explicitly establishes an interest-analysis approach: "The law of the jurisdiction having the greatest interest in the litigation will be applied . . . ." *Schultz*, 65 N.Y.2d at 197, 491 N.Y.S.2d at 95, 480 N.E.2d at 684 (internal

7

quotation marks and alterations omitted).  As we pointed out in *AmEx*, interest analysis is a "flexible approach intended to give controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation."  *AmEx*, 672 F.3d at 157-58 (quoting *Cooney v. Osgood Mach., Inc.*, 81 N.Y.2d 66, 72, 595 N.Y.S.2d 919, 922, 612 N.E.2d 277, 280 (1993) (intermediate citation to Second Circuit authority omitted)).

Under *Schultz*, the interest analysis is applied differently depending on whether the rules in question are conduct-regulating rules that "people use as a guide to governing their primary conduct," or loss-allocating rules that "prohibit, assign, or limit liability after the tort occurs."  *AmEx*, 672 F.3d at 158 (internal quotation marks omitted).

All parties and we agree that the law with which we are dealing is "conduct regulating."  And as we further observed in *AmEx*, "[i]f conflicting conduct-regulating laws are at issue, the law of the jurisdiction where the [allegedly tortious acts] occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders."  *AmEx*, 672 F.3d at 158 (quoting *Cooney*, 81 N.Y.2d at 72, 595 N.Y.S.2d at 922, 612 N.E.2d at

8

280) (intermediate citation to Second Circuit authority omitted).[3]  As we

concluded in *AmEx*, "New York, not Israel, has the stronger interest in

regulating the conduct of New York-based banks operating in New York." *Id.*

It seems to be without question that the conduct of AmEx that appellants

allege was tortious occurred in New York.  New York has the greatest interest

in regulating conduct within its borders, and consequently its law applies.

We think that in *Bank of China*, the Appellate Division misapplied the

*Schultz* rule by failing to give effect to the distinction between the two different

kinds of tort-law rules for choice-of-law purposes.  It cited *Schultz* for the

proposition that "[w]here a defendant's negligent conduct occurs in one

jurisdiction and the plaintiff suffers injuries in another, 'the place of the wrong

is considered to be the place where the last event necessary to make the actor

liable occurred,' that is, 'where the plaintiffs' injuries occurred.'"  *Bank of China*,

---

[3]  For additional cases in this Circuit applying the law of the jurisdiction
where the allegedly tortious act occurred when conduct-regulating rules conflict,
see *AroChem Int'l, Inc. v. Buirkle*, 968 F.2d 266, 270-71 (2d Cir. 1992); *LaSala v.
Lloyds TSB Bank, PLC*, 514 F. Supp. 2d 447, 465-66  (S.D.N.Y. 2007); *HSA
Residential Mortg. Servs. of Tex. v. Casuccio*, 350 F. Supp. 2d 352, 365-66 (E.D.N.Y.
2003); *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 492-93 (S.D.N.Y. 2001);
*Sussman v. Bank of Israel*, 801 F. Supp. 1068, 1075 (S.D.N.Y. 1992), *aff'd*, 990 F.2d 71
(2d Cir. 1993).

9

__A.D.2d__, 971 N.Y.S.2d at 514 (quoting *Schultz*, 65 N.Y.2d at 195, 491 N.Y.S.2d at 94, 480 N.E.2d at 683).  Put simply, *Bank of China* read *Schultz* to require a "place of injury" rule.

But *Schultz*'s reference to the "place of injury" rule occurred in the context of discussing the "traditional rule[]" of *lex loci delicti*, which equates the "place of the wrong" with the place of the injury.  *Schultz*, 65 N.Y.2d at 195, 491 N.Y.S.2d at 93-94, 480 N.E.2d at 682-83.  And, as the court went on to point out, it has "refused to invariably apply" that rule "to determine the availability of relief for commission of a tort."  *Id.* at 196, 491 N.Y.S.2d at 94, 480 N.E.2d at 683.  *Schultz* was explicit:  "[W]hen the conflicting rules involve the appropriate standards of conduct, rules of the road, for example, the law of the place of the tort will usually have a predominant, if not exclusive, concern."  *Id.* at 198, 491 N.Y.S.2d at 95, 480 N.E.2d at 684 (internal quotation marks omitted).[4]

---

[4]  The court went on to explain that the reason for this rule is that, in such cases, "the locus jurisdiction's interests in protecting the reasonable expectations of the parties who relied on it to govern their primary conduct and in the admonitory effect that applying its law will have on similar conduct in the future assume critical importance and outweigh any interests of the common-domicile jurisdiction."  *Schultz*, 65 N.Y.2d at 198, 491 N.Y.S.2d at 96, 480 N.E.2d at 684-85.

The New York Court of Appeals has not been presented with this precise

issue, *i.e.*, a conflict between the conduct-regulating rules of the place where the

injury occurred and the conduct-regulating rules of the place where the conduct

of the defendant in question occurred and whose laws did not impose on that

defendant a duty of care toward the plaintiffs.  Several decisions of the

Appellate Division appear to have read *Schultz* to stand for the proposition that,

when there is a conflict between the conduct-regulating rules of the place of the

conduct and those of the place of the injury, it is the latter that generally apply.

