15-1580
*Licci et al. v. Lebanese Canadian Bank, SAL*

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

——————————

August Term 2015

(Argued: April 18, 2016    Decided: August 24, 2016)

Docket No. 15-1580

——————————

YAAKOV LICCI, a minor, by his father and natural guardian
Elihav Licci and by his mother and natural guardian Yehudit
Licci, et al., ELIHAV LICCI, YEHUDIT LICCI, TZVI HIRSH,
ARKADY GRAIPEL, TATIANA KREMER, YOSEF ZARONA,
TAL SHANI, SHLOMO COHEN, NITZAN GOLDENBERG,
RINA DAHAN, RAPHAEL WEISS, AGAT KLEIN, TATIANA
KOVLEYOV, VALENTINA DEMESH, RIVKA EPON, JOSEPH
MARIA, IMMANUEL PENKER, ESTHER PINTO, AVISHAI
REUVANCE, ELISHEVA ARON, CHAYIM KUMER, SARAH
YEFET, SHOSHANA SAPPIR, RAHMI GUHAD GHANAM, a
minor, by his father and natural guardian Fuad Shchiv Ghanam
and by his mother and natural guardian Suha Shchiv Ghanam,
FUAD SHCHIV GHANAM, individually, SUHA SHCHIV
GHANAM, individually, MA'AYAN ARDSTEIN, a minor, by
her father and natural guardian, Brian Ardstein, and by her
mother and natural guardian, Keren Ardstein, NOA ARDSTEIN,
a minor, by her father and natural guardian, Brian Ardstein, and
by her mother and natural guardian, Keren Ardstein, NETIYA

Case 1:07-1353-GBD Document 179-2 08/07/2018 1299549 Page 2 of 34

YESHUA ARDSTEIN, a minor, by her father and natural
guardian, Brian Ardstein, and by her mother and natural
guardian, Keren Ardstein, ARIEL CHAIM ARDSTEIN, a minor,
by her father and natural guardian, Brian Ardstein, and by her
mother and natural guardian Keren Ardstein, BRIAN
ARDSTEIN, individually, KEREN ARDSTEIN, individually,
MARGALIT RAPPEPORT, a minor, by her mother and natural
guardian, Laurie Rappeport, LAURIE RAPPEPORT,
individually, ORNA MOR, YAIR MOR, MICHAEL FUCHS,
ESQ., MUSHKA KAPLAN, a minor, by her father and natural
guardian Chaim Kaplan, and by her mother and natural
guardian Rivka Kaplan, ARYE LEIB KAPLAN, a minor, by his
father and natural guardian Chaim Kaplan, and by his mother
and natural guardian Rivka Kaplan, MENACHEM KAPLAN, a
minor, by his father and natural guardian Chaim Kaplan, and by
his mother and natural guardian Rivka Kaplan, CHANA
KAPLAN, a minor, by her father and natural guardian Chaim
Kaplan, and by her mother and natural guardian Rivka Kaplan,
EFRAIM LEIB KAPLAN, a minor, by his father and natural
guardian Chaim Kaplan and by his mother and natural guardian
Rivka Kaplan, CHAIM KAPLAN, individually, RIVKA
KAPLAN, individually, ROCHELLE SHALMONI, OZ
SHALMONI, DAVID OCHAYON, YAAKOV MAIMON, MIMI
BITON, MIRIAM JUMA'A, as personal representative of the
estate of Fadya Juma'a, MIRIAM JUMA'A, individually, SALAH
JUMA'A, as personal representative of the estate of Samira
Juma'a, SALAH JUMA'A, individually, SAID JUMA'A,
individually, ABD EL-RAHMAN JUMA'A, as personal
representative of the estate of Samira Juma'a, ABD EL-
RAHMAN JUMA'A, individually, RAHMA ABU-SHAHIN,
ABDEL GAHNI, as personal representative of the estate of
Soltana Juma'a and individually, SHADI SALMAN AZZAM, as
the personal representative of the estate of Manal Camal Azam,

KANAR SHA'ADI AZZAM, a minor, by his father and natural
guardian, Shadi Salman Azzam, ADEN SHA'ADI AZZAM, a
minor, by his father and natural guardian, Shadi Salman Azzam,
SHADI SALMAN AZZAM, individually, ADINA
MACHASSAN DAGESH, ARKADY SPEKTOR, YORI ZOVREV,
MAURINE GREENBERG, JACOB KATZMACHER, DEBORAH
CHANA KATZMACHER, CHAYA KATZMACHER, MIKIMI
STEINBERG, JARED SAUTER, DANIELLE SAUTER, YAAKOV
ABUTBUL, ABRAHAM NATHAN MOR, a minor, by his father
and natural guardian, Zion Mor, and by his mother and natural
guardian, Revital Mor, BAT ZION MOR, a minor, by her father
and natural guardian, Zion Mor, and by her mother and natural
guardian, Revital Mor, MICHAL MOR, a minor, by her father
and natural guardian, Zion Mor, and by her mother and natural
guardian, Revital Mor, ODED CHANA MOR, a minor, by her
father and natural guardian, Zion Mor, and by her mother and
natural guardian, Revital Mor, ZION MOR, individually,
REVITAL MOR, individually, ADHAM MAHANE
TARRABASHI, JIHAN KAMUD ASLAN, ZOHARA LOUIE
SA'AD, IYAH ZAID GANAM, a minor, by his father and natural
guardian Ziad Shchiv Ghanam, and by his mother and natural
guardian Gourov Tisir Ghanam, ZIAD SHCHIV GHANAM,
individually, GOUROV TISIR GHANAM, individually,
THEODORE GREENBERG, EMILLA SALMAN ASLAN,

*Plaintiffs-Appellants,*

v.

LEBANESE CANADIAN BANK, SAL,

*Defendant-Appellee,*

AMERICAN EXPRESS BANK, LTD.,

*Defendant*.

———————

Before:

SACK, WESLEY, and LYNCH, *Circuit Judges*.

———————

Plaintiffs-Appellants ("Plaintiffs") are foreign civilians residing in Israel who were injured or whose family members were killed in a series of Hezbollah rocket attacks in Israel. Plaintiffs brought suit under the Alien Tort Statute against Defendant-Appellee Lebanese Canadian Bank, SAL (the "bank"), alleging that the bank facilitated the terrorist rocket attacks by using a correspondent banking account at a New York bank to effectuate wire transfers totaling several million dollars on behalf of Hezbollah. The United States District Court for the Southern District of New York (Daniels, *J.*), granted a motion to dismiss in favor of the bank based on the presumption against extraterritorial application of the Alien Tort Statute, *see Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013) ("*Kiobel II*"). Though we conclude that Plaintiffs have displaced the presumption against extraterritoriality, *see Kiobel II*, 133 S. Ct. at 1669, we also conclude that customary international law does not recognize liability for the bank, a corporation, *see Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 145 (2d Cir. 2010). Accordingly, we AFFIRM IN PART the District Court's dismissal.

_____

> MEIR KATZ (Robert J. Tolchin, *on the brief*), The Berkman Law Office, LLC, Brooklyn, NY, *for Plaintiffs-Appellants*.
>
> JONATHAN D. SIEGFRIED (Douglas W. Mateyaschuk & Peter J. Couto, *on the brief*), DLA Piper LLP (US), New York, NY, *for Defendant-Appellee*.

