PREET BHARARA
United States Attorney for the
Southern District of New York
By:  SHARON COHEN LEVIN
     MICHAEL D. LOCKARD
     JASON H. COWLEY
     ALEXANDER J. WILSON
One St. Andrew's Plaza
New York, New York 10007

JUDGE HOLWELL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,                       :

                   Plaintiff,                   :          **VERIFIED COMPLAINT**

              - v. -                            :     11 Ci. CIV 9186

LEBANESE CANADIAN BANK SAL, ELLISSA             :
HOLDING COMPANY, HASSAN AYASH EXCHANGE
COMPANY, CYBAMAR SWISS GMBH, LLC, STE           :
NOMECO SARL, STE MARCO SARL, and THE
SALHAB TRAVEL AGENCY,                           :

                   Defendants;                  :

ALL ASSETS OF LEBANESE CANADIAN BANK            :
SAL OR ASSETS TRACEABLE THERETO; ALL
ASSETS OF ELLISSA HOLDING COMPANY; ALL          :
ASSETS OF HASSAN AYASH EXCHANGE
COMPANY; ALL ASSETS OF CYBAMAR SWISS            :
GMBH, LLC, STE MARCO SARL, STE NOMECO
SARL, AND THE SALHAB TRAVEL AGENCY,             :
INCLUDING BUT NOT LIMITED TO ALL FUNDS
ON DEPOSIT IN THE BANK ACCOUNTS AS              :
PARTICULARLY DESCRIBED IN SCHEDULE A;
and ALL ASSETS OF 30 USED CAR BUYERS            :
IN THE UNITED STATES LISTED IN
SCHEDULE A, INCLUDING BUT NOT LIMITED           :
TO APPROXIMATELY $248 MILLION
PREVIOUSLY ON DEPOSIT AT APPROXIMATELY          :
57 BANK ACCOUNTS, AS DESCRIBED IN
SCHEDULE A, AND ALL PROPERTY TRACEABLE          :
THERETO,

                                                :

                   Defendants in rem.           :

- - - - - - - - - - - - - - - - - - - x

# TABLE OF CONTENTS

I. NATURE OF THE ACTION. . . . . . . . . . . . . 3

II. JURISDICTION AND VENUE. . . . . . . . . . . . 7

III. STATUTORY AUTHORITIES. . . . . . . . . . . . 7

   The International Emergency Economic Powers Act. . . . . 8

   The Terrorism Sanctions Regulations. . . . . . . . . . 8

   The Foreign Terrorist Organizations
       Sanctions Regulations. . . . . . . . . . 10

   The Global Terrorism Sanctions Regulations. . . . . . 12

   Iran and Syria Nonproliferation Act. . . . . . . . . 14

IV. PROBABLE CAUSE FOR FORFEITURE. . . . . . . . 15

   A. Overview. . . . . . . . . . . . . . . . . 15

   B. Hizballah. . . . . . . . . . . . . . . . . 16

   C. Narcotics Trafficking in West Africa. . . . . . . . 19

   D. Lebanese Canadian Bank. . . . . . . . . . . 24

   E. Hassan Ayash Exchange Company. . . . . . . . 34

   F. The Ellissa Exchange, Ellissa Shipping Company,
      and Ellissa Car Parc in Cotonou. . . . . . . . . 35

   G. Transfers from Ayash, Ellissa and Others to the
      United States to Buy and Ship Used Cars. . . . . . 35

   H. Cybamar Swiss Family of Companies. . . . . . . . 37

   I. The Link Between U.S. Car Buyers and the Salhab
      West African Bulk Money Courier Network. . . . . . 39

   J. Movement of Hundreds of Millions of Dollars from
      West Africa to Lebanon. . . . . . . . . . . . 40

   K. Used Car Buyers in the U.S. Receive Wire Transfers
      for Buying and Shipping Used Cars as Part of the
      Money Laundering Scheme. . . . . . . . . . . 45

V. CLAIMS FOR FORFEITURE. . . . . . . . . . . . 58

VI. CIVIL MONEY LAUNDERING PENALTIES. . . . . . . . 63

Plaintiff United States of America, by its attorney, Preet Bharara, United States Attorney for the Southern District of New York, for its verified complaint alleges, upon information and belief, as follows:

## I.   **NATURE OF THE ACTION**

1.   This in rem forfeiture action and civil money laundering complaint arises out of an investigation by the Drug Enforcement Administration ("DEA") and other federal law enforcement agencies of a scheme to launder money through the United States financial system and the United States used car market.  As part of the scheme, funds are transferred from Lebanon to the United States in order to purchase used cars, which are then shipped to West Africa and sold for cash.  Cash proceeds of these car sales are then transferred, along with the proceeds of narcotics trafficking and other crimes, to Lebanon. The cash is often moved through bulk cash smuggling.

2.   Hizballah members and supporters are involved at various points in the money laundering scheme.  Hizballah members and supporters facilitate the smuggling of cash, including proceeds from the sale of used cars exported from the United States and narcotics proceeds, from West Africa to Lebanon; and finance and facilitate the purchase of some of the used cars in the United States.  Because Hizballah is a designated Foreign

3

Terrorist Organization, a Specially Designated Terrorist, and a Specially Designated Global Terrorist (discussed more fully below), the money laundering scheme also involves violations of the International Emergency Economic Powers Act of 1977 ("IEEPA"), codified at Title 50, United States Code, Sections 1701-1705.

3.  Lebanese financial institutions and exchange houses play a key role in these money laundering channels. For example, on January 26, 2011, the U.S. Department of the Treasury, Office of Foreign Assets Control ("OFAC") designated Ayman Joumaa, a Lebanese narcotics trafficker and money launderer, under the Foreign Narcotics Kingpin Designation Act, codified at Title 21, United States Code, Sections 1901 to 1908 (the "Kingpin Act"). The same day, OFAC designated, among others, the Hassan Ayash Exchange Company and the Ellissa Exchange Company (the "Ellissa Exchange") -- two Lebanese exchanges houses -- for their roles in Joumaa's laundering of narcotics proceeds. In addition, Ellissa Group SA, Ellissa Holding, Ellissa Megastore, Ellissa Parc Cotonou, and Ellissa Shipping, the latter three of which are located in Benin, were designated (the Ellissa companies collectively, "Ellissa Holding"). OFAC also designated Phenicia Shipping Offshore SARL

4

for being owned or controlled by members of Ayman Joumaa's organization.

    4.   On February 10, 2011, the U.S. Department of the Treasury, Financial Crimes Enforcement Network ("FinCEN") issued a finding and a proposed rule, pursuant to Section 311 of the USA PATRIOT Act, Title 31, United States Code, 5318A, that the Lebanese Canadian Bank SAL ("LCB") is a financial institution of primary money laundering concern (the "311 Action"). The proposed rule would prohibit U.S. financial institutions from opening or maintaining correspondent or payable-through accounts for LCB. The 311 Action was based, inter alia, on FinCEN's determination that there was reason to believe that LCB has been routinely used by drug traffickers and money launderers operating in various countries in Central and South America, Europe, Africa, and the Middle East, including by at least one narco-trafficker who is a supporter of Hizballah and another who provides financial support to Hizballah. FinCEN also determined that there was reason to believe that LCB managers are complicit in the network's money laundering activities.

    5.   As a result of its identification as a financial institution of primary money laundering concern, LCB was no longer able to operate in the United States. Although the proposed rule prohibiting U.S. financial institutions from

opening or maintaining correspondent or payable-through accounts for LCB was not yet in effect, financial institutions in the United States nonetheless terminated their correspondent banking relationships with LCB, cutting off LCB's access to the United States financial system. Prior to its identification as a financial institution of primary money laundering concern, LCB maintained correspondent accounts with financial institutions in the Southern District of New York.

6.    In or about September 2011, another Lebanese financial institution, Société Générale de Banque au Liban ("SGBL"), completed the acquisition of certain assets and liabilities of LCB.

7.    Between approximately January 2007 and early 2011, at least $329 million was transferred by wire from accounts held in Lebanon at LCB, Federal Bank of Lebanon ("Federal Bank"), Middle East and Africa Bank ("MEAB"), and BLOM Bank ("BLOM") to the United States through their correspondent bank accounts with U.S. financial institutions located in the Southern District of New York and elsewhere for the purchase of used cars. Of that amount, $141,522,091 was transferred from accounts held by Hassan Ayash Exchange Company and $61,747,524 was transferred from accounts held by the Ellissa Exchange, with the remaining $126,281,969 transferred from accounts held by others.

6

8.  For the reasons set forth in more detail below, the United States seeks civil money laundering penalties against LCB, Hassan Ayash Exchange Company, Ellissa Holding, Cybamar Swiss GMBH, LLC ("Cybamar Swiss"), STE Marco SARL, STE Nomeco SARL, and the Salhab Travel Agency (collectively, the "Defendant Entities"), in the amount of at least $446 million, representing the sum of the funds laundered by each of those entities.

9.  In addition, as set forth in more detail below, the United States seeks the forfeiture, pursuant to Title 18, United States Code, Sections 981(a)(1)(A) and (a)(1)(C), of property involved in or traceable to the money laundering offenses and property traceable to the IEEPA offenses alleged in this Complaint.  Those assets include all assets of LCB, Hassan Ayash Exchange Company, Ellissa Holding, Cybamar Swiss, STE Marco SARL, STE Nomeco SARL, the Salhab Travel Agency, and all assets of 30 used car purchasers as described in more detail in Schedule A to this Complaint, including, but not limited to, funds transferred to certain bank accounts also described in more detail in Schedule A to this Complaint and all property traceable thereto (collectively, the "Defendant Properties").

## II.  JURISDICTION AND VENUE

10.  This Court has jurisdiction pursuant to Title 28, United States Code, Sections 1345 and 1355.

11.  Venue is proper pursuant to Title 28, United States Code, Section 1355(b)(1)(A) because acts and omissions giving rise to the forfeiture took place in the Southern District of New York.

### III.  STATUTORY AUTHORITIES

### The International Emergency Economic Powers Act

12.  This in rem forfeiture and civil money laundering penalty action relates to violations of regulations and Executive Orders issued pursuant to the International Emergency Economic Powers Act ("IEEPA"), codified at 50 U.S.C. §§ 1701-1705.  IEEPA gives the President certain powers, defined in Section 1702, to respond to threats with respect to which the President has declared a national emergency.  Section 1705 provides, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this title."  50 U.S.C. § 1705(a).

13.  As described below, the President has issued executive orders, and the Department of State and the Department of the Treasury have promulgated regulations, pursuant to the IEEPA that prohibit a broad range of conduct with respect to Hizballah, including providing goods or services to Hizballah or

any transactions or dealings in property in which Hizballah has an interest.

### The Terrorism Sanctions Regulations

14.  On January 23, 1997, President William Jefferson Clinton issued Executive Order 12947, declaring a national emergency pursuant to the IEEPA and other statutes with respect to the threat to the national security, foreign policy, and economy of the United States posed by grave acts of violence committed by foreign terrorists that disrupt the Middle East peace process.  Executive Order 12947 blocked all property subject to U.S. jurisdiction in which any of 12 designated terrorist organizations, including Hizballah, had an interest. See 60 Fed. Reg. 5079 (Jan. 23, 1997).

15.  To implement Executive Order 12947, OFAC issued the Terrorism Sanctions Regulations, Title 31, Code of Federal Regulations, Part 595.  The Terrorism Sanctions Regulations ("TSR") generally block the property of "Specially Designated Terrorists" ("SDTs"), consisting of the 12 organizations designated in Executive Order 12947 and any persons designated by the Secretary of State that are found to have committed, or to pose a significant risk of committing, acts of violence that have the purpose or effect of disrupting the Middle East peace process or that assist in, sponsor, or provide financial, material, or

9

technological support for, or services in support of, such acts of violence.

