## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- X

CHAIM KAPLAN, *et al.*,

                    Plaintiffs,               Case No.

            -against-              08-cv-7253(GBD)

LEBANESE CANADIAN BANK, SAL, *et al.*,

                    Defendants.

-------------------------------------------------------------------- X

### PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S <u>MOTION TO DISMISS</u>

THE BERKMAN LAW OFFICE, LLC

*Attorneys for the Plaintiffs*

111 Livingston Street, Suite 1928

Brooklyn, New York 11201

718-855-3627

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

ARGUMENT ........................................................................................................................2

Plaintiffs Are Not "Estopped" by Their FSIA Action Against Iran and North Korea ..................2

The Second Circuit's Holdings That Plaintiffs Sufficiently Alleged Both Personal
Jurisdiction and ATS Aiding and Abetting Preclude Most of the Current Motion .......................3

The Personal Jurisdiction Ruling .............................................................................................3

The Aiding and Abetting Ruling..............................................................................................6

The SAC States a Claim for Secondary Liability ....................................................................12

The SAC Alleges That LCB Aided, Abetted and Conspired With "the person who
committed" the Rocket Attacks ...............................................................................................12

The SAC States a Claim for Aiding and Abetting.....................................................................16

The SAC States a Claim for Conspiracy...................................................................................21

The SAC States a Claim for Primary Liability ........................................................................23

CONCLUSION.......................................................................................................................25

Plaintiffs respectfully submit this opposition to the motion to dismiss filed by defendant Lebanese Canadian Bank ("LCB"). For the reasons below that motion should be denied.

## INTRODUCTION

The plaintiffs' First Amended Complaint ("FAC") in this action was filed in 2009. On December 5, 2018, the plaintiffs filed a Second Amended Complaint ("SAC"). DE 99. The SAC differs from the FAC in several important respects. *First*, the SAC asserts only claims for primary and secondary liability under the Antiterrorism Act ("ATA"), 18 U.S.C. §§ 2333(a) and 2333(d). *Second*, while the FAC alleged connections between defendant LCB and a single Hizbollah entity, *i.e.*, the Shahid ("Martyrs") Foundation, the SAC details the close financial relationship between LCB and three Hizbollah entities: (i) Shahid; (ii) Bayt al-Mal; and (iii) the Yousser Company. *Third*, unlike the FAC, the SAC also discusses the relationship between LCB and two senior Hizbollah leaders, Husayn al-Shami and Wahid Mahmoud Sbeity. *Fourth* while the FAC referenced only a single Hizbollah bank account at LCB, the SAC provides details of multiple Hizbollah accounts at LCB, including account numbers and details of the LCB branches involved. *Fifth*, the SAC includes allegations from, and incorporates by reference, a Verified Amended Complaint ("VAC") filed by the United States in *U.S. v. Lebanese Canadian Bank*, 11-cv-9186 (S.D.N.Y.), which is a forfeiture action against LCB arising from its wide-ranging Hizbollah-related activities dating back at least to 2002. A copy of the VAC is attached hereto as Exhibit A.[1] *Sixth*, the SAC also relies on a 2011 U.S. Treasury designation of LCB as a "primary money laundering concern" due to its extensive involvement with and support for Hezbollah.

---

[1] Materials incorporated by reference into the SAC are properly considered on a Rule 12(b)(6) motion. *In re JPMorgan Chase & Co. Sec. Litig.*, 2014 WL 1297446, at *4 (S.D.N.Y. Mar. 31, 2014) (Daniels, D.J.) ("Although this motion is addressed to the face of the pleadings, the Court may consider also the full text of documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.") (quotations and citation omitted).

LCB has moved to dismiss plaintiffs' action for failure to state a claim. As shown below, LCB's motion is without merit and should be denied.

## ARGUMENT

As shown below, the SAC states a claim for both primary and secondary ATA liability.

### A.    Plaintiffs Are Not "Estopped" by Their FSIA Action Against Iran and North Korea

LCB asserts as a threshold argument that plaintiffs are "judicially estopped" from asserting that LCB was a "factual, proximate, or substantial cause of their injuries," or that "LCB's financial services were 'integral' to the Hezbollah attacks that caused their injuries," due to the arguments they made and the final judgment they obtained against North Korea and the Iran in the District of Columbia, and are therefore unable to state a claim for primary liability or aiding and abetting liability under the ATA. DE 106 at 18-20; 24 (uppercase letters modified to lowercase).[2]

This argument is meritless – indeed, it is frivolous.[3] As an elementary matter of both law and logic, a given event may have numerous causes, both factual and legal. In fact, "it is common for injuries to have multiple proximate causes." *Staub v. Proctor Hosp.*, 562 U.S. 411, 420 (2011). Likewise, "a plaintiff's injury can have multiple 'but-for' causes, each one of which may be sufficient to support liability. … Probably it cannot be said of any event that it has a single causal

---

[2] As detailed *infra*, LCB's descriptions of the applicable causation standards are also wrong. For example, as shown below, there is no requirement that LCB's conduct be the "but-for" cause or "integral" to the attacks. But for the purpose of rebutting LCB's estoppel argument in this section, we simply quote LCB's (mistaken) statements regarding causation standards and note our disagreement with it.

[3] LCB's "estoppel" argument is so self-evidently baseless as to appear pretextual. It seems that the improper purpose of this argument, like the obsessive and irrelevant references to other ATA actions the plaintiffs have brought against other banks, Al Jazeera, and Hezbollah itself with which LCB has larded its motion, is to persuade the Court that the plaintiffs may recover from other defendants and so LCB should be "let off the hook," and/or that the plaintiffs are unduly litigious and so undeserving of relief. *Cf.* DE 106 at 8 ("Plaintiffs are prepared to indiscriminately sue any and all financial institutions they can think of, regardless of whether they have the facts to support their claims or not.").

As this Court is aware from its handling of the *In Re: Terrorist Attacks on September 11, 2001* litigation, it is both common and proper for terror victims to exercise their rights to sue *multiple* defendants.

antecedent." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013) (quotation marks and citation omitted). Since that is true of a simple tort, all the more so where, as here, the torts at issue involve the firing of thousands of rockets by Hizbollah over a period of many weeks – a project which required material resources of many different types to prepare for and execute.

Indeed, the types of material support provided by Iran and North Korea to Hizbollah and cited by LCB, *i.e.* "weapons, training, logistical support, infrastructure, and financing" (DE 106 at 18, quoting the decision of the D.C. district court), do not include and are vastly different from the banking services LCB provided to Hizbollah. Thus, the assertion that plaintiffs are precluded in this case by the findings regarding Iran and North Korea therefore simply makes no sense.[4]

In sum, LCB's judicial estoppel argument fails completely.

**B.      The Second Circuit's Holdings That Plaintiffs Sufficiently Alleged Both Personal Jurisdiction and ATS Aiding and Abetting Preclude Most of the Current Motion**

As shown below, LCB's challenge to plaintiffs' ATA claims is almost wholly precluded by the Second Circuit's prior holdings finding that the plaintiffs in this case sufficiently pled both personal jurisdiction and an aiding and abetting claim under the Alien Tort Statute ("ATS").

