**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: SEP 2 0 2019

CHAIM KAPLAN, RIVKA KAPLAN, BRIAN
ERDSTEIN, KARENE ERDSTEIN, MA'AYAN
ERDSTEIN, CHAYIM KUMER, NECHAMA KUMER,
LAURIE RAPPEPPORT, MARGALIT RAPPEPORT,
THEODORE (TED) GREENBERG, MOREEN
GREENBERG, JARED SAUTER, DVORA CHANA
KASZEMACHER, CHAYA KASZEMACHER
ALKAREIF, AVISHAI REUVANE, ELISHEVA
ARON, YAIR MOR, and MIKIMI STEINBERG,

               Plaintiffs,

    -against-

LEBANESE CANADIAN BANK, SAL,

               Defendant.

: : : : : : : : : : : : : : : : : :

MEMORANDUM DECISION
AND ORDER

08 Civ. 7253 (GBD)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

GEORGE B. DANIELS, United States District Judge:

Plaintiffs, American citizens who were injured by rocket attacks perpetrated by the terrorist

organization Hizbollah in Israel during July and August 2006, bring this action under the Anti-

Terrorism Act, 18 U.S.C. § 2333 (the "ATA"), as amended by the Justice Against State Sponsors

of Terrorism Act, Pub. L. 114-222, 130 Stat. 852 (2016) ("JASTA"). (Second Am. Compl.

("SAC"), ECF No. 99.) Plaintiffs allege that Defendant Lebanese Canadian Bank, SAL (the

"Defendant" or "LCB") facilitated these attacks by providing banking services to Hizbollah

through Hizbollah's affiliates. (*See id.* ¶ 3.) Defendant moves to dismiss Plaintiffs' complaint

for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). (Notice of Mot.

to Dismiss Second Am. Compl., ECF No. 105.) Defendant's motion to dismiss is GRANTED.

## I. FACTUAL BACKGROUND

This action arises out of a series of rocket attacks carried out by Hizbollah in Israel between

July 12 and August 14, 2006. (SAC ¶ 4.) Plaintiffs are eighteen American citizens who suffered

injuries as a result of those attacks, including physical, psychological, and emotional injuries, property damage, and lost income. (*Id.* ¶¶ 51–61.) Defendant is a now-defunct Lebanese bank[1] that Plaintiffs allege "intentionally and/or recklessly provided [to Hizbollah] extensive banking services" that "caused, enabled and facilitated" the attacks at issue. (*Id.* ¶¶ 5–6.)

Plaintiffs allege that between at least 2004 through July 2006, Defendant maintained bank accounts (the "LCB Accounts") for Hizbollah under the names of two Hizbollah leaders and three "subordinate entities" created and wholly controlled by Hizbollah (the "Five Customers"). (*Id.* ¶¶ 21, 23, 37–39.) These leaders include Husayn al-Shami and Wahid Mahmoud Sbeity, and these "subordinate entities" include the Shahid (Martyrs) Foundation ("Shahid"), which allegedly provides "financial and other material support to Hizbollah terrorists wounded in action, and to the families of Hizbollah terrorists killed in action"; Bayt al-Mal, which allegedly functions as Hizbollah's "main financial body"; and the Yousser Company for Finance and Investment ("Yousser"), which, together with Bayt al-Mal, allegedly functions as Hizbollah's "unofficial treasury." (*Id.* ¶¶ 21–24.) Plaintiffs allege that at "all times," all of the LCB Accounts and funds therein "belonged to" and "were under the control of" Hizbollah, and that all transactions carried out in the LCB Accounts were "carried out by" and "at the direction of" Hizbollah. (*Id.* ¶¶ 41–44.) Plaintiffs further allege that between 2004 and July 2006, Hizbollah made and received wire transfers totaling millions of dollars through the LCB Accounts. (*Id.* ¶¶ 45–46.)