*See Bank of China*, --- A.D.3d ---, 971 N.Y.S.2d 504 (1st Dep't 2013); *Devore v.*

*Pfizer Inc.*, 58 A.D.3d 138, 141, 867 N.Y.S.2d 425, 427-28 (1st Dep't 2008), *leave*

*denied*, 12 N.Y.3d 703, 876 N.Y.S.2d 704 (2009);[5] *Ackerman v. Price Waterhouse*, 252

---

[5] The degree to which *Devore* rests on this ground is unclear to us.  In *Devore*, the First Department set forth accurately the *Schultz* rule that "[w]hen the purpose of the statute is to regulate conduct, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders." 58 A.D.3d at 141, 867 N.Y.S.2d at 427-28 (internal quotation marks omitted).  While the *Devore* panel went on to state that the place of the tort is "generally defined as the place of the injury," *id.* at 141, 867 N.Y.S.2d at 428 (citing *Schultz*, 65 N.Y.2d at 195, 491 N.Y.S.2d at 94, 480 N.E.2d at 683 (discussing the "traditional rule[]" of *lex loci delicti*)), the court apparently did not ultimately rely on a place-of-injury analysis but rather on case law that under "a true application of the interest analysis approach, the law of the forum in which the products are sold should govern."  *Devore*, 58 A.D.3d at 142, 867 N.Y.S.2d at 428-29 (quoting *Doe v. Hyland Therapeutics Div.*, 807 F. Supp. 1117, 1130 n.16 (S.D.N.Y. 1992)) (internal quotation marks omitted).

11

A.D.2d 179, 192-93, 683 N.Y.S.2d 179, 189 (1st Dep't 1998).  Respectfully, we do not agree with that interpretation.  Although *Schultz* involved injuries some of which were experienced in a state different from the states in which the institutional tortfeasors' conduct (the allegedly negligent hiring, supervision, and retention of a child-molesting employee) occurred, the state in which each defendant employer's conduct occurred undeniably imposed a duty of care on that defendant, and the only question was whether to apply a loss-allocation doctrine (charitable immunity) that was recognized by only one of the states in which injury occurred.

The New York Court of Appeals has consistently explained that, for conduct-regulating rules, "the law of the jurisdiction where the [alleged] tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders."  *Cooney*, 81 N.Y.2d at 72, 595 N.Y.S.2d at 922, 612 N.E.2d at 280; *see also In re Allstate Ins. Co. (Stolarz)*, 81 N.Y.2d 219, 225, 597 N.Y.S.2d 904, 907, 613 N.E.2d 936, 939 (1993) ("*Stolarz*").  This is because "[w]here the defendant's exercise of due care . . . is in issue, the jurisdiction in which the allegedly wrongful conduct occurred will usually have a predominant, if not exclusive, concern."  *Babcock v. Jackson*, 12 N.Y.2d 473, 483,

12

240 N.Y.S.2d 743, 750, 191 N.E.2d 279, 284 (1963).  In the ordinary tort case, "both the wrong and the injury t[ake] place" in the same jurisdiction.  *Id.* at 477 n.2, 240 N.Y.S.2d at 746 n.2, 191 N.E.2d at 280 n.2.  But where they do not, it is the place of the allegedly wrongful conduct that generally has superior "interests in protecting the reasonable expectations of the parties who relied on [the laws of that place] to govern their primary conduct and in the admonitory effect that applying its law will have on similar conduct in the future." *Schultz*, 65 N.Y.2d at 198, 491 N.Y.S.2d at 96, 480 N.E.2d at 684-85.

We recognize decisions of the Appellate Division as "a basis for ascertaining state law . . . unless [we are] convinced by other persuasive data that the highest court of the state would decide otherwise." *DiBella*, 403 F.3d at 112 (internal quotation marks omitted).  To the extent that our decision in this case differs from that of *Bank of China* or other Appellate Division cases, it is because we are persuaded by the consistent rationale of the New York Court of Appeals as it has applied interest analysis.  Here, we conclude that it is New York, and not Israel, that "has an overriding interest in regulating" the conduct of banks operating "within its borders," *Stolarz*, 81 N.Y.2d at 225, 597 N.Y.S.2d at

13

907, 613 N.E.2d at 939.  Therefore, we adhere to our conclusion that the law applicable to plaintiffs' negligence claims against AmEx is that of New York.

We therefore reject the view of *Bank of China* that the law of the place of injury ordinarily or always governs where conduct-regulating rules are involved as inconsistent with the law as clearly established by New York's highest court in *Schultz*.

With respect to jurisdiction over the Lebanese Canadian Bank, we were unsure as to New York's applicable law and therefore certified questions to the New York Court of Appeals in order to answer the question in a manner consonant with the State's jurisprudence.  We harbor no similar doubts as to the issues we resolved by *per curiam* opinion in *AmEx*.

III.    Other Observations

First, we recognize that the decision in *Bank of China* is subject to appeal. We issue this opinion nonetheless to make clear, in this complex set of proceedings, that the substance of the First Department opinion insofar as it is relevant to the appeal before us does not cause us to alter the conclusion we reached in our *per curiam* opinion in *AmEx*.

14

Second, for reasons that become obvious upon a reading of the *Bank of China* opinion, the facts in that case differ starkly from those before us.  Beyond our conclusions as to its challenge to the soundness of *AmEx*, we emphasize that we offer no views as to the law affecting or the proper outcome of that case and should not be understood to imply any.

## CONCLUSION

For the foregoing reasons, we GRANT the appellants' motion insofar as it asks us to hear their petition for panel rehearing prior to the entry of a final judgment in this appeal, and we DENY that petition.

15