_____

WESLEY, *Circuit Judge*:

In July and August 2006, Hezbollah carried out a series of terrorist rocket attacks on civilians in Israel.  Several dozen United States, Israeli, and Canadian civilians seek to hold Defendant-Appellee Lebanese Canadian Bank, SAL ("LCB"), a Lebanese bank headquartered in Beirut, liable for providing international financial services to Hezbollah that they claim facilitated Hezbollah's attacks that injured them or killed  family members.  These civilians assert claims against LCB under the Anti–Terrorism Act and Israeli tort law.[1]  In addition, some of the Israeli and Canadian plaintiffs (collectively, "Plaintiffs") assert claims under the Alien Tort Statute, 28 U.S.C. § 1350 (the "ATS")—these claims are the subject of the present opinion.[2]

_____

[1]  An accompanying summary  order addresses  Plaintiffs'  Anti–Terrorism Act and Israeli tort law claims.

[2]  Four Israeli and Canadian Plaintiffs do not assert Alien Tort Statute claims against LCB:  Sarah Yefet, Shoshana Sappir, Rochelle Shalmoni, and Oz Shalmoni.  App. 110.  Except in reviewing procedural history, in which case the term "Plaintiffs" refers to all plaintiffs in this action,

This case is not new to our Court. In fact, this appeal is in its third appearance before us in the last five years. In our prior opinions, we determined (with an assist from the New York Court of Appeals, *see Licci v. Lebanese Canadian Bank, SAL*, 20 N.Y.3d 327, 339 (2012) ("*Licci III*")) that the District Court had personal jurisdiction over defendant LCB, and that subjecting the foreign bank to personal jurisdiction in New York comports with due process protections provided by the United States Constitution. *See Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 165 (2d Cir. 2013) ("*Licci IV*"); *Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 73–74 (2d Cir. 2012) ("*Licci II*"). This case presents a different question: Whether the District Court has *subject matter* jurisdiction over Plaintiffs' ATS claims. The District Court dismissed the ATS claims under *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013) ("*Kiobel II*"), reasoning that Plaintiffs failed to displace the presumption against extraterritorial application of the ATS. Though we disagree with the District Court's basis for dismissal, we affirm because the ATS claims seek to impose corporate liability in contravention of our decision in *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 145 (2d Cir. 2010) ("*Kiobel I*").

---

we use the term "Plaintiffs" to refer only to those Israeli and Canadian Plaintiffs-Appellants bringing Alien Tort Statute claims against LCB.

## BACKGROUND[3]

### I. Plaintiffs' Complaint

According to Plaintiffs' complaint, Hezbollah,[4] a terrorist organization, fired thousands of rockets into northern Israel between July 12, 2006 and August 14, 2006. App. 58, 66. Plaintiffs or their family members were injured or killed by these attacks. *See* App. 54.

LCB is a Lebanese bank with no branches, offices, or employees in the United States. *Licci IV*, 732 F.3d at 165; *Licci II*, 673 F.3d at 56. To effectuate U.S.-dollar-denominated transactions, LCB maintained a correspondent bank account with defendant American Express Bank Ltd. ("AmEx") in New York.[5] *Licci IV*, 732 F.3d at 165; *Licci II*, 673 F.3d at 56. Plaintiffs allege that LCB used this account to conduct dozens of international wire transfers on behalf of the Shahid (Martyrs) Foundation ("Shahid"), an entity that maintained bank accounts with LCB and that Plaintiffs allege to be an "integral part" of Hezbollah and "part of [its] financial arm." App. 65; *see also id.* (alleging that the Shahid-titled bank accounts "belonged to [Hezbollah] and were under the control of [Hezbollah]"). These wire transfers, which totaled several million dollars, "substantially increased and facilitated [Hezbollah's] ability to

---

[3] The facts set forth below are drawn from the record, Plaintiffs' First Amended Complaint (the "complaint"), *see* App. 48–120, and this Court's previous opinions in this case, *see Licci IV*, 732 F.3d at 165–67; *Licci II*, 673 F.3d at 55–59. We accept as true all non-conclusory factual allegations relevant to this decision. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Kiobel I*, 621 F.3d at 124.

[4] "Hezbollah" may also be spelled "Hizbollah," as in the complaint, *see* App. 58, or "Hizballah," as in *Licci II*, 673 F.3d at 54–55.

[5] Defendant AmEx is not a party to this appeal.

plan, to prepare for[,] and to carry out" the rocket attacks that
injured Plaintiffs.  App. 66, 86.  Plaintiffs further allege that LCB
carried out the wire transfer services from 2004 until the rocket
attacks began on July 12, 2006, and "subsequently" continued to
carry out those transfers.  App. 66.

As relevant here, Plaintiffs contend that LCB's role in
conducting those wire transfers on Shahid's behalf amounted to
aiding and abetting genocide, war crimes, and crimes against
humanity in violation of international law, and is actionable
under the Alien Tort Statute.  App. 110.  They allege that LCB
had "actual knowledge" that Hezbollah was a violent terrorist
organization, as reflected on official U.S. government lists,[6] and
that Shahid was "part of [Hezbollah's] financial arm."  App. 88–
90.  They assert that the bank accounts held by LCB "were
owned and controlled by [Hezbollah]," and that the wire
transfers carried out by the bank were "by and at the direction of
[Hezbollah]."  App. 90.  According to Plaintiffs' complaint, LCB
carried out various wire transfer services between Hezbollah
accounts "via Am[E]x Bank in New York," and all of the wire
transfers at issue "were carried out in and through the State of
New York."  App. 66; *see also* App. 58.

Plaintiffs contend, moreover, that LCB knew that
Hezbollah required "transfer services in order to operate and in

---

[6] "LCB notes that at all relevant times, Shahid itself was not designated
as a terrorist organization on official U.S. government lists. Shahid
was, however, added to the U.S. Treasury Department's 'Specially
Designated Nationals' list in July 2007."  *Licci II*, 673 F.3d at 56 n.4.
Shahid today remains on that list of "individuals, groups, and entities,
such as terrorists . . . that are not country-specific."  *See generally* U.S.
Dep't of Treasury, *Specially Designated Nationals and Blocked Persons List
(SDN)* 741, https://www.treasury.gov/ofac/downloads/sdnlist.pdf (last
visited Aug. 22, 2016).

order to plan, to prepare for[,] and to carry out terrorist attacks."
App. 89. They similarly allege that LCB knew that providing
wire transfer services to Hezbollah would enable Hezbollah "to
plan, to prepare for[,] and to carry out terrorist attacks and/or
enhance" its ability to do so, in part because LCB was aware that
the U.S. sanction regime "is and was intended to prevent
[Hezbollah] from conducting banking activities, including wire
transfers, and thereby limit its ability to operate and to carry out
terrorist attacks." App. 89. Plaintiffs allege that LCB, equipped
with this knowledge, "as a matter of official LCB policy,"
"continuously supports and supported [Hezbollah] and its anti-
Israel program, goals[,] and activities." App. 88. In particular,
Plaintiffs allege that LCB carried out the wire transfers at issue
"with the specific purpose and intention of enabling and
assisting [Hezbollah] [in] carry[ing] out terrorist attacks against
Jewish civilians in Israel," App. 109, and "to assist and advance
[Hezbollah's] goal of using terrorism to destroy the State of
Israel."[7] App. 88.