16. Subpart 595.201(a) of the TSR provides, in relevant part:

> [N]o property or interests in property of a specially designated terrorist, that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of U.S. persons, including their overseas branches, may be transferred, paid, exported, withdrawn or otherwise dealt in.

17. Subpart 595.204 of the TSR prohibits transactions with, or for the benefit of, an SDT:

> Except as otherwise authorized, no U.S. person may deal in property or interests in property of a specially designated terrorist, including the making or receiving of any contribution of funds, goods, or services to or for the benefit of a specially designated terrorist.

18. Subpart 595.205 of the TSR further prohibits attempts and conspiracies to violate or to evade the prohibitions of the TSR:

> Any transaction for the purpose of, or which has the effect of, evading or avoiding, or which facilitates the evasion or avoidance of, any of the prohibitions set forth in this part, is hereby prohibited. Any attempt to violate the prohibitions set forth in this part is hereby prohibited. Any conspiracy formed for the purpose of engaging in a transaction prohibited by this part is hereby prohibited.

## The Foreign Terrorist Organizations Sanctions Regulations

19.  On October 8, 1997, the U.S. Department of State further designated Hizballah as a Foreign Terrorist Organization ("FTO") pursuant to Section 219 of the Immigration and Nationality Act, codified at Title 8, United States Code, Section 1189.  See 62 Fed. Reg. 52650 (Oct. 8, 1997).  Section 219 of the Immigration and Nationality Act authorizes the Secretary of State to designate as an FTO foreign organizations that engage in terrorist activity, or retain the capability and intent to engage in terrorist activity or terrorism, and whose terrorist activity or terrorism threatens the security of U.S. nationals or the national security of the United States.

20.  To implement Section 219 of the Immigration and Nationality Act, OFAC issued the Foreign Terrorist Organizations Sanctions Regulations, Title 31, Code of Federal Regulations, Part 597.  The Foreign Terrorist Organizations Sanctions Regulations ("FTOSR") generally block the property of FTOs and prohibit certain transactions with, or for the benefit of, FTOs by U.S. persons.

21.  Subpart 597.201(a) of the FTOSR provides, in relevant part:

> Upon notification to Congress of the
> Secretary of State's intent to designate an
> organization as [an FTO] . . . any U.S.
> financial institution receiving notice from
> the Secretary of the Treasury . . . shall,
> except as otherwise provided in such notice,
> block all financial transactions involving
> any assets of such organization within the
> possession or control of such U.S. financial
> institution until further directive from the
> Secretary of the Treasury, Act of Congress,
> or order of court.

22.  Subpart 597.204 further prohibits attempts and conspiracies to violate or to evade the prohibitions of the FTOSR.

### The Global Terrorism Sanctions Regulations

23.  On September 23, 2001, in the wake of the September 11, 2001, terrorist attacks, President George W. Bush issued Executive Order 13224, declaring a national emergency pursuant to IEEPA and other statutes with respect to the threat to the national security, foreign policy, and economy of the United States posed by grave acts of terrorism and threats of terrorism committed by foreign terrorists, including the terrorist attacks in New York, Pennsylvania, and at the Pentagon, and the continuing and immediate threat of further attacks on United States nationals or the United States.  Executive Order 13224 identified 12 individuals and 15 entities whose assets were blocked.  See 66 Fed. Reg. 49079 (Sept. 23, 2001).

12

24.  On October 31, 2001, the Secretary of State identified Hizballah, among others, as a specially designated global terrorist ("SDGT") pursuant to Executive Order 13224 because it had committed, or posed a significant risk of committing, acts of terrorism that threaten the security of U.S. nationals or the national security, foreign policy, or economy of the United States.  See 67 Fed. Reg. 12633 (Mar. 19, 2002).

25.  To implement Executive Order 13224, OFAC issued the Global Terrorism Sanctions Regulations, Title 31, Code of Federal Regulations, Part 594 ("GTSR").

26.  Subpart 594.201 of the GTSR provides, in relevant part:

> [P]roperty and interests in property of the following persons [including SDGT's] that are in the United States, that hereafter come within the United States, or that hereafter come within the possession or control of U.S. persons, including their overseas branches, are blocked and may not be transferred, paid, exported, withdrawn or otherwise dealt in . . . .

27.  Subpart 594.204 of the SDGT further prohibits certain transactions with, or for the benefit of, an SDGT:

> Except as otherwise authorized, no U.S. person may engage in any transaction or dealing in property or interests in property of persons whose property or interests in property are blocked pursuant to § 594.201(a), including but not limited to the making or receiving of any contribution

13

of funds, goods, or services to or for the benefit of persons whose property or interests in property are blocked pursuant to § 594.201(a).

28. Subpart 594.205 of the SDGT further prohibits attempts and conspiracies to violate or to evade the prohibitions of the SDGT:

(a) Except as otherwise authorized, and notwithstanding any contract entered into or any license or permit granted prior to the effective date, any transaction by any U.S. person or within the United States on or after the effective date that evades or avoids, has the purpose of evading or avoiding, or attempts to violate any of the prohibitions set forth in this part is prohibited.

(b) Except as otherwise authorized, and notwithstanding any contract entered into or any license or permit granted prior to the effective date, any conspiracy formed for the purpose of engaging in a transaction prohibited by this part is prohibited.

### Iran and Syria Nonproliferation Act

29. On November 22, 2005, President George W. Bush signed into law the Iran Nonproliferation Amendments Act of 2005, which, in part, expanded the scope of the Iran Nonproliferation Act of 2000. Accordingly, the Iran Nonproliferation Act of 2000 was renamed the Iran and Syria Nonproliferation Act. On April 23, 2007, the U.S. Department of State issued a determination that, inter alia, Hizballah and any successor, sub-unit, or

14

subsidiary, had engaged in activities warranting the imposition of measures pursuant to the Iran and Syria Nonproliferation Act (currently the Iran, North Korea, and Syria Nonproliferation Act, codified as amended at 50 U.S.C. § 1701 note), which provides for penalties on foreign persons and entities for the transfer to or acquisition from Iran since January 1, 1999, or the transfer to or acquisition from Syria since January 1, 2005, of equipment and technology controlled under multilateral export control lists or otherwise having the potential to make a material contribution to the development of weapons of mass destruction or cruise or ballistic missile systems.  See 72 Fed. Reg. 20158 (Apr. 23, 2007).  This State Department determination regarding Hizballah expired on April 17, 2009.

## IV.  PROBABLE CAUSE FOR FORFEITURE

### A.  Overview of Money Laundering Scheme

30.  This civil forfeiture action relates to a trade-based money laundering scheme involving the purchase of used cars and other vehicles in the United States for shipment and sale abroad, with funds provided by banks, currency exchanges, and individuals associated with, funded by, controlled by, or directed by the Lebanon-based terrorist organization known as Hizballah.

31.  Among the documents reviewed by law enforcement agencies in their investigation of this matter are wire transfer records from approximately January 1, 2007, through early 2011 (the "Wire Transfer Period").  In the United States, the Federal Reserve Banks operate a major wire transfer system (the Fedwire Funds Service); the Clearing House Payments Company L.L.C. operates another, called CHIPS.  Both systems are used to make large-value or time-critical domestic and international payments in U.S. dollars.  Wire transfers can also be accomplished through other means, including book transfers or proprietary networks, and may be facilitated by communication systems such as SWIFTNet.  The wire transfer information obtained in the investigation reveals the date, amount, beneficiary, originator, and various other details about the transfers.  Analysis of the comment section data contained within the wire transfer records also reveals, in some cases, the purpose for the transactions and the names of the individuals or entities responsible for initiating the transactions, or on whose behalf the transactions were ordered other than the originating account holder.

32.  As described more fully below, the key participants and facilitators of the money laundering scheme include Hizballah members and supporters, the Lebanese Canadian Bank, the Hassan Ayash Exchange Company, Ellissa Holding and its

16

subsidiaries and affiliates, Ayman Saied Joumaa, the Cybamar Swiss group of companies, and their principals, members of the Salhab family, used car lots in West Africa, money couriers operating in West Africa and the Middle East, and used car buyers in the United States.

**B.    Hizballah**

33.    Hizballah is a Lebanon-based terrorist organization formed in approximately 1982.  Hizballah is responsible for some of the deadliest terrorist attacks against the United States, including the suicide truck bombings of the U.S. Embassy and U.S. Marine barracks in Beirut in 1983 and the U.S. Embassy Annex in Beirut in 1984.

34.    According to the U.S. Department of State, Hizballah receives training, weapons, and explosives, as well as political, diplomatic, monetary, and organizational aid from Iran; training, weapons, diplomatic, and political support from Syria; and funding from private donations and profits from legal and illegal businesses.

35.    Hizballah operates a network of social programs and political operations within Lebanon alongside its militia and terrorist operatives, and has been described as a "state within a state."  As discussed above, Hizballah has been identified as a

terrorist organization by the U.S. Government under numerous sanctions regulations.

36. In testimony before the Subcommittee on Near Eastern and South Central Asian Affairs of the Senate Committee on Foreign Relations in June 2010, the U.S. Department of State Coordinator for Counterterrorism described Hizballah as follows:

> Hizballah's persistence as a well-armed terrorist group within Lebanon, as well as its robust relationships with Iran and Syria, and the transfer of increasingly sophisticated missiles and rockets to Hizballah, threaten the interests of the United States, Lebanon, and our partners in the region, especially Israel.
>
> * * *
>
> Hizballah remains the most technically-capable terrorist group in the world and a continued security threat to the United States. Hizballah is responsible for some of the deadliest terrorist attacks against Americans in history, and the United States has designated it as a Foreign Terrorist Organization since 1997.
>
> * * *
>
> There has been much debate over the political identity of Hizballah, as well as the prospects for Hizballah to become a legitimate political party within Lebanon. Following Lebanon's bloody civil war, other militias disbanded or were integrated into Lebanon's legitimate defense force, the Lebanese Armed Forces (LAF). However, despite the group's rhetoric and political campaigning, there remains today no meaningful distinction between the military and political wings of Hizballah, as

Hizballah's own leaders regularly acknowledge publicly. . . . Hizballah is the lone militia that refused to disarm following the signing of the Taif Accord, which marked the end of Lebanon's tragic civil war.

* * *

Despite the devastating effects of its 2006 war with Israel and the 2008 domestic conflict in Lebanon, which Hizballah initiated, Hizballah remains today one of the best armed and most dangerous militias in the world. Its capabilities exceed those of the legitimate Lebanese security services and the United Nations Interim Force in Lebanon (UNIFIL). . . .

Hizballah also claims publicly to have reconstituted and improved its arsenal since the 2006 war. As Lebanon has no domestic arms industry, this would have undoubtedly been accomplished by means of smuggling activity via Syria and Iran. In 2008 alone, Iran provided hundreds of millions of dollars to Hizballah and trained thousands of Hizballah fighters at camps in Iran. Iran continues to assist Hizballah in rearming, violating Security Council resolution 1701. . . .

While Iran continues to provide a significant portion of Hizballah's funding, Hizballah has also broadened its sources of financial support in recent years. Hizballah is now heavily involved in a wide range of criminal activity, including the drug trade and smuggling. It also receives funds from both legitimate and illicit businesses that its members operate, from NGOs under its control, and from donations from its supporters throughout the world. Hizballah also has established its own commercial and communications networks outside the Lebanese legal system that in essence rob the Lebanese treasury of the tax revenues that would come

via legitimate licensing, registration, and tax reporting.