**1.   The Personal Jurisdiction Ruling**

As the Second Circuit has pointed out, plaintiffs' merits allegations and personal jurisdictional allegations are intertwined in this case: "The plaintiffs' claims are … based upon the assertion that LCB knowingly wired money on behalf of a Hizballah affiliate through New York;

---

[4] LCB asserts that plaintiffs are collaterally estopped both by the arguments and allegations they made in their suit against Iran and North Korea, and by the final decision in that case. However, as LCB admits, judicial estoppel can only arise when (among other things) a litigant's contrary argument was adopted in previous litigation. DE 106 at 18 (quoting *DeRosa v. Nat'l Envelope Corp.*, 595 F.3d 99, 103 (2d Cir. 2010) for the requirement that "the party's former position has been adopted in some way by the court in the earlier proceeding."). Thus, any arguments and allegations made by plaintiffs in the Iran/North Korea action that were not adopted by the D.C. court would be irrelevant. In any event, LCB points to no arguments or allegations other than those adopted by the D.C. court.

that LCB purposefully did so in order to assist Hizballah (irrespective of how it intended the money would be used by Hizballah, or how it was in fact used); that these services constituted material support to a terrorist organization; and that LCB therefore violated the Anti-Terrorism Act. It would appear, then, that *LCB's transactions in New York are among the operative facts underpinning the plaintiffs' Anti-Terrorism Act claims as alleged*." *Licci v. LCB*, 673 F.3d 50, 69 (2d Cir. 2012) (emphasis added).

After receiving a response from the New York Court of Appeals to certified questions, the Second Circuit had to determine whether plaintiffs had made a "prima facie showing that jurisdiction exists." *Licci v. LCB*, 732 F.3d 161, 167 (2d Cir. 2013) (citation omitted). The Second Circuit adopted the analysis of the Court of Appeals, and explicitly found that the plaintiffs had "made a *prima facie* showing that the district court may exercise personal jurisdiction over LCB with respect to their Anti-Terrorism Act" claims (*id*. at 169), on the basis of the allegations below:

- "With respect to LCB's contacts with New York, the Court of Appeals found both the frequency and deliberate nature of LCB's use of its correspondent account to be determinative. The Court focused on the allegations that LCB used its New York correspondent account 'dozens' of times 'to effect its support of Shahid and shared terrorist goals,' not 'once or twice by mistake.' The Court confirmed that this conduct 'indicates desirability and a lack of coincidence,'; that is, it reflects LCB's purposeful availment of the privilege of doing business in the New York forum."

- "[T]he Court [of Appeals] pointed out [that] the plaintiffs' claims are also grounded in the allegation that LCB violated various statutory duties by using its correspondent account to funnel money to Shahid and Hizballah. Because the defendant's allegedly culpable conduct stems from this use of the New York correspondent account, the Court of Appeals concluded, the plaintiffs' claims are sufficiently related to LCB's New York business activity to satisfy the second prong of section 302(a)(1)."

- "The jurisdictional basis for the plaintiffs' claims is LCB's execution of dozens of dollar-denominated wire transfers through its AmEx correspondent account in New York. These wire transfers are a part of the principal wrong at which the plaintiffs' lawsuit is directed inasmuch as they allege that 'LCB carried out the ... [t]ransfers as a matter of official LCB policy, in order to assist and advance Hizbollah's terrorist activities against Jews in Israel" in violation of various statutory duties. Am. Compl. ¶ 129."

-4-

- "We conclude that the selection and repeated use of New York's banking system, as an instrument for accomplishing the alleged wrongs for which the plaintiffs seek redress …. permit[s] the subjecting of LCB to specific jurisdiction within the Southern District of New York consistent with due process requirements."

- "LCB could have, as it acknowledges, processed U.S.-dollar-denominated wire transfers for the Shahid account through correspondent accounts anywhere in the world … But LCB deliberately chose to process the many Shahid wire transfers through AmEx in New York."

- "LCB's use of a correspondent account in New York to accomplish its dollar-denominated wire transfers was recurring. Indeed, the plaintiffs allege wire transfers through AmEx that numbered in the dozens and totaled several million dollars … This deliberate and recurring activity constitutes, as the Court of Appeals put it in analyzing the applicability of New York's long-arm statute, LCB's 'purposeful availment'."

- "We conclude that in connection with this particular jurisdictional controversy—a lawsuit seeking redress for the allegedly unlawful provision of banking services of which the wire transfers are a part—allegations of LCB's repeated, intentional execution of U.S.-dollar-denominated wire transfers on behalf of Shahid, in order to further Hizballah's terrorist goals, are sufficient."

- "LCB's repeated use of the correspondent account and hence New York's banking system—as an instrument to achieve the wrong complained of in this suit satisfies the minimum contacts component of the due process inquiry."

*Licci*, 732 F.3d at 169-173 (citations to the New York Court of Appeals' decision omitted).

The Second Circuit's ruling (which triply governs this action as res judicata, under the mandate rule, and as binding Circuit precedent), that plaintiffs made out a prima facie case of personal jurisdiction based on the allegations detailed above, *necessarily* precludes LCB's claim that plaintiffs' allegations against it are "conclusory."[5] It is black-letter law in this Circuit that "conclusory allegations are not enough to establish personal jurisdiction" even under a prima facie standard. *Alpha Capital Anstalt v. Oxysure Sys.*, 252 F. Supp. 3d 332, 337 (S.D.N.Y. 2017) (quotation marks and citation omitted). Rather, "[a] prima facie case requires **nonconclusory fact-**

---

[5] All of the allegations cited by the Second Circuit are also contained in the SAC. Indeed, the SAC contains additional extensive factual detail that was not included in the FAC, as of course does the VAC. Thus, the Second Circuit's findings regarding these allegations apply *a fortiori* in respect to the SAC.

*specific allegations* or evidence showing that activity that constitutes the basis of jurisdiction has taken place." *Chirag v. MT Marida Marguerite Schiffahrts,* 604 Fed.Appx. 16, 19 (2d Cir. 2015) (emphasis added) (citing *Jazini v. Nissan Motor* 148 F.3d 181, 186 (2d Cir. 1998)). *See also e.g. Blau v. Allianz Life Ins. Co. of N. Am.*, 124 F. Supp. 3d 161, 171 (E.D.N.Y. 2015) (same).

Though the question of whether a complaint states a claim for purposes of Rule 12(b)(6) is conceptually distinct from the question of whether its allegations add up to a prima facie showing of personal jurisdiction under Rule 12(b)(2), both analyses require the plaintiff to make "nonconclusory fact-specific allegations." *Chirag*, at 19. Thus, where, as here, the factual allegations giving rise to personal jurisdiction are deeply intertwined with the allegations underlying the cause of action, a court resolving the jurisdictional issue will of necessity reach the question of whether plaintiffs' intertwined merits allegations are "nonconclusory" and "fact-specific." That is exactly what happened here: the Second Circuit expressly found the allegations listed above to make out a prima facie showing of personal jurisdiction, which perforce means that those allegations – which of course also constitute *merits* allegations underlying the plaintiffs' ATA action against LCB – are "nonconclusory."

Therefore, LCB is precluded from asserting, as it purports to do, that the merits allegations relied upon by the Second Circuit in finding jurisdiction, detailed above, are "conclusory."

### 2.   The Aiding and Abetting Ruling

In its 2015 decision in this action, this Court dismissed the plaintiffs' ATS claims on the grounds that "Plaintiffs insufficiently allege that the wire transfers aided and abetted a violation of the law of nations." *Licci v. LCB*, 2015 WL 13649462, at *4 (S.D.N.Y. Apr. 14, 2015). Specifically, the Court cited Second Circuit precedent holding that "[t]o state a claim for aiding and abetting a violation of the law of nations under the ATS, the analysis necessarily focuses on

allegations that the defendant *intended* to aid and abet violations" of international law and that "[t]he *mens rea* standard for aiding and abetting liability in ATS actions is purpose rather than knowledge alone," and found that plaintiffs' "Amended Complaint inadequately pleads that the wire transfers at issue were made with the intent to aid and abet the alleged terrorist activities." *Id*. (quotation marks, bracket and citations omitted).