According to Plaintiffs, Hizbollah conducted wire transfers through the LCB Accounts "in order to transfer and receive funds necessary for planning, preparing and carrying out Hizbollah's terrorist activity," including the rocket attacks that injured Plaintiffs. (*Id.* ¶ 64.) Plaintiffs allege

---

[1] According to Defendant, it operated as a financial institution from 1988 to 2011. (Mem. of Law in Supp. of Def.'s Mot. to Dismiss Pls.' Second Am. Compl. Pursuant to Fed. R. Civ. P. 12(b)(6) ("Def.'s Mem."), ECF No. 106, at 4.)

that Hizbollah perpetrated the attacks using funds received through the wire transfers, and that these funds were sufficient to carry out the attacks. (*Id.* ¶¶ 68–69.) Plaintiffs further allege that but for Defendant's provision of wire transfer and other banking services to Hizbollah, Hizbollah's ability to carry out the attacks would have been "severely crippled and limited." (*Id.* ¶ 66.)

In their complaint, Plaintiffs allege that Defendant knew or should have known that providing such banking services would result in Plaintiffs' injuries. In particular, they allege that Defendant knew that Shahid, Bayt-al-Mal, and Yousser were "integral constituent parts of Hizbollah," that the LCB Accounts and funds therein were owned and controlled by Hizbollah, and that the wire transfers were conducted by and at the direction of Hizbollah. (*Id.* ¶ 76.) Plaintiffs allege that Defendant had such knowledge because Hizbollah's affiliation with Shahid, Bayt-al-Mal, and Yousser was "notorious public knowledge," as evidenced by various news articles, reports, and Hizbollah's own media sources. (*Id.* ¶¶ 77–79.) According to Plaintiffs, if Defendant did not have such actual knowledge, then Defendant should have known because it had a duty to perform due diligence on its customers, monitor and report suspicious or illegal banking activities, and not provide banking services to terrorist organizations. (*Id.* ¶¶ 84–87.)

Finally, Plaintiffs allege that Defendant provided the wire transfer and other banking services to Hizbollah "as a matter of official LCB policy and practice" in order, among other things, "to assist and advance Hizbollah's terrorist activities against Jews in Israel." (*Id.* ¶ 96.)

3

## II. PROCEDURAL HISTORY

Plaintiffs commenced this action on July 11, 2008. (Compl., ECF No. 1-2.) On January 22, 2009, Plaintiffs filed an amended complaint asserting claims against Defendant under the ATA, the Alien Tort Statute (the "ATS"), and Israeli law. (First Am. Compl., ECF No. 23.)

Subsequently, on April 17, 2009, Defendant moved to dismiss all claims against it for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2) and for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). (Notice of Mot., ECF No. 34.) This Court granted Defendant's motion to dismiss on March 31, 2010, finding that Defendant's maintenance and use of a New York correspondent bank account to provide the wire transfer services at issue were too attenuated from the rocket attacks to assert personal jurisdiction. *Licci v. Am. Exp. Bank Ltd.*, 704 F. Supp. 2d 403, 408 (S.D.N.Y. 2010), *aff'd in part sub nom. Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 672 F.3d 155 (2d Cir. 2012), *and vacated in part sub nom. Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161 (2d Cir. 2013) ("*Licci I*"). This Court declined to rule, however, on Defendant's alternative grounds for seeking dismissal under Rule 12(b)(6). On appeal, the Court of Appeals for the Second Circuit vacated the dismissal of Plaintiffs' claims against Defendant and remanded for further proceedings. *Licci I*, 732 F.3d at 165.

Following remand, this Court issued a second decision on April 14, 2015, again dismissing Plaintiffs' ATA, ATS, and Israeli law claims against Defendant. *Licci by Licci v. Lebanese Canadian Bank, SAL*, No. 08 CIV. 7253 (GBD), 2015 WL 13649462, at \*3 (S.D.N.Y. Apr. 14, 2015) ("*Licci II*"), *aff'd on other grounds*, 834 F.3d 201 (2d Cir. 2016) ("*Licci III*"), *and aff'd in part sub nom. Licci v. Lebanese Canadian Bank, SAL*, 659 F. App'x 13 (2d Cir. 2016), *and order vacated in part sub nom. Licci v. Lebanese Canadian Bank, SAL*, No. 08 CIV. 7253 (GBD), 2018

4

WL 5090972 (S.D.N.Y. Oct. 3, 2018) ("*Licci IV*"). This Court found that the ATA claims, in particular, were precluded by a prior decision rendered by a district court in the District of Columbia, dismissing similar ATA claims asserted by Plaintiffs in connection with the same rocket attacks at issue here. *Id.* at \*2–3 (citing *Kaplan v. Central Bank of Islamic Republic of Iran*, 961 F. Supp. 2d 185 (D.D.C. 2013) ("*Kaplan I*"), *aff'd in part, vacated in part, remanded sub nom. Kaplan v. Central Bank of the Islamic Republic of Iran*, 896 F.3d 501 (D.C. Cir. 2018) ("*Kaplan II*")). The court in that case had found that the rocket attacks were an "act of war" and therefore fell within an exception under the ATA. *Kaplan I*, 961 F. Supp. at 204.