## II. Shaya Declaration

Plaintiffs submitted an expert declaration from former
Israeli intelligence officer Uzi Shaya (the "Shaya declaration") in
support of the allegations set forth in their complaint. App. 125–
28. Shaya has served in various roles in the Israeli intelligence

---

[7] At another point in the complaint, Plaintiffs allege that LCB carried
out the wire transfers at issue "with the specific purpose and intention
of enabling and assisting [Hezbollah] to carry out its goal of physically
exterminating or expelling the Jewish residents of Israel, and its goal of
intentionally and systematically using violence against Jewish civilians
in Israel." App. 111. They further allege that LCB supports
Hezbollah's "terrorist activities against Jews in Israel" and Hezbollah's
"goal of using terrorism to coerce, intimidate and influence the Israeli
government and public." App. 88.

services since 1984.  App. 125.  From 2004 to 2008, Shaya served as the Deputy Chief of the Israeli National Security Council's Interagency Unit for Combating Terrorist Financing and Financing of State Sponsors of Terrorism.  App. 126.  After 2008, Shaya maintained a working relationship with Israel's National Security Council, providing assistance to counterterrorism staff on the matters he dealt with as Deputy Chief.  App. 126.  In this capacity, Plaintiffs requested that Shaya "examine documents in possession of the State of Israel relating to fund[] transfers carried out by [Hezbollah] via [AmEx and LCB]."  App. 126.  Shaya stated that, with one exception identified below, "all" of his testimony was "based upon [his] examination" of these documents.  App. 126.

Shaya stated that "[f]or many years," "including the period between 2004 and July 12, 2006," Hezbollah "maintained bank accounts at various LCB branches," and that some of the accounts Hezbollah maintained were "titled to" Shahid.  App. 126–27.  He stated that Shahid was integral to Hezbollah, and that it "serves as an important component of [Hezbollah's] financial apparatus."  App. 127.  He further specified that Hezbollah uses Shahid funds to prepare for and carry out "a wide range of terrorist and other violent activities, including rocket and missile attacks on Israel."  App. 127.

Shaya stated that leading up to and following the July 2006 attacks, Hezbollah made "dozens" of wire transfers from one Shahid account at LCB in Lebanon, "total[ing]" several million dollars," and LCB executed the transfers "through Am[E]x Bank in New York, which acted as LCB's correspondent bank for these dollar transfers."  App. 127.  "In other words," Shaya explained, "LCB specifically requested Am[E]x Bank in New York to carry out all these dollar wire transfers, and Am[E]x Bank processed all these dollar wire transfers by and

7

through its New York branch."  App. 127.  Shaya further stated that AmEx knew that it was executing wire transfers on behalf of Shahid.  App. 128.  In the sole statement not based on his review of Israel's documents related to the funds Hezbollah allegedly transferred through LCB and its correspondent bank, Shaya declared that, based on his experience in counterterrorism and familiarity with Hezbollah's operations, he had "no doubt that the millions of dollars of wire transfers carried out by Am[E]x Bank and LCB for [Hezbollah]" significantly enhanced Hezbollah's "ability to plan and carry out . . . the rocket attacks" that injured Plaintiffs.  App. 128.

### III. U.S. Government Actions Against LCB

The U.S. government has taken two actions that reinforce many of Plaintiffs' allegations against LCB.  First, in October 2012, the U.S. government initiated a civil forfeiture action against LCB properties.  App. 323–95.  In its complaint, the government asserted that there is "reason to believe that LCB has been routinely used by drug traffickers and money launderers," including at least one "who provides financial support to [Hezbollah]."  App. 328.[8]  It also asserted "that there was reason to believe that LCB managers are complicit in the

---

[8] The government's complaint in its civil forfeiture action against LCB includes allegations of an elaborate scheme involving used car sales as proxies for narcotics trafficking and money laundering.  Specifically, the government alleged that LCB "provided funds, goods, and services to or for the benefit of [Hezbollah] . . . by causing funds to be wired from Lebanon to U.S. persons in the United States for purchase of used cars to be shipped by U.S. persons to West Africa in order to create a channel for laundering proceeds of narcotics trafficking and other unlawful activities, [and] to generate fees and commissions to be paid to [Hezbollah] members and supporters who were involved at various points in the money laundering scheme."  App. 340.

network's money laundering activities."   App. 328.   The government alleged that between approximately January 2007 and 2011, "at least $329 million was transferred by wire from accounts held in Lebanon at LCB [and various other banks] to the United States through their correspondent bank accounts with U.S. financial institutions located in the Southern District of New York and elsewhere."  App. 329.

Second, we note that the U.S. Department of Treasury ("Treasury") has designated LCB as "a financial institution of primary money laundering concern."  Finding That the Lebanese Canadian Bank SAL Is a Financial Institution of Primary Money Laundering Concern, 76 Fed. Reg. 9403-01, 9404 (Feb. 17, 2011). In identifying LCB as a potential conduit for money laundering, Treasury noted that while LCB is based in Lebanon, it "maintains extensive correspondent accounts with banks worldwide, including several U.S. financial institutions."  *Id.* Treasury explained that it identified LCB as a cause for concern because the government "has information through law enforcement and other sources indicating that LCB—through management complicity, failure of internal controls, and lack of application of prudent banking standards—has been used extensively by persons associated with . . . money laundering." *Id.* at 9405.   Treasury also found that Hezbollah—a U.S. government-designated foreign terrorist organization—"derived financial support from the criminal activities" of the network of drug traffickers and money launderers that rely on LCB, noting that "LCB managers are complicit in the network's money laundering activities."  *Id.* at 9404–05; *see also* App. 327–28, 402, 407.

## II. Procedural History

Because our previous opinions recite much of the procedural history in this case, *Licci IV*, 732 F.3d at 165–67; *Licci*

9

*II*, 673 F.3d at 55–59, we provide a truncated version of events here.  In July 2008, Plaintiffs initiated this action against LCB and AmEx in state court; the action was removed to federal court soon thereafter.  *Licci II*, 673 F.3d at 57.  In January 2009, Plaintiffs filed the amended complaint that is at issue on this appeal.  *See id.*  Plaintiffs brought five claims against LCB: (1) commission of international terrorism in violation of the Anti–Terrorism Act, 18 U.S.C. § 2333; (2) aiding and abetting international terrorism in violation of the Anti–Terrorism Act; (3) aiding and abetting genocide, war crimes, and crimes against humanity in violation of international law, under the ATS; (4) negligence in violation of Israeli Civil Wrongs Ordinance § 35; and (5) breach of statutory duty in violation of Israeli Civil Wrongs Ordinance    § 63.  LCB moved to dismiss all five claims for lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2) and for failure to state a claim under Fed. R. Civ. P. 12(b)(6).  *Id.*

### A. Licci I

On March 31, 2010, the District Court granted LCB's motion to dismiss for lack of personal jurisdiction.  *Licci v. Am. Express Bank Ltd.*, 704 F. Supp. 2d 403, 408 (S.D.N.Y. 2010) ("*Licci I*").  The District Court correctly noted that a defendant may be subject to personal jurisdiction in New York under N.Y. C.P.L.R. § 302(a)(1) if (1) the defendant "transacted business within the state; and (2) the claim asserted . . . arise[s] from that business activity," *id.* at 406 (internal quotation marks omitted), but determined that the allegations in the amended complaint were insufficient to satisfy either prong, *id.* at 406–08.