37. Hizballah has developed links to money laundering and narcotics trafficking. Since in or around 2006, such narcotics trafficking has been condoned through the issuance of fatwas by radical Islamic clerics. The narcotics trade has become a source of revenue for Hizballah.

**C. Narcotics Trafficking in West Africa**

38. During the last decade, drug trafficking organizations have increasingly used countries along or near the West African coast as trans-shipment hubs for importing massive quantities of narcotics, particularly cocaine from South America, to be later distributed in Europe or elsewhere within Africa. Through a combination of privately owned aircraft and maritime vessels, these organizations, predominantly based in Venezuela and Colombia, have transported hundreds of tons of cocaine, worth billions of dollars, to West African nations such as Benin, Sierra Leone, and Togo.

39. According to a 2010 report by the U.S. Congressional Research Service, law enforcement officials seized at least 46 metric tons of cocaine bound for Europe via West Africa between 2005 and 2008. As much as 300 metric tons of cocaine, worth approximately $13.5 billion, is estimated to be trafficked through West Africa to Europe each year. The

wholesale profits reaped by narco-traffickers during this period are estimated to be approximately $3.5 billion per year.

40. Narco-traffickers connected to the money laundering scheme are heavily involved in this West African narcotics trade. For example:

a. Ayman Joumaa's drug-trafficking organization transports, distributes and sells multi-ton bulk shipments of South American cocaine through West Africa. Joumaa and his organization operate in Lebanon, West Africa, Panama and Colombia, and launder proceeds from their illicit activities, as much as $200 million per month, through various channels, including bulk cash smuggling operations and Lebanese exchange houses. Joumaa's organization uses, among other things, Hizballah couriers to transport and launder narcotics proceeds. Joumaa's organization pays fees to Hizballah to facilitate the transportation and laundering of narcotics proceeds. For example, Joumaa's organization sends bulk cash shipments through the Beirut International Airport, and pays Hizballah security to safeguard and transport the cash to its recipient.

b. As described above, these activities led OFAC to designate Joumaa as a Specially Designated Narcotics Trafficker, pursuant to the Foreign Narcotics Kingpin Designation Act. On November 23, 2011, Joumaa was charged in an indictment,

United States v. <u>Ayman Joumaa</u>, 11 Cr. 560 (TSE), filed in the Eastern District of Virginia, with conspiracy to distribute narcotics and conspiracy to commit money laundering. The indictment alleges that Joumaa and his co-conspirators coordinated the shipment of tens of thousands of kilograms of cocaine, including at least 85,000 kilograms of cocaine sold to Los Zetas, a Mexican drug cartel, between in or around 2005 to in or around 2007. The indictment also alleges that Joumaa laundered hundreds of millions of dollars in drug proceeds from West Africa, Europe, Mexico and the United States, largely for cocaine suppliers in Colombia and Venezuela, who paid Joumaa's organization a fee of between 8% and 14% of the laundered proceeds.

c.   Another drug trafficking organization, led by Maroun Saade, was also involved in the transportation and distribution of large quantities of cocaine and other narcotics in West Africa. On February 8, 2011, Saade, along with other defendants, was charged in an indictment, <u>United States</u> v. <u>Maroun Saade, et al.</u>, 11 Cr. 111 (NRB), filed in the Southern District of New York with offenses arising from an agreement to sell approximately one thousand kilograms of cocaine or more to individuals he believed to be affiliated with the Taliban and to

transport and distribute Taliban-owned heroin in West Africa.[1]
Saade is a member of the Free Patriotic Movement, a Lebanese
Christian organization allied with Hizballah, and has provided
services to Hizballah members engaged in narcotics trafficking
and bulk cash smuggling in West Africa.  Saade is a close
associate of Oussama Salhab, a Hizballah operative who, among
other things, controls a network of money couriers who have
transported millions of dollars in cash from West Africa to
Lebanon.  As described more fully below, see ¶¶ 72-73, Saade has
paid bribes to obtain the release of money couriers working for
Salhab who were detained by Togolese authorities.  For example,
after Salhab's and an employee's arrest by Togolese law
enforcement on July 21, 2010, for smuggling bulk currency across
the Togo/Ghana border, Saade secured Salhab's release.  Saade has
also bribed government officials to terminate certain
investigations, most notably an investigation into narcotics

---

[1]  Saade is charged with conspiracy to commit
narcoterrorism, in violation of Title 21, United States Code,
Section 960a and Title 18, United States Code, Section 3238;
conspiracy to import cocaine, in violation of Title 21, United
States Code, Section 963; conspiracy to import heroin, in
violation of Title 21, United States Code, Section 963;
conspiracy to provide material support to terrorists, in
violation of Title 18, United States Code, Sections 2339A and
3238; conspiracy to acquire and transfer anti-aircraft missiles,
in violation of Title 18, United States Code, Sections 2332g and
3238.

trafficking by Imad Zbib, a prominent Hizballah representative in Togo. Saade has also facilitated the operations of Hizballah operative Oussama Salhab (discussed below, see ¶¶ 56-59, 68-73). See ¶¶ 72-73.

        d.   Zbib is a close associate of Salhab and a West African narco-trafficker. Zbib's organization has, for example, transported loads of two to three metric tons of cocaine from South America to Togo via maritime shipping. Zbib distributes this cocaine in Europe, transporting it concealed in used cars nominally purchased for several used car lots he owns in Togo. Zbib personally transported bulk United States and Euro currency in the amount of at least approximately $2,068,520 and €974,490 across the Togo/Ghana border in 2007 and 2008.

        e.   Between at least 2007 and 2009, a Colombia-based drug trafficking organization connected to this conspiracy shipped thousands of kilograms of cocaine from South America to West Africa. In July 2008, a plane carrying 600 kilograms of cocaine was seized in Sierra Leone, leading to the arrest of several members of the organization. On July 7, 2009, several of these members and other co-conspirators were charged in an indictment, United States v. Geraldo Quintana-Perez, et al., 08 Cr. 977 (RPP), filed in the Southern District of New York with conspiracy to distribute narcotics in violation of Title 21,

United States Code, Section 846, and other charges.

**D.   Lebanese Canadian Bank**

    41.   Prior to being identified by FinCEN as a financial institution of primary money laundering concern in the 311 Action, LCB was Lebanon's eighth-largest bank, headquartered in Beirut and having approximately 35 branches throughout Lebanon. As of 2009, LCB's total assets were worth more than $5 billion. LCB had a controlling financial interest in a number of subsidiaries, including LCB Investments (Holding) SAL, LCB Finance SAL, LCB Estates SAL, LCB Insurance Brokerage House SAL, Dubai-based Tabadul for Shares and Bonds LLC, and Prime Bank Limited of Gambia.  LCB owned 51 percent of Prime Bank, with remaining shares held by local and Lebanese partners.  LCB served as the sole correspondent bank for Prime Bank.

    42.   Following FinCEN's identification of LCB as a financial institution of primary money laundering concern in the 311 Action, LCB entered into an agreement with SGBL for SGBL to acquire certain assets and liabilities of LCB.  SBGL completed this acquisition in or about September 2011.

    43.   Between approximately January 2007 and approximately February 10, 2011, approximately $229,872,953 was transferred from accounts at LCB to United States car buyers for buying and shipping used cars.

44.  Prior to being identified as an entity of primary money laundering concern by FinCEN in the 311 Action, LCB had poor anti-money laundering controls and, indeed, knowingly conducted business with Hizballah-controlled entities and individuals and entities linked to, among other things, African diamond smuggling, money laundering, and narcotics trafficking.

a.  For example, LCB maintained a banking relationship with the Yousser Company for Finance and Investment (the "Yousser Company") and Bayt al-Mal.  These relationships were managed by LCB's branch on Airport Road in Beirut.  Loans to the Yousser Company were guaranteed by, among others, "Hussain Shami," a director of the company. On September 7, 2006, OFAC designated the Yousser Company, Bayt al-Mal, and an individual named Husayn al-Shami as SDGTs pursuant to Executive Order 13224 and the Global Terrorism Sanctions Regulations.  OFAC described the Yousser Company and Bayt al-Mal as "Hizballah's unofficial treasury, holding and investing its assets and serving as intermediaries between the terrorist group and mainstream banks. . . . Institutions considering dealing with these two entities are now on notice as to their true character."  Al-Shami was described as the head of Bayt al-Mal and:

a senior Hizballah leader who has served as a
member of Hizballah's Shura Council and as
the head of several Hizballah-controlled
organizations, including the Islamic
Resistance Support Organization. Shami is
also responsible for foreign donations to
Hizballah fundraising organizations.

b.    LCB also maintained a banking relationship

with Farah Company, a subsidiary of "Yousser Finance & Investment

Company, Limited Liability Company." This banking relationship

was also managed by the LCB Airport Road branch in Beirut.

c.    LCB maintained a banking relationship with

Lebanese Arab Company for Touristic Services SARL, a company

owned by the Al Mabarat Association, or "Mabarat Khairiah,"

Hamzeh Safieddine, Mohammed Fadlallah, Kamal Makki, and Ali

Fadlallah. The relationship was managed by LCB's branch on

Airport Road in Beirut. On January 25, 1995, Mohammad Hussein

Fadlallah was designated by the U.S. Department of the Treasury

as a Specially Designated Terrorist pursuant to Executive Order

12947, see 60 Fed. Reg. 5084 (Jan. 24, 1995) and the Terrorism

Sanctions Regulations, and had been called Hizballah's spiritual

leader by OFAC.[2] Fadlallah was the founder of the Al Mabarat

Association.

d.    LCB maintained a banking relationship with

Rayan (Offshore) LLC. Rayan was owned by, among others, Colonel

_____

    [2]  Fadlallah died on July 3, 2010.

27

Rida el-Moussaoui, the brother-in-law of LCB Executive Board
Member and Deputy General Manager Mohammed Hamdoun and a former
officer in the Lebanese security forces; and Nawaf Moussaoui, a
Hizballah public spokesperson and presently a member of the
Lebanese Parliament for the Loyalty to the Resistance Bloc,
Hizballah's political party.

       e.   LCB maintained a banking relationship with
Matrix SAL Off-shore, a company controlled by Kassem Mohamad
Ajami and Mohamad Ali Ezzedine. Ajami and Ezzedine also owned
Babylon Enterprises Nigeria Limited. Ajami and Ezzedine are
business associates of Ali Tajideen's company, Tajco. On
December 9, 2010, OFAC designated Ali Tajideen, his brother
Husayn Tajideen, and their company, Tajco SARL -- along with a
network of businesses owned or controlled by them in Gambia,
Sierra Leone, the Democratic Republic of Congo, Angola, and the
British Virgin Islands -- as SDGTs pursuant to Executive Order
13224 and the Global Terrorism Sanctions Regulations. OFAC
described Ali Tajideen as a former Hizballah commander and the
Tajideen brothers as Hizballah fundraisers. Their company,
Tajco, was described as an international trade and real-estate
company that purchased and developed properties in Lebanon on
behalf of Hizballah and that generated millions of dollars in
proceeds used to provide financial support to Hizballah. Ali and

Husayn Tajideen's brother, Kassim Tajideen, was designated a SDGT on May 27, 2009, and described by OFAC as an important financial contributor to Hizballah who runs a network of businesses in Lebanon and Africa.

      f.   LCB maintained a banking relationship with individuals and entities involved in the African diamond smuggling trade. For example, LCB maintained a banking relationship with Nazem Ibrahim Ahmad, a Belgian of Lebanese origin trading in rough diamonds. On October 8, 2002, the United Nations Security Council's Panel of Experts on the Illegal Exportation of Natural Resources and Other Forms of Wealth of the Democratic Republic of Congo ("DRC") issued a report, S/2002/1146, addressing possible actions to help bring an end to the plundering of the natural resources of the DRC and the effect of those actions on the humanitarian and economic situation of the DRC. The report described the Sierra Gem Diamonds Company, whose principals were Nazem Ahmad, Hassan Ahmad, and Said Ali Ahmad, as associated with one of three Lebanese clans that purchased $150 million in diamonds from the DRC in 2001. The report alleged that the three clans, including the Ahmad clan, had ties to Hizballah and also were involved in counterfeiting, money-laundering and diamond smuggling. In response to an LCB customer due diligence report on Ahmad and the UN report

29

S/2002/1146, the LCB credit department stated that "we consider such allegation as part of the propaganda and war launched by the Jewish state against Lebanon," and authorized an increase in credit limits for Ahmad.

        g.   In or about September 2003, Ahmad Safa, the Associate General Manager for Branches and Operations, granted exceptions for certain LCB clients from LCB's policy of requiring cash transaction slips ("CTS") for cash transactions greater than $10,000. CTSs required disclosure of the source of funds deposited and were filed with the Central Bank of Lebanon. The clients granted exceptions by Safa included individuals and entities related to Hizballah.