On appeal, the Second Circuit reversed this finding. The Court first noted that "*[t]he U.S. government has taken two actions that reinforce many of Plaintiffs' allegations against LCB*. First … the U.S. government initiated a civil forfeiture action against LCB properties … Second … the U.S. Department of Treasury … has designated LCB as 'a financial institution of primary money laundering concern.'" *Licci*, 834 F.3d at 208-209 (emphasis added).[6] The Second Circuit also credited "an expert declaration from former Israeli intelligence officer Uzi Shaya" which plaintiffs had submitted to this Court. *Id*. at 207.[7] The Second Circuit then proceeded to analyze whether the allegations of plaintiffs' complaint, as bolstered by the factual information contained in the Government's forfeiture complaint, the Treasury Designation, and the Shaya Declaration, stated a claim for aiding and abetting under the ATS.[8] The Court found both that plaintiffs had stated a

---

[6] As discussed above, the VAC was previously put into the record in this case (DE 77-1) and is incorporated into the SAC. The Treasury Designation is cited and relied upon in the SAC (*see* ¶ 98) and is published in the Federal Register. *See* 76 Fed. Reg. 9403, Feb. 17, 2011. A copy is attached as Exhibit B.

[7] The Shaya Declaration was docketed in this action as DE 43. A copy is attached as Exhibit C.

[8] Even absent the Second Circuit's decision containing findings based on the VAC, the Treasury Designation, and the Shaya Declaration, those three documents are independently subject to consideration by this Court in disposing of LCB's Rule 12(b)(6) motion. The VAC was previously put into the record in this case (DE 77-1) and is incorporated by reference into the SAC. The Treasury Designation is a public record subject to judicial notice relied upon in the SAC (*see* ¶ 98), and the Shaya Declaration was already introduced into the record in this action (DE 43), and both are therefore also properly considered on a Rule 12(b)(6) motion. *Day v. Moscow*, 955 F.2d 807, 811 (2d Cir. 1992) (Court may consider items in its "own records" in deciding Rule 12(b)(6) motion); *D.P. Tech. Corp. v. Sherwood Tool*, 751 F. Supp. 1038, 1039 (D. Conn. 1990) ("matters of public record, orders, items appearing in the record of the case, and exhibits

valid ATS aiding and abetting claim, and that the conduct at issue "sufficiently 'touches and concerns' the territory of the United States," based on the allegations and findings below:

- "LCB used its correspondent banking account in New York to facilitate dozens of international wire transfers for the Shahid, an entity alleged to be an 'integral part' of Hezbollah."

- "LCB 'provided extensive banking services to [Hezbollah]' that 'caused, enabled[,] and facilitated the terrorist rocket attacks in which the plaintiffs and their decedents were harmed and killed' … Plaintiffs further allege that 'between 2004 and July 12, 2006 (and subsequently), [Hezbollah] made and received dozens of dollar wire transfers ... totaling several million dollars,' and that '[a]ll' of those wire transfers 'were made to, from, and/or between' Hezbollah's bank accounts at various LCB branches."

- "Plaintiffs here assert that LCB, a Lebanese Bank, used a correspondent banking account at a New York bank to facilitate wire transfers between Hezbollah's bank accounts in the months leading up to the rocket attacks."

- "Plaintiffs adequately allege that these wire transfer services had a substantial effect on Hezbollah's actions insofar as they 'enabled' and 'facilitated' terrorist rocket attacks harming or killing Plaintiffs and their decedents. Plaintiffs further allege that LCB's wire transfers 'substantially increased and facilitated [Hezbollah's] ability to plan, to prepare for[,] and to carry out rocket attacks on civilians,' including the rocket attacks injuring or killing Plaintiffs and their family members. In addition, Plaintiffs particularly allege that '[Hezbollah] planned, made the preparations necessary for and carried out' the rocket attacks by 'utilizing funds' received as part of the wire transfers. Plaintiffs' allegations are bolstered by evidence in the record that LCB's wire transfers 'significantly enhanced [Hezbollah]'s ability to plan and carry out terrorist and other violent actions, including the rocket attacks in which [Plaintiffs] were harmed.'"

- "Plaintiffs allege that (1) LCB acted intentionally, and pursuant to its official policy, in assisting Hezbollah in carrying out the rocket attacks by carrying out the wire transfers, and (2) LCB knew that the bank accounts between which it facilitated transfers were owned and controlled by Shahid, an integral part of Hezbollah."

- "Plaintiffs allege that 'as a matter of official LCB policy' LCB 'continuously supports and supported [Hezbollah] and its anti-Israel program, goals[,] and activities.' They

---

attached to the complaint, also may be taken into account."); *Kramer v. Time Warner, Inc.,* 937 F.2d 767, 774 (2d Cir.1991) (taking judicial notice on Rule 12(b)(6) motion of public documents filed with SEC)

Of course, since the factual information contained in those three documents has been incorporated into findings contained in the decision of the Second Circuit, the facts and findings contained in that decision can and should be considered by the Court in disposing of the Rule 12(b)(6) motion.

also allege that LCB had 'actual knowledge' that (1) '[Hezbollah] is a violent terrorist organization [that] carried out numerous terrorist attacks against Israeli civilians and American targets and which planned and intended to carry out additional such terrorist attacks,'; (2) 'Shahid is an integral part of [Hezbollah] and constitutes part of [Hezbollah's] financial arm,'; (3) Hezbollah's bank accounts at various LCB branches and the funds therein 'were owned and controlled by [Hezbollah],'; (4) the wire transfers made and received by Hezbollah leading up to the 2006 rocket attacks 'were being carried out by and at the direction of [Hezbollah],'; and (5) Hezbollah 'require[d] wire transfer services ... in order to plan, to prepare for and to carry out terrorist attacks.' Plaintiffs then allege that LCB, equipped with this actual knowledge, carried out the wire transfers at issue 'with the specific purpose and intention of enabling and assisting [Hezbollah] to carry out terrorist attacks against Jewish civilians in Israel.' Indeed, the complaint states that LCB carried out the wire transfers 'as a matter of official LCB policy, in order to assist and advance [Hezbollah's] terrorist activities against Jews in Israel, in order to assist and advance [Hezbollah's] goal of using terrorism to destroy the State of Israel and murder or expel its Jewish inhabitants and in order to assist and advance [Hezbollah's] goal of coercing, intimidating and influencing the Israeli government and public.'"

- "[T]he Shaya declaration states that between '2004 and July 12, 2006 (and later),' Hezbollah 'made dozens of dollar wire transfers in and out of' a specific account number at LCB's headquarters. Shaya stated that LCB requested that its correspondent bank in New York carry out the wire transfers and identified Shahid as the account-holder."

- "In addition, the government forfeiture action against LCB lends support to Plaintiffs' allegations. Specifically, the government alleged that LCB engaged in activity 'intended to conceal and disguise the true source, nature, ownership, and control of' proceeds of illegal activities in a scheme that 'benefitted [Hezbollah].'"

*Licci*, 834 F.3d at 215–219. (citations to the appellate record omitted).

On the basis of the above, the Second Circuit found that plaintiffs stated a valid claim for ATS aiding and abetting against LCB. *Id.* The Second Circuit nonetheless dismissed the ATS claim, on the *sole* ground that its prior decision in *Kiobel v. Royal Dutch Petroleum*, 621 F.3d 111 (2d Cir. 2010) precluded ATS actions against corporate defendants. *Licci*, 834 F.3d at 219-220.[9]

_____

[9] By reversing this Court's decision finding that plaintiffs had failed to plead a claim for ATS aiding and abetting, independently reaching out and finding that the conduct at issue "sufficiently 'touches and concerns' the territory of the United States," and then dismissing on the *sole* ground that LCB is a

The Second Circuit's holding (which governs here both as binding Circuit precedent and on grounds of issue preclusion) that plaintiffs stated an ATS aiding and abetting claim disposes of most of LCB's Rule 12(b)(6) motion, because the Second Circuit could not have reached that conclusion unless it found the underlying factual allegations supporting ATS subject-matter jurisdiction – which obviously also constitute *merits* allegations in this action – to be both plausible and nonconclusory.[10] "[T]he Second Circuit has made clear that factual allegations going to the

_____

corporation not subject to ATS liability under *Kiobel*, the Second Circuit enabled the ATS plaintiffs in this case to seek Supreme Court review of the corporate liability holding in *Kiobel*. The plaintiffs did just that. *Licci v. LCB*, No. 16-778 (Supreme Court). However, their petition for certiorari was denied after *Jesner v. Arab Bank*, 138 S. Ct. 1386 (2018) later affirmed *Kiobel* (in respect to foreign corporations).