On July 20, 2018, the Court of Appeals for the District of Columbia Circuit vacated the dismissal of Plaintiffs' claims in *Kaplan I*. *Kaplan II*, 896 F.3d at 512–14. The D.C. Circuit found that the "act of war" exception "presents a merits issue, not a jurisdictional one," and that the district court had therefore erred in relying on the exception to dismiss Plaintiffs' claims without first establishing personal jurisdiction. *Id.* at 512. Plaintiffs consequently moved for vacatur of this Court's dismissal in *Licci II* of Plaintiffs' ATA claims. (Notice of Mot., ECF No. 88.) This Court granted Plaintiffs' motion on October 3, 2018. *Licci IV*.

Following such vacatur, this Court granted Plaintiffs' request for leave to file a seconded amended complaint, (Memo Endorsement dated Nov. 5, 2018, ECF No. 96), which Plaintiffs did on December 5, 2018, (SAC). In their complaint, Plaintiffs assert two claims against Defendant: (1) primary liability for international terrorism under the ATA, § 2333(a), and (2) secondary liability for international terrorism under the ATA, § 2333(d)(2). (*Id.* ¶¶ 99–116.) Defendant now moves to dismiss Plaintiffs' complaint for failure to state a claim.

## III.   LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).   The plaintiff must demonstrate "more than a sheer possibility that a defendant has acted unlawfully"; stating a facially plausible claim requires the plaintiff to plead facts that enable the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted). The factual allegations pled must therefore "be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citation omitted).[2]

A district court must first review a plaintiff's complaint to identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679.   The court then considers whether the plaintiff's remaining well-pleaded factual allegations, assumed to be true, "plausibly give rise to an entitlement to relief." *Id.*; *see also Targum v. Citrin Cooperman & Co., LLP*, No. 12 Civ. 6909 (SAS), 2013 WL 6087400, at \*3 (S.D.N.Y. Nov. 19, 2013).   In deciding the 12(b)(6) motion, the court must also draw all reasonable inferences in the non-moving party's favor. *See N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109, 119–20 (2d Cir. 2013).

## IV.   PLAINTIFFS FAIL TO ALLEGE A CLAIM OF PRIMARY LIABILITY UNDER 18 U.S.C. § 2333(a)

The ATA establishes a cause of action for U.S. nationals who are the victims of international terrorism.   It provides, in pertinent part, that "[a]ny national of the United States

---

[2] "In deciding a motion to dismiss under Rule 12(b)(6), the court may refer 'to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit.'" *Fishbein v. Miranda,* 670 F. Supp. 2d 264, 271 (S.D.N.Y. 2009) (quoting *Brass v. Am. Film Tech., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)).

injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States." 18 U.S.C § 2333(a). To prevail on a claim of primary liability under the ATA, a plaintiff must demonstrate "(1) an injury to a U.S. national, (2) an act of international terrorism, and (3) causation." *O'Sullivan v. Deutsche Bank AG*, No. 17 CV 8709-LTS-GWG, 2019 WL 1409446, at \*4 (S.D.N.Y. Mar. 28, 2019) (citation omitted). Plaintiffs here fail to sufficiently allege that Defendant committed any act of "international terrorism" or that their injuries were proximately caused by Defendant's actions. Accordingly, Plaintiffs' claim of primary liability under § 2333(a) must be dismissed.