Although *Licci I*'s Rule 12(b)(2) dismissal rested entirely on Plaintiffs' failure to make a *prima facie* showing of long-arm jurisdiction under New York law, the District Court also offered its view—without further explanation—that "[t]he exercise of personal jurisdiction over LCB on the basis alleged by plaintiffs

10

would not comport with constitutional principles of due process." *Id.* at 408. The court did not reach LCB's alternative argument that the claims against it should be dismissed for failure to plead a cause of action under Rule 12(b)(6). *See id.*

### B. Licci II

In our initial consideration of Plaintiffs' appeal, we found the scope and application of the long-arm statute's "transaction of business" and "arising from" tests to be uncertain. We determined that we could not "confidently say whether the New York Court of Appeals would conclude that the plaintiffs" have made a *prima facie* showing of jurisdiction under N.Y. C.P.L.R. § 302(a)(1). *Licci II*, 673 F.3d at 73. We therefore certified the following questions to the New York Court of Appeals:

> (1) Does a foreign bank's maintenance of a correspondent bank account at a financial institution in New York, and use of that account to effect "dozens" of wire transfers on behalf of a foreign client, constitute a "transact[ion]" of business in New York within the meaning of N.Y. C.P.L.R. § 302(a)(1)?

> (2) If so, do the plaintiffs' claims under the Anti–Terrorism Act, the ATS, or for negligence or breach of statutory duty in violation of Israeli law, "aris[e] from" LCB's transaction of business in New York within the meaning of N.Y. C.P.L.R. § 302(a)(1)?

*Id.* at 74–75 (alterations in original).

In the time between *Licci I* and *Licci II*, our Circuit decided *Kiobel I*, in which we held that the ATS does not provide subject matter jurisdiction for civil actions against corporations for violations of customary international law. *Kiobel I*, 621 F.3d at 145; *see Licci II*, 673 F.3d at 73. In *Licci II*, we predicted that

11

should the Supreme Court affirm *Kiobel I*, and hold that ATS does not allow for corporate liability, "we will likely be required to affirm the dismissal of the ATS claims." *Licci II*, 673 F.3d at 73. Accordingly, we decided to "await" the decision of the Supreme Court "as to the ATS claims against LCB," in addition to the New York Court of Appeals' response to our certified questions. *Id.*

### C. *Licci III*

On March 29, 2012, the New York Court of Appeals accepted the certified questions. *Licci v. Lebanese Canadian Bank, SAL*, 18 N.Y.3d 952 (2012). The Court answered the certified questions in the affirmative. *Licci III*, 20 N.Y.3d at 341.

### D. *Licci IV*

Following the guidance from the New York Court of Appeals, we held that (1) Plaintiffs made a *prima facie* showing that the District Court had personal jurisdiction over LCB, *Licci IV*, 732 F.3d at 168–69, and (2) subjecting LCB, as a foreign bank, "to personal jurisdiction in New York comports with due process protections provided by the United States Constitution," *id.* at 165; *see also* 169–74. Accordingly, we vacated and remanded the portion of the District Court's judgment in *Licci I* dismissing claims against defendant LCB for lack of personal jurisdiction. *Id.* at 174.

In *Licci IV*, we did not reach the question of whether the ATS provides subject matter jurisdiction over this case. We noted that while the Supreme Court did in fact affirm *Kiobel I* on appeal, it did so on different grounds than those upon which we decided *Kiobel I*. *Id.* (citing *Kiobel II*, 133 S. Ct. at 1669 (deciding that the presumption against extraterritoriality constrains federal courts from hearing causes of action under the ATS "seeking relief for violations of the law of nations occurring outside the

12

United States")).[9]  We decided, therefore, that because *Kiobel II* "did not directly address the question of corporate liability under the ATS," and because "the question of subject matter jurisdiction was not briefed on appeal," it was best that the District Court "address this issue in the first instance."  *Id.*

### E. Licci V

On remand, the District Court dismissed Plaintiffs' case once more.  In relevant part, the District Court held that it lacked subject matter jurisdiction over Plaintiffs' ATS claims under *Kiobel II*.  Specifically, the court held that Plaintiffs failed to rebut the presumption against the extraterritorial application of the ATS because their complaint's allegations regarding LCB's provision of banking services failed to state a claim for aiding and abetting another's violation of the law of nations.  The court concluded that Plaintiffs failed to allege adequately that LCB had the required *mens rea* for aiding and abetting liability, reasoning that the complaint lacked sufficiently detailed allegations as to LCB's intent.  Plaintiffs timely appealed.

### DISCUSSION

We review *de novo* a district court's dismissal for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), accepting all well-pleaded factual allegations in the complaint as true and drawing all inferences in favor of the plaintiffs.  *See Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555–56

---

[9] *Kiobel I* and *Kiobel II*'s separate grounds for dismissing the plaintiffs' Alien Tort Statute claims are distinct and, as we have previously observed, "not logically inconsistent."  *In re Arab Bank, PLC Alien Tort Statute Litig.*, 808 F.3d 144, 153 (2d Cir. 2015), *as amended* (Dec. 17, 2015) ("The two decisions adopted different bases for dismissal for lack of subject-matter jurisdiction.  Whatever the tension between them, the decisions are not logically inconsistent.").

13

(2007); *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 179 (2d Cir. 2014). Although courts are generally limited to examining the sufficiency of the pleadings on a motion to dismiss, on a challenge to a district court's subject matter jurisdiction, the court may also resolve disputed jurisdictional fact issues by reference to evidence outside the pleadings. *Flores v. S. Peru Copper Corp.*, 414 F.3d 233, 255 n.30 (2d Cir. 2003) (consulting evidence outside the pleadings to resolve disputed jurisdictional fact issues); *see also Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1019 (2d Cir. 1993) ("In resolving the jurisdictional dispute, the district court must review the pleadings and any evidence before it, such as affidavits.").

## I. The Alien Tort Statute

In full, the ATS states: "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. Enacted as part of the Judiciary Act of 1789, the ATS received little or no judicial attention until 1980, when this Court decided *Filártiga v. Peña-Irala*, 630 F.2d 876 (2d Cir. 1980). The years that followed *Filártiga* witnessed a dramatic increase in ATS litigation, as the ATS came to be viewed as a means to help victims of human rights violations.[10]

In its history, the Supreme Court has decided two cases directly addressing the ATS: *Sosa v. Alvarez–Machain*, 542 U.S.