        (1)   For example, the Yousser Company, which has been designated as a SDGT by OFAC as discussed above, was exempted from signing CTSs for cash transactions up to $50,000 per week at the Nabatieh branch and up to $60,000 per day at the Airport Road branch.

        (2)   The Farah Company for Tourism, a subsidiary of the Yousser Company, was exempted from signing CTSs for cash transactions up to 50,000,000 Lebanese pounds[3] per week at the Nabatieh branch.

---

    [3]  As of September 1, 2003, the exchange rate was approximately $1.00 per 1,515 Lebanese pounds, or approximately $33,000 per 50 million Lebanese pounds.

(3) Hussein Ali Mohamed Chami (Husayn al-Shami), who has been designated as a SDGT by OFAC as discussed above, and Wahid Mahmoud Sbeity, another owner of the Yousser Company, were exempted from signing CTSs for cash transactions up to $30,000 per week at the Nabatieh branch. Al-Shami, along with two other directors of the company, were exempted from signing CTSs for cash transactions up to $200,000 per day and up to 200,000,000 Lebanese pounds[4] per day at the Airport Road Branch.

(4) In other words, the Yousser Company, its subsidiary the Farah Company, and its owners and directors collectively were granted exemptions from signing CTSs disclosing the source of funds for cash transactions totaling up to $80,000 and 50,000,000 Lebanese pounds per week at the Nabatieh branch and up to $260,000 and 200,000,000 Lebanese pounds per day at the Airport Road branch.

(5) The Al Mabarat Association, whose founder was designated a SDT as discussed above, and the Lebanese Arab Touristic Company, a company owned by the Al Mabarat Association, were exempted from signing CTSs for cash transactions up to $55,000 per day and $22,000 per day, respectively, at the Airport Road branch.

---

[4] As of September 1, 2003, approximately $132,000.

(6)  Al-Aytam, another organization founded by Fadlallah, was exempted from signing CTSs for cash transactions up to $50,000 per day at the Airport Road branch.

(7)  The Al-Shahid Foundation, which OFAC designated as a SDGT pursuant to Executive Order 13224 on July 24, 2007, see 72 Fed. Reg. 60715, was exempted from signing CTSs for cash transactions up to $100,000 per day at the Airport Road branch.

h.  On October 16, 2006, the LCB Anti-Money Laundering Special Committee discussed, among other things, recent OFAC designations of LCB clients the Yousser Company and Hussein Chami (Husayn al-Shami).  Committee members were directed to take the OFAC listing seriously and to avoid implicating the bank with irregular situations with U.S. banking institutions. However, LCB continued to maintain banking relationships with the Yousser Company and al-Shami.

i.  When FinCEN identified LCB as an entity of primary money laundering concern in the 311 Action, it noted that exchange houses with accounts at LCB were used by Ayman Joumaa to launder hundreds of millions of dollars in proceeds of narcotics trafficking.  As described by FinCEN, exchanges and companies related to Joumaa originated over $66 million in wire transfers from Lebanese banks since January 2006, with approximately one-

32

half of the wire transfers and approximately 94% of the funds originating from LCB, indicating that LCB is the favored bank for these Joumaa-related entities, particularly for illicit banking activity.

45. LCB also had substantial banking relationships with the Hassan Ayash Exchange and the Ellissa Exchange. LCB maintained these relationships, despite substantial violations of LCB's anti-money laundering and compliance policies.

a. The Ellissa Exchange, the Hassan Ayash Exchange, and their principals held accounts with LCB through LCB's branch in Verdun, Beirut. The Ellissa Exchange was introduced to LCB as a client through the Hassan Ayash Exchange.

b. A 2006 LCB customer due diligence report noted that the Ellissa Exchange and its principals were implicated in smuggling cash out of Africa through several channels, including cash smuggling on flights from Ghana to Beirut. The report further noted that LCB had limited "know your customer" files for these clients and that another Lebanese bank had closed its accounts with the Ellissa Exchange. The report described large cash deposits into accounts of the exchange's owners, transactions inconsistent with the nature and purpose of the accounts, and the exchange's failures to supply information about the nature and purpose of transactions.

33

c.    As a result of this 2006 due diligence report, the LCB Anti-Money Laundering Special Committee directed Ahmad Safa to ensure that the Ellissa Exchange accounts complied with LCB reporting and diligence requirements.  Despite this direction, however, the Ellissa Exchange accounts continued to operate with inadequate diligence and reporting.

d.    In approximately 2006, at Ahmad Safa's direction, the Hassan Ayash Exchange became LCB's primary source of foreign currencies, in particular U.S. dollars.  Prior to Safa's intervention, LCB had maintained a diversified source of foreign currencies.

**E.    Hassan Ayash Exchange Company**

46.   The Hassan Ayash Exchange Company is a money exchange based in Beirut, Lebanon.  The Hassan Ayash Exchange is owned and controlled by Mahmoud Hassan Ayash ("Hassan Ayash") and his son, Hassan Mahmoud Ayash.  The exchange's principal office is located adjacent to the Caesar Park Hotel in Beirut, which is owned by Ayman Joumaa.

47.   Wire transfers originating from the Hassan Ayash Exchange Company totaling approximately $141,522,091 were sent to United States accounts for the purpose of purchasing or shipping cars between in or about January 2007 and in or about January 2011.

34

48.  Hassan Ayash and the Hassan Ayash Exchange Company facilitate bulk cash transfers and money laundering by, among others, Ayman Joumaa and Joumaa's narcotics trafficking and money laundering network.

49.  Hassan Ayash has stated that he has family ties to Hizballah, including Secretary General Hassan Nasrallah, the leader of Hizballah.  Hassan Ayash has further stated that his connections to important people in Lebanon help him provide services for clients of the Hassan Ayash Exchange.  Hassan Ayash requires that an existing client of the Hassan Ayash Exchange Company vouch for a prospective client before the prospective client can establish an account with the exchange to transfer large amounts of money.

**F.  The Ellissa Exchange, Ellissa Shipping Company, and Ellissa Car Parc in Cotonou**

50.  The Ellissa Holding Company owns or controls approximately nine companies in Lebanon, Benin and the DRC, including the Ellissa Exchange, a money exchange based in Sarafand, Lebanon; Ellissa Group SA, which owns a car park in Cotonou, Benin, for receiving and selling used cars imported to the Cotonou port; and Ellissa Shipping, which is principally engaged in shipping used cars to Benin through the Cotonou port. The Ellissa Holding Company is principally owned and controlled by Jamal Mohamad Kharoubi and Ali Mohammed Kharroubi.

35

51.  Wire transfers originating from the Ellissa Exchange totaling approximately $61,747,524 were sent to United States accounts for the purpose of purchasing or shipping cars between in or about January 2007 and in or about January 2011.

**G.    Transfers from Ayash, Ellissa and Others to the United States to Buy and Ship Used Cars**

52.  Between in or about January 2007 and in or about January 2011, the Ayash Exchange and the Ellissa Exchange originated approximately $203,269,615 or more in wire transfers (the "Exchange Funds") from accounts held at LCB, Federal Bank, BLOM, and MEAB (collectively, the "Lebanese Banks") to bank accounts in the United States for the purchase or shipping of used cars.

53.  Account holders other than Hassan Ayash Exchange and Ellissa Exchange initiated wire transfers totaling at least approximately $126,281,969 (the "Non-Exchange Funds") to bank accounts in the United States for the purchase or shipping of used cars.  Some of the originators for these Non-Exchange Funds are discussed below, see ¶ 77.

54.  The following table summarizes the Exchange Funds and Non-Exchange Funds that were wired to the Lebanese Banks and then further wired to correspondent bank accounts in the United States, including in the Southern District of New York:

36

| Bank | Exchange Funds | Non-Exchange Funds | Total |
|---|---|---|---|
| Lebanese Canadian Bank | $170,848,679 | $59,024,274 | $229,872,953 |
| BLOM Bank | $27,717,176 | $65,468,173 | $93,185,349 |
| Middle East and Africa Bank | $1,913,625 | $1,506,477 | $3,420,102 |
| Federal Bank of Lebanon | $2,790,135 | $283,045 | $3,073,180 |
| TOTAL | $203,269,615 | $126,281,969 | **$329,551,584** |

## H.    Cybamar Swiss Family of Companies

55.    Between 2008 and 2010, used cars valued collectively at over $1 billion were shipped from the United States to Benin, including hundreds of millions' worth of used cars purchased with funds from the Lebanese Banks.

56.    Cybamar Swiss is a shipping company frequently used by the car buyers who received the Exchange Funds and Non-Exchange Funds transferred from the Lebanese Banks, as described above. Cybamar Swiss is headquartered in Redford, Michigan, with several locations worldwide, including Switzerland. STE Nomeco SARL, a Cybamar Swiss affiliate, owns and operates used car lots in Benin; STE Marco SARL, another Cybamar Swiss affiliate, is a transportation company operating between Togo and Ghana; and the Salhab Travel Agency operates in West Africa (collectively, with Cybamar Swiss, the "Cybamar Companies"). The Cybamar Companies are owned, operated, or controlled by Oussama Salhab, Fadi

Salhab, who resides in Michigan, and other members of the Salhab family.

57. During the Wire Transfer Period, approximately 195 wire transfers or more totaling approximately $10,867,684 or more in United States currency were routed to account number 1852078466, held in the name of Cybamar Swiss GMBH LLC, at Comerica Bank, Detroit, Michigan, from the Hassan Ayash Exchange (approximately $51,421), Oussama Salhab (approximately $6,750,371); STE Marco SARL (approximately $297,751); STE Nomeco SARL (approximately $1,720,436); and Cross Continents Lines (Offshore) SAL (approximately $1,087,628).

58. Additionally, during the Wire Transfer Period, approximately 13 wire transfers or more totaling approximately $2,346,028 or more in United States currency were routed to account number 985914906, held in the name of Cybamar Swiss GMBH LLC, at PNC Bank, Pittsburgh, Pennsylvania, from the Hassan Ayash Exchange (approximately $237,123); Oussama Salhab (approximately $2,022,338); STE Nomeco SARL (approximately $49,937); and Imad Zbib (approximately $36,630).