   LCB argued in its opposition to plaintiffs' cert petition that the Second Circuit's holding that plaintiffs had satisfied all elements of the ATS (except for the corporate liability bar) was mere dicta, and LCB will likely make the same claim in its reply on this motion. The Court should reject any assertion that the Second Circuit's ATS decision was dicta. The ATS decision was necessary to the result, which was very different than the result in the decision appealed: but for the Second Circuit's ATS decision, the plaintiffs would have had no basis for seeking cert, and no basis to pursue their ATS claims if the Supreme Court had later ruled differently in *Jesner*. The ATS decision therefore kept those claims alive, and would have enabled the plaintiffs to pursue their ATS claims to trial, if the subsequent decision in *Jesner* had gone the other way. The ATS decision was thus not dicta. *Seminole Tribe v. Fla.*, 517 U.S. 44, 67 (1996) ("When an opinion issues for the Court, it is not only the *result* but also those *portions of the opinion necessary to that result* by which we are bound.") (emphasis added).

   Indeed, courts within and without this circuit have recognized that the Second Circuit's ATS decision in this case is a binding holding. For example, in an ATS action brought against LCB's managers, Judge Schofield of this court has consistently treated the Second Circuit's ATS decision in this case as binding Circuit precedent. *See Nahl v. Jaoude*, 2018 WL 2994391, at \*4 (S.D.N.Y. June 14, 2018) ("[I]n *Licci* … the Second Circuit **held** that a complaint "state[d] a claim for aiding and abetting [Hizballah's] violation of the law of nations.") (quoting *Licci*, 834 F.3d at 219); *Nahl v. Jaoude*, 354 F. Supp. 3d 489, 502 (S.D.N.Y. 2018) ("In *Licci II*, the Second Circuit **held** that money laundering – also committed by LCB in support of Hizballah – provided a sufficient basis for an ATS claim brought by the victims of rocket attacks in Israel, because the plaintiffs adequately pleaded that the defendants "aid[ed] and abet[ed]" "[g]enocide, crimes against humanity, and war crimes [which] certainly constitute violations of the law of nations...." 834 F.3d at 213 … This **holding** illustrates that terrorism – at least under the rubric of crimes against humanity and war crimes – can form the basis for a valid ATS claim.") (all emphases added). *See also e.g. U.S. v. Prevezon Holdings*, 251 F. Supp. 3d 684, 692-693 (S.D.N.Y. 2017) (relying on the ATS holding in *Licci* as binding circuit precedent); *U.S. v. Zarrab*, 2016 WL 6820737, at \*4 (S.D.N.Y. Oct. 17, 2016) (same); *Doe v. Nestle*, 906 F.3d 1120, 1126 (9th Cir. 2018) (same).

   [10] The plaintiffs here are U.S. citizens and so unable to assert ATS claims. But since the instant plaintiffs assert ATA aiding and abetting claims arising from the same set of facts, the Second Circuit's

Court's subject matter jurisdiction should be not merely threadbare and conclusory, but rather should be 'affirmatively and plausibly' pled." *Schwartz v. HSBC Bank*, 2017 WL 2634180, at *3 (S.D.N.Y. June 19, 2017), *aff'd*, 750 F. App'x 34 (2d Cir. 2018) (quoting *Amidax Trading* v. *S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011)); *Wood v. Maguire Auto., LLC*, 508 F. App'x 65, 65-66 (2d Cir. 2013) (affirming dismissal for lack of subject matter jurisdiction where plaintiff's allegation in support of subject-matter jurisdiction "is conclusory and not entitled to a presumption of truth") (citing *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)); *Fleming v. Laakso*, 2019 WL 959521, at *6 (S.D.N.Y. Feb. 5, 2019) ("a plaintiff's jurisdictional allegations, like her substantive allegations, must be plausible rather than 'conclusory.'").

Moreover, the Second Circuit has expressly held that a court cannot determine that a plaintiff states a claim under the ATS for the purpose of subject-matter jurisdiction – *i.e.*, the very determination that the Second Circuit made in this case – unless the relevant allegations are

---

ATS ruling created res judicata in favor of the instant plaintiffs. At a minimum, the instant plaintiffs were in privity with the ATS plaintiffs for purposes of res judicata. Alternatively, even if res judicata did not apply because the instant plaintiffs did not have ATS claims, LCB is collaterally estopped by the Second Circuit's holdings regarding ATS aiding and abetting, because the issues determined were "fully litigated," LCB "had a full and fair opportunity" to litigate them, and the Second Circuit's holdings were necessary to its ultimate finding that the *sole* ground to dismiss the ATS case was LCB's corporate status. *See Licci*, 2015 WL 13649462, at *2 (discussing elements of collateral estoppel). *See also e.g. U.S. v. Walker*, 239 F. Supp. 3d 738 (S.D.N.Y. 2017) (discussing "rule of practical finality" for collateral estoppel) In any event, regardless of preclusion rules, the Second Circuit's holdings are binding precedent as discussed *supra*.

     Indeed, the Second Circuit's ATS decision here would be binding even if it were technically dictum (which it is not). "[I]n some contexts expressions of views by an appellate court must be regarded as the law of the circuit, even though not an announcement of a holding or even of a necessary step in the reasoning leading to a holding." *U.S. v. Oshatz*, 912 F.2d 534, 540 (2d Cir. 1990). *See also Cornwell v. Credit Suisse*, 729 F. Supp. 2d 620, 625-626 (S.D.N.Y. 2010) (decision by a higher court which "reached beyond the four corners of the case before it and went out of its way" to reject reasoning of the court below is binding, even if technically dicta); *Patsy's Italian Rest. v. Banas*, 508 F. Supp. 2d 194, 209-210 (E.D.N.Y. 2007) (statements in Second Circuit decision affirming with modifications an order of the district court, were effectively binding since they were the "carefully considered" opinion of the Second Circuit, the opinion was recent, "and the suit involved parties nearly identical to those in the instant proceeding.").

"plausible" under the *Iqbal* test. *See Mastafa v. Chevron Corp.*, 770 F.3d 170, 186 (2d Cir. 2014) ("the pleaded conduct must be 'plausible', and allow the court 'to infer more than the mere possibility of misconduct', *Iqbal*, 556 U.S. at 679.") (brackets omitted).

Therefore, the Second Circuit's holding that the plaintiffs stated a claim for ATS aiding and abetting, necessarily means that they also satisfy the *Iqbal* standard for Rule 12(b)(6).

*** 

In sum, the Second Circuit has already established that the substantive merits allegations underlying plaintiffs' ATA claims are "plausible" and "nonconclusory." LCB's arguments to the contrary are therefore precluded. Specifically, as discussed below in Parts C and D, LCB's challenge to the sufficiency of plaintiffs' secondary liability claims is *entirely* precluded, and its challenge to the sufficiency of plaintiffs' primary liability claims is *mostly* precluded.[11]

## C.    The SAC States a Claim for Secondary Liability

### 1.    *The SAC Alleges That LCB Aided, Abetted and Conspired With "the person who committed" the Rocket Attacks*

---

[11] LCB's motion points to statements this Court made in its earlier decisions in this case regarding the 2009 FAC, which decisions LCB asserts are "*a fortiori* precedent" in support of its motion to dismiss the ATA claims asserted in the 2018 SAC. DE 106 at 1-2; 8-9. But LCB fails to mention that all of the Court's statements which it now claims are "*a fortiori* precedent" for dismissing plaintiffs' ATA claims, related solely to the viability of plaintiffs' *negligence* claim against Amex Bank and to the ATS claim against LCB. *See* DE 106 at 1-2; 8-9, 17 (citing *Licci*, 704 F. Supp. 2d at 410 and *Licci*, 2015 WL 13649462, at *4). Needless to say, the elements of liability under ATA § 2333 bear no resemblance whatsoever to those of common-law negligence. And this Court's holding regarding the ATS claim, which LCB now points to as "*a fortiori* precedent," was reversed on appeal.