## A. An Act of "International Terrorism."

The ATA defines "international terrorism" as activities that (1) "involve violent acts or acts dangerous to human life"; (2) qualify as "a violation of the criminal laws of the United States or of any State" if committed within the United States; (3) "appear to be intended" to "intimidate or coerce a civilian population," to "influence the policy of a government by intimidation or coercion," or to "affect the conduct of a government by mass destruction, assassination, or kidnapping"; and (4) "occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries." 18 U.S.C. § 2331(1). Although "[t]he provision of material support to a designated terrorist organization . . . can . . . satisfy . . . *part* of the statutory definition," such action "does not invariably equate to an act of international terrorism." *Linde v. Arab Bank, PLC*, 882 F.3d 314, 326 (2d Cir. 2018). Indeed, "providing financial services to a known terrorist organization may afford material support to the organization even if the services do not involve violence or endanger life and do not manifest the apparent intent required." *Id.* Therefore, to

7

qualify as international terrorism, the defendant's act must also satisfy the three other separate requirements under the ATA. *Id.*

Here, Plaintiffs fail to allege facts from which it can be inferred that Defendant's conduct constitutes international terrorism. There is no dispute that Defendant did not itself perpetrate the rocket attacks that injured Plaintiffs. Instead, Defendant's alleged misconduct was providing wire transfer and other financial services to the Five Customers, which Plaintiffs argue was equivalent to providing such services directly to Hizbollah since the Five Customers are affiliated with Hizbollah. However, even assuming, *arguendo*, that Defendant was aware that it was providing such services to Hizbollah affiliates and that doing so violated economic sanctions imposed by the U.S. government, the provision of financial services does not, in itself, equate to international terrorism. Plaintiffs must plausibly allege that Defendant's *own* actions "*also* involve[d] violence or endanger[ed] human life" and that these actions "appear[ed] to be intended to intimidate or coerce a civilian population or to influence or affect a government." *Linde*, 882 F.3d at 326. Because Plaintiffs fail to allege any of that here, their primarily liability claim cannot survive a motion to dismiss. *See O'Sullivan*, 2019 WL 1409446, at *8 (dismissing plaintiff's claim of primarily liability under the ATA for failure to plausibly allege that defendant bank's provision of financial services, "which are not inherently violent or dangerous," qualified as act of international terrorism).

## B. Proximate Cause.

Even if Defendant's provision of financial services to the Five Customers could constitute international terrorism, Plaintiffs' primary liability claim would still fail because Plaintiffs have not sufficiently alleged that such conduct was the proximate cause of their injuries. The Second Circuit has held that "the 'by reason of' language of the [ATA] restricts the imposition of such

liability to situations where plaintiffs plausibly allege that defendants['] actions proximately caused their injuries." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 118, 125 (2d Cir. 2013) (citation omitted).[3] "Central to the notion of proximate cause is the idea that a person is not liable to all those who may have been injured by his conduct, but only to those with respect to whom his acts were a substantial factor in the sequence of responsible causation and whose injury was reasonably foreseeable or anticipated as a natural consequence." *Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013) (emphasis and citation omitted).

The causal link between Defendant's provision of financial services and Plaintiffs' injuries is too attenuated to support a finding of proximate cause. Plaintiffs allege that Defendant "intentionally and/or recklessly provided extensive banking services to Hizbollah, which caused . . . the terrorist rocket attacks," (SAC ¶ 3), that Hizbollah's ability to carry out the attacks "would have been severely crippled and limited" "[b]ut for the [wire transfers] and other banking services provided by [Defendant] to Hizbollah," (*id.* ¶ 66), and that Defendant "provided Hizbollah with extensive banking services with the purpose of facilitating, enabling and causing Hizbollah to carry out acts of violence against Israeli targets," (*id.* ¶ 103). However, "these are conclusory allegations that do not meet *Twombly*'s plausibility standard with respect to the need for a proximate causal relationship between the cash transferred by [Defendant] to [the Five Customers] and the terrorist attacks by Hizbollah . . . that injured [P]laintiffs." *Rothstein*, 708 F.3d at 97. Indeed, Plaintiffs' complaint is devoid of any factual, non-conclusory allegations that demonstrate, for example, that Defendant provided money directly to Hizbollah to carry out the attacks; that any funds transferred through the LCB Accounts were, in fact, sent to Hizbollah and then used by Hizbollah to perpetrate

---

[3] Contrary to Defendant's assertion, (Def.'s Mem. at 15–16), Plaintiffs are not required to establish "but-for" causation in addition to proximate causation. *Hussein v. Dahabshiil Transfer Servs. Ltd.*, 230 F. Supp. 3d 167, 171 n.3 (S.D.N.Y. 2017), *aff'd sub nom. Hussein v. Dahabshiil Transfer Servs. Ltd*, 705 F. App'x 40 (2d Cir. 2017).

the rocket attacks; or that Hizbollah would not have been able to carry out the attacks absent those specific funds. *See id.*; *see also In re Terrorist*, 714 F.3d at 124.[4] Plaintiffs therefore fail to allege proximate cause.