---

[10] *See, e.g.*, Beth Stephens, *Judicial Deference and the Unreasonable Views of the Bush Administration*, 33 BROOK. J. INT'L L. 773, 777 & n.18, 810–11 (2008) (estimating in 2008, that approximately 185 human rights lawsuits were filed after *Filártiga*, as compared to 21 total suits before *Filártiga*) (citing BETH STEPHENS ET AL., INTERNATIONAL HUMAN RIGHTS LITIGATION IN U.S. COURTS 12–25 (2d ed. 2008)).

692 (2004), and *Kiobel II*.[11]  The Supreme Court clarified that the ATS is a "jurisdictional" statute in the sense that it "address[es] the power of the courts to entertain cases concerned with a certain subject."  *Sosa*, 542 U.S. at 714.  Though the "statute provides district courts with jurisdiction to hear certain claims, [it] does not expressly provide any causes of action."  *Kiobel II*, 133 S. Ct. at 1663.  The ATS's grant of jurisdiction is "best read as having been enacted on the understanding that the common law would provide a cause of action for a modest number of international law violations."  *Id.* (alteration and internal quotation marks omitted) (quoting *Sosa*, 542 U.S. at 724).

The Plaintiffs here—Israeli and Canadian citizens—assert a civil tort action, and thus satisfy the first clause of the ATS.  In determining whether the tort was "committed in violation of the law of nations or a treaty of the United States," we look to Supreme Court and Second Circuit precedent, mindful that there are "numerous jurisdictional predicates, all of which must be met before a court may properly assume jurisdiction over an ATS claim."  *Mastafa v. Chevron Corp.*, 770 F.3d 170, 179 (2d Cir. 2014).  These include, "but may not be limited to," *id.*, the following:

> (1) [T]he complaint pleads a violation of the law of nations, *see Sosa*, 542 U.S. at 732; *Kadic v. Karadžić*, 70 F.3d 232, 238 (2d Cir. 1995);

---

[11] In one other case, *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428 (1989), the Supreme Court briefly discussed the ATS in the context of foreign state immunity, holding that it did not permit jurisdiction over a foreign sovereign.

(2) [T]he presumption against the extraterritorial application of the ATS, announced by the Supreme Court in *Kiobel* [*II*] does not bar the claim;

(3) [C]ustomary international law recognizes liability for the defendant, *see Kiobel* [*I*], 621 F.3d at 145 ; and

(4) [T]he theory of liability alleged by plaintiffs (*i.e.*, aiding and abetting, conspiracy) is recognized by customary international law, *see Khulumani v. Barclay National Bank Ltd.*, 504 F.3d 254, 264 (2d Cir. 2007) (Katzmann, J., concurring).

*Id.* (citation omitted).

The District Court found that the complaint failed to rebut the presumption against extraterritoriality. On appeal, the parties focus on that inquiry, as well as whether customary international law recognizes liability for LCB in its capacity as a corporation. *See* Appellants Br. 18–40; Appellees Br. 36–48. Nevertheless, we consider all four inquiries, as each "requires an affirmative determination before a court properly has jurisdiction over an ATS claim." *Mastafa*, 770 F.3d at 179. As set forth below, we conclude that Plaintiffs have satisfied all of the jurisdictional predicates but one. Because this Circuit has ruled that customary international law does not recognize liability for corporations, *see Kiobel I*, 621 F.3d at 145, we must conclude that the District Court does not have jurisdiction over Plaintiffs' ATS claims against LCB, a corporation.

## II. Pleading a Violation of the Law of Nations

The ATS confers jurisdiction over only two varieties of torts: (1) violations of treaties ratified by the United States and

16

(2) violations of the law of nations, *i.e.*, customary international law. 28 U.S.C. § 1350; *see also Flores*, 414 F.3d at 247. "There is no federal subject-matter jurisdiction under the [ATS] unless the complaint adequately pleads a violation of the law of nations (or treaty of the United States)." *Kadic*, 70 F.3d at 238; *see also Mastafa*, 770 F.3d at 179–81. "Because the [ATS] requires that plaintiffs plead a violation of the law of nations at the jurisdictional threshold, this statute requires a more searching review of the merits to establish jurisdiction than is required under the more flexible 'arising under' formula of [28 U.S.C. §] 1331." *Kadic*, 70 F.3d at 238 (other internal quotations marks omitted). Therefore, "it is not a sufficient basis for jurisdiction to plead merely a colorable violation of the law of nations." *Id.* This inquiry has a definitive historical dimension, as "federal courts should not recognize private claims under federal common law for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar when [the ATS] was enacted." *Sosa*, 542 U.S. at 732.

Plaintiffs assert that Hezbollah's actions, including "its attempts to physically exterminate or expel the Jewish residents of Israel and its intentional and systematic use of violence against civilians, constitute genocide, crimes against humanity[,] and war crimes under customary international law, and therefore constitute violations of 'the law of nations' within the meaning of [the ATS]." App. 110. They allege that LCB's actions "constitute[] aiding and abetting [Hezbollah's] acts of genocide, crimes against humanity[,] and war crimes." App. 111.

Genocide, crimes against humanity, and war crimes certainly constitute violations of the law of nations under customary international law. *See Kadic*, 70 F.3d at 236 (observing that a defendant "may be found liable for genocide, war crimes,

17

Case 15-7533, Document 179-2, 08/07/2018, 2356349, Page21 of 34

and crimes against humanity" under the ATS); *Sosa*, 542 U.S. at 762 (Breyer, J., concurring in part and concurring in judgment) (describing a "subset" of "universally condemned behavior" for which "universal jurisdiction exists," including "torture, genocide, crimes against humanity, and war crimes").  Plaintiffs have alleged systematic rocket attacks against the Jewish civilian population in Israel, committed with the intent to exterminate or expel them from the territory.  These allegations adequately plead acts of genocide and crimes against humanity.  Therefore, Plaintiffs have satisfied their burden to assert a cause of action grounded in actions recognized as violations of the law of nations.  *See Mastafa*, 770 F.3d at 181 (finding that "plaintiffs have satisfied their burden of asserting some causes of actions grounded in actions recognized as violations of customary international law" where they asserted that the principal committed genocide, war crimes, and crimes against humanity).

### III. Theory of Liability

Plaintiffs assert that the "actions of defendant LCB . . . constituted *aiding and abetting* [Hezbollah's] acts of genocide, crimes against humanity[,] and war crimes under the law of nations."  App. 111 (emphasis added).  Aiding and abetting is a theory of liability recognized by customary international law. *Khulumani*, 504 F.3d at 260 (Opinion of the Court); *see id.* at 270 (Katzmann, J., concurring); *see also Mastafa*, 770 F.3d at 181 (recognizing that, in this Circuit, a plaintiff may plead a theory of aiding and abetting liability under the ATS).  Accordingly, Plaintiffs have pleaded a theory of liability over which we have subject matter jurisdiction.