59. Oussama Salhab was born in the Bekaa Valley, Lebanon and currently resides in Togo and Lebanon. Salhab is a Hizballah operative. On or about November 22, 2009, Salhab flew into the Detroit Metropolitan Airport on a flight from Beirut,

Lebanon.  During an interview with a U.S. Customs and Border Protection ("CBP") officer, Salhab stated that he was traveling to the United States for business on behalf of Cybamar Swiss.  He had on his person a business card identifying Salhab as the President of STE Marco SARL.  During a border inspection of a fingerprint-encrypted laptop Salhab carried with him, CBP officers found, among other things, images of Hizballah Secretary General Hassan Nasrallah; audio of the Hizballah anthem; images of Hizballah militants stomping on an Israeli flag; and movie files of executions, hangings, torture, and beheadings.  Salhab claimed that the images were placed on his computer by an employee, Houssam Mehana.  Salhab was allowed to withdraw his application for admission into the United States, and departed the country.  As described in more detail below, Oussama Salhab is heavily involved in the used car business in Benin and Togo and controls a network of money couriers who have transported millions of dollars in cash from West Africa to Lebanon, and who have traveled to the United States to transport cash and to purchase used cars for shipment to West Africa.

I.    **The Link Between U.S. Car Buyers and the Salhab West African Bulk Money Courier Network**

      60.  In addition to hundreds of millions of dollars wired into the United States by LCB, the Hassan Ayash Exchange, and the Ellissa Group to buy used cars, money was also brought

into the United States by multiple individuals involved in the trade-based money laundering scheme. Some of these individuals transported cash, while other used pre-funded U.S. bank accounts created with money transferred from overseas. These individuals' entries into the United States were facilitated by other members of the conspiracy, particularly members of the Salhab family.

61. For example, on January 5, 2009, Mouhsen Ali Yassine, a Lebanese citizen residing in Togo, Africa, was stopped and interviewed by CBP officers while trying to enter the United States at Boston Logan International Airport. When questioned, Yassine acknowledged his and his family's membership in Hizballah. He carried with him a business card for the Salhab Travel Agency in Togo. The SIM card from his cellular telephone was discovered hidden in his shoe. He was determined to be inadmissible and processed for expedited removal.

62. Yassine, along with nine other Lebanese individuals, most of whom were from Togo, Africa, who attempted to enter the United States around the same time period all listed Fadi Salhab as their point of contact when applying for a non-immigrant visa to enter the United States.

63. Between approximately 2003 and 2011, at least 34 individuals who transported cash as couriers from Togo to Ghana (discussed further below, see ¶¶ 68-74) also applied for non-

immigrant visas for admission to the United States. Most identified their employment as car traders or car buyers, and some identified U.S. car buyers who received overseas wires from the Hassan Ayash Exchange, the Ellissa Exchange, and LCB as their points of contact while in the U.S., including five who identified Fadi Salhab as their point of contact.

## J.   Movement of Hundreds of Millions of Dollars from West Africa to Lebanon

64.   At least hundreds of millions of dollars in U.S. currency are transported annually from Benin and other West African countries to Lebanon by money couriers, hawaladars, and currency brokers. These U.S. dollars include the proceeds of car sales from the Benin car parks, along with the proceeds of narcotics trafficking, money laundering proceeds, and other crimes. A significant portion of this money moves through courier and security networks controlled by Hizballah or individuals affiliated with Hizballah. The proceeds of the car sales help to conceal and disguise the true source, nature, ownership, and control of the narcotics proceeds.

65.   Money couriers also transport millions of dollars from Benin on commercial air flights. Couriers travel on these flights and carry the undeclared cash with them in order to evade detection. For example, on December 9, 2010, three individuals who had traveled on a flight from Benin were arrested at Charles

De Gaulle International Airport in Paris, France. The three were en route to Beirut, Lebanon. They were discovered to be carrying over $6.5 million in United States currency and €48,500. These funds were not declared. One of the individuals was carrying a business card for Ellissa Megastore, Ellissa's car lot in Cotonou, Benin.

      66. Cash is also commonly transported out of Benin through the airport in Accra, Ghana, approximately 210 miles from Cotonou, Benin. The route from Cotonou to Accra passes through Togo and its capital, Lome, on the Ghana border. The Ghanaian Customs, Excise, and Preventive Services recorded approximately $1.2 billion in declared United States currency imported across the Lome border crossing in 2007 and 2008. Approximately $845 million of this was declared by Lebanese nationals.

      67. From Accra, the cash is often flown to Beirut. Hizballah security facilitates the receipt of cash flown into the Beirut International Airport. For example, money couriers are sometimes instructed over the public address system to deplane first, and are escorted to private rooms in the airport where the cash would be received.

      68. A network of couriers linked to Oussama Salhab, other members of the Salhab family, and related companies, together declared over $97 million in U.S. currency couriered

42

over the Togo/Ghana border in 2007 and 2008, along with over €22,494,463.

69. Moreover, some of these same couriers applied for non-immigrant visas to enter the United States in order to purchase used cars, and listed a member of the Salhab family or other related individuals as their point of contact. See ¶ 63, supra.

70. Oussama Salhab and at least four other individuals provided a phone number for STE Marco SARL (the "STE Marco Phone Number") to Ghanaian authorities in connection with transporting currency across the Togo/Ghana border in 2007 and 2008. Together, Salhab and these four couriers declared a total of approximately $7,922,950, along with approximately €2,667,600. At least 38 couriers, including Houssam Mehanna, provided either an office number or a mobile phone number for the Salhab Travel Agency to Ghanaian authorities in connection with transporting currency across the Togo/Ghana border in 2007 and 2008. These 38 couriers declared a total of approximately $77,178,683, along with €16,013,808. Hassan Chokr (discussed further below), an associate of Maroun Saade and Oussama Salhab, declared a total of $12,552,400, along with €3,813,055, that he transported across the Togo/Ghana in 2007 and 2008.

71. Oussama Salhab has offered free airline tickets from Ghana to Beirut, Lebanon, for individuals willing to courier bulk cash from West Africa to Lebanon.

72. Money couriers transporting cash across the Togo/Ghana border are sometimes detained and their cash loads seized by law enforcement if couriers attempt to smuggle the cash without declaring it or otherwise in violation of post-October 2008 restrictions on currency imports.[5] Maroun Saade would pay bribes to release money couriers and others detained by law enforcement. For example, on March 15, 2009, Mehanna Houssam, Oussama Salhab's employee, was arrested by Togolese law enforcement. In exchange for a payment, Saade arranged for Houssam's release.

73. On July 21, 2010, Oussama Salhab and his employee Wissam Damen were stopped by Togolese law enforcement before driving across the Togo-Ghana border. Salhab and Damen had approximately $798,150 and €311,910 in a concealed compartment in their car. Salhab advised Togolese law enforcement that he was part owner of a shipping company called Marco, the cash was from the sale of cars shipped to Togo, and he and Damen were transporting the cash to Ghana and then to Lebanon. Salhab paid

---

[5] Effective October 20, 2008, currency with a value greater than $10,000 could only be transferred through Ghana through a bank or other authorized dealer.

Maroun Saade for Saade to obtain Salhab's and Damen's release from custody.

74. As described above, in 2007 and 2008, Hassan Chokr transported approximately $12,552,400 and €3,813,055, together with British pounds and Swiss francs, across the Togo/Ghana border. Chokr is a Hizballah weapons dealer who reports to senior Hizballah members in Lebanon. For example, Maroun Saade invited Chokr to Accra, Ghana, to attend a November 2010, meeting with three individuals working at the direction of the DEA as confidential sources ("CS-1," "CS-2," and "CS-3") with whom Saade was negotiating narcotics and arms deals. Chokr attended the meeting with his son-in-law, Alwar Pouryan, where they discussed supplying weapons to the CSs. Saade identified Chokr to CS-1 as being from Hizballah, and Pouryan as someone who sold weapons to Hizballah. Chokr has also described Pouryan as someone who supplied Hizballah with weapons when Hizballah could not procure them from other sources.

75. In an email Chokr sent to Pouryan in approximately November 2009, Chokr referred Pouryan to a certain money exchange house located in the United Arab Emirates and instructed Pouryan to reference "Mr Oussama Salhab (Hassan Exhange [sic] [C]ompany Lebanon)."

45

**K.    Used Car Buyers in the U.S. Receive Wire Transfers for Buying and Shipping Used Cars as Part of the Money Laundering Scheme**

76.   As described in more detail below, certain used car buyers in the United States (collectively the "Car Buyers") have received wire transfers from the Elissa Exchange and the Hassan Ayash Exchange via the Lebanese Banks for the purpose of buying and shipping used cars.  The businesses of these Car Buyers typically have little or no property or assets other than bank accounts that are used to receive wires from overseas to buy cars, and to purchase used cars at auction.  These cars are then transported to shipping ports, where they are shipped to West Africa.  The Car Buyers typically do not have offices, car lots, or an inventory of used cars other than cars that are in transit to the ports.  Some of the Car Buyers purchase cars for their own account, but others simply retain a fee of a few hundred dollars for each car that they buy.

77.   The Car Buyers also received wire transfers for the purpose of buying and shipping used cars from other account holders at the Lebanese Banks ("Additional Transferors"), including the OFAC-designated Phenicia Shipping (Offshore); Ali Salhab and Yasmin Shipping & Trading; Fadi Star and its owners, Mohammad Hammoud and Fadi Hammoud; Fakih for General Trade, Khodor Fakih, and Ali Fakih; and Youssef Nehme.

46

a.    In wire transfer instructions for wires from Phenecia Shipping (Offshore), a telephone number for the Ellissa Exchange is provided.  From approximately January 2007 through early 2011, Phenecia Shipping wired approximately $12,406,212 to the U.S. relating to buying and shipping cars.

b.    In wire transfer instructions for wires from Yasmin Shipping & Trading, Ali Salhab's name appears next to Yasmin Shipping & Trading's.  Ali Salhab is believed to be a relative of Ousamma Salhab's.  From approximately January 2007 through early 2011, Ali Salhab and Yasmin Shipping & Trading wired approximately $10,305,512 to the U.S. relating to buying and shipping cars.

c.    Khodor Fakih is a Hizballah member from Kafra, Lebanon, who now works in the car business in Cotonou, Benin.  Khodor Fakih and Ali Fakih are believed to own and control Fakih for General Trade.  From approximately January 2007 through early 2011, Khodor Fakih, Ali Fakih, and Fakih for General Trade wired approximately $2,589,325 to the U.S. relating to buying and shipping cars.

d.    Fadi Hassan Hammoud and Mohammad Hassan Hammoud own and operate Fadi Star, a shipping company in Cotonou, Benin.  Mohammad Hammoud is a Hizballah supporter from Kafra, Lebanon, and has done business with Khodor Fakih.  From

47

approximately January 2007 through early 2011, Fadi Star, Mohammad Hassan Hammoud, and Fadi Hassan Hammoud wired approximately $11,382,906 to the U.S. relating to buying and shipping cars.

e.   Deeb Atieh is also a Hizballah member from Kafra, Lebanon.  Deeb Atieh, Mohammad Deeb Atieh, and Fakih Atieh are believed to own and control M/S Universal Motors.  From approximately January 2007 through early 2011, the Atiehs and M/S Universal Motors wired approximately $2,657,307 to the U.S. relating to buying and shipping cars.

f.   Youssef Sobhi Nehme is a close associate of Ali Kharroubi and self-proclaimed supporter of Hizballah.  From approximately January 2007 through early 2011, Nehme wired approximately $21,832,344 to the U.S. relating to buying and shipping cars.

g.   Mohamad Manana is believed to be a Hizballah member and an associate of Maroun Saade.  From approximately January 2007 through early 2011, Mohamed Manana and Moustapha Manana wired approximately $2,444,527 to the U.S. relating to buying and shipping cars.