LCB also repeatedly directs the Court to Judge Wood's 2011 decision in plaintiffs' action against Al Jazeera, ignoring both the utter dissimilarity between Al Jazeera' conduct and LCB's conduct, and the fact that the Al Jazeera decision long preceded the enactment of JASTA and numerous appellate and district court decisions parsing the ATA. LCB also fails to note that that decision was dismissed without prejudice, and that the action itself was also subsequently dismissed without prejudice. *See Kaplan v. Jazeera*, 2011 WL 2314783, at *9 (S.D.N.Y. June 7, 2011); *Kaplan v. Jazeera*, No. 10-cv-5298 (S.D.N.Y.) at DE 42.

LCB argues, as a "threshold" challenge to secondary liability, that the SAC fails to allege that LCB aided, abetted or conspired with "the person who committed" the acts of international terrorism from which plaintiffs' injuries arise, as required by ATA § 2333(d)(2). DE 106 at 20. Though not entirely clear, LCB's argument here appears to be that Hezbollah is "the person who committed" the acts of international terrorism, because it fired the rockets, whereas LCB's "customers" did not include Hezbollah by name.[12] LCB further argues that its nominal customers – *i.e.*, Shahid, Bayt al Mal, Yousser, al-Shami and Sbeity – were not U.S.-designated FTOs or aliases of Hezbollah at the relevant time or at all. *Id*. at n.26.

This argument fails for two reasons. ***First***, plaintiffs have plausibly alleged – echoing multiple statements of the U.S. government and other highly authoritative sources – that Shahid, Bayt al Mal and Yousser are integral *parts* of Hizbollah *itself*. *See* SAC at ¶ 20 (Hizbollah is a "composite organization, which is composed of various subordinate entities which were created, and are entirely controlled, by Hizbollah … to carry out specific tasks or categories of tasks. These

---

[12] LCB coyly refrains from identifying Hezbollah as the "person" who fired the rockets, within the meaning of ATA § 2333(d)(2). If LCB plans to argue that "the person who committed" the act of international terrorism in § 2333(d)(2) includes only the individual terrorists who fired the rockets, such an argument is foreclosed by § 2333(d)(1), which incorporates by reference the definition of "person" contained in U.S.C. § 1. That provision (1 U.S.C. § 1) in turn broadly defines "person" to include "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals." 1 U.S.C. § 1. Thus, the definition of "person" applicable here includes both natural persons *and* organizational entities and associations – whether incorporated or not. *See Jund v. Town of Hempstead*, 941 F.2d 1271, 1284 (2d Cir. 1991) (1 U.S.C. § 1 includes unincorporated associations).

Therefore, "the person who committed" the act of international terrorism within the meaning of § 2333(d)(2) plainly includes *both* the FTO itself (in this case, Hezbollah), *and* the individual terrorist operatives who were involved in the attack. "Congress intended a broader definition of 'person' beyond just the specific individual representative of the Foreign Terrorist Organization who, for instance, actually planted the EFP that injured or killed a plaintiff." *Freeman v. HSBC Holdings PLC*, 2018 WL 3616845, at 17 (E.D.N.Y. July 27, 2018); *Miller v. Arab Bank, PLC*, 2019 WL 1115027, at *8-9 (E.D.N.Y. Mar. 11, 2019) ("the 'person' who committed such an act of international terrorism may include individuals but may also include associations, societies, and other entities … a defendant may be liable under the ATA for aiding the organization behind the attacks, not only the individual 'triggerman' or suicide bomber. That is precisely why Congress broadly defined 'person' under the ATA to include entities, as well as individuals.").

subordinate entities are integral, constituent parts of Hizbollah itself … As a Congressional Research Service Report accurately explained, 'Lebanon's Hezbollah ('Party of God') is a Shiite Islamist militia, political party, social welfare organization, and U.S. State Department-designated terrorist organization … Hezbollah has a unified leadership structure that oversees the organization's complementary, partially compartmentalized elements.'"); at ¶¶ 21-22 (Shahid provides financial and other support "to Hizbollah terrorists wounded in action, and to the families of Hizbollah terrorists killed in action" and is "[o]ne of Hizbollah's most important subordinate entities, which was created by and is and at all times was wholly controlled by Hizbollah … Shahid is part of Hizbollah's Social Service Section, which a senior U.S. military analyst has correctly characterized as the 'most important branch of the Hezbollah organization… The Social Service Section serves as an equal arm within the organization.'"); and at ¶¶ 23-24 (identifying Bayt al Mal and Yousser as "wholly-controlled subordinate entities within Hizbollah" and quoting U.S. Treasury findings that "Bayt al-Mal and the Yousser Company function as Hizballah's unofficial treasury, holding and investing its assets" and that "Bayt al-Mal is a Hizballah-controlled organization that performs financial services for the terrorist organization. … As Hizballah's main financial body, Bayt al-Mal serves as a bank, creditor, and investment arm for Hizballah.")

Thus, the FTO known as Hizbollah includes, as part of the Hizbollah organization, the subordinate constituent entities known as Shahid, Bayt al Mal and Yousser; accordingly, by aiding, abetting and conspiring with Shahid, Bayt al Mal and Yousser, which are part of FTO Hizbollah, defendant LCB *per se* aided, abetted and conspired with Hizbollah.

*Second*, it is long and well established that entities which are affiliated with an FTO are considered legally inseparable parts of the FTO for purposes of the Anti-Terrorism and Effective Death Penalty Act (AEDPA) and ATA, even though such entities were never designated by the

United States. Thus, in *Nat'l Council of Resistance of Iran v. Dep't of State*, 373 F.3d 152 (D.C. Cir. 2004), the D.C. Circuit found that "it is silly to suppose that Congress empowered the Secretary to designate a terrorist organization only for such periods of time as it took such organization to give itself a new name, and then let it happily resume the same status it would have enjoyed had it never been designated" and that such a "crabbed view of alias status" "is at war not only with the antiterrorism objective of AEDPA, but common sense as well." *Id*. at 157-158.

Courts in this Circuit have consistently applied *Nat'l Council of Resistance* to hold that liability may be imposed under ATA §§ 2333(a) and 2339B where the defendant provided material support to an affiliate of an FTO. *See Strauss v. Credit Lyonnais*, 925 F. Supp. 2d 414, 434 (E.D.N.Y. 2013) ("The court … finds unconvincing [bank] Defendant's argument that its alleged support for Hamas was indirect because the money went through [various charities]. A jury could find that *Defendant sent the money to organizations that were controlled by Hamas, which is no different from sending the money directly to Hamas for purposes of the ATA*.") (emphasis added); *Goldberg v. UBS*, 660 F. Supp. 2d 410, 432-433 (E.D.N.Y. 2009) ("liability may be found under § 2339B even where support wasn't provided directly to an FTO. Such a circumstance may be found where an entity provides support to an alias or agent of an FTO" or "where an entity provides money or support to an organization knowing that the ultimate beneficiary is the FTO."); *Gill v. Arab Bank*, 893 F. Supp. 2d 542, 555 (E.D.N.Y. 2012) ("liability may attach under § 2339B when a defendant provides material support to the alter ego or alias of a designated FTO."); *Strauss v. Credit Lyonnais*, 2006 WL 2862704, at \*10 (E.D.N.Y. Oct. 5, 2006) (same).