## V.    PLAINTIFFS FAIL TO ALLEGE A CLAIM OF SECONDARY LIABILITY UNDER 18 U.S.C. § 2333(d)(2)

In addition to their claim of primary liability, Plaintiffs assert a claim of secondary liability under JASTA, which amended the ATA by providing a cause of action against "secondary actors who, while not committing international terrorist acts themselves, facilitated such acts by others." *Linde*, 882 F.3d at 319–20 (citations omitted). Specifically, ATA liability now extends to "any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism." 18 U.S.C § 2333(d)(2). Congress has instructed that the "proper legal framework" for assessing civil aiding and abetting and conspiracy liability under JASTA is set forth in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983). *Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217, 223 (2d Cir. 2019) (citation and internal quotation marks omitted). Specifically, to assert a claim of conspiracy here, Plaintiffs must allege that Defendant and Hizbollah entered into an agreement to commit an act of international terrorism, and that Plaintiffs were injured by an unlawful overt act performed by Defendant or Hizbollah pursuant to this agreement. *Halberstam*, 705 F.2d at 477. To assert their aiding and abetting claim, Plaintiffs must allege that Hizbollah committed an act of international

---

[4] Defendant tries to argue that Plaintiffs are judicially estopped from asserting that Defendant was a proximate cause of their injuries since the court in *Kaplan I* found that North Korea and Iran "provided the weapons, training, logistical support, infrastructure, and financing, utilized by H[i]zbollah to commit the rocket attacks that caused Plaintiffs' injuries." (Def.'s Mem. at 18 (citing *Kaplan I*, 55 F. Supp. 3d at 192–97).) Because "it is common for injuries to have multiple proximate causes," *Staub v. Proctor Hosp.*, 562 U.S. 411, 420 (2011) (citing *Sosa v. Alvarez-Machain*, 542 U.S. 692, 704 (2004)), this argument is unavailing. *See also Hydro Inv'rs, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 15 (2d Cir. 2000) ("A proximate cause determination does not require a jury to identify the liable party as the sole cause of harm; it only asks that the identified cause be a substantial factor in bringing about the injury." (citations omitted)).

terrorism that caused Plaintiffs' injuries, and that Defendant, in providing the financial services at issue, was generally aware that it was thereby playing a role in such act of international terrorism. *Id.* Here, Plaintiffs fail to plausibly allege that Defendant, when processing the wire transfers, conspired with or aided and abetted Hizbollah in perpetrating the rocket attacks.

## A. Conspiracy Liability.

Under the *Halberstam* framework, the elements of a conspiracy include:

(1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme.

705 F.2d at 477 (citation omitted). "[T]o be subject to secondary liability under JASTA on the basis of a conspiracy, a defendant must have conspired to commit an act of international terrorism." *O'Sullivan*, 2019 WL 1409446, at *9.

Here, fatal to Plaintiffs' claim for conspiracy liability is their failure to sufficiently allege any unlawful agreement between Defendant and Hizbollah. Plaintiffs allege that Defendant "engaged in an extensive, long-term criminal scheme with Hizbollah, pursuant to which [Defendant] provided Hizbollah with wire transfer and other banking services to support Hizbollah's terrorist activities," and that "[p]ursuant to and in furtherance of that common plan, Hizbollah fired the rockets that harmed the [P]laintiffs." (SAC ¶ 115.) Still, Plaintiffs provide no factual basis for these allegations that would lead one to infer that Defendant shared any common goal of committing an act of international terrorism. Rather, the allegations in the complaint indicate, at most, that Plaintiffs provided financial services to the Five Customers. As discussed *infra*, however, Plaintiffs again provide no factual support for their claim that Defendant knew of the planned rocket attacks, or that the Five Customers were affiliated with Hizbollah. As such, Defendant's provision of financial services to the Five Customers "is so far removed from the acts

11

of terrorism that injured Plaintiffs that th[is] Court cannot infer that Defendant[] shared the common goal of committing an act of international terrorism." *O'Sullivan*, 2019 WL 1409446, at *9.