### IV. Displacing the Presumption against Extraterritoriality

The presumption against extraterritoriality provides that "when a statute gives no clear indication of an extraterritorial

18

application, it has none, and reflects the presumption that United States law governs domestically but does not rule the world." *Kiobel II*, 133 S. Ct. at 1664 (alteration, citations, and internal quotation marks omitted). The presumption typically applies when a court is discerning "whether an Act of Congress regulating conduct applies abroad." *Id.*

In *Kiobel II*, the Supreme Court held that the presumption against extraterritoriality constrains courts exercising their power under the ATS. *Id.* at 1664–65. *Kiobel II*'s extension of the presumption against extraterritoriality to the ATS in its capacity as a "strictly jurisdictional" statute was principally based on foreign policy considerations. *Id.* at 1664 (quoting *Sosa*, 542 U.S. at 713). The Court observed that the "danger of unwarranted judicial interference in the conduct of foreign policy is magnified in the context of the ATS, because the question is not what Congress has done but instead what courts may do." *Id.* It underscored, therefore, "the need for judicial caution in considering which claims could be brought under the ATS, in light of foreign policy concerns." *Id.* The Court was careful, however, to provide that a plaintiff could "displace" the presumption:

> [E]ven where the claims touch and concern the territory of the United States, they must do so with sufficient force to displace the presumption against extraterritorial application. Corporations are often present in many countries, and it would reach too far to say that mere corporate presence suffices.

*Id.* at 1669 (citation omitted).

To determine whether Plaintiffs have displaced the presumption against extraterritoriality, we first consider the threshold inquiry of whether the presumption is "self-evidently

19

dispositive" or whether "its application requires further analysis." *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 266 (2010); *see also Mastafa*, 770 F.3d at 182. That is, when a complaint alleges *no* contact "between the injuries alleged and the territory of the United States," the presumption against extraterritoriality is not displaced and the inquiry, in all likelihood, ends there. *Mastafa*, 770 F.3d at 182–83; *Balintulo v. Daimler AG*, 727 F.3d 174, 189 (2d Cir. 2013) (holding plaintiffs' claims did not rebut the presumption against extraterritoriality set forth in *Kiobel II* "because the plaintiffs have failed to allege that *any* relevant conduct occurred in the United States" (emphasis added)).

The *Kiobel* complaint, which contained no averment of contact between the conduct alleged and U.S. territory, was self-evidently dispositive. *See Kiobel II*, 133 S. Ct. at 1669. The *Kiobel* plaintiffs were Nigerian nationals alleging that certain Dutch, British, and Nigerian corporations aided and abetted Nigerian military and police forces in "attack[ing] [plaintiffs'] villages, beating, raping, killing, and arresting residents and destroying or looting property" by "among other things, providing the Nigerian forces with food, transportation, and compensation, as well as by allowing the Nigerian military to use respondents' property as a staging ground for attacks." *Id.* at 1662–63. The Supreme Court held that because "all the relevant conduct took place outside the United States," the plaintiffs' claims did not displace the presumption against extraterritorial application. *Id.* at 1669.

*Kiobel* is not this case. Unlike the *Kiobel* plaintiffs, who only alleged extraterritorial conduct, Plaintiffs allege, *inter alia*, that LCB used its correspondent banking account in New York to facilitate dozens of international wire transfers for the Shahid, an entity alleged to be an "integral part" of Hezbollah. App. 65.

20

Thus, Plaintiffs allege sufficient connections with the United States to require "further analysis." *Mastafa*, 770 F.3d at 182 (internal quotation mark omitted). Applying *Kiobel II* and *Morrison*, we have previously set forth exactly what that "further analysis" entails. *See Mastafa*, 770 F.3d at 185–87. As a preliminary matter, the court must isolate the "relevant conduct" in the complaint—here, "the conduct of the defendant . . . that constitutes aiding and abetting another's violation of the law of nations." *Id.*

In isolating the relevant conduct of the defendant, a court must evaluate the "territorial events" or "relationships" that were the "focus" of the ATS. *Id.* at 184 (alterations omitted) (quoting *Morrison*, 561 U.S. at 266). Then, in "determining whether this conduct displaces the presumption, the district court must engage in a two-step jurisdictional analysis of this conduct." *Id.* Step one is a determination of whether the relevant conduct—*i.e.*, conduct aiding and abetting a violation of the law of nations—"sufficiently 'touches and concerns' the territory of the United States so as to displace the presumption against extraterritoriality." *Id.* at 186 (quoting *Kiobel II*, 133 S. Ct. at 1669). Step two is a determination of whether "the *same conduct*, upon preliminary examination, states a claim for a violation of the law of nations or aiding and abetting another's violation of the law of nations." *Id.* at 187.

Applying this framework, the District Court appears to have found that step one was satisfied; it dismissed the complaint on its conclusion that Plaintiffs failed to meet the requirements of step two. Special App. 9–10. On appeal, the parties dispute whether either step is met. *See* Appellants Br. 21–23; Appellee Br. 37–39. We consider each in turn.

21

### A. Conduct that Touches and Concerns the United States

The "relevant conduct" in the complaint is LCB's provision of wire transfers between Hezbollah accounts through its correspondent bank in New York. Specifically, Plaintiffs allege (1) LCB "provided extensive banking services to [Hezbollah]" that "caused, enabled[,] and facilitated the terrorist rocket attacks in which the plaintiffs and their decedents were harmed and killed" and (2) those banking services "were carried out by LCB *in and through the State of New York*." App. 58 (emphasis added). Plaintiffs further allege that "between 2004 and July 12, 2006 (and subsequently), [Hezbollah] made and received dozens of dollar wire transfers . . . totaling several million dollars," and that "[a]ll" of those wire transfers "were made to, from, and/or between" Hezbollah's bank accounts at various LCB branches through AmEx in New York. App. 66. Plaintiffs allege that LCB worked "in concert with" AmEx to carry out the wire transfers, and that AmEx acted "on behalf of" LCB in carrying out the transfers. App. 66. Plaintiffs offer additional allegations that the New York State Banking Department investigated LCB's correspondent bank in New York when the wire transfers took place, and that the bank violated various terrorist financing and money laundering laws in carrying out the transfers. App. 104–05.

We have previously concluded that a claim similar to the Plaintiffs' sufficiently touched and concerned the United States to displace the presumption against extraterritorial application. Specifically, in *Mastafa*, we considered an ATS claim brought by five Iraqi nationals against an oil company and a French bank. *See* 770 F.3d at 174. The *Mastafa* plaintiffs alleged that the oil company and the bank aided and abetted the Saddam Hussein regime in its torture, imprisonment, and execution of the plaintiffs or their family members "by paying the regime

22

kickbacks and other unlawful payments, which enabled the regime to survive and perpetrate the abuses suffered by plaintiffs or their husbands." *Id.* at 175. The allegations stemmed from the United Nations' Oil for Food Programme ("OFP"), a program that "permitted the export of oil from Iraq in exchange for food, medicine, and other basic civilian necessities by allowing the purchase of Iraqi oil to proceed through an escrow account, into which purchasers submitted payments and from which providers of civilian necessities received payment." *Id.* (internal quotation marks omitted). In essence, the *Mastafa* plaintiffs alleged "that the Saddam Hussein regime—then subject to United Nations economic sanctions—misused the OFP in order to elicit income outside the United Nations' oversight and fund its regime and to fund its campaign of human rights abuses against its people." *Id.* (alterations and internal quotation marks omitted).