78.   The chart below sets forth Car Buyers, wire originators or initiators who sent transfers to these Car Buyers during the Wire Transfer Period, the number of wires sent by

48

those originators, and the total amount of such transfers.  The
chart includes only wire transfers for which records indicate a
connection to the purchase, sale, shipment, or otherwise related
transaction regarding used cars in the United States.

| U.S. Car Buyer | Wire Originator | # | Amount |
|---|---|---|---|
| A & J Auto Sales Inc. Lansing, MI | Hassan Ayash Exchange | 54 | $4,495,293 |
| | Ellissa Exchange | 6 | $374,454 |
| | Yasmin Shipping & Trading | 3 | $249,635 |
| | Phenicia Shipping | 2 | $57,961 |
| | Others | 128 | $5,571,301 |
| Total: | | 193 | **$10,748,644** |
| Ace Auto Leasing Inc. Tulsa, OK | Hassan Ayash Exchange | 4 | $418,641 |
| | Mohamad Hassan Hammoud | 42 | $5,101,035 |
| | Fadi Hammoud | 5 | $454,300 |
| | Fadi Star | 43 | $5,030,006 |
| | Khodor Fakih | 6 | $688,974 |
| | Ali Fakih | 4 | $289,704 |
| | Fakih for General Trade | 11 | $694,266 |
| | Others | 104 | $7,564,257 |
| Total: | | 219 | **$20,241,183** |
| ARZ Export LLC Columbia, MD | Ellissa Exchange | 4 | $215,446 |
| | Ellissa Group | 23 | $1,327,474 |
| | Mohamad Hassan Hammoud | 6 | $231,154 |
| | Ali Kharoubi | 1 | $84,968 |
| | Others | 9 | $298,005 |
| Total: | | | **$2,157,047** |

| U.S. Car Buyer | Wire Originator | # | Amount |
|---|---|---|---|
| Auto Care LLC d/b/a Golden Eagle Motors Vernon, CT | Hassan Ayash Exchange | 15 | $887,012 |
| | Mohamad Hassan Hammoud | 1 | $16,945 |
| | Others | 20 | $1,194,151 |
| Total: | | 44 | **$2,206,078** |
| Auto Rama Inc. Detroit, MI | Hassan Ayash Exchange | 8 | $298,562 |
| | Ellissa Exchange | 2 | $142,828 |
| | Ellissa Group | 6 | $255,319 |
| | Others | 61 | $1,859,802 |
| Total: | | 77 | **$2,556,511** |
| Baaklini North America Inc. Fairburn, GA | Oussama Salhab | 8 | $629,427 |
| | Others | 28 | $846,705 |
| Total: | | 36 | **$1,476,132** |
| Bassam G. Hanna d/b/a Cary Auto Sales Cary, NC | Hassan Ayash Exchange | 1 | $49,880 |
| | Others | 2 | $122,882 |
| Total: | | | **$172,672** |
| Car UZD and Mid Overseas Inc. d/b/a Car UZD Miami, FL | Ellissa Exchange | 6 | $478,810 |
| | Jamal Kharoubi | 20 | $2,079,597 |
| | Ellissa Group | 1 | $49,777 |
| | Others | 231 | $19,626,097 |
| Total: | | 258 | **$22,234,281** |
| Cary Auto Sales Inc. Cary, NC | Hassan Ayash Exchange | 7 | $419,299 |
| | Others | 105 | $3,669,314 |
| Total: | | 112 | **$4,088,613** |

50

| U.S. Car Buyer | Wire Originator | # | Amount |
|---|---|---|---|
| Cedar Exports Auto Sales Mt. Juliet, TN | Hassan Ayash Exchange | 13 | $1,196,346 |
| | Ali Salhab | 3 | $232,054 |
| | Mohamad Hassan Hammoud | 8 | $878,289 |
| | Fadi Hammoud | 2 | $199,600 |
| | Fadi Star | 2 | $199,745 |
| | Others | 98 | $3,673,303 |
| Total: | | 126 | **$6,379,337** |
| Eagle Auto Sales Inc. Dearborn Heights, MI | Ellissa Exchange | 1 | $41,855 |
| | Mohamad Hassan Hammoud | 31 | $2,794,220 |
| | Others | 24 | $1,164,698 |
| Total: | | 56 | **$4,000,773** |
| Edya Export Import Inc. Holly Hill, FL | Hassan Ayash Exchange | 14 | $1,145,540 |
| | Oussama Salhab | 17 | $1,679,051 |
| | Others | 17 | $317,145 |
| Total: | | 48 | **$3,141,736** |
| EZ Auto Export LLC New Britain, CT | Ellissa Exchange | 1 | $92,418 |
| | Ali Salhab | 5 | $194,341 |
| | Yasmin Shipping & Trading | 5 | $230,821 |
| | Fadi Star | 7 | $593,180 |
| | Others | 36 | $1,969,924 |
| Total: | | 54 | **$3,080,684** |

| U.S. Car Buyer | Wire Originator | # | Amount |
|---|---|---|---|
| **Ezedine Brothers LLC** Hartford, CT | Hassan Ayash Exchange | 9 | $444,080 |
| | Ellissa Exchange | 1 | $24,930 |
| | Khodor Fakih | 1 | $99,818 |
| | Fadi Star | 16 | $1,076,597 |
| | Mohamad Hassan Hammoud | 6 | $389,009 |
| | Phenicia Shipping | 1 | $31,808 |
| | Ellissa Group | 4 | $157,409 |
| | Ali Salhab | 1 | $49,923 |
| | Yasmin Shipping & Trading | 1 | $23,912 |
| | Others | 63 | $2,532,728 |
| Total: | | 103 | **$4,830,214** |
| **Global Auto LLC South Windsor, CT** | Hassan Ayash Exchange | 17 | $1,234,008 |
| | Ellissa Exchange | 1 | $34,918 |
| | Ellissa Group | 8 | $318,384 |
| | Mohamad Hassan Hammoud | 19 | $2,030,506 |
| | Fadi Star | 60 | $5,868,008 |
| | Fadi Hammoud | 5 | $393,400 |
| | Oussama Salhab | 1 | $74,943 |
| | Ali Salhab | 4 | $238,726 |
| | Others | 124 | $7,788,910 |
| Total: | | 239 | **$17,981,803** |

| U.S. Car Buyer | Wire Originator | # | Amount |
|---|---|---|---|
| **Global Shipping Services** Detroit, MI | Hassan Ayash Exchange | 36 | $4,315,811 |
| | Ellissa Exchange | 5 | $102,058 |
| | Oussama Salhab | 2 | $210,525 |
| | STE Nomeco | 10 | $400,359 |
| | STE Marco | 3 | $571,334 |
| | Yasmin Shipping & Trading | 2 | $120,208 |
| | Mohamad Hassan Hammoud | 2 | $138,379 |
| | Fadi Star | 7 | $521,435 |
| | Youssef Nehme | 1 | $32,253 |
| | Imad Zbib | 2 | $21,429 |
| | Others | 75 | $2,936,206 |
| Total: | | 145 | **$9,369,997** |
| **H & D Export, Import Inc.** Detroit, MI | Ellissa Exchange | 1 | $89,868 |
| | Mohamad Manana | 2 | $199,936 |
| | Moustapha Manana | 1 | $149,968 |
| | Ellissa Group | 1 | $199,600 |
| | Others | 42 | $3,602,571 |
| Total: | | 47 | **$4,241,943** |
| **HH Automotive Inc.** Detroit, MI | Ellissa Exchange | 1 | $204,700 |
| | Youssef Nehme | 5 | $708,688 |
| | M/S Universal Motors Co. | 2 | $89,815 |
| | Deeb Atieh | 2 | $139,815 |
| | Others | 8 | $271,161 |
| Total: | | 18 | **$1,414,179** |

| U.S. Car Buyer | Wire Originator | # | Amount |
|---|---|---|---|
| **Hijazi General Trading LLC** Burtonsville, MD | Hassan Ayash Exchange | 11 | $371,257 |
| | Ellissa Exchange | 6 | $181,561 |
| | Oussama Salhab | 3 | $215,563 |
| | Ellissa Group | 11 | $586,649 |
| | Phenicia Shipping | 2 | $38,130 |
| | United Auto Enterprize | 1 | $30,000 |
| | Others | 165 | $5,727,093 |
| Total: | | 193 | **$7,150,253** |
| **Jean Y. Chedid Trading Est d/b/a Jean Y. Chedid** Dartmouth, MA | Hassan Ayash Exchange | 2 | $199,680 |
| | Ellissa Exchange | 1 | $149,775 |
| | Youssef Nehme | 55 | $8,236,087 |
| | Others | 14 | $1,390,030 |
| Total: | | 72 | **$9,975,572** |
| **Kamal Al Khawand** Dayton, OH | Ellissa Exchange | 1 | $99,818 |
| | Youssef Nehme | 11 | $1,148,358 |
| | Phenicia Shipping | 6 | $599,124 |
| | Others | 19 | $722,196 |
| Total: | | 54 | **$3,355,982** |

54

| U.S. Car Buyer | Wire Originator | # | Amount |
|---|---|---|---|
| **Kassab Auto Dealer LLC**<br>**North Arlington, NJ** | Hassan Ayash Exchange | 2 | $69,780 |
| | Ellissa Exchange | 1 | $30,968 |
| | Mohamad Deeb Atieh | 1 | $99,950 |
| | Deeb Atieh | 1 | $49,925 |
| | Fadi Hammoud | 1 | $99,850 |
| | Mohamad Hassan Hammoud | 7 | $424,353 |
| | M/S Universal Motors | 5 | $524,590 |
| | Khodor Fakih | 1 | $69,798 |
| | Ali Mohamad Fakih | 1 | $24,839 |
| | M/S Fakih for General Trade | 1 | $49,945 |
| | Fadi Star | 44 | $2,891,825 |
| | Others | 69 | $3,782,815 |
| Total: | | 150 | **$9,116,281** |
| **Mansour Brothers Auto Trading Inc.**<br>**Tampa, FL** | Ellissa Group | 7 | $543,880 |
| | Youssef Nehme | 3 | $299,441 |
| | Mohamad Hassan Hammoud | 1 | $99,786 |
| | Others | 29 | $2,300,780 |
| Total: | | 40 | **$3,243,869** |

| U.S. Car Buyer | Wire Originator | # | Amount |
|---|---|---|---|
| MGM Global Trading LLC South Windsor, CT | Hassan Ayash Exchange | 51 | $5,826,171 |
| | Ellissa Exchange | 1 | $99,772 |
| | Mohamad Hassan Hammoud | 34 | $3,149,542 |
| | Fadi Hammoud | 4 | $344,525 |
| | Fadi Star | 75 | $6,906,387 |
| | Ellissa Group | 4 | $324,429 |
| | M/S Fakih for General Trade | 2 | $126,709 |
| | Khodor Fakih | 1 | $49,938 |
| | Yasmin Shipping and Trading | 2 | $349,508 |
| | Ali Salhab | 2 | $349,536 |
| | Others | 176 | $15,886,958 |
| Total: | | 352 | **$33,413,475** |
| Myles Auto Sales New Bradford, MA | Hassan Ayash Exchange | 2 | $149,569 |
| | Ellissa Exchange | 3 | $149,561 |
| | Mohamad Deeb Atieh | 1 | $200,000 |
| | Ellissa Group | 4 | $289,042 |
| | Mohamad Hassan Hammoud | 3 | $249,466 |
| | Deeb Atieh | 11 | $1,009,032 |
| | M/S Universal Motors Co. | 4 | $144,750 |
| | Others | 49 | $2,626,566 |
| Total: | | 77 | **$4,862,986** |
| Poliproject Inc. d/b/a Fouad Autotrade St. Lawrence, MA | Hassan Ayash Exchange | 48 | $8,931,410 |
| | Mohamad Hassan Hammoud | 16 | $2,165,885 |
| | Others | 27 | $4,750,986 |
| Total: | | 91 | **$15,848,281** |