The Second Circuit has endorsed these precedents, holding that "a defendant may be liable for civil remedies under § 2333(a) for providing material support to an organization that solicits funds for an FTO." *Weiss v. Nat'l Westminster Bank*, 768 F.3d 202, 209 (2d Cir. 2014).

And in *Freeman v. HSBC Holdings PLC*, 2018 WL 3616845, (E.D.N.Y. July 27, 2018), these holdings were applied to ATA § 2333(d)(2):

> This Court agrees with the reasoning of the court in *National Council of Resistance of Iran* and finds that it would be "silly" to enable an FTO to escape liability simply by creating a new front organization to fundraise or engage in financial transactions on its behalf … Thus, the Court finds that not only would FTO Hezbollah … fall within the definition of a "person who committed an act of terrorism," but ***a Hezbollah-affiliated entity would also fall within the definition*** of persons or entities that Congress was concerned with in enacting JASTA.

*Freeman*, 2018 WL 3616845, at *17 (emphasis added) (citing also *Goldberg* and *Gill*).

As discussed *supra*, plaintiffs have plausibly alleged, based on unimpeachable sources, that Shahid, Bayt al Mal and Yousser are controlled by Hizbollah and serve as Hizbollah's central financial arms. SAC at ¶¶ 20-24. These facts (which LCB does not and cannot dispute) place this case on all fours with the precedents above. *Strauss*, 925 F. Supp. 2d at 434 (bank's transfer of funds to charities "controlled by Hamas" was " no different from sending the money directly to Hamas for purposes of the ATA."); *Weiss*, 768 F.3d at 209 (bank which provided services to Welsh charity which "solicit[ed] funds or other things of value" for Hamas could be held liable for provision of material support to FTO Hamas); *Goldberg*, 660 F. Supp. at 432-433 (Plaintiffs "sufficiently pled that UBS knowingly provided financial support to a FTO, Hamas," because it provided services to two charities which raised funds for Hamas); *Strauss*, 2006 WL 2862704, at *11 (bank's provision of services to support to Hamas-affiliated charitable organizations which "collect and distribute their funds on behalf of HAMAS by paying expenses for and assisting with the provision of housing subsidies to the families of suicide bombers recruited by HAMAS" constituted provision of material support to FTO Hamas); *Freeman*, at *9 (banks can be held liable

for providing services to "organizations that solicit funds or provide other forms of assistance and support, such as funds or transfer of funds, on behalf of a designated FTO.").[13]

Thus, LCB's "threshold" challenge to secondary liability fails.

### 2.   *The SAC States a Claim for Aiding and Abetting*

Section 2333(d) of the ATA provides that for "an injury arising from an act of international terrorism committed, planned, or authorized" by an FTO, liability will be imposed on "any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism." 18 U.S.C. § 2333(d). As discussed *supra*, the "person" who committed such an act of international terrorism may include both the FTO and its affiliates, and natural persons.

In enacting ATA § 2333(d), Congress "instructed that the 'proper legal framework for how aiding and abetting liability should function' under the ATA is that identified in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983)." *Linde v. Arab Bank, PLC*, 882 F.3d 314, 329 (2d Cir. 2018) (citing 18 U.S.C. § 2333 Statutory Note (Findings and Purpose § 5)) (brackets omitted).

Aiding and abetting liability under ATA § 2333(d) requires that: "(1) the party whom the defendant aids must perform a wrongful act that causes an injury, (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he

---

[13] LCBs' provision of services to Hizbollah leaders al-Shami and Sbeity, whose names were also on some of Bayt al-Mal's accounts (SAC at ¶ 38) also constituted provision of material support to, and aiding, abetting and conspiring with, FTO Hizbollah. *See Miller*, 2019 WL 1115027, at *1, *5 (allegation that bank provided services to Hamas and Hamas leaders stated claim under the ATA); *Linde v. Arab Bank*, 97 F. Supp. 3d 287, 328 (E.D.N.Y. 2015), *vacated on other grounds*, 882 F.3d 314 (2d Cir. 2018) (bank liable under the ATA for transferring funds to accounts held by Hamas leaders); *U.S. v. Jama*, 217 F. Supp. 3d 882, 892 (E.D. Va. 2016) (provision of material support to an individual is material support to an FTO if the individual "is engaged in significant activity on behalf of an FTO relative to that FTO's goals and objectives"), *aff'd* 896 F.3d 295 (4th Cir. 2018).

provides the assistance, and (3) the defendant must knowingly and substantially assist the principal violation." *Linde*, 882 F.3d at 329 (quoting *Halberstam*) (internal quotation marks omitted).

A plaintiff does not have to prove the defendant "knew of the specific attacks at issue when it provided financial services for" organizations like Hizbollah to prove the defendant's general awareness, nor is it necessary to prove "defendant's intent to participate in a criminal scheme as something that he wishes to bring about and seek by his action to make it succeed." Rather, to be liable a defendant need only be "generally aware that it was thereby playing a role in [the FTO's] violent or life-endangering activities." *Id.* (internal quotation marks omitted).

Following *Halberstam*, the Second Circuit identified six factors relevant to determining "how much encouragement or assistance is substantial enough" to satisfy the third element, namely: "(1) the nature of the act encouraged, (2) the amount of assistance given by defendant, (3) defendant's presence or absence at the time of the tort, (4) defendant's relation to the principal, (5) defendant's state of mind, and (6) the period of defendant's assistance." *Id.*

LCB argues that the SAC's aiding and abetting claims fail for "three reasons." DE 106 at 24.[14] LCB's first "reason" is that LCB's "Five Customers" – *i.e.* Shahid, Bayt al Mal, Yousser, al-Shami and Sbeity – "are not plausibly alleged to be the principals who committed an act of 'international terrorism' that injured Plaintiffs." As discussed above however, Shahid, Bayt al Mal, Yousser, al-Shami and Sbeity are indistinguishable from Hizbollah for purposes of the ATA. LCB's third "reason" for dismissing the aiding and abetting claims is that "Plaintiffs are judicially estopped" by their judgment against Iran and North Korea. But, as shown above, plaintiffs are not.

---

[14] Actually, LCB asserts that the claims fail "for at least three reasons," but enumerates only three reasons. DE 106 at 24. Needless to say, LCB was duty-bound to assert any and all purported "reasons" in its opening papers, and cannot, and should not be permitted to, adduce any further "reasons" in its reply brief.

Thus, LCB's sole challenge to the aiding and abetting claim is its second "reason," namely:

> (2) the SAC fails to provide factual matter to support a reasonable inference that by providing financial services to the Five Customers, LCB (a) "knowingly and substantially assisted" the person who committed an act of "international terrorism" that injured Plaintiffs, or (b) "was 'generally aware' that it was thereby playing a 'role' in [Hezbollah's] violent or life-endangering activities;"

DE 106 at 24.[15]

As a threshold matter, this last remaining argument is precluded by the Second Circuit's rulings, discussed above, which found that plaintiffs had made a sufficient showing that LCB *purposely* and *intentionally* assisted Hizbollah to carry out terrorist attacks against civilians in Israel as a matter of policy, and that the assistance provided by LCB "substantially" assisted and enabled Hizbollah to carry out the attacks here. *See Licci*, 732 F.3d at 169-173; *Licci*, 834 F.3d at 215-219. Indeed, unlike ATA aiding and abetting, ATS aiding and abetting requires "purpose rather than knowledge alone." *Licci*, 834 F.3d at 217 (citation omitted). Thus, the Second Circuit's holding regarding ATS aiding and abetting applies to plaintiffs' ATA claims *a fortiori*.