## B. Aiding and Abetting Liability.

In *Halberstam*, the D.C. Circuit observed that civil aiding and abetting includes three elements: (1) "the party whom the defendant aids must perform a wrongful act that causes an injury," (2) "the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance," and (3) "the defendant must knowingly and substantially assist the principal violation." 705 F.2d at 477 (citations omitted). Here, Plaintiffs fail to allege adequately the "general awareness" element or the "assistance" element.

### 1. "General Awareness" Element of Aiding and Abetting.

To adequately plead the "general awareness" element, a plaintiff must plausibly allege that the defendant was "'aware' that, by assisting the principal, it is itself assuming a 'role' in terrorist activities." *Linde*, 882 F.3d at 329 (citing *Halberstam*, 705 F.2d at 477). In the context of an ATA action against a bank, such awareness does not require proof of specific intent or knowledge of the particular attacks at issue. *Id.* However, it *does* require a showing that in providing financial services, the bank "was 'generally aware' that it was thereby playing a 'role' in [the terrorist organization's] violent or life-endangering activities," which "requires more than the provision of material support to a designated terrorist organization." *Id.* (emphasis omitted) (citing *Halberstam*, 705 F.2d at 477).

Plaintiffs do not offer any non-conclusory allegations that Defendant was aware that, by providing financial services to the Five Customers, it was playing a role in violent or life-threatening acts intended to intimate or coerce civilians or affect a government. Plaintiffs

12

principally argue that Defendant had such awareness because Defendant knew, or should have known, that the Five Customers are "integral constituent parts" and leaders of Hizbollah. (Pls.' Mem. in Opp'n to Def.'s Mot. to Dismiss ("Pls.' Opp'n"), ECF No. 109, at 19.) However, as Defendant correctly notes, none of the Five Customers were designated by the United States— prior to the rocket attacks in July and August 2006—as having an affiliation with Hizbollah. (Def.'s Mem., App. A.)

Plaintiffs nonetheless allege that Defendant knew or should have known prior to the attacks about the connection between Hizbollah and the Five Customers. They claim, for example, that "[t]he fact that Shahid, Bayt al-Mal and Yousser were integral constituent parts of Hizbollah was openly, publicly and repeatedly acknowledged and publicized by Hizbollah during the several year period prior [to] July 12, 2006" on Hizbollah's websites, press releases, television and radio stations, press conferences, and interviews. (SAC ¶ 78.) Shahid's connection with Hizbollah was also allegedly "repeatedly publicized" "in various English-language publications." (*Id.* ¶ 79.) Plaintiffs nowhere allege, however, that Defendant read or was aware of such sources. Plaintiffs point to other sources describing the alleged affiliations between the Five Customers and Hizbollah, but these sources are dated *after* July and August 2006, when the rocket attacks at issue occurred. (*See, e.g.*, *id.* ¶¶ 22 n.5 (dated 2010), 23 n.7 (dated Sept. 7, 2006), 81 n.9 (same).)

Even assuming, *arguendo*, that Defendant knew or should have known prior to the attacks about the Five Customers' relationships with Hizbollah, failure to perform due diligence on clients or to adhere to sanctions and counter-terrorism laws do not, on their own, equate to knowingly playing a role in terrorist activities. *See, e.g.*, *O'Sullivan*, 2019 WL 1409446, at *10 (finding that allegations regarding Iran's status as state sponsor of terrorism and purpose of U.S. sanctions against Iran were insufficient to plausibly allege aiding and abetting liability claim); *Siegel v.*

13

*HSBC Bank USA, N.A.*, No. 17CV6593 (DLC), 2018 WL 3611967, at \*4 (S.D.N.Y. July 27, 2018), *aff'd sub nom. Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217 (2d Cir. 2019) (finding as insufficient allegations that defendants knew they were circumventing and violating banking regulations by providing Saudi Arabian bank with correspondent banking services, and that defendants were aware of Saudi Arabian bank's own connections with terrorist organizations).

## 2. "Assistance" Element of Aiding and Abetting.

Plaintiffs similarly fail to plead the "assistance" element of aiding and abetting under JASTA—that is, whether Defendant "knowingly and substantially assist[ed] the principal violation." *Halberstam*, 705 F.2d at 477. Six factors are relevant to determining knowing and substantial assistance: "(1) the nature of the act encouraged, (2) the amount of assistance given by defendant, (3) defendant's presence or absence at the time of the tort, (4) defendant's relation to the principal, (5) defendant's state of mind, and (6) the period of defendant's assistance." *Linde*, 882 F.3d at 329 (citing *Halberstam*, 705 F.2d at 483–84). As the Second Circuit has observed, "aiding and abetting focuses on the relationship between the act of international terrorism and the secondary actor's alleged supportive conduct. *Id.* at 331.