Three of the four allegations in the *Mastafa* plaintiffs' complaint came up short. The allegations were insufficient to satisfy the touch and concern inquiry because they were either (1) too tangential to the conduct alleged to aid and abet a violation of the law of nations or (2) inadequately pleaded. *See id.* at 189–90. First, we determined that "the fact that the United Nations is located in New York, and that the OFP's inception and administration occurred in New York, [was] irrelevant" to the touch and concern inquiry, as "[s]uch allegations, by themselves, are not facts related to defendants at all, let alone alleged conduct taken by defendants to aid and abet violations of the law of nations." *Id.* at 190. Second, we considered the fact that the oil company is headquartered in the United States to be "immaterial" because "the relevant inquiry is on conduct constituting a violation of customary international law or of aiding and abetting such violations, not on where defendants are

23

present." *Id.* Third, we rejected the plaintiffs' allegation that because the defendant oil company is headquartered in the United States, "its profits reaped from the transactions were recouped in the United States" as a mere conclusory statement that "d[id] not satisfy basic pleading requirements." *Id.* (internal quotation marks omitted).

However, we found that the *Mastafa* plaintiffs' fourth allegation—that the French bank "entered into a Banking Agreement with the United Nations in New York pursuant to which it maintained an escrow account in New York City through which all OFP funds moved, including the illicit surcharge payments"—sufficiently touched and concerned the United States to surpass the first step of displacing the presumption against extraterritoriality. *Id.* at 190–91. Specifically, the *Mastafa* plaintiffs alleged that both the bank and the oil company made "U.S.-based attempts to skirt the sanctions regime." *Id.* at 190. As to the bank, plaintiffs alleged that it "maintained [an] escrow account in New York City through which all [relevant] payments were transmitted." *Id.* (internal quotation marks omitted). The plaintiffs alleged that the bank "allowed payments" through the New York City account that included kickbacks to the Saddam Hussein regime, and that the bank's financing arrangements "allowed the oil purchasers to conceal the true nature of the oil purchase." *Id.* (internal quotation mark omitted). As to the oil company, plaintiffs alleged, *inter alia*, that it facilitated surcharge payments to the Hussein regime as part of particular transactions. *Id.* Assessing this allegation, we concluded that the relevant conduct was sufficiently "specific and domestic" to (1) be non-conclusory and (2) touch and concern the United States. *Id.* at 191. We held that the plaintiffs' fourth allegation touched and concerned the United States with sufficient force to displace the presumption

24

against extraterritoriality and establish ATS jurisdiction—so long as it also "satisfie[d] a preliminary determination that such conduct aided and abetted a violation of the law of nations." *Id.*

Like the *Mastafa* plaintiffs' allegations against the French bank, Plaintiffs here assert that LCB, a Lebanese Bank, used a correspondent banking account at a New York bank to facilitate wire transfers between Hezbollah's bank accounts in the months leading up to the rocket attacks. Plaintiffs specifically allege that LCB carried out the specific "banking services which harmed the plaintiffs and their decedents . . . *in and through the State of New York.*" App. 58 (emphasis added). Plaintiffs here have alleged that LCB engaged in "numerous New York-based payments and 'financing arrangements' conducted exclusively through a New York bank account." *See Mastafa*, 770 F.3d at 191. As in *Mastafa*, we find these allegations to be both specific and domestic. *See id.* Plaintiffs' allegations "touch and concern" the United States with sufficient force to displace the presumption, so long as such conduct also meets the second prong of our extraterritoriality analysis.[12]

---

[12] As the above analysis indicates, the fact that LCB's correspondent bank in New York, AmEx, is no longer a party to this appeal, is immaterial to our conclusion that the allegations against defendant LCB sufficiently touch and concern the United States. Plaintiffs' only allegations against AmEx that did not also involve LCB's domestic contacts include (1) AmEx is headquartered in New York and incorporated in Connecticut, and (2) AmEx "does extensive business and holds significant assets in New York." App. 57. Because the relevant inquiry is whether the defendant's conduct touches and concerns the United States, not where the defendant or particular assets are located, AmEx's absence as a party does not affect that inquiry. *See Mastafa*, 770 F.3d at 190.

### B. States a Claim for Violation of the Law of Nations

To displace the presumption against extraterritoriality, the conduct "which the court has determined sufficiently 'touches and concerns' the United States" must also, upon preliminary examination, state a claim for a violation of the law of nations or aiding and abetting another's violation of the law of nations. *Mastafa,* 770 F.3d at 186–87. "This second step of the extraterritoriality analysis ensures . . . that 'the statute's jurisdictional reach will match the statute's underlying substantive grasp.'" *Id.* at 186 (alteration omitted) (quoting *Kiobel II,* 133 S. Ct. at 1673 (Breyer, J., concurring in the judgment)). A defendant may be held liable under an aiding and abetting theory of liability under international law if the defendant "(1) provide[d] practical assistance to the principal which has a substantial effect on the perpetration of the crime, and (2) d[id] so with the purpose of facilitating the commission of that crime." *Presbyterian Church of Sudan v. Talisman Energy, Inc.,* 582 F.3d 244, 259 (quoting *Khulumani,* 504 F.3d at 277 (Katzmann, J., concurring)). As to the latter requirement, we have underscored that the *mens rea* standard for accessorial liability in ATS actions is "purpose rather than knowledge alone." *Id.*

The District Court here did not address whether Plaintiffs adequately alleged that LCB provided practical assistance to LCB that had a substantial effect on the perpetration of the crime. It concluded only that Plaintiffs have "insufficiently allege[d] that the wire transfers aided and abetted a violation of the law of nations." Special App. 9. The court reasoned that Plaintiffs failed to surpass its preliminary *mens rea* determination because the complaint's allegations of LCB's intent are merely "conclusory." *Id.* It further noted that the complaint is "devoid of any factual allegations supporting LCB's specific intent, in

26

executing the wire transfers, to promote or engage in
Hezbollah's coercive actions against the Israeli government and
public." *Id.* "Because the [complaint] inadequately pleads that
the wire transfers at issue were made with the intent to aid and
abet the alleged terrorist activities," it concluded, "Plaintiffs have
not established that there is subject matter jurisdiction under the
ATS." Special App. 10.

The relevant conduct alleged here—*i.e.*, LCB's alleged act
of carrying out wire transfer services on Hezbollah's behalf
through the state of New York, *see* App. 58, 65–66—satisfies a
preliminary determination that such conduct provided practical
assistance to Hezbollah that substantially affected Hezbollah's
perpetration of the underlying violations of the law of nations.
Plaintiffs adequately allege that these wire transfer services had
a substantial effect on Hezbollah's actions insofar as they
"enabled" and "facilitated" terrorist rocket attacks harming or
killing Plaintiffs and their decedents. App. 54. Plaintiffs further
allege that LCB's wire transfers "substantially increased and
facilitated [Hezbollah's] ability to plan, to prepare for[,] and to
carry out rocket attacks on civilians," including the rocket
attacks injuring or killing Plaintiffs and their family members.
App. 86. In addition, Plaintiffs particularly allege that
"[Hezbollah] planned, made the preparations necessary for and
carried out" the rocket attacks by "utilizing funds" received as
part of the wire transfers. *Id.* Plaintiffs' allegations are bolstered
by evidence in the record that LCB's wire transfers "significantly
enhanced [Hezbollah]'s ability to plan and carry out terrorist
and other violent actions, including the rocket attacks in which
[Plaintiffs] were harmed." App. 128.