| U.S. Car Buyer | Wire Originator | # | Amount |
|---|---|---|---|
| **Safari Enterprises LLC, Sahari Motors Orlando, FL** | Hassan Ayash Exchange | 24 | $1,279,431 |
| | Ellissa Exchange | 8 | $368,706 |
| | Ellissa Group | 2 | $37,102 |
| | Ali Fakih | 5 | $348,850 |
| | Mohamad Hassan Hammoud | 1 | $39,895 |
| | Yasmin Shipping & Trading | 2 | $99,741 |
| | Fadi Star | 7 | $346,297 |
| | Ali Salhab | 4 | $274,493 |
| | Others | 49 | $2,342,546 |
| Total: | | 102 | **$5,137,061** |
| **United Auto Enterprize Inc. Redford, MI** | Hassan Ayash Exchange | 2 | $249,880 |
| | Oussama Salhab | 17 | $1,518,022 |
| | Cross Continents Lines SAL | 1 | $49,972 |
| | Yasmin Shipping & Trading | 2 | $139,733 |
| | Imad Zbib | 1 | $48,805 |
| | Mohamad Hassan Hammoud | 2 | $55,737 |
| | Bilal Hassan Salhab | 1 | $27,000 |
| | Others | 8 | $307,194 |
| Total: | | 34 | **$2,396,343** |

| U.S. Car Buyer | Wire Originator | # | Amount |
|---|---|---|---|
| United Quality Auto Sales Inc., Detroit, MI | Hassan Ayash Exchange | 1 | $214,237 |
| | Ellissa Exchange | 5 | $664,103 |
| | Youssef Nehme | 31 | $5,661,437 |
| | Ellissa Group | 3 | $284,493 |
| | Deeb Atieh | 3 | $159,770 |
| | M/S Universal Motors Co. | 1 | $39,915 |
| | Others | 29 | $1,901,167 |
| Total: | | 73 | **$8,925,122** |
| World Auto Sales LLC, Birmingham, AL | Hassan Ayash Exchange | 2 | $99,715 |
| | Ellissa Exchange | 1 | $219,558 |
| | Mohamad Hassan Hammoud | 22 | $2,791,829 |
| | Fadi Star | 29 | $2,974,780 |
| | Others | 436 | $17,978,260 |
| Total: | | 490 | **$24,064,172** |
| Aggregate: | | | **$247,822,334** |

## V.   CLAIMS FOR FORFEITURE

### First Claim for Forfeiture -- Proceeds Traceable to Violations of IEEPA
### (18 U.S.C. § 981(a)(1)(c))

79.   Paragraphs 1 through 78 of this Complaint are repeated and realleged as if fully set forth herein.

80.   Title 18, United States Code, Section 981(a)(1)(C) subjects to forfeiture "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of . . . any offense constituting 'specified unlawful activity'

58

(as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense."

81.  Under Section 1956(c)(7), the term "specified unlawful activity" includes, among other things, violations of "section 206 (relating to penalties) of the International Emergency Economic Powers Act [50 U.S.C. § 1705]."  Section 1705 provides, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this title."  50 U.S.C. § 1705(a).

82.  In addition, Title 18, United States Code, Section 984 provides in relevant part that:

> (a)(1) In any forfeiture action in rem in which the subject property is cash, monetary instruments in bearer form, funds deposited in an account in a financial institution (as defined in section 20 of this title), or precious metals —
>
> > (A) it shall not be necessary for the Government to identify the specific property involved in the offense that is the basis for the forfeiture; and
> >
> > (B) it shall not be a defense that the property involved in such an offense has been removed and replaced by identical property.
>
> (2) Except as provided in subsection (b), any identical property found in the same place or account as the property involved in the offense that is the basis for the forfeiture shall be subject to forfeiture

under this section.

(b) No action pursuant to this section to
forfeit property not traceable directly to
the offense that is the basis for the
forfeiture may be commenced more than 1 year
from the date of the offense.

83.  Because the Defendant Properties constitute or
were derived from proceeds traceable to violations of executive
orders and regulations issued pursuant to IEEPA (including
Executive Order 13224), the Defendant Properties are subject to
forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

**Second Claim for Forfeiture -- Property Involved In and Traceable
to Money Laundering Transactions
(18 U.S.C. § 981(a)(1)(A))**

84.  Paragraphs 1 through 78 of this Complaint are
repeated and realleged as if fully set forth herein.

85.  Title 18, United States Code, Section 981(a)(1)(A)
subjects to forfeiture "[a]ny property, real or personal,
involved in a transaction or attempted transaction in violation
of . . . section 1956 or 1957 of this title [relating to money
laundering], or any property traceable to such property."

86.  Title 18, United States Code, Section 1956(a)
provides criminal penalties for:

(a)(1) [w]hoever knowing that the property
involved in a financial transaction
represents the proceeds of some form of
unlawful activity, conducts or attempts to
conduct a financial transaction which in fact
involves the proceeds of specified unlawful

activity –

    (A)(i) with the intent to promote the carrying on of specified unlawful activity; or

    . . .

    (B) knowing that the transaction is designed in whole or in part --

        (i) to conceal or disguise the nature, the location, the source of ownership, or the control of the proceeds of specified unlawful activity; or

        (ii) to avoid a transaction reporting requirement under State or Federal law . . . .

    (2) Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States--

    (A) with the intent to promote the carrying on of specified unlawful activity; or

    (B) knowing that the monetary instrument or funds involved in the transportation represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part--

        (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or

                    (ii) to avoid a transaction
                    reporting requirement under State or
                    Federal law.

        87.  In addition, Section 1956(h) provides, in part,

that "[a]ny person who conspires to commit any offense defined in

this section or section 1957 shall be subject to the same

penalties as those prescribed for the offense the commission of

which was the object of the conspiracy."

        88.  18 U.S.C. § 1957 provides in relevant part that:

        Whoever . . . knowingly engages or attempts
        to engage in a monetary transaction in
        criminally derived property of a value
        greater than $10,000 and is derived from
        specified unlawful activity, shall be
        punished as provided in subsection (b).

        89.  "Monetary transactions" is defined in 18 U.S.C. §

1957(f)(1) as the "deposit, withdrawal, transfer, or exchange, in

or affecting interstate or foreign commerce of funds . . . by,

through, or to a financial institution . . . including any

transaction that would be a financial transaction under section

1956(c)(4)(B) of this title . . . ."

        90.  "Criminally derived property" is defined in 18

U.S.C. § 1957(f)(2) as "any property constituting, or derived

from, proceeds obtained from a criminal offense."

        91.  "Specified unlawful activity" is defined in 18

U.S.C. § 1957(f)(3) as having the same meaning as that term has

in 18 U.S.C. § 1956.  As noted above, the term "specified

                                62

unlawful activity," as defined in Section 1956, includes violations of IEEPA.

92. The term "specified unlawful activity" further includes the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), punishable under any law of the United States.

93. In addition, the term "financial transaction" is defined in 18 U.S.C. § 1956(c)(4), and includes "a transaction which in any way or degree affects interstate or foreign commerce (i) involving the movement of funds by wire or other means or (ii) involving one or more monetary instruments . . . ."

94. Because the Defendant Properties constitute properties involved in money laundering transactions and attempted money laundering transactions in violation of Sections 1956 and 1957, they are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

## VI.  CIVIL MONEY LAUNDERING PENALTIES

95. Paragraphs 1 through 78 of this Complaint are repeated and realleged as if fully set forth herein.

96. Pursuant to Title 18, United States Code, Section 1956(b), "[w]hoever conducts or attempts to conduct a transaction

described in subsection (a)(1) or (a)(3), or section 1957, or a transportation, transmission, or transfer described in subsection (a)(2), is liable to the United States for a civil penalty of not more than the greater of — (A) the value of the property, funds, or monetary instruments involved in the transaction; or (B) $10,000."

97.    Accordingly, the Defendant Entities are liable to the Government for a sum of money representing the amount of property, funds, or monetary instruments involved in the money laundering offenses described above, in an amount that is no less than $229,872,953 for LCB; $141,522,091 for the Hassan Ayash Exchange Company; $61,747,524 for Ellissa Holding, including the Ellissa Exchange; and an amount to be determined but not less than $50,000,000 for the Cybamar Companies.

WHEREFORE, plaintiff United States of America prays that process issue to enforce the forfeiture of the Defendant Properties and that all persons having an interest in the Defendant Properties be cited to appear and show cause why the forfeiture should not be decreed, and that this Court decree forfeiture of the Defendant Properties to the United States of America for disposition according to law and that this Court grant plaintiff such further relief as this Court may deem just and proper together with costs and disbursements in this action.

Dated:  New York, New York
        December 15, 2011

PREET BHARARA
United States Attorney for the
Southern District of New York

By:  _____
Sharon Cohen Levin
Michael D. Lockard
Jason H. Cowley
Alexander J. Wilson
Assistant United States Attorneys
One St. Andrew's Plaza
New York, New York 10007
(212) 637-1060/2193/2479/2453

VERIFICATION

STATE OF NEW YORK            )
COUNTY OF NEW YORK           :
SOUTHERN DISTRICT OF NEW YORK )

CHRISTOPHER MILLER, being duly sworn, deposes and says that he is a Special Agent with the Drug Enforcement Administration ("DEA"); that he has read the foregoing amended complaint and knows the contents thereof; and that the same is true to the best of his knowledge, information and belief.

The sources of deponent's information and the grounds of his belief are his personal involvement in the investigation, and conversations with and documents prepared by law enforcement officers and others.