Moreover, even assuming *arguendo* that it was not precluded, LCB's argument here is soundly refuted by a perusal of the actual allegations of the SAC:

- LCB knew that Hizbollah is a violent, dangerous and deadly terrorist organization – SAC at ¶¶ 5-19.
- Shahid, Bayt al Mal and Yousser are integral constituent parts of Hizbollah, and al-Shami and Sbeity are Hizbollah leaders – SAC at ¶¶ 20-24.
- LCB knew that Shahid, Bayt al Mal and Yousser are integral constituent parts of Hizbollah, and that al-Shami and Sbeity are Hizbollah leaders – SAC at ¶¶ 76-86.

---

[15] LCB asserts (DE 106 at 23) that under *Halberstam* the conduct must have a "major part in prompting the tort" or be "integral" to the tort. Not so. The language from *Halberstam* quoted by LCB is from other cases referenced in *Halberstam*, and was *not* adopted by *Halberstam* as a standard.

- Shahid's full name means "Martyr Foundation" in Arabic, and its role within Hizbollah is to *provide funding and other material support to injured terrorists and the families of terrorists* who were killed, in order to "provide peace of mind to current and prospective" terrorists, and LCB was well aware of these facts – SAC at ¶¶ 21-22, 79.[16]

- Hizbollah needed banking services to plan, prepare for and carry out terrorist attacks, and provision of such services to Hizbollah enabled and caused such terrorist attacks – SAC at ¶¶ 25-31 and ¶¶ 62-75.

- LCB knew that Hizbollah needed banking services to plan, prepare for and carry out terrorist attacks, and that providing Hizbollah such services would enable and cause such terrorist attacks – SAC at ¶¶ 25-31 and ¶¶ 72-75.

- LCB provided extensive banking services to Hizbollah for *many years*, including transfers and deposits totaling *many millions of dollars*, through accounts nominally titled to Shahid, Bayt al Mal, Yousser, al-Shami and Sbeity – SAC at ¶¶ 32-45.

- LCB also assisted Hizbollah to *evade reporting requirements* on its banking activities – SAC at ¶ 82.[17]

- LCB was involved in transferring funds, and concealing and disguising the true facts regarding those funds, as part of a scheme to benefit Hizbollah. VAC at ¶ 50.

- LCB dismissed a 2002 UN report about its relationship with Hizbollah as "propaganda" from "the Jewish state," and in response *increased* Hizbollah's credit limits. SAC at ¶ 97 (citing the VAC).

- Even *after* Yousser was designated by the U.S Treasury as a Specially Designated Global Terrorist, because of its role as "Hizballah's unofficial treasury," LCB continued to maintain a banking relationship with Yousser. *Id*.

- Between 2007 and 2011 LCB knowingly assisted Hizbollah to launder hundreds of millions of dollars through a complex international scheme. *Id*.[18]

---

[16] LCB's relationship with Shahid is especially salient. As discussed at SAC ¶¶ 21-22, Shahid's role in Hizbollah is to fund a "terrorist insurance scheme," which makes it identical in all relevant aspects to the "terrorist insurance scheme" which gave rise to liability in the ATA litigation in the EDNY against the Arab Bank. *See e.g. Miller*, 2019 WL 1115027 at *2, 7-9 (holding that bank's administration of "terrorist insurance scheme" gives rise to primary and secondary ATA liability); *Linde v. Arab Bank*, 706 F.3d 92, 97 (2d Cir. 2013) (discussing "death and dismemberment benefit plan" serving same role as Shahid).

[17] Notably, "[t]he provision of banking services, 'in an unusual way under unusual circumstances for a long period of time' supports the inference that the defendant provided knowing assistance." *Miller*, 2019 WL 1115027, at *9 (quoting *Halberstam*, 705 F.2d at 487).

[18] LCB's post-2006 conduct is of course relevant to proving its state of mind prior to 2006. *See e.g. U.S. v. Germosen*, 139 F.3d 120, 127 (2d Cir. 1998) (finding "'Subsequent act' evidence may be admitted under

- LCB ultimately "martyred" itself on behalf of Hizbollah – it was forced to cease operations and shut down, due to its activities on behalf of Hizbollah. This clearly demonstrates LCB's dedication to Hizbollah and its terroristic goals. SAC at ¶ 98.

All of these allegations are highly detailed, specific and fully plausible; indeed, many of them rest on statements by the U.S. government, including the information contained in the VAC, and testimony and statements made by respected terrorism experts. These allegations easily state a claim that LCB "knowingly and substantially assisted" Hizbollah and "was 'generally aware' that it was thereby playing a 'role' in [Hezbollah's] violent or life-endangering activities."

Additionally, Shahid's specific role of supporting Hizbollah *terrorists* – as opposed to some other element of Hizbollah's activities – is particularly relevant here. Because Shahid is a constituent part of Hizbollah involved particularly in assisting terrorists, this is not a case where the defendant can claim to have been supporting an FTO *generally*, but not its terror activities. Shahid's role was not a secret: on the contrary, the fact that Shahid's raison d'être was to assist Hizbollah terrorists was widely and repeatedly publicized for many years prior to 2006, including even in public service announcements on Hizbollah's TV station in Lebanon! SAC at ¶ 79.[19] Therefore, similar to Arab Bank, LCB knew full well that it was "playing a 'role' in [Hezbollah's] violent or life-endangering activities," inter alia by providing banking services in support of a program providing financial support for killed and injured terrorists. "Arab Bank … contends that, since the terrorist organizations it provided financial services to were also engaged in humanitarian activities, Arab Bank was not generally aware it was playing a role in their terrorist activities.

---

Rule 404(b)" to show intent of conduct during charged conspiracy.); *U.S. v. Rutkoske,* 506 F.3d 170, 174, 178 (2d Cir. 2007); *Ismail v. Cohen,* 899 F.2d 183, 185, 188-89 (2d Cir. 1990).

[19] Thus, LCB cannot rely on the decisions such as *Weiss v. National Westminster Bank*, 2019 WL 1441118, at *11 (E.D.N.Y. Mar. 31, 2019), *O'Sullivan, v. Deutsche Bank*, 2019 WL 1409446, at *10 (S.D.N.Y. Mar. 28, 2019), or *Siegel v. HSBC Bank*, 2018 WL 3611967, at *4 (S.D.N.Y. July 27, 2018) where the plaintiffs failed to allege that the defendant banks had assisted the terrorism-related activities of the FTOs involved.

However, these 'humanitarian' activities involved providing payments to the families of terrorists through the Insurance Scheme that Arab Bank administered." *Miller*, 2019 WL 1115027 at *9.

Therefore, LCB's Rule 12(b)(6) challenge to plaintiffs' aiding and abetting claims is both precluded by the Second Circuit's previous holdings, and without merit.

### 3. *The SAC States a Claim for Conspiracy*

As its Second Claim for Relief, the SAC explicitly asserts a claim for conspiracy liability under the ATA, stating that LCB "engaged in an extensive, long-term ***criminal scheme*** with Hizbollah, pursuant to which LCB provided Hizbollah with wire transfer and other banking services to support Hizbollah's terrorist activities. Pursuant to and in furtherance of that ***common plan***, Hizbollah fired the rockets that harmed the plaintiffs." SAC at ¶ 115 (emphasis added).

LCB first argues that the phrases "criminal scheme" and "common plan" are insufficient, and in order to properly assert a claim for conspiracy plaintiffs were required to use the terms "agreed," "agreement," or "conspired." DE 106 at 21. This argument is plainly meritless. "Federal pleading does not require the incantation of magic words." *Mercer v. Jaffe, Snider, Raitt & Heuer, P.C.*, 713 F. Supp. 1019, 1033 (W.D. Mich. 1989). Rather, the real question is whether the factual allegations of the SAC sufficiently plead conspiracy.

LCB also argues that none of its five customers, *i.e.*, Shahid, Bayt al Mal, Yousser, al-Shami and Sbeity, was a designated terrorist organization or involved in terrorism. This is just a rehash of the argument that was already refuted in Part C.1 *supra*.