Here, Plaintiffs do not advance any factual, non-conclusory allegations that Defendant knowingly and intentionally supported Hizbollah in perpetrating the rocket attacks. In particular, although Plaintiffs assert that Defendant processed millions of dollars' worth of wire transfers through the LCB Accounts, Plaintiffs do not plausibly allege that Hizbollah received any of those funds or that Defendant knew or intended that Hizbollah would receive the funds. Nor do Plaintiffs sufficiently allege that Defendant knew, prior to the attacks, about any affiliations between Hizbollah and the Five Customers under whose names the LCB Accounts were held, as discussed above.

14

Plaintiffs assert that Defendant effectuated the wire transfers pursuant to its "long-standing official policy and practice of support for Hizbollah[]" and Hizbollah's "anti-Israel program, goals and activities," (SAC ¶¶ 93, 97), but they again fail to provide a sufficient factual basis for this claim. The only support they provide are the U.S. Treasury's designation in February 2011 of Defendant as a "primary money laundering concern," (*id.* ¶ 98), and certain allegations made by the United States in a forfeiture action brought against Defendant in December 2011, (*id.* ¶ 97 (incorporating by reference the complaint filed in *United States v. Lebanese Canadian Bank, SAL*, No. 11 Civ. 9186 (PAE)).) To be sure, the U.S. Treasury's analysis and the complaint in the forfeiture action include damning allegations that Defendant was involved in a money laundering scheme with links to Hizbollah. (Pls.' Mem. in Opp'n to Def.'s Mot. to Dismiss ("Pls.' Opp'n"), Ex. A (Forfeiture Action Verified Am. Compl.), ECF No. 109-1; Pls.' Opp'n, Ex. B (U.S. Treasury Notice of Finding), ECF No. 109-2.)[5] Neither the analysis nor the complaint, however, suggests that Defendant supported Hizbollah's "anti-Israel" agenda or that Defendant provided financial services to the Five Customers pursuant to this agenda. Accordingly, Plaintiffs' claim of aiding and abetting cannot withstand a motion to dismiss.[6]

---

[5] Defendant contested all of the allegations in the complaint but ultimately settled the forfeiture action—without any admission of wrongdoing—with the United States in 2013. (Stipulation and Order of Settlement Regarding Lebanese Canadian Bank and Société Générale de Banque au Liban S.A.L., *United States v. Lebanese Canadian Bank*, SAL, No. 11 Civ. 9186 (PAE), ECF No. 462.) As part of the settlement, Defendant was required, among other things, to forfeit $102 million to the United States. (*Id.* ¶ 11.)

[6] Plaintiffs try to argue that the Second Circuit's previous rulings in this action preclude Defendant's argument that the complaint fails to sufficiently allege a claim for aiding and abetting. (Pls.' Opp'n at 19.) Specifically, Plaintiffs contend that the Second Circuit already found that Plaintiffs have "made a sufficient showing that [Defendant] *purposely* and *intentionally* assisted Hizbollah to carry out terrorist attacks against civilians in Israel as a matter of policy, and that the assistance provided by [Defendant] 'substantially' assisted and enabled Hizbollah to carry out the attacks here." (*Id.*) The Second Circuit said no such thing. Instead, the Second Circuit found, in the context of the *jurisdictional inquiry*, that Plaintiffs sufficiently alleged that Defendant purposefully established minimum contacts within New York through its repeated use of a New York correspondent bank account to effectuate the wire transfers. *Licci I*, 732 F.3d at 171–73. It also found, in relation to Plaintiffs' *ATS claims*, that there were sufficient allegations that Defendant

## VI.   CONCLUSION

Defendant's motion to dismiss, (ECF No. 105), is GRANTED.  The Clerk of Court is directed to close the motion accordingly.

Dated: New York, New York
   September 20, 2019

SO ORDERED.

*[signature]*

GEORGE B. DANIELS
United States District Judge

_____

aided and abetted Hizbollah's violation of the law of nations under customary international law, as required to establish jurisdiction for such claims. *Licci III*, 834 F.3d. at 217–19.