LCB does not dispute whether Plaintiffs have adequately
shown that it provided practical assistance to Hezbollah that has
had a substantial effect on the perpetration of the underlying

27

crimes. Rather, it argues only that the District Court correctly held that Plaintiffs have failed to meet the required *mens rea* for accessorial liability. We disagree. Plaintiffs' complaint, considered in conjunction with the Shaya declaration and the government's actions against LCB, satisfies our preliminary review of the *mens rea* requirement for aiding and abetting violations of the law of nations. *See Presbyterian Church*, 582 F.3d at 259. In essence, Plaintiffs allege that (1) LCB acted intentionally, and pursuant to its official policy, in assisting Hezbollah in carrying out the rocket attacks by carrying out the wire transfers, and (2) LCB knew that the bank accounts between which it facilitated transfers were owned and controlled by Shahid, an integral part of Hezbollah.

As an initial matter, Plaintiffs allege that "as a matter of official LCB policy" LCB "continuously supports and supported [Hezbollah] and its anti-Israel program, goals[,] and activities." App. 88. They also allege that LCB had "actual knowledge" that (1) "[Hezbollah] is a violent terrorist organization [that] carried out numerous terrorist attacks against Israeli civilians and American targets and which planned and intended to carry out additional such terrorist attacks," App. 88–89; (2) "Shahid is an integral part of [Hezbollah] and constitutes part of [Hezbollah's] financial arm," App. 90; (3) Hezbollah's bank accounts at various LCB branches and the funds therein "were owned and controlled by [Hezbollah]," *Id*.; (4) the wire transfers made and received by Hezbollah leading up to the 2006 rocket attacks "were being carried out by and at the direction of [Hezbollah]," *Id*.; *see also* App. 65—66; and (5) Hezbollah "require[d] wire transfer services . . . in order to plan, to prepare for and to carry out terrorist attacks." App. 89. Plaintiffs then allege that LCB, equipped with this actual knowledge, carried out the wire transfers at issue "with the specific purpose and intention of

28

enabling and assisting [Hezbollah] to carry out terrorist attacks against Jewish civilians in Israel." App. 109. Indeed, the complaint states that LCB carried out the wire transfers "as a matter of official LCB policy, in order to assist and advance [Hezbollah's] terrorist activities against Jews in Israel, in order to assist and advance [Hezbollah's] goal of using terrorism to destroy the State of Israel and murder or expel its Jewish inhabitants and in order to assist and advance [Hezbollah's] goal of coercing, intimidating and influencing the Israeli government and public." App. 88.

As set forth above, in determining this disputed jurisdictional fact, we may also consider evidence in the record outside the pleadings. *See Flores*, 414 F.3d at 255 n.30. The Shaya declaration provides context to Plaintiffs' allegations that LCB aided and abetted Hezbollah's alleged violations of the law of nations. Specifically, the Shaya declaration states that between "2004 and July 12, 2006 (and later)," Hezbollah "made dozens of dollar wire transfers in and out of" a specific account number at LCB's headquarters. App. 127. Shaya stated that LCB requested that its correspondent bank in New York carry out the wire transfers and identified Shahid as the account-holder, and thus "there is no question" that Amex Bank *knew* that it was executing wire transfers on behalf of Shahid. App. 127–28. In addition, the government forfeiture action against LCB lends support to Plaintiffs' allegations. *See* App. 323–95. Specifically, the government alleged that LCB engaged in activity "intended to conceal and disguise the true source, nature, ownership, and control of" proceeds of illegal activities in a scheme that "benefitted [Hezbollah]." App. 358.

We conclude that Plaintiffs' complaint alleges conduct by LCB that touched and concerned the United States, and that the same conduct, upon preliminary examination, states a claim

29

for aiding and abetting Hezbollah's violation of the law of nations, with sufficient force to displace the presumption against extraterritoriality. Accordingly, Plaintiffs have surpassed the jurisdictional hurdle set forth in *Kiobel II*, 133 S. Ct. at 1669.

### V. Corporate Liability

Nevertheless, *Kiobel I* forecloses Plaintiffs' claims against LCB. In *Kiobel I*, we established that the law of nations, while imposing civil liability on individuals for torts that qualify under the ATS, immunizes corporations from liability. *Kiobel I*, 621 F.3d at 120. Specifically, *Kiobel I* held that "insofar as plaintiffs bring claims under the ATS against corporations, plaintiffs fail to allege violations of the law of nations, and plaintiffs' claims fall outside the limited jurisdiction provided by the ATS." *Id.* Neither party disputes that LCB is a corporation. Accordingly, we cannot exercise subject matter jurisdiction over Plaintiffs' ATS claims pursuant to that statute.

To the extent Plaintiffs submit that *Kiobel I* was wrongly decided, we reaffirm *Arab Bank*'s conclusion—we are not free to consider that argument. *In re Arab Bank*, 808 F.3d at 157. "[I]t is axiomatic that a panel of this court is bound by the decisions of prior panels until such time as they are overruled either by an en banc panel of our Court or by the Supreme Court." *See NML Capital v. Republic of Argentina*, 621 F.3d 230, 243 (2d Cir. 2010) (internal quotation marks omitted); *accord In re Arab Bank*, 808 F.3d at 157. Indeed, this Court has previously declined similar attempts by ATS plaintiffs to overturn *Kiobel I*. *See In re Arab Bank, PLC Alien Tort Statute Litig.*, 822 F.3d 34, 35 (2d Cir. 2016) (denying rehearing en banc). Accordingly, we faithfully apply

*Kiobel I* and affirm the District Court's dismissal of this case on that basis.[13]

## CONCLUSION

For the foregoing reasons, we AFFIRM IN PART[14] the judgment of the District Court.

---

[13] In voting against reconsideration of *Kiobel I*'s holding that the ATS does not regulate corporate conduct, four judges of our Court reasoned that "the population of cases dismissible under *Kiobel I* is *largely coextensive* with those dismissible under *Kiobel II*." *In re Arab Bank*, 822 F.3d at 35 (Jacobs, *J.*, concurring in the denial of rehearing en banc) (emphasis added). The concurring judges concluded that "[t]he principle of *Kiobel I* has been largely overtaken, and its importance for outcomes has been sharply eroded." *Id.* But as is often the case in the law, no sooner is a certainty expressed than an exception presents itself. This case, in which defendants are accused of domestic acts that aided and abetted torts committed abroad, may illustrate a category of cases that surpass *Kiobel II*'s extraterritoriality inquiry but do not survive *Kiobel I*'s bar on corporate liability. At present, how large a class of cases that may be is difficult to know.

[14] This opinion affirms the District Court's judgment with regard to Plaintiffs' ATS claims. This opinion and the accompanying summary order, which addresses the balance of Plaintiffs' claims, combine to affirm the District Court's judgment *in toto*.

31