_____
CHRISTOPHER MILLER
Special Agent
Drug Enforcement Administration

Sworn to before me, this
15 th day of December 2011

_____
Notary Public

MARCO DASILVA
Notary Public, State of New York
No. 01DA6145603
Qualified in Nassau County
My Commission Expires _May 8, 2014_

## SCHEDULE A

### I.  USED CAR BUYERS IN THE UNITED STATES AND THEIR ACCOUNTS

1.  **A & J Auto Sales Inc., Lansing, MI**

    **Account:**

    a.  account number 1852318300, held in the name of A & J Auto Sales Inc., at Comerica Bank, Detroit, MI, and all funds traceable thereto;

2.  **Ace Auto Leasing Inc., Tulsa, OK**

    **Account:**

    a.  account number 1021354, held in the name of Ace Auto Leasing Inc., at Security Bank, Tulsa, OK, and all funds traceable thereto;

3.  **ARZ Export LLC, Columbia, MD**

    **Account:**

    a.  account number 003915682358, held in the name of ARZ Export LLC, at Bank of America NA, Richmond, VA, and all funds traceable thereto;

4.  **Auto Care LLC (d/b/a Golden Eagle Motors), Vernon, CT**

    **Accounts:**

    a.  account number 003851460139, held in the name of Auto Care LLC (d/b/a Golden Eagle Motors), at Bank of America NA, Richmond, VA, and all funds traceable thereto;

    b.  account number 100010418954, held in the name of Auto Care LLC (d/b/a Golden Eagle Motors), at Webster Bank NA, New Britain, CT, and all funds traceable thereto;

5.  **Auto Rama Inc., Detroit, MI**

    **Accounts:**

    a.  account number D3640502130, held in the name of Auto Rama Inc., at RBS Citizens Bank NA, Riverside, RI, and all funds traceable thereto;

b. account number D450559055, held in the name of Auto Rama Inc., at RBS Citizens Bank NA, Riverside, RI, and all funds traceable thereto;

c. account number D3660794805, held in the name of Auto Rama Inc., at RBS Citizens Bank NA, Riverside, RI, and all funds traceable thereto;

6. __Baaklini North America Inc., Fairburn, GA__

__Account__:

a. account number 334009142209, held in the name of Baaklini North America Inc., at Bank of America, Richmond, VA, and all funds traceable thereto;

7. __Bassam G. Hanna d/b/a Cary Auto Sales, Cary, NC__

__Account__:

a. account number 0071124646, held in the name of Bassam G. Hanna d/b/a Cary Auto Sales, at Fidelity Bank, Fuquay Varina, NC, and all funds traceable thereto;

8. __Car UZD and Mid Overseas Inc. (d/b/a Car UZD), Miami, Florida__

__Accounts__:

a. account number 005488236598, held in the name of Car UZD, at Bank of America, Richmond, VA, and all funds traceable thereto;

b. account number 2000044100650, held in the name of Mid Overseas Inc. d/b/a Car UZD, at Wachovia Bank NA, Winston-Salem, NC;

9. __Cary Auto Sale Inc., Cary, NC__

__Account__:

a. account number 200041752616, held in the name of Cary Auto Sale Inc., at Wachovia Bank, Winston-Salem, NC, and all funds traceable thereto;

2

10. **Cedar Exports Auto Sales, Mt. Juliet, TN**

**Accounts:**

a.  account number 003780099354, held in the name of Cedar Exports Auto Sales, at Bank of America NA, Richmond, VA, and all funds traceable thereto;

b.  account number 003780100146, held in the name of Cedar Exports Auto Sales, at Bank of America NA, Richmond, VA, and all funds traceable thereto;

c.  account number 151205758239, held in the name of Cedar Exports Auto Sales, at U.S. Bank National Association, St. Paul, MN, and all funds traceable thereto;

d.  account number 183725977, held in the name of Cedar Exports Auto Sales, at First Tennessee Bank, Memphis, TN, and all funds traceable thereto;

e.  account number 3006360, held in the name of Cedar Exports Auto Sales, at Reliant Bank, Brentwood, TN, and all funds traceable thereto;

11. **Eagle Auto Sales Inc., Dearborn Heights, MI**

**Accounts:**

a.  account number 5404311333, held in the name of Eagle Auto Sales Inc., at Bank of America NA (formerly LaSalle Bank), Henrico, VA, and all funds traceable thereto;

b.  account number 5404706474, held in the name of Eagle Auto Sales Inc., at Bank of America NA (formerly LaSalle Bank), Henrico, VA, and all funds traceable thereto;

12. **Edya Export Import Inc., Holly Hill, FL**

**Account:**

a.  account number 0010200496580, held in the name of Edya Export Import Inc., at Bank of America NA, Richmond, VA, and all funds traceable thereto;

13. **EZ Auto Export LLC, New Britain, CT**

   Account:

   a.   account number 385005031155, held in the name of EZ
        Auto Export LLC, at Bank of America NA, Richmond, VA,
        and all funds traceable thereto;

14. **Ezedine Brothers LLC, Hartford, CT**

   Accounts:

   a.   account number 6500023951, held in the name of Ezedine
        Brothers LLC, at People's United Bank, Hartford, CT,
        and all funds traceable thereto;

   b.   account number 7000380666, held in the name of Ezedine
        Brothers LLC, at First Niagara Bank NA, Lockport, NY,
        and all funds traceable thereto;

   c.   account number 9501914077, held in the name of Ezedine
        Brothers LLC, at First Niagara Bank NA, Lockport, NY,
        and all funds traceable thereto;

   d.   account number 1000010094950, held in the name of
        Ezedine Brothers LLC, at Webster Bank NA, New Britain,
        CT, and all funds traceable thereto;

   e.   account number 7070205177, held in the name of Ezedine
        Brothers LLC, at First Niagara Bank NA, Lockport, NY,
        and all funds traceable thereto;

   f.   account number 9500946008, held in the name of Ezedine
        Brothers LLC, at First Niagara Bank NA, Lockport, NY,
        and all funds traceable thereto;

15. **Global Auto LLC, South Windsor, CT**

   Account:

   a.   account number 100010497762, held in the name of Global
        Auto LLC, at Webster Bank NA, New Britain, CT, and all
        funds traceable thereto;

   b.   account number 385000239567, held in the name of Global
        Auto LLC, at Bank of America NA, Richmond, VA, and all

4

funds traceable thereto;

16. **Global Shipping Services, Detroit, MI**

**Account:**

    **a.** account number 1851738532, held in the name of Global Shipping Services, at Comerica Bank, Detroit, MI, and all funds traceable thereto;

17. **H & D Export and Import Inc., Detroit, MI**

**Account:**

    **a.** account number 4506043277, held in the name of H & D Export and Import Inc., at RBS Citizens NA, Riverside, RI, and all funds traceable thereto;

18. **HH Automotive Inc., Detroit, MI**

**Accounts:**

    **a.** account number 7913961236, held in the name of HH Automotive Inc., at Fifth Third Bank, Cincinnati, OH, and all funds traceable thereto;

    **b.** account number 771360245, held in the name of HH Automotive Inc., at JPMorgan Chase Bank, Tampa, FL, and all funds traceable thereto;

19. **Hijazi General Trading LLC, Burtonsville, MD**

**Account:**

    **a.** account number 1461670301, held in the name of Hijazi General Trading LLC, at Sandy Spring National Bank, Columbia, MD, and all funds traceable thereto;

20. **Jean Y. Chedid Trading Est d/b/a Jean Y. Chedid, Dartmouth, MA**

**Accounts:**

    **a.** account number 004601044225, held in the name of Jean Y. Chedid Trading Est. d/b/a Jean Y. Chedid, at Bank of America NA, Richmond, VA, and all funds traceable

5

thereto;

b.   account number 22071326, held in the name of Jean Y.
     Chedid Trading Est. d/b/a Jean Y. Chedid, at RBS
     Citizens Bank, Riverside, RI, and all funds traceable
     thereto;

21.  **Kamal Al Khawand, Dayton, OH**

     **Account:**

a.   account number 415006924, held in the name of Kamal Al
     Khawand, at Liberty Savings Bank, Wilmington, OH, and
     all funds traceable thereto;

22.  **Kassab Auto Dealer LLC, North Arlington, NJ**

     **Accounts:**

a.   account number 381005084630, held in the name of Kassab
     Auto Dealer LLC, at Bank of America NA, Richmond, VA,
     and all funds traceable thereto;

b.   account number 4245299816, held in the name of Kassab
     Auto Dealer LLC, at TD Bank NA, Lewiston, ME, and all
     funds traceable thereto;

23.  **Mansour Brothers Auto Trading Inc., Tampa, FL**

     **Account:**

a.   account number 8042546625, held in the name of Mansour
     Brothers Auto Trading Inc., at BB&T Bank, Wilson, NC,
     and all funds traceable thereto;

b.   account number 8048989720, held in the name of Mansour
     Brothers Auto Trading Inc., Tampa, FL;

24.  **MGM Global Trading LLC, South Windsor, CT**

     **Accounts:**

a.   account number 100010497742, held in the name of MGM
     Global Trading LLC, at Webster Bank NA, New Britain,
     CT, and all funds traceable thereto;

6

**b.** account number 385002807418, held in the name of MGM Global Trading LLC, at Bank of America NA, Richmond, VA, and all funds traceable thereto;

**c.** account number 385002807421, held in the name of MGM Global Trading LLC, at Bank of America NA, Richmond, VA, and all funds traceable thereto;

**d.** account number 7070181080, held in the name of MGM Global Trading LLC, at First Niagara Bank NA, Lockport, NY, and all funds traceable thereto;

**e.** account number 51304962536, held in the name of MGM Global Trading LLC, at Sovereign Bank, Reading, PA, and all funds traceable thereto;

25. <u>Myles Auto Sales, New Bradford, MA</u>

   <u>Accounts</u>:

   **a.** account number 68500026114, held in the name of Myles Auto Sales, at Sovereign Bank, Reading, PA, and all funds traceable thereto;

   **b.** account number 9496873999, held in the name of Myles Auto Sales, at Bank of America NA, Richmond, VA, and all funds traceable thereto;

26. <u>Poliproject Inc. d/b/a Fouad Autotrade, St. Lawrence, MA</u>

   <u>Account</u>:

   **a.** account number 8245243071, held in the name of Poliproject Inc. d/b/a Fouad Autotrade, at TD Bank NA, Lewiston, ME, and all funds traceable thereto;

27. <u>Safari Enterprises LLC, Orlando, FL & Sahari Motors, Orlando, FL</u>

   <u>Accounts</u>:

   **a.** account number 100010323810, held in the name of Safari Enterprises LLC, at Webster Bank NA, New Britain, CT, and all funds traceable thereto;

    **b.**   account number 2000036107470, held in the name of Safari Enterprises LLC, at Wachovia Bank NA, Winston-Salem, NC, and all funds traceable thereto;

    **c.**   account number 200051058944, held in the name of Sahari Motors, at Wachovia Bank NA, Winston-Salem, NC, and all funds traceable thereto;

**28.** **United Auto Enterprize Inc., Redford, MI**

    **Accounts:**

    **a.**   account number 1852550415, held in the name of United Auto Enterprize Inc., at Comerica Bank, Detroit, MI, and all funds traceable thereto;

    **b.**   account number 229034804888, held in the name of United Auto Enterprize Inc., at Bank of America NA, Richmond, VA, and all funds traceable thereto;

**29.** **United Quality Auto Sales Inc., Detroit, MI**

    **Account:**

    **a.**   account number 1851548741, held in the name of United Quality Auto Sales Inc., at Comerica Bank, Detroit, MI, and all funds traceable thereto;

**30.** **World Auto Sales LL, Birmingham, AL**

    **Account:**

    **a.**   account number 0028860, held in the name of World Auto Sales LLC, at Iberia Bank, Lafayette, LA, and all funds traceable thereto.

      **II.** **CYBAMAR SWISS ENTITITES AND THEIR ACCOUNTS**

**1.** **Cybamar Swiss GMBH LLC**

    **Accounts:**

    **a.**   account number 1852078466, held in the name of Cybamar Swiss GMBH LLC, at Comerica Bank, Detroit, MI, and all funds traceable thereto;

b. account number 985914906, held in the name of Cybamar Swiss GMBH LLC, at PNC Bank, Pittsburgh, PA, and all funds traceable thereto.

c. account number 177717592000, held in the name of Cybamar Swiss GMBH LLC, at Credit Suisse AG, and all funds traceable thereto.

d. account number 076705931001, held in the name of Cybamar Swiss GMBH LLC, at Credit Suisse AG, and all funds traceable thereto.

e. account number 076705932000, held in the name of Cybamar Swiss GMBH LLC, at Credit Suisse AG, and all funds traceable thereto.

9