LCB's third and final challenge to plaintiffs' ATA conspiracy claim is that the SAC "provides no factual matter to support a reasonable inference that LCB and the Five Customers reached a 'meeting of the minds' to engage in "international terrorism,' or on any subject other than what may be inferred from a typical arms-length customer relationship." DE 106 at 22. This

argument fails, in the first place, because it is precluded by the findings contained in the Second Circuit's decisions in this case. As discussed above in the section on aiding and abetting liability, the Second Circuit expressly found that plaintiffs made a plausible, nonconclusory showing that LCB shared Hizbollah's terroristic goals as a matter of policy, and provided it with extensive banking services over a period of many years in order to help Hizbollah achieve those goals. That is precisely a "meeting of the minds to engage in international terrorism."

Likewise, preclusion aside, the allegations of the SAC, detailed above in the section on aiding and abetting liability, clearly show the same thing: *i.e.*, that LCB and Hizbollah consciously and cooperatively worked in tandem for years in order to advance Hizbollah's terrorist goals. And since the rocket attacks which harmed the plaintiffs were carried out by Hizbollah in furtherance of that common plan, LCB is liable for conspiracy under the ATA.[20]

LCB's Rule 12(b)(6) motion to dismiss plaintiffs' conspiracy claim is thus both precluded by the Second Circuit's previous holdings, and lacking any merit.

## D.   The SAC States a Claim for Primary Liability

LCB challenges plaintiffs' primary liability claims on a number of meritless bases. LCB first asserts that plaintiffs fail to sufficiently allege that LCB provided anything more than "routine" financial services to Hizbollah. DE 106 at 10. But as discussed above, the Second Circuit's findings and the highly detailed allegations of the SAC (and the VAC) show that LCB's services to Hizbollah were anything but "routine." In any event, "Whether financial services are

---

[20] There is a disagreement between *O'Sullivan*, 2019 WL 1409446 (S.D.N.Y. Mar. 28, 2019) and *Freeman*, 2018 WL 3616845 (E.D.N.Y. July 27, 2018), relating to the question of how to define the scope and goals of a conspiracy for the purpose of ATA liability. While plaintiffs believe that *Freeman*'s holding (*i.e.*, that co-conspirators are liable even if they do not share all the same goals) is correct, it is unnecessary to resolve this dispute here because plaintiffs meet even the stricter test followed in *O'Sullivan* (*i.e.*, that the common goal of the conspiracy must be *terrorist* activity, and not merely illegal activity).

'routine ... raises questions of fact for a jury to decide.'" *Miller*, 2019 WL 1115027, at *6 (quoting *Linde v. Arab Bank, PLC*, 882 F.3d 314, 327 (2d Cir. 2018)).

LCB next argues that primary liability under the ATA can be imposed only on the entity that actually carried out the terrorist attack, and not on a defendant that assisted the entity that carried out the attack. DE 106 at 11. This argument is foreclosed by the Second Circuit's decision in *Linde*, 882 F.3d 314, which expressly recognized that ATA primary liability can be imposed on a bank which provided financial services to a terrorist group which carried out an attack.

LCB then asserts that plaintiffs failed to adequately allege *any* of the four elements of primary liability under the ATA. DE 106 at 11-12. But LCB does not actually dispute that two of those elements were adequately pled: (1) that the conduct at issue occurred primarily outside the U.S., or transcended national boundaries, and (2) that the conduct at issue (knowingly providing material support to FTO Hizbollah, a crime *inter alia* under 18 U.S.C.  § 2339B) violated U.S. criminal law, or would violate U.S. criminal law if carried out in the United States.

Rather, LCB challenges only the sufficiency of the allegations relating to the two other ATA elements, *i.e.*, apparent intent and dangerousness. The ATA's "apparent intent" requirement is measured objectively. *Weiss v. Nat'l Westminster Bank*, 768 F.3d 202, 207, n. 6 (2d Cir. 2014). Here, as discussed *supra*, the Second Circuit found, and the SAC sufficiently alleges, that LCB had *actual*, subjective intent to support Hizbollah's terrorism against Israel and civilians in Israel. The ATA's "apparent intent" requirement is therefore clearly satisfied.

As for "dangerousness," in *Linde* the Second Circuit found that "providing routine financial services to members and associates of terrorist organizations" is not inevitably, as a matter of law, dangerous to human life. *Linde*, 882 F.3d 314, 327. On the other hand, *Linde* did not hold that such conduct is *not* be dangerous to human life. Moreover, as discussed *supra*, LCB's provision of

-24-

services to Hizbollah was anything but "routine." LCB moved tens of millions of dollars for Hizbollah over a period of many years, and significantly enhanced Hizbollah's ability to carry out terrorist attacks – LCB thereby endangered human life.

Furthermore, LCB provided services to Shahid, which as discussed above was directly and specifically involved in funding Hizbollah's *terrorist* activities. The "dangerousness" element of the ATA is therefore satisfied here. *See Miller*, 2019 WL 1115027, at *7 (finding that the Arab Bank's provision of services to a program to financially support injured or killed terrorists, analogous to Shahid's assistance program, satisfied the ATA's "dangerousness" requirement).

Finally, LCB argues that plaintiffs have failed to sufficiently allege "direct," "but-for" or proximate causation. DE 106 at 15-18. LCB badly misstates governing law. It cites *Fields v. Twitter*, 881 F.3d 739 (9th Cir. 2018) which created a "direct-relationship" causation standard in ATA cases. But *Fields* rejected the "substantial factor" causation standard established by the Second Circuit in *Rothstein v UBS*, 708 F.3d 82 (2d Cir. 2013), in favor of its own "higher" standard. *Id*. at 744. In this Circuit, *Rothstein* controls.

LCB also attempts to analogize this case to *Rothstein*, *Owens v. BNP Paribas*, 897 F.3d 266 (D.C. Cir. 2018) and other cases involving defendants which provided material support to foreign states and other independent third-parties, which in turn were alleged to have provided material support to terrorist groups.[21] But those indirect support cases are simply inapposite on the facts here: LCB did not provide services to Iran, or some other independent actor, which in turn funded Hizbollah. Rather, LCB provided material support directly to FTO Hizbollah through its wholly-controlled constituent Hizbollah entities and Hizbollah leaders.

---

[21] The recent decision in *O'Sullivan*, 2019 WL 1409446 (S.D.N.Y. Mar. 28, 2019) is also an indirect support case, and so factually irrelevant to this action.

LCB's claim that "but-for" causation is required for primary ATA liability is wrong. In this Circuit but-for causation is not required. *Miller*, 2019 WL 1115027, at *7-8 (collecting cases).

Plaintiffs were required only to make plausible allegations that LCB's "conduct was a proximate cause of [their] harm, *i.e.* the conduct was a 'substantial factor in the sequence of responsible causation and whose injury was reasonably foreseeable or anticipated as a natural consequence.'" *Miller*, 2019 WL 1115027, at *7 (quoting *Rothstein*, 708 F.3d at 92). Plaintiffs' detailed allegations that LCB moved tens of millions of dollars for Hizbollah which significantly enhanced its ability to carry out the rocket attacks, and that LCB not only foresaw but intended this result, easily meet this standard. *Cf. Miller*, 2019 WL 1115027, at *8 (finding proximate causation on the basis of similar facts).

## CONCLUSION

For the reasons stated herein, LCB's motion to dismiss should be denied in its entirety, and this matter should proceed to discovery and trial.


Dated:   Brooklyn, New York
         April 4, 2019

Respectfully submitted,

THE BERKMAN LAW OFFICE, LLC
*Attorneys for the Plaintiffs*


by: _____
    Robert J. Tolchin

111 Livingston Street, Suite 1928
Brooklyn, New York 11201
718-